## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**, 600 14th Street N.W., Washington, D.C. 20005, *Plaintiff,* v. **NATIONAL PARK SERVICE**, 1849 C Street, N.W., Washington, D.C. 20240; **JESSICA BOWRON, in her official capacity as ACTING DIRECTOR, NATIONAL PARK SERVICE**, 1849 C Street, N.W., Washington, D.C. 20240; **JOHN STANWICH, in his official capacity as SUPERINTENDENT, THE WHITE HOUSE AND PRESIDENT'S PARK**, 1849 C Street, N.W., Washington, D.C. 20240; **DEPARTMENT OF THE INTERIOR**, 1849 C Street, N.W., Washington, D.C. 20240; **DOUGLAS BURGUM, in his official capacity as SECRETARY OF THE INTERIOR**, 1849 C Street, N.W., Washington, D.C. 20240; **GENERAL SERVICES ADMINISTRATION**, 1800 F Street, N.W., Washington, D.C. 20405; **MICHAEL J. RIGAS, in his official capacity as ACTING ADMINISTRATOR, GENERAL SERVICES ADMINISTRATION,** 1800 F Street, N.W., Washington, D.C. 20405; and **DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES**, 1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500, *Defendants.* | Civil Action No. _____ |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      With its modest neoclassical design, the White House has served as a symbol of the United States for over two hundred years. In late October 2025, at the direction of President Donald J. Trump, the defendants in this action (together, "Defendants") demolished the East Wing of the White House in order to build a 90,000-square-foot ballroom ("Ballroom") on its site ("Ballroom Project"). They did so without seeking approval from Congress; without requesting review and approval from the federal commissions charged with oversight of development in the nation's capital; without conducting the required environmental studies; and without allowing the public any opportunity for input. Within days, the East Wing and its colonnade—a version of which was first built on the site during the presidency of Thomas Jefferson—were completely destroyed.

2.      The Defendants did not stop with the demolition of the East Wing. Recent reporting describes the former location of the East Wing as a bustling construction site, with dozens of workers driving piles, stockpiling materials, and amassing heavy machinery. Just last week, a towering construction crane was erected on the White House grounds, and President Trump recounted that work on the Ballroom Project was audible all night. Yet the Defendants *still* have not sought review of the Ballroom Project or obtained the necessary approvals. And the American public, to whom the White House belongs, *still* has had no chance to provide its input.

3.      No president is legally allowed to tear down portions of the White House without any review whatsoever—not President Trump, not President Biden, and not anyone else. And no president is legally allowed to construct a ballroom on public property without giving the public the opportunity to weigh in. President Trump's efforts to do so should be immediately halted, and work on the Ballroom Project should be paused until the Defendants complete the required

reviews—reviews that should have taken place *before* the Defendants demolished the East Wing, and *before* they began construction of the Ballroom—and secure the necessary approvals.

4.    Plaintiff, the National Trust for Historic Preservation in the United States ("National Trust"), is a private charitable, educational non-profit corporation chartered by Congress in 1949.  *See* Pub. L. 81-408, 63 Stat. 927 (Oct. 26, 1949). The purpose of the National Trust is to further the historic preservation policy of the United States and to promote the public's awareness of and ability to comment on any activity that might damage or destroy our nation's architectural heritage. *See* 54 U.S.C. § 312102. The Trust is obligated by its charter "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." *Id.* § 312102(a). In furtherance of those goals, the Trust has brought historic preservation suits across—and against—numerous Presidential administrations.

5.    Upon learning of the Defendants' sudden, unilateral, and unlawful decision to destroy the East Wing of the White House, the National Trust immediately wrote to the National Park Service, the National Capital Planning Commission ("NCPC"), and the Commission of Fine Arts ("CFA") on October 21, 2025, urging the cessation of demolition and initiation of the review procedures for the plans for the Ballroom Project. The National Trust received no response. The National Trust brings this action to compel the Defendants to comply with procedural requirements that inform the public and protect the public's opportunity to comment on the Ballroom Project.

6.    The Defendants were required to submit their plans to the NCPC, the CFA, and Congress for review before they began work on the demolition of the East Wing and the construction of the Ballroom. *See* 40 U.S.C. §§ 8106 ("A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."), 8722(b) ("[A] federal . . . agency, before preparing

construction plans the agency originates for proposed developments and projects . . . shall advise and consult with the [NCPC] as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital."), 8722(d) ("[T]he location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of the [NCPC]."); 45 C.F.R. § 2101.2(b) ("Officers and departments of the federal government responsible for finally approving or acting upon proposed projects [for certain development within the District of Columbia] are required first to submit plans or designs for such projects to the [CFA] for its advice and comments."). And they were required to secure the approval of the NCPC and Congress. *See* 40 U.S.C. §§ 8106; 8722(d). Yet it appears that site preparation and preliminary construction of the proposed new Ballroom is proceeding without any review by either commission or by Congress, and without the necessary approvals.

7.     By evading this required review, the Defendants are depriving the public of its right to be informed and its opportunity to comment on the Defendants' proposed plans for the Ballroom Project. This public involvement, while important in all preservation matters, is particularly critical here, where the structure at issue is perhaps the most recognizable and historically significant building in the country.

8.     The National Trust therefore brings this action for declaratory and injunctive relief. Specifically, the National Trust requests that this Court declare that the Defendants' commencement of, and continued work on, the Ballroom Project violates numerous federal statutes, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; certain statutes requiring review of the project by the NCPC and the CFA, and approval by the NCPC, *see* 40 U.S.C. §§ 8721-8722, 9102; *see also* 45 C.F.R. §§ 2101.1-2101.2; a statute requiring

4

construction of the Ballroom to be expressly authorized by Congress, *see* 40 U.S.C. § 8106; and the National Environmental Policy Act ("NEPA"), *see* 42 U.S.C. § 4332(2)(C). The National Trust further requests that the Defendants be enjoined from continuing work on the Ballroom Project until the necessary federal commissions have reviewed and approved the project's plans; adequate environmental review has been conducted; and Congress has authorized the Ballroom's construction.

## PARTIES

9.      Defendant National Park Service is a federal agency within the Department of the Interior that is charged with the management of most of the country's national parks, including the national park known as "The White House and President's Park" (hereinafter "President's Park") in Washington, D.C., within which the White House is located. The National Park Service is headquartered in Washington, D.C.

10.     Defendant Jessica Bowron was appointed Acting Director of the National Park Service in or about January 2025. Defendant Bowron is the highest-ranking official of the National Park Service. As such, she is responsible for overseeing the National Park Service's management of the country's national parks, including President's Park in Washington, D.C. Acting Director Bowron is also responsible for ensuring that the National Park Service complies with all laws in its operations. Acting Director Bowron is sued in her official capacity.

11.     Defendant John Stanwich is Superintendent of President's Park. In that capacity, Superintendent Stanwich is responsible for overseeing the management of President's Park in Washington, D.C. Superintendent Stanwich is sued in his official capacity.

12.     Defendant Department of the Interior is an executive department charged with the management and conservation of most federal lands, including President's Park in Washington, D.C. The Department of the Interior is headquartered in Washington, D.C.

13.     Defendant Douglas Burgum is the Secretary of the Interior. As head of the Department of the Interior, he is responsible for the Department's management and conservation of federal lands, including President's Park in Washington, D.C. Secretary Burgum is also responsible for ensuring that the Department of the Interior complies with all laws in its operations. Secretary Burgum is sued in his official capacity.

14.     Defendant General Services Administration ("GSA") is an independent agency that assists in the management of federal property. Among other things, GSA manages and supports federal construction projects. GSA is headquartered in Washington, D.C.

15.     Defendant Michael J. Rigas is the Acting Administrator of GSA. As Acting Administrator, he is responsible for overseeing and directing GSA's operations. Acting Administrator Rigas is also responsible for ensuring that GSA complies with all laws in its operations. Acting Administrator Rigas is sued in his official capacity.

16.     Defendant Donald J. Trump is the President of the United States. President Trump planned and directed the demolition of the East Wing and is planning and directing the construction of the Ballroom on its site. President Trump is sued in his official capacity.

17.     Plaintiff, the National Trust for Historic Preservation in the United States, is a private charitable, educational, non-profit corporation headquartered in Washington, D.C. The National Trust protects America's historic sites through stewardship, advocacy, and direct assistance. It stewards twenty-seven historic sites, all of which are open to the public. The National Trust owns the historic Stephen Decatur House on Lafayette Square, which is managed by the White House Historical Association pursuant to co-stewardship agreements. The Trust helps neighbors, partners, and individuals across the country protect threatened historic sites in their own communities. And it takes legal action to protect threatened sites where necessary. For example,

the National Trust has filed suit numerous times over the years to stop highway projects that would have destroyed historic neighborhoods and communities. *See, e.g., Coalition Against a Raised Expressway v. Dole,* 835 F.2d 803 (11th Cir. 1988); *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d 700 (11th Cir. 1985); *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 770 F.2d 423 (5th Cir. 1985); *City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106 (C.D. Cal. 1999).

18.     The National Trust has thousands of members across the country. Members of the National Trust use, enjoy, derive personal and professional benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park. For example, one Trust member—a professor emerita at a university where she taught history and historic preservation, and a member of the boards of various historic-preservation organizations—resides in Washington, D.C., and frequently visits the White House neighborhood in order to enjoy the historic buildings and the beauty of the city's design, in which the White House prominently features. The interests of this Trust member, and those of other members, have been impaired by the destruction of the East Wing of the White House by the Defendants, and will be impaired further by the construction on the East Wing's former site of a ballroom substantially similar to that which the Defendants propose to build. If given the legally required opportunity, the National Trust would provide comments expressing its and its members concerns regarding the Ballroom Project, the substance of which is described further herein.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action presents federal questions under the Constitution and the laws of the United States. An actual, justiciable

controversy now exists between the National Trust and the Defendants, and relief may be granted under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

20.     Venue is proper in this district because the parties reside in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(c), (e).

## FACTUAL BACKGROUND

### The White House

21.     The White House is the official residence of the President of the United States. It is located in President's Park, a federal park administered by the National Park Service in Washington, D.C. President's Park encompasses the White House and its grounds, the Ellipse, Lafayette Square, the Eisenhower Executive Office Building, and the Treasury Building.

22.     Conceived by the capital's initial planner, Pierre Charles L'Enfant, as a grand presidential palace, the White House owes its modest yet iconic profile to James Hoban, an Irish-born architect whose winning submission to an architectural competition served as the plans for the new building. Hoban's surviving sketches depict a structure, on the scale of what would then have been a large country house, that substantially resembles the Executive Residence today.



*Figure 1 – Plan drawn by James Hoban circa his 1793-1794 designs for the White House. The White House Historical Association.*

23.     Construction of the White House according to Hoban's plans began in the 1790s and, in 1800, near the end of his presidency, President John Adams moved into the still unfinished building. In 1801, President Adams was succeeded in the presidency—and in the White House—by Thomas Jefferson. Every president since has resided in the White House while in office.

24.     President Jefferson, a talented self-trained architect, took an active interest in the White House, remodeling the residence's interiors, adding fencing, and developing its grounds. Perhaps his most significant improvement, however, was the construction of colonnades extending east and west from the White House, initial plans for which the President sketched himself. These colonnades were likely inspired by Renaissance villas with which President Jefferson was familiar, and were similar to structures that he had previously built at Monticello, his personal residence in Virginia.



*Figure 2 – "Elevation of the South front of the President's house, copied from the design as proposed to be altered in 1817," Benjamin Henry Latrobe. The colonnades are depicted on the left and the right of the main structure. Library of Congress.*

25.     President Jefferson's colonnades, along with much of the rest of the White House, suffered substantial damage during the War of 1812. After the war, the White House—including its colonnades—was rebuilt under the supervision of Hoban, with input from then-former President

Jefferson. The White House returned to use by 1818, and reconstruction of the east and west colonnades continued through the remainder of the decade.

### The East and West Wings of the White House

26.     In 1902, the East and West Wings were added at the ends of new east and west colonnades. The West Wing was constructed as an executive office building; today, it houses the Oval Office, the Cabinet Room, and office space for the President and executive staff. Initially, the East Wing served as a receiving area for visitors and guests attending functions at the White House.

27.     The East Wing was expanded in 1942 to increase its footprint, add a second story, and construct a bunker underneath the building. The bunker provided the President and staff with a secure meeting place in the event of an emergency during the war, and continued to serve that purpose in the decades thereafter.

28.     The principal function of the modern East Wing, however, has been to house the offices of the First Lady. By the 1930s, First Lady Eleanor Roosevelt was using the East Wing for official functions and news conferences. Subsequent presidential spouses kept their own staff and offices in the East Wing. This arrangement, by then commonplace, was formalized in the latter part of the century by the White House Personnel Authorization Act of 1978, Pub. L. 95-570, § 105(e), 92 Stat. 2445, 2446 (Nov. 2, 1978), which made available to the First Lady funds for an office and staff.

29.     In addition to offices for the First Lady and her staff, the East Wing contained a small theater. Constructed during the 1942 renovations, the theater was used by many presidents, their families, and guests for more than eighty years to show movies and watch major sporting events.

 

*Figure 3 (left) – "President George W. Bush Speaks to the Attendees of the Screening of 'United 93' in the White House Family Theater." National Archives Catalog / George W. Bush Library.*

*Figure 4 (right) – President Bill Clinton, family, staffers, and guests watching the Super Bowl in 1993. Clinton Library.*

30.    Located on the grounds outside of the East Wing was a garden, constructed shortly after the East Wing itself. Dating to 1903, but dedicated to former First Lady Jacqueline Kennedy in 1965, the Jacqueline Kennedy Garden balanced the Rose Garden on the west side of the White House. The Jacqueline Kennedy Garden, depicted below, featured a defined central lawn bordered by a brick walk and various botanical specimens. A pergola designed by the architect I.M. Pei was located at its west end. Like the Rose Garden, the Jacqueline Kennedy Garden was used to host events and receptions. Along with the East Wing, the Kennedy Garden was demolished in its entirety by the Defendants.



*Figure 5 – Jacqueline Kennedy Garden (2023). National Park Service / Kelsey Graczyk.*

31.    Around the East Wing and the Jacqueline Kennedy Garden were several commemorative trees, including a silver linden planted by former First Lady Laura Bush and two magnolias planted in the middle of the twentieth century and dedicated to the memory of President Warren Harding and President Franklin D. Roosevelt, respectively. On information and belief, one or more of these trees were also destroyed by the Defendants.

### The Defendants Announce Plans for the Ballroom

32.    On July 31, 2025, the White House issued a press release (the "July 2025 Press Release") announcing plans to build a "White House State Ballroom" on the White House grounds. The purpose of the Ballroom, as announced by the July 2025 Press Release, was to host "substantially more guests" at the White House than could presently be accommodated indoors. The press release stated that the Ballroom would be "approximately 90,000 total square feet of ornately designed and carefully crafted space, with a seated capacity of 650 people – a significant increase from the 200-person seated capacity in the East Room of the White House."

33.    According to the July 2025 Press Release, the Ballroom "will be substantially separated from the main building of the White House, but at the same time, it's [sic] theme and architectural heritage will be almost identical." The press release stated that "[t]he site of the new ballroom will be where the small, heavily changed, and reconstructed East Wing currently sits."

34.    The July 2025 Press Release announced that "[t]he project will begin in September 2025" and was "expected to be completed long before the end of President Trump's term" in January 2029. The press release stated that McCrery Architects would serve as the lead architect on the project; that the construction team would be headed by Clark Construction; and that the engineering team would be led by AECOM.

35.     Included at the bottom of the July 2025 Press Release was a series of six images. Five of the images appeared to depict a structure on the east side of the White House, roughly on the site where its East Wing then stood. The structure shown in the images was substantially larger than the East and West Wings, and out of proportion to the Executive Residence to which it appeared to be attached. The sixth image depicted what was presumably the interior of that structure—a large room with oversized windows and gold trim on the ceiling.

 

*Figure 7 (left) – Rendering of the exterior of the planned Ballroom. July 2025 Press Release.*
*Figure 8 (right) – Rendering of the interior of the planned Ballroom. July 2025 Press Release.*

36.     The July 2025 Press Release did not specify whether the Defendants intended to replace the East Wing with the planned Ballroom, or instead incorporate some or all of the East Wing into the larger structure.

37.     However, on or about July 31, 2025, President Trump stated that the proposed Ballroom "won't interfere with the current building. . . . It'll be near it, but not touching it, and pays total respect to the existing building, which I'm the biggest fan of."

38.     The Defendants also gave no indication that they planned to ignore or to attempt to circumvent the statutorily required review processes for the Ballroom Project. For example, the White House Chief of Staff, Susie Wiles, was quoted in the July 2025 Press Release as saying that "[t]he President and the Trump White House [we]re fully committed to working with the

appropriate organizations to preserving [sic] the special history of the White House" while building the Ballroom.

39.    The July 2025 Press Release also stated that, "[i]n recent weeks, President Trump ha[d] held several meetings with members of the White House Staff, the National Park Service, the White House Military Office, and the United States Secret Service to discuss design features and planning"—meetings which, in the normal course, would be followed by the legally required submission of design plans for the Ballroom Project to the federal commissions responsible for oversight of the construction of public buildings in the District of Columbia.

40.    However, during the months following the July 2025 Press Release, none of the agencies responsible for the Ballroom Project submitted plans or proposals for the Ballroom Project to the NCPC or the CFA, or sought Congressional approval for the project.

41.    Rather, the Defendants and their associates began to suggest that they intended to proceed without the required reviews. In September 2025, William Scharf, a lawyer and aide for the President who had also been serving as chairman of the NCPC since his appointment two months prior, stated that, in his opinion, what the NCPC "deal[t] with [wa]s essentially construction, vertical build"—not demolition. And at a dinner for donors on or about October 15, 2025, President Trump said that he had been told by two men that, as President, he could "do anything [he] want[ed]" to the White House.

42.    During this time, the planned size of the Ballroom, already out of proportion to the rest of the White House, appeared to increase substantially. On September 13, 2025, President Trump stated in an interview with NBC News that he was "making [the Ballroom] a little bigger." Under the President's new plan, the Ballroom would accommodate 900 people—more than a 30 percent increase from the 650-person capacity announced in the July 2025 Press Release. The size

of the proposed new Ballroom increased further in October 2025, as the President, while speaking

to a group of donors, stated that it would now be capable of accommodating nearly 1,000 people.

43.    During this same period, several architectural groups sought to persuade the

Defendants to engage in the required reviews before beginning work on the Ballroom Project.  In

an August 5, 2025 letter, the American Institute of Architects ("AIA") urged defendant Stanwich,

in his capacity as Executive Secretary for the Committee for the Preservation of the White House—

an advisory committee responsible for matters concerning the preservation of the building—"to

allocate the time necessary for a rigorous process" and "ensur[e that] decisions" concerning the

White House were "made with the utmost care and consideration."  The White House, the AIA's

letter noted, was "not a private building," and "[a]ny modifications to [the White House]—

especially modifications of th[e] magnitude [of the Ballroom]—should reflect the importance,

scale, and symbolic weight of the White House itself."  To that end, the AIA urged a review process

that "r[o]se to the significance of the building and the proposed alterations," including, among

other things, a transparent and publicly accountable historic-preservation review.

44.    Similarly, in an October 16, 2025 statement, the Heritage Conservation Committee

for the Society of Architectural Historians ("SAH") "expresse[d] great concern over the proposed

ballroom addition to the White House." Although "recogniz[ing] that the White House [wa]s a

building with evolving needs," the SAH noted that "the proposed ballroom w[ould] be the first

major change to [the White House's] exterior appearance in the last 83 years," "since the East

Wing in its current form was built in 1942." "[S]uch a significant change to a historic building of

this import," the SAH urged, "should follow a rigorous and deliberate design and review process."

The SAH requested that a comprehensive preservation review be undertaken; that the impacts of

the Ballroom Project on the White House grounds be evaluated; and that the broader national impacts on historic preservation be considered.

45.      It is not unusual for even minor structures proposed to be built on the White House grounds to be subject to extensive review. For example, in 2016, defendant the National Park Service submitted concept plans to the NCPC for the installation of a new perimeter fence around the White House. The National Park Service's proposal included three options for the fence's finials and the design of its base, and two variations of the size and spacing of its pickets. The NCPC's executive director prepared a lengthy evaluation of the National Park Service's proposal, with detailed analysis and comments regarding how the various picket styles cohered with the design of the White House, the potential for the new fence to obstruct the public's view of the building, and other matters. Notably, this evaluation, although favorable, was not an approval of the National Park Service's project—for that, the National Park Service had to submit preliminary and then final project plans for further review by the NCPC.

46.      Further, in 2019, during President Trump's first term, the National Park Service submitted multiple sets of plans to the NCPC in connection with its proposed replacement of a small building on the White House grounds housing a restroom and storage space with a new tennis pavilion. The NCPC approved the National Park Service's final construction plans. A report prepared by the executive director in connection with the proposal concluded, after thorough consideration, that the pavilion would "improve the existing restroom facility, provide a connection between the Children's Garden and the tennis court, and w[ould] not impact any historic resources or prominent vistas," and recommended its approval.

**The Defendants Demolish the East Wing**

47.     Despite not having sought review of the plans for the Ballroom Project—a much more significant project than either the new fence or the tennis pavilion—and despite the public's concerns, the Defendants forged ahead. On October 20, 2025, President Trump posted a statement to social media announcing that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." President Trump stated that "the East Wing"—which he characterized as "[c]ompletely separate from the White House itself"—was "being fully modernized as part of this process, and will be more beautiful than ever when it is complete!"

48.     During a press conference in the East Room of the White House that same day—while destruction of the East Wing was actually underway—President Trump confirmed that the demolition of the East Wing was happening "right behind us" and "might [be] hear[d] periodically."

49.     On October 21, 2025, various media outlets reported on the demolition of the East Wing. Images published by the New York Times showed heavy machinery tearing down the East Wing's façade.



*Figure 9 – Demolition of the East Wing of the White House. Alex Kent / The New York Times.*

50.     Later that day, the National Trust submitted a letter to Commissioner Scharf, in his capacity as the chairman of the NCPC; the chair of the CFA; and defendant Bowron, in her capacity as Acting Director of the National Park Service.

51.     In the letter, the National Trust explained that its congressional charter obligated it to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." The National Trust expressed its "deep[] concern[] that the massing and height of the proposed new construction w[ould] overwhelm the White House itself . . . and m[ight] also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings." The National Trust's letter further explained that "[t]he federally recognized Secretary of the Interior's Standards for Rehabilitation offer[ed] clear guidance for construction projects affecting historic properties," specifically "provid[ing] that new additions should not destroy the historic fabric of the property and that the new work should be compatible with existing massing, size, scale, and architectural features."

52.     The National Trust "respectfully urge[d] the Administration and the National Park Service to pause demolition until plans for the proposed ballroom [went] through the legally required public review process, including consultation and review by the [NCPC] and the [CFA], and to invite comment from the public." These processes, the Trust explained, "provide[d] a crucial opportunity for transparency and broad engagement—values that ha[d] guided preservation of the White House under every administration going back to the public competition in 1792 that produced the building's original design."

53.     The National Trust received no response to its letter.

54.     Despite the Trust's concerns, and those of the public, the Defendants did not pause demolition of the East Wing or engage, however belatedly, in the legally required review process.

18

Rather, that same day, the White House issued a press release asserting that "unhinged leftists and their Fake News allies" were "manufactur[ing] outrage" and "clutching their pearls" over President Trump's "visionary addition of a grand, privately funded ballroom to the White House."

55.     The next day, October 22, 2025, President Trump showed renderings of the Ballroom to members of the press and other persons gathered in the White House during a meeting with NATO Secretary General Mark Rutte. A three-dimensional model on a table in front of President Trump displayed the Ballroom on the site of the East Wing.



*Figure 10 – Three-dimensional rendering of the Executive Residence and of the planned Ballroom displayed by President Trump in the Oval Office.*

56.     President Trump stated that the East Wing was "a very small building" that was "never thought of as being much." "Over the years, many presidents have made changes," President Trump claimed, while showing renderings of the Ballroom. "This," he continued, referring to the ongoing razing of the East Wing, "obviously would be the biggest change."

57.     President Trump did not explain why it had been determined that the East Wing would have to be razed to accommodate the Ballroom except to say that, "[i]n order to do it properly, we had to take down the existing structure." Nor did President Trump divulge when it

had been decided that the East Wing would be razed; who had been consulted; or why the statutorily required processes had not been followed.

58.    The updated renderings of the Ballroom displayed by President Trump showed marked differences from the images in the July 2025 Press Release, including the number of large exterior windows, the number of columns in the proposed northeast portico, and the design of the staircase leading from the Ballroom to the South Lawn. Other aspects of the October renderings suggested a haphazard design process—the exterior trim of two windows appeared to collide, for instance, and a set of stairs led to no apparent landing.

59.    On or about the same day, October 22, 2025, a White House official confirmed to the press that the "entirety" of the East Wing would be "modernized and rebuilt." The same official acknowledged that "[t]he scope and size of the ballroom project ha[d] always been subject to vary as the process develop[ed]."

60.    Within days, the Defendants had demolished the entirety of the East Wing. An aerial photograph taken on October 23, 2025, reflected the demolition of the East Wing and the east colonnade.



*Figure 11 – Aerial photograph of President's Park and the surrounding area on October 23, 2025. The site of the former East Wing is to the right of the remainder of the White House.  ABC News / Katie Harbath.*

61.    A satellite photograph likewise depicted cleared space where the East Wing previously stood.



*Figure 12 (left) – Satellite photograph of the White House and grounds taken on September 26, 2025. Planet Labs PBC.*

*Figure 13 (right) – Satellite photograph of the White House and grounds taken on October 23, 2025. Planet Labs PBC.*

62.    And photographs taken from near the White House showed the demolition of nearly the entire East Wing and east colonnade.



*Figure 14 – Photograph of debris at the East Wing taken on October 23, 2025. Jacquelyn Martin / AP.*

63.    Debris from the demolished East Wing was dumped at a nearby public park. Photographs of the dumping of the debris were published by media organizations. On information

and belief, the dumping of debris at the park was done by or at the direction of one or more of the Defendants or their agents.

64. In a press conference held on October 23, 2025, Press Secretary Karoline Leavitt, when asked by a reporter why the public had not been informed of the decision to demolish the East Wing, stated that, "[w]ith any construction project, changes come" and claimed that the press and public had been "ke[pt] . . . apprised" by having been shown renderings of the Ballroom.

65. Press Secretary Leavitt explained that "the President heard counsel from the architects and the construction companies who said that in order for the East Wing to be modern and beautiful for many, many years to come, for it to be a truly strong and stable structure, this phase one that we're now in"—presumably a reference to the demolition of the East Wing—"was necessary." Press Secretary Leavitt did not explain why the Defendants had not also sought counsel from the federal commissions charged with reviewing such projects.

66. When asked by another reporter if the President could "tear down anything he wants" at the White House "without oversight," Secretary Leavitt stated her opinion that approval was needed only for vertical construction, not demolition, echoing statements previously made by Commissioner Scharf and President Trump.

67. The Defendants have provided no information about the results of any environmental review or the safety precautions, if any, that were undertaken in connection with the demolition of the East Wing and the disposal of the debris. Insofar as the Defendants have conducted an environmental assessment under NEPA, they have failed to publish that assessment, despite being required by statute to publish it, *see* 42 U.S.C. § 4336(b)(2). Nor, on information and belief, have the Defendants prepared an environmental impact statement, despite the potential environmental impacts from the demolition of a building as old as the East Wing, its replacement

by a structure of the magnitude of the Ballroom, and the transport of debris that is substantially likely to be contaminated to be dumped in a public park.

**The Defendants Begin to Construct the Ballroom Without Submitting Plans for Review**

68.    Although more than a month has passed since the demolition of the East Wing, on information and belief, the Defendants have not submitted any plans for the Ballroom Project to the NCPC, the CFA, or Congress for review and approval as of the filing of this complaint.

69.    The CFA has not met since all its members were dismissed by President Trump on or about October 28, 2025. As of the filing of this complaint, the CFA has no sitting members and is not scheduled to meet again until January 2026.

70.    As for the NCPC, although Chair Scharf stated at the NCPC's December 4, 2025 meeting that he had "been told by colleagues at the White House . . . that the ballroom plans will be submitted to NCPC this month, in December," he acknowledged that he had been "screened from planning itself over there." Plans for the Ballroom Project were not reviewed at the December 4, 2025 meeting, and the Ballroom Project was not on the list of projects anticipated for review over the next six months issued by the NCPC prior to that meeting. The NCPC is not scheduled to meet again until January 2026.

71.    The Defendants have never publicly acknowledged their obligation to secure Congress's express authorization for the Ballroom Project, and on information and belief have not sought such authorization or submitted any project plans to Congress.

72.    Despite having failed to obtain (or even request) review and approval of their plans for the Ballroom Project, the Defendants have begun construction at the site of the East Wing. The White House's website announces that "construction commence[d]" in "September 2025" and invites the reader "to check back here for completed phases of renovation."  None of the White

House's listed stages of the Ballroom Project include review or approval by the NCPC, CFA, or Congress.



73.     Recent public reporting describes the location of the former East Wing as "a bustling project site . . . almost entirely fenced off from public view" and "contain[ing] dozens of workers and materials ready to be installed, including reinforced concrete pipes and an array of cranes, drills, pile drivers and other heavy machinery."

74.     In late November 2025, it was reported that President Trump had been "holding frequent meetings about [the Ballroom's] design and materials"; clashing with James McCrery, then the project's lead architect, over the President's desire to keep increasing the size of the Ballroom; personally selecting the project's contractors and handling details of their contracts, including amounts of payment; and telling people working on the project that they did not need to follow permitting, zoning, or code requirements because the structure was on White House grounds.

75.     On December 4, 2025, it was reported that President Trump had chosen a new architect, Shalom Baranes, to replace McCrery.

76.     In recent days, heavy construction machinery and construction materials, including concrete pipes, pile drivers, and drills, have been installed at the former site of the East Wing. A construction crane anchored to a concrete paddock now towers above the fences surrounding the site. President Trump told his cabinet that the pile drivers operate "all night," and that he had rebuffed requests from the First Lady to cease the pounding, stating: "Sorry, darling, that's progress."

## STATUTORY AND REGULATORY BACKGROUND

### The National Capital Planning Act

77.     Enacted in 1952, the National Capital Planning Act established the NCPC "as the central planning agency for . . . the appropriate and orderly development and redevelopment of the National Capital and the conservation of the important natural and historical features thereof." National Capital Planning Act of 1952, Pub. L. No. 82-592, § 2(a), 66 Stat. 781, 782 (July 19, 1952) (codified as amended at 40 U.S.C. § 8711(a) ("The [NCPC] is the central federal planning agency for the Federal Government in the National Capital, created to preserve the important historical and natural features of the National Capital . . . .")).

78.     The NCPC consists of twelve members. *See* 40 U.S.C. § 8711(b). Seven—the Secretary of the Interior, the Secretary of Defense, the General Services Administrator, the Mayor of the District of Columbia, the chair of the Council of the District of Columbia, the chair of the Committee on Governmental Affairs of the Senate, and the chair of the Committee on Government Reform of the House of Representatives—are *ex officio* and ordinarily appoint alternates in connection with NCPC business. *See id.* The other five members of the NCPC are "citizens with

experience in city or regional planning" appointed by either the President or the Mayor of the District of Columbia. *Id.*

79.     The NCPC is charged by statute with "preparing, adopting, and amending a comprehensive plan for the federal activities" in the District of Columbia and its federal environs, and with "making related recommendations to the appropriate developmental agencies." *Id.* § 8711(e)(1); *see id.* § 8721. The comprehensive plan (the "Comprehensive Plan"), which must by law be made available to the public, *see id.* § 8721(g), is published on the NCPC's website, *see* Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025). The most recent version of the Comprehensive Plan, issued in 2024, contains hundreds of pages of detailed guidance for construction and development in and around the District of Columbia. *See* Comprehensive Plan for the National Capital: Federal Elements, available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025).

80.     One of the principal elements of the Comprehensive Plan is the historic preservation of the capital district. *See id.* at 1. The Comprehensive Plan explains that "[t]he federal government's goal is to preserve, protect, and rehabilitate historic properties in the National Capital Region and promote design and development that is respectful of . . . the symbolic character of the capital's setting." *Id.* at 266. It identifies "[t]he protection and management of historic properties" as "critical elements to successful historic preservation planning." *Id.* at 272. To that end, the Comprehensive Plan instructs the federal government to "[s]ustain exemplary standards of historic property stewardship." *Id.* at 273; *see also id.* at 271 (stating that federal agencies should "be careful stewards of the historic properties under their care or affected by their decisions"). The federal government is obligated to "[r]ecognize the role historic properties . . . have in defining the

national capital and its image" and to "[p]lan carefully for appropriate uses and compatible design in and near the monumental core to protect and preserve the nation's key historic properties." *Id.* at 276.

81.    Before "any revision" to the Comprehensive Plan "is adopted," the NCPC must present the revision "to the appropriate federal or District of Columbia authorities for comment and recommendations." 40 U.S.C. § 8721(e)(1). The NCPC and the Mayor of the District of Columbia must "jointly . . . establish procedures for appropriate meaningful continuing consultation throughout the planning process for the National Capital." *Id.* § 8721(h)(1). The NCPC "may provide periodic opportunity for review and comments by nongovernmental agencies or groups through public hearings, meetings, or conferences, exhibitions, and publication of its plans," and may, "in consultation with" the Council of the District of Columbia, "encourage the formation of citizen advisory councils." *Id.* § 8721(e)(2).

82.    The Comprehensive Plan's requirements reflect Congress's desire, as expressed in federal statutes governing the NCPC and its operations, for carefully managed development of the capital district, "proceed[ing] along the lines of good order [and] good taste, and with due regard to the public interests involved." *Id.* § 8104(a). Construction in the capital district has broadly adhered to the Comprehensive Plan and these congressional goals, and the district's present state of development stands as evidence of their enduring value.

83.    In addition to promulgating and maintaining the Comprehensive Plan, the NCPC is charged with reviewing agencies' "development programs" for the District of Columbia and its federal environs; "advis[ing] as to [their] consistency with the [C]omprehensive [P]lan"; and ultimately approving, or disapproving, of various elements of proposed development projects. *Id.*

§§ 8711(e)(2), 8722(d). Federal buildings proposed to be built in the District of Columbia must receive the NCPC's approval. *Id.* § 8722(d).

84.     An agency intending to engage in development in the District of Columbia must "advise and consult" with the NCPC "before preparing construction plans the agency originates for proposed developments and projects," and must thereafter continue to advise and consult with the NCPC as it "prepares [its] plans and programs in preliminary and successive stages." *Id.* § 8722(b)(1).

85.     "After receiving the [federal agency's] plans," the NCPC is tasked with "promptly . . . mak[ing] a preliminary report and recommendations to the agency." *Id.* The agency then has the opportunity, if it disagrees with the NCPC's preliminary report and recommendations, to advise the NCPC of the reasons for its disagreement. *Id.* Thereafter, the NCPC must make a final report and ruling on the project. *Id.*; *see id.* § 8722(d).

86.     The NCPC considers proposed projects in open, public sessions. On its website, the NCPC states that it "welcomes public comment" both prior to and during these sessions. How to Comment, NCPC, https://www.ncpc.gov/participate/guidelines/#written (last visited Dec. 10, 2025). The NCPC's website allows members of the public to submit written comments on "projects, plans, or initiatives where NCPC has a lead or shared responsibility." *See* Public Comment Opportunities, NCPC, https://www.ncpc.gov/participate/notices/ (last visited Dec. 10, 2025). It offers a description of pending projects and information about the type of input the NCPC is seeking, *see id.*, and gives "Commenting Tips" to help members of the public craft their submissions, *see* How to Comment, NCPC, https://www.ncpc.gov/participate/guidelines/#written (last visited Dec. 10, 2025).

87.    The NCPC's website also allows members of the public to register to speak at NCPC meetings. *See id.* Under the heading "Commission Meeting 101," the website offers guidance on various aspects of speaking at NCPC meetings, from how and when to submit testimony in advance of the meeting to where in the NCPC's meeting room the podium at which the public should address the NCPC can be found. *See id.*

88.    The NCPC's advise-and-consult process is mandatory for agency programs that would "affect the plan and development" of the District of Columbia or its federal environs, *see* 40 U.S.C. § 8722(b)(1), with exceptions made only for buildings within the Capitol grounds and structures erected by the Department of Defense on military installations during wartime, *see id.* § 8722(b)(2)(A). Further, "[i]n order to ensure the orderly development" of the capital district and its federal environs, "the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around [such] buildings" must be "approv[ed]" by the NCPC. *Id.* § 8722(d).

## The Commission of Fine Arts

89.    The CFA is an independent federal agency established by Congress in 1910 to advise on matters of fine art within the District of Columbia. *See* An Act Establishing a Commission of Fine Arts, Pub. L. 61-181, 36 Stat. 371 (May 17, 1910) (codified as amended at 40 U.S.C. §§ 9101-9104). Like the NCPC, the CFA plays an important role in shaping the District of Columbia and the historic buildings it contains.

90.    The CFA is composed of "seven well-qualified judges of the fine arts" appointed by the President for four-year terms, 40 U.S.C. § 9101(a), who are assisted in their duties by a secretary and by "staff as authorized by the [CFA]," 45 C.F.R. § 2101.10; *see* 40 U.S.C. § 9103. As of the filing of this complaint, all seven seats on the CFA are vacant, President Trump having dismissed each of the six then-sitting members on or about October 28, 2025.

91.    Federal agencies intending to undertake development or construction projects in the capital district must seek the advice of the CFA on matters concerning fine arts. *See* 40 U.S.C. § 9102(a); 45 C.F.R. § 2101.1(a)(1). "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the designs" "before final approval" of the plans or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1); *see also id.* § 2102.10(a) (requiring submission to the CFA "when concept plans for the project are ready but before detailed plans and specifications or working drawings are prepared").

92.    The agency's submission to the CFA should state, among other things, "the nature, location, and justification of the project" regarding which the CFA's advice is sought, "including any relevant historical information about the building or other structure to be altered or razed," as well as, to the extent relevant, "area studies, site plans, building and landscape schematics, renderings, models, depictions or samples of exterior materials and components, and photographs of existing conditions to be affected by the project." 45 C.F.R. § 2102.10(b)(1). The information submitted must "be sufficiently complete, detailed, and accurate as will enable the [CFA] to judge the ultimate character, siting, height, bulk, and appearance of the project, in its entirety, including the grounds within the scope of the project, its setting and environs, and its effect upon existing conditions and upon historical and prevailing architectural values." *Id.* § 2102.10(b)(2).

93.    After receiving an agency's proposal, the CFA will "comment[] and advise[] on the plans and on the merits of the designs" of the proposed "public building[]." *Id.* § 2101.1(a)(1). The CFA is generally required to "conduct its deliberations and reach its conclusions" in open meetings, *id.* § 2102.1, and must keep "detailed record[s]" of these meetings and of its decision-making, *see id.* § 2102.5.

94.    Notice of the CFA's meetings must be published in the Federal Register. *See id.* § 2102.3. "Interested persons are permitted to attend meetings of the [CFA], to file statements with the [CFA] at or before a meeting, and to appear before the [CFA] when it is in meeting" to present their views on "the matter or issues then before the [CFA]." *Id.* § 2102.4.

95.    The only buildings excepted from the advise-and-consult requirement are the Capitol Building and the Library of Congress buildings, *see* 40 U.S.C. § 9102(c); in all other cases, seeking the CFA's advice is mandatory. Further, even if the agency's project is to proceed in multiple stages, "information about the eventual plans should accompany" the agency's initial submission, regardless of whether the first stage only seeks "approval for razing or removal of a building or other structure." 45 C.F.R. § 2102.10(c).

## The National Environmental Policy Act

96.    NEPA, codified as amended at 42 U.S.C. § 4321 *et seq.*, has long been described as the "basic national charter for protection of the environment." *Los Angeles v. Nat'l Highway Traffic Safety Admin.,* 912 F.2d 478, 491 (D.C. Cir. 1990) (quoting 40 C.F.R. § 1500.1(a)). The statute, which is intended "to inform agency decisionmaking," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025), requires federal agencies to take a "hard look" at the environmental consequences of their proposals before approving or taking action on them, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  It also requires agencies to make their environmental analyses available to the public. *See* 42 U.S.C. §§ 4332(2)(C), 4336(b)(2).

97.    NEPA is "a purely procedural statute." *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 235 (D.C. Cir. 2025).  As such, it does not "force . . . agenc[ies] to change the course of action [they] propose[]"; instead, it obligates them to make "fully-informed and well-

considered" decisions. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (first quoting *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008); and then quoting *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799-800 (D.C. Cir. 2022)). In order to carry out that obligation, agencies must "have available, and . . . carefully consider, detailed information concerning significant environmental impacts" of their proposed actions, and share such information with "the larger audience that may play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

98.     In furtherance of those aims, NEPA requires federal agencies to prepare a "detailed statement" for any "major Federal action[]" that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major" federal actions are those that the responsible agency "determines [to be] subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

99.     If a proposed major federal action does not have "a reasonably foreseeable significant effect" on the quality of the human environment, or if the significance of its effects are unknown, the agency must prepare an "environmental assessment." *Id.* § 4336(b)(2); *see also* 43 C.F.R. § 46.210. In form, the agency's environmental assessment must be "a concise public document" that "set[s] forth the basis of" the agency's findings. 42 U.S.C. § 4336(b)(2). In substance, the environmental assessment must reach one of two conclusions: either that the proposed action has "no significant impact" or "that an environmental impact statement is necessary." *Id.* The agency may issue a finding of no significant impact only if a contemplated action has no reasonably foreseeable significant effects on the quality of the human environment, *see id.* §§ 4332(2)(C), 4336(b)(2); in all other cases, the agency must prepare an environmental impact statement ("EIS").

100.    The agency's EIS must take the form of a "detailed written statement," *id.* § 4336e(6), that describes the "reasonably foreseeable environmental effects of the proposed agency action," including "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented," *id.* § 4332(2)(C)(i), (ii).

101.    Effects of a proposed agency action "are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (alteration in original) (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)). They need not be direct or immediate effects of the agency's action to qualify as "reasonably foreseeable." *See id.*

102.    The agency's EIS must also propose "a reasonable range of alternatives to the proposed agency action," including a no-action alternative. 42 U.S.C. § 4332(2)(C)(iii); *see* 43 C.F.R. § 46.30. This alternatives analysis, long referred to as "the heart of the environmental impact statement," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (quoting 40 C.F.R. § 1502.14), requires the agency to "look hard" at its options to "bring about the ends of the federal action" proposed, *id.* at 195-96. The agency must "consider[] the relevant factors" and "define goals for its action that fall somewhere within the range of reasonable choices." *Id.* In so doing, the agency may not define "the objectives of its action in terms so unreasonably narrow that only one alternative would accomplish the goals of its action." *Sierra Club v. FERC*, 145 F.4th 74, 88 (D.C. Cir. 2025) (quoting *Citizens Against Burlington*, 938 F.2d at 196) (citation modified).

103.    Throughout its analysis, the agency must consider the proposed project as a whole—from the demolition through to the completion of construction, taking into account all

reasonably foreseeable effects. An agency impermissibly "segments" its NEPA review when it divides "connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "The justification for the rule against segmentation is obvious: it 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (alteration in original) (quoting *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)). The rule also prevents agencies from evading NEPA review with respect to one or more portions of a larger and ostensibly separate project for which the agency has prepared, or will prepare, an EIS.

### Administrative Procedure Act

104.     The APA affords federal judicial review of agency action. *See* 5 U.S.C. §§ 701-706. It provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).

### CLAIMS FOR RELIEF

### Count I – Violation of Administrative Procedure Act (Failure to Advise and Consult with the NCPC and to Obtain NCPC Approval, 40 U.S.C. §§ 8721, 8722)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

105.     The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

106.     Federal agencies that "originate[ plans] for proposed developments and projects" that "affect the plan and development of the National Capital" must "advise and consult" with the NCPC with respect to those plans. 40 U.S.C. § 8722(b)(1). Specifically, such federal agencies must

"advise and consult" with the NCPC "before preparing construction plans" and "as the agency prepares plans and programs in preliminary and successive stages." *Id.*

107.    Separately, the federal agency must also secure the NCPC's approval of various aspects of the proposed project, namely its "location, height, bulk, number of stories, and size . . . and the provision for open space in and around" the proposed development. *Id.* § 8722(d).

108.    The Defendants are federal agencies, heads or senior officials thereof, and an executive department having authority over a defendant agency.

109.    The Defendants' Ballroom Project is a "proposed development[]" or "project." *Id.* § 8722(b)(1).

110.    The Ballroom is a major building proposed to be located in the monumental core of the District of Columbia, and as such "affect[s] the plan and development of the National Capital." *Id.*

111.    The Defendants have commenced work on the Ballroom Project without submitting project plans to the NCPC. Consequently, they have neither advised or consulted with the NCPC, nor have they secured the NCPC's approval of the Ballroom Project. *Id.* § 8722(b)(1), (d).

112.    If the Defendants had submitted project plans to the NCPC, the National Trust would have submitted comments on those plans. The National Trust's comments would have informed the NCPC of its concerns with the Ballroom Project, which include but are not limited to the Ballroom's size, which threatens to overwhelm the White House itself, and the Ballroom's permanent disruption of the carefully balanced classical design of the White House, with its central Executive Residence and two smaller, and lower, East and West Wings.

113.    The National Trust's comments would have also explained that the Trust stands ready to assist the White House, the National Park Service, and relevant review agencies in

exploring design alternatives and modifications that would accomplish the objectives of the administration while preserving the historic integrity and symbolism of the White House.

114.    The Defendants' Ballroom Project also alters the NCPC's Comprehensive Plan for the capital district. *See id.* § 8721.

115.    The Comprehensive Plan explains that the capital district's "iconic cityscape is distinguished through the close relationship between its form and the functional and visual symbols of national civic life." Comprehensive Plan for the National Capital: Federal Elements, 50 available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025). This "symbolic identity," the Comprehensive Plan states, "expresses itself in a number of ways," including a visual hierarchy "that emphasizes symbols and structures, particularly the . . . White House" and several other major buildings and monuments. *Id.*

116.    The Comprehensive Plan cautions against "infrastructure solutions" that would "permanently alter[]" "symbolic views of . . . the White House." *Id.* at 18. And it instructs that "the preeminence of the . . . White House" and other significant structures should be "[v]isually reinforce[d]" "by protecting the visual frame around them." *Id.* at 55. The effect of these admonitions is to elevate to a "guiding urban design principle[]" the "[p]reserv[ation of] the physical preeminence and visual hierarchy of the most significant civic structures within the city, including the White House." *Id.* at 38 (capitalization removed).

117.    Simply put, demolishing the East Wing and erecting the Ballroom on its site is not just a "project[]" or a "proposed development[]"—it is also a "revision" of basic principles underpinning the Comprehensive Plan. 40 U.S.C. §§ 8721-8722.

118.    The NCPC's responsibilities therefore do not end with its review of the plans for the Ballroom Project. Rather, the NCPC must present the "revision" to the Comprehensive Plan

36

that the Ballroom Project has effected "to the appropriate federal or District of Columbia authorities for comment and recommendations." *Id.* § 8721(e)(1). The NCPC must also, "jointly" with the Mayor, "establish procedures for appropriate meaningful continuing consultation" regarding the revision to the Comprehensive Plan. *Id.* § 8721(h)(1).

119.    The National Trust would participate in this consultation process, and would provide comments similar to those detailed above.

120.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the NCPC violates 40 U.S.C. § 8722, and that any further work on the Ballroom Project without plans having been submitted to the NCPC, and the NCPC's approval of those plans having been secured, is unlawful, in violation of 40 U.S.C. §§ 8722 and 8721.

121.    The National Trust is further entitled to an injunction against the performance of any further work on the Ballroom Project until the Defendants have submitted plans for the project to the NCPC; the National Trust has had the opportunity to comment on those plans; until the revision to the Comprehensive Plan caused by the Defendants' proposal has undergone the review process required by 40 U.S.C. § 8721; and until both the proposed project plans and the revision to the Comprehensive Plan have been approved by the NCPC and any other relevant authorities.

### Count II – Violation of Administrative Procedure Act
### (Improper Segmentation of NCPC Review)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

122.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

123.    Defendant President Trump and Press Secretary Leavitt have suggested or stated that the NCPC's review is not necessary for demolition of the East Wing, or for demolition of other portions of the White House.

124.    Insofar as the Defendants failed to submit plans for the Ballroom Project to the NCPC for review prior to the demolition of the East Wing because they believe that such review is not required for demolition, but only for vertical construction, the Defendants are wrong.

125.    The NCPC is the zoning authority for federal public buildings in the District of Columbia. *See* 40 U.S.C. § 8722(d). "[T]he location, height, bulk, number of stories, and size of federal public buildings," as well as "the provision for open space in and around federal public buildings" are therefore subject to the NCPC's approval, "[i]n order to ensure the orderly development" of the capital district. *Id.*

126.    To that end, the NCPC requires the submission of "construction plans" for its review. *Id.* § 8722(b). Where, as here, construction of a new building is proposed to take place on the site that an old building already occupies, "construction plans" for the new building necessarily include demolition of the old building. *Id.*

127.    Insofar as the Defendants rely on the opinion of Commissioner Scharf, or on other legal opinions previously produced by the NCPC, that adopt the position that "construction" for the purposes of the NCPC's review encompasses only vertical build, and not demolition, such opinions are entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

128.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the NCPC before demolishing the East Wing violates 40 U.S.C. § 8722, and an injunction against any further demolition at or around the site of the East Wing until the Defendants have submitted plans for the project to the NCPC; the National Trust has had the opportunity to comment on those plans; the revision to the Comprehensive Plan caused by the Defendants' proposal has undergone the review process required by 40 U.S.C. § 8721; and both

the proposed project plans and the revision to the Comprehensive Plan have been approved by the NCPC and any other relevant authorities.

**Count III – Violation of Administrative Procedure Act**
**(Failure to Request Advice from Commission of Fine Arts, 40 U.S.C. § 9102)**

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

129.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

130.    Federal agencies intending to undertake development or construction projects in the capital district, including demolition in furtherance thereof, must seek the advice of the CFA on matters concerning fine arts.  *See* 40 U.S.C. § 9102. "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the designs" "before" the plans are "final[ly] approv[ed]" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1).

131.    The Ballroom affects the appearance of the city and is a "public building[] to be erected in the District of Columbia by the federal government." *Id.* As such, it is a structure for which the CFA's review is required under 40 U.S.C. § 9102.

132.    The Defendants have commenced work on the Ballroom Project, including demolition in furtherance thereof, without submitting plans for the project to the CFA or otherwise advising and consulting with the CFA in connection with the project.

133.    If the Defendants had submitted plans for the Ballroom Project to the CFA, the National Trust would have provided comments on those plans. The National Trust's comments would have informed the CFA of its concerns with the Ballroom Project, including the demolition of the East Wing, and the excessive massing and height of the proposed new building.

134.     The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the CFA violates 40 U.S.C. § 9102 and 45 C.F.R. § 2101.1 and that the performance of any further work on the Ballroom Project without having advised and consulted with the CFA, including by submitting plans for the project to the CFA, is unlawful. The National Trust is further entitled to an injunction against the performance of any further work on the Ballroom Project until the Defendants have submitted plans for the Ballroom Project to the CFA, and the National Trust has had the opportunity to provide comments on those plans.

### Count IV – Violation of Administrative Procedure Act<br>(Inadequate Environmental Assessment, 42 U.S.C. § 4336)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

135.     The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

136.     The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action."  42 U.S.C. § 4336e(10)(A).

137.     As a major federal action, the Ballroom Project requires that the Defendants prepare an environmental assessment. Notwithstanding that the environmental assessment is required to be a "concise *public* document," the environmental assessment conducted by the Defendants, if any, has not been made public, and the National Trust therefore does not know the scope or contents of the environmental assessment, if one was prepared at all. *Id.* § 4336(b)(2) (emphasis added).

138.     However, given that no EIS was published following the environmental assessment, if any, conducted by the Defendants, the National Trust must conclude that the Defendants, insofar as they conducted an environmental assessment, found that the Ballroom Project would have no significant impact on the quality of the human environment. *See id.*

139.    Insofar as the Defendants reached this conclusion, it was arbitrary and capricious, and otherwise improper. When the East Wing was demolished, it was over 120 years old, and many buildings of similar age contain environmental hazards—such as, for example, asbestos and lead paint—that must be properly handled. The building was also one of great historical significance, which the environmental assessment would have to consider. Further, debris from the East Wing has been dumped at a public park, with no apparent plan or regard for its potential hazards. And the proposed Ballroom itself is a large building in a dense urban area that will, if constructed, have significant aesthetic and other effects on its historic surroundings. Under these circumstances, a finding of no significant impact cannot be supported.

140.    The National Trust is entitled to a declaration that the environmental assessment performed by the Defendants, if any, is inadequate, and an injunction against the performance of any further work on the Ballroom Project until the Defendants have conducted an appropriate environmental review, and published said review.

## Count V – Violation of Administrative Procedure Act
## (Failure to Prepare an Environmental Impact Statement, 42 U.S.C. § 4336)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

141.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

142.    The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." *Id.* § 4336e(10)(A).

143.    As a major federal action, the Ballroom Project required the Defendants to prepare at least an environmental assessment. *See id.* §§ 4332(2)(C), 4336(b).

144.    As alleged above, the Defendants' environmental assessment, if any was prepared, was improperly conducted, and their finding of no significant impact was not supported.

145.    The Defendants were therefore required to prepare an EIS in connection with the Ballroom Project.

146.    No EIS has been published in connection with the Ballroom Project and, on information and belief, no EIS for the project has been prepared.

147.    The National Trust is entitled to a declaration that the Defendants must prepare and publish an EIS in connection with the Ballroom Project, and an injunction against the performance of further work in connection with the Ballroom Project until the Defendants have prepared and published such an EIS.

### Count VI – Violation of Administrative Procedure Act
### (Improper Segmentation of NEPA Review)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

148.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

149.    The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." 42 U.S.C. § 4336e(10)(A).

150.    As a major federal action, the Ballroom Project required the Defendants to prepare at least an environmental assessment. *See id.* §§ 4332(2)(C), 4336(b).

151.    As alleged above, the Defendants' environmental assessment, if any was prepared, was improperly conducted, and their finding of no significant impact was not supported.

152.    Insofar as the Defendants conducted an environmental assessment and found no significant impact based on their review of the *demolition* of the East Wing of the White House alone (that is, without consideration of the construction of the Ballroom, the disposal of debris, and other pertinent factors) or, alternatively, found no significant impact based on their review of

the *construction* of the Ballroom alone (without consideration of the impacts of the demolition of the East Wing, the disposal of debris, and other pertinent factors), the Defendants improperly segmented their NEPA review.

153.    Insofar as the Defendants (a) limited their environmental assessment, if any, to the demolition of the East Wing; (b) limited any such assessment to the construction of the Ballroom; or (c) otherwise failed to account for the impacts of the Ballroom Project on the human environment as a whole, the National Trust is entitled to a declaration that the Defendants' environmental assessment was improperly segmented and an injunction against the performance of further work in connection with the Ballroom Project until the Defendants perform and publish a comprehensive environmental assessment for the Ballroom Project and, subsequently, prepare and publish an EIS.

## Count VII – Violation of Administrative Procedure Act (40 U.S.C. § 8106)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

154.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

155.    Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

156.    President's Park comprises the White House and its grounds, and is the planned site of the Ballroom.

157.    President's Park is owned by the Federal Government, managed by the National Park Service, and located in the District of Columbia. It is within the statutory meaning of a "reservation, park, or public grounds." *Id.*

158.     The Defendants intend to "erect[]" the Ballroom—a "building or structure"—on the grounds of President's Park. *Id.* That work has already begun: recent reporting has revealed that the site of the East Wing is a bustling project site filled with dozens of workers and materials pertaining to construction, not demolition.

159.     Congress has not authorized, expressly or otherwise, the construction of the Ballroom in President's Park. *See id.*

160.     The National Trust is entitled to a declaration that construction of the Ballroom violates 40 U.S.C. § 8106, and an injunction prohibiting the Defendants from performing further work on the Ballroom Project or proceeding with the erection of any building or structure similar to the Ballroom in President's Park without having first obtained express authorization to do so from Congress.

### Count VIII – Violation of the Separation of Powers (Property Clause, U.S. Const. Art. IV, § 3, cl. 2).

**(Against Defendant President Donald J. Trump)**

161.     The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

162.     The Constitution divides the powers of the federal government between and among its three branches. The Property Clause vests in Congress the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2.

163.     Congress's power over federal property is exclusive. Nothing in the Constitution gives the President overlapping authority to dispose of federal property.  As a result, only Congress may authorize the demolition or construction of federal buildings. The President, acting unilaterally, is wholly without constitutional authority to build or demolish anything on federal grounds.

164.    President's Park and the White House, located therein, are "Property belonging to the United States." *Id.*

165.    President Trump, and others acting at his direction and subject to his control, have demolished the East Wing and are building the Ballroom.

166.    There is no statute that provides the President with the authority to demolish the White House or construct a ballroom on the White House grounds. And the President has pointed to no statute giving him such authority. Any justification for the President's actions must therefore rest in his inherent constitutional authority. But, as noted, the President has no constitutional authority to dispose of federal property—that authority rests exclusively with Congress. *See id.*

167.    By nevertheless demolishing the White House and beginning to construct the Ballroom, President Trump has unconstitutionally invaded Congress's prerogative to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *Id.*

168.    President Trump has thereby violated the separation of powers and the Property Clause. *See id.*

169.    The National Trust is entitled to a declaration that President Trump's actions and omissions violate the separation of powers and the Property Clause. The National Trust is further entitled to an injunction against President Trump and/or all those operating or acting at his direction or in concert with him prohibiting further work on the Ballroom Project.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the National Trust for Historic Preservation in the United States, respectfully requests that this Court grant the following relief:

i.      Declare that the commencement of, and continued work on, the Ballroom Project by defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas violates the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; and 40 U.S.C. §§ 8106, 8722, and 9102;

ii.     Enjoin defendants the National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas, and anyone acting at their direction or in concert therewith, from performing any additional work on the Ballroom Project until an EIS has been prepared and published; the NCPC and the CFA have reviewed the plans for the Ballroom Project; the NCPC has approved the plans for the Ballroom Project; Congress has expressly authorized the Ballroom's construction; and the public has had time and opportunity to comment;

iii.    Declare that President Trump has violated the separation of powers by purporting to exercise constitutional powers vested exclusively in Congress by the Property Clause, U.S. Const. Art. IV, § 3, cl. 2, and enjoin defendant President Trump, and anyone acting at his direction or in concert with him, from performing further work on the Ballroom Project;

iv.     Award the National Trust reasonable fees, costs, and expenses, including attorneys' fees; and

v.      Grant any such other relief that the Court deems just and proper.

Respectfully submitted,

Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice* forthcoming)
Matthew F. Casassa (*pro hac vice* forthcoming)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000