## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,**

*Plaintiff*,

v.

**NATIONAL PARK SERVICE;**

**JESSICA BOWRON, in her official capacity as ACTING DIRECTOR, NATIONAL PARK SERVICE;**

**JOHN STANWICH, in his official capacity as SUPERINTENDENT, THE WHITE HOUSE AND PRESIDENT'S PARK;**

**DEPARTMENT OF THE INTERIOR;**

**DOUGLAS BURGUM, in his official capacity as SECRETARY OF THE INTERIOR;**

**GENERAL SERVICES ADMINISTRATION;**

**MICHAEL J. RIGAS, in his official capacity as ACTING ADMINISTRATOR, GENERAL SERVICES ADMINISTRATION; and**

**DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES,**

*Defendants*.

Civil Action No. 25-4316

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

   I.   The East Wing of the White House. ............................................................................. 4

  II.  President Trump Announces Plans to Build the Ballroom. ............................................. 6

 III. The Defendants Fail to Submit the Ballroom Project to the NCPC, the CFA, and
      Congress for Review, and Fail to Prepare an Environmental Impact Statement. ......... 7

 IV. The Defendants Demolish the East Wing. .................................................................. 10

  V.  The Defendants Continue Construction of the Ballroom Without Submitting Plans
      to the NCPC, the CFA, or Congress for Review. ......................................................... 13

ARGUMENT ...................................................................................................................... 14

   I.   The National Trust Is Likely to Succeed on the Merits of its Claims. ........................ 15

     A. The Defendants' Failure to Submit Plans for the Ballroom Project to the National
         Capital Planning Commission for Review Violates the APA. ................................... 16

       1.  The Defendants' demolition and construction at the White House may not proceed
           without NCPC review. ................................................................................................. 16

       2.  The Defendants may not segment the Ballroom Project to evade NCPC review. ........... 19

     B. The Defendants' Failure to Consult with the Commission of Fine Arts
         Violates the APA. .......................................................................................................... 21

     C. Construction of the Ballroom Without Express Authorization of Congress
         Violates the APA. .......................................................................................................... 22

     D. The Defendants Have Flouted NEPA's Procedural Safeguards. ............................... 23

       1.  Any EA prepared by the Defendants was inadequate, as a proper EA would have
           been published and followed by the preparation and publication of an EIS. ............... 24

       2.  If the Defendants considered only the demolition of the East Wing or only the
           construction of the Ballroom in preparing an EA, they improperly segmented
           NEPA review. ............................................................................................................. 28

     E. The President's Unilateral Action Violates the Constitution. ................................... 31

   II.  The National Trust Will Be Irreparably Harmed Absent a TRO. .................................. 34

 III. The Balance of Hardships and the Public Interest Weigh Overwhelmingly
      in Favor of the National Trust. ....................................................................................... 38

 IV. Any Security Bond Requirement Should Be Waived Due To the National Trust's
      Nonprofit Status and Pursuit of Litigation in the Public Interest. ............................... 40

    CONCLUSION .................................................................................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ........................................................................36

*Advance Am. Cash Advance Ctrs., Inc. v. FDIC*,
    Civ. Action No. 14-953, 2017 U.S. Dist. LEXIS 27887 (D.D.C. Feb. 23,
    2017) ...............................................................................................................15

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    No. 25-5046, 2025 U.S. App. LEXIS 4611 (D.C. Cir. Feb. 26, 2025)...................14

*All. for Retired Ams. v. Bessent*,
    No. 25-0313, 2025 U.S. Dist. LEXIS 42019 (D.D.C. Mar. 7, 2025) .....................38

*American Rivers & Ala. Rivers Alliance v. FERC*,
    895 F.3d 32 (D.C. Cir. 2018) ...........................................................................38

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)....................................................................................35, 37

*Bayer HealthCare, LLC v. U.S. FDA*,
    942 F. Supp. 2d 17 (D.D.C. 2013) .....................................................................15

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009) ..................................................................37, 39

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ..........................................................................15

*Collins v. Yellen*,
    594 U.S. 220 (2021).........................................................................................31

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ..........................................................................35

*Dalton v. Specter*,
    511 U.S. 462 (1994)....................................................................................32, 33

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ........................................................................29

*Dellinger v. Bessent*,
    2025 U.S. App. LEXIS 3987 (D.C. Cir. Feb. 15, 2025)........................................33

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*,
   412 F.2d 165 (D.C. Cir. 1969) ............................................................................ 15

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) .............................................................................. 40

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ........................................................................................... 30

*Found. on Econ. Trends v. Heckler*,
   756 F.2d 143 (D.C. Cir. 1985) ............................................................................ 37

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................................... 16, 34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................................... 31

*Freytag v. C.I.R.*,
   501 U.S. 868 (1991) ........................................................................................... 32

*Fund for Animals, Inc. v. Espy*,
   814 F. Supp. 142 (D.D.C. 1993) ......................................................................... 38

*Fund for Animals v. Clark*,
   27 F. Supp. 2d 8 (D.D.C. 1998) .......................................................................... 38

*Fund for Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) .................................................................... 37

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
   836 F.2d 760 (2d Cir. 1988) ............................................................................... 30

*Kirwa v. United States DOD*,
   285 F. Supp. 3d 21 (D.D.C. 2017) ...................................................................... 15

*Kleppe v. New Mexico*,
   426 U.S. 529 (1976) ..................................................................................... 31, 32

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 39, 40

*Lemon v. McHugh*,
   668 F. Supp. 2d 133 (D.D.C. 2009) .................................................................... 26

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ..................................................................................... 16, 21

*LULAC v. Exec. Off. of the President,*
  No. 25-0946, 2025 U.S. Dist. LEXIS 215411 (Oct. 31, 2025)........................................31, 32

*Marin Audubon Soc'y v. FAA,*
  121 F.4th 902 (D.C. Cir. 2024)...............................................................................................39

*Marsh v. Ore. Nat. Res. Council,*
  490 U.S. 360 (1989)................................................................................................................28

*McDonnell Douglas Corp. v. United States Dep't of the Air Force,*
  375 F.3d 1182 (D.C. Cir. 2004)..............................................................................................22

*McDonnell Douglas Corp. v. Widnall,*
  57 F.3d 1162 (D.C. Cir. 1995)................................................................................................22

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)..................................................................................................................30

*Nat. Res. Def. Council, Inc. v. Morton,*
  337 F. Supp. 167 (D.D.C. 1971).............................................................................................41

*Nat'l Council of Nonprofits v. OMB,*
  775 F. Supp. 3d 100 (D.D.C. 2025)........................................................................................41

*Nat'l Parks Conservation Ass'n v. Semonite,*
  916 F.3d 1075 (D.C. Cir. 2019)........................................................................................25, 38

*Nken v. Holder,*
  556 U.S. 418 (2009)................................................................................................................38

*NRDC v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988)................................................................................................29

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
  896 F.3d 520 (D.C. Cir. 2018)..........................................................................................37, 38

*P.J.E.S. v. Wolf,*
  502 F. Supp. 3d 492 (D.D.C. 2020)........................................................................................40

*\*People for the Ethical Treatment of Animals v. USDA,*
  797 F.3d 1087 (D.C. Cir. 2015)..............................................................................................36

*Preservation Coalition, Inc. v. Pierce,*
  667 F.2d 851 (9th Cir. 1982) .................................................................................................26

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)..........................................................................................................23, 27

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ..................................................................15

*Stewart Park & Reserve Coalition, Inc. v. Slater*,
  352 F.3d 545 (2d Cir. 2003) ....................................................................29

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .................................................................................35

*Trump v. United States*,
  603 U.S. 593 (2024) .................................................................................34

*United States v. San Francisco*,
  310 U.S. 16 (1940) ...................................................................................31

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) .................................................................................14

*Vieux Carre Property Owners, Residents & Assocs., Inc. v. Pierce*
  719 F.2d 1272 (5th Cir. 1983) .................................................................30

*\*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ...........................................................................27, 28

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977) .................................................................39

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ...................................................................39

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) .................................................................................38

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) .........................................................................15, 35, 38

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669 (D.C. Cir. 1985) (per curiam) ......................................34, 37

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...........................................................................32, 33

**Statutes**

*\*5 U.S.C. § 701 et seq.* ...................................................................................42

5 U.S.C. § 706(1) ...........................................................................16, 21, 28

*\*5 U.S.C. § 706(2)* .........................................................................................22

5 U.S.C. § 706(2)(A)............................................................................................16, 21, 28

5 U.S.C. § 706(2)(C)....................................................................................................28

*40 U.S.C. § 8106................................................................................................*passim*

40 U.S.C. § 8711(a).....................................................................................................37

40 U.S.C. § 8711(e)(2)...................................................................................................7

*40 U.S.C. § 8721.............................................................................................2, 18, 20

40 U.S.C. § 8721(a).....................................................................................................17

40 U.S.C. § 8721(e).....................................................................................................42

40 U.S.C. § 8721(e)(1).................................................................................................17

40 U.S.C. § 8721(e)(2).................................................................................................18

40 U.S.C. § 8721(h).....................................................................................................42

40 U.S.C. § 8721(h)(1).................................................................................................18

*40 U.S.C. § 8722..........................................................................................................2

40 U.S.C. § 8722(b)..................................................................................................7, 42

40 U.S.C. § 8722(b)(1)....................................................................................16, 17, 20

40 U.S.C. § 8722(c)(2).................................................................................................20

40 U.S.C. § 8722(d)...........................................................................................*passim*

40 U.S.C. § 9102......................................................................................................2, 42

40 U.S.C. § 9102(a)..................................................................................................7, 21

42 U.S.C. § 4331(b)(4)...........................................................................................25, 37

42 U.S.C. § 4331 *et seq.*............................................................................................42

*42 U.S.C. § 4332(2)(C)........................................................................................3, 8, 24, 25

42 U.S.C. § 4332(2)(C)(iii) & (v)..............................................................................28

*42 U.S.C. § 4336.........................................................................................................24

42 U.S.C. § 4336(a).....................................................................................................24

42 U.S.C. § 4336(b) ...................................................................................................3, 24

42 U.S.C. § 4336(b)(2) ......................................................................................................24

42 U.S.C. § 4336e(10)(a) ...................................................................................................24

54 U.S.C. § 312102 ...............................................................................................................2

54 U.S.C. § 312102(a) ........................................................................................................41

**Other Authorities**

40 C.F.R. § 1508.1(i)(4) .....................................................................................................25

40 C.F.R. § 1508.27 ............................................................................................................25

40 C.F.R. § 1508.27(b)(2) ...................................................................................................27

40 C.F.R. § 1508.27(b)(3) ...................................................................................................25

40 C.F.R. § 1508.27(b)(4) ...................................................................................................25

40 C.F.R. § 1508.27(b)(7) ...................................................................................................29

40 C.F.R. § 1508.27(b)(8) ...................................................................................................25

45 C.F.R. § 2101.1 ................................................................................................................2

45 C.F.R. § 2101.1(a)(1) ............................................................................................. *passim*

45 C.F.R. § 2101.2 ................................................................................................................2

45 C.F.R. § 2102.1 ................................................................................................................8

45 C.F.R. § 2102.4 ................................................................................................................8

45 C.F.R. § 2102.10(a) .........................................................................................................7

90 Fed. Reg. 10610 .............................................................................................................25

Commission of Fine Arts, Submit a Comment, https://www.cfa.gov/submit-
    public-comment ............................................................................................................8

Comprehensive Plan for the National Capital: Federal Elements (2024),
    Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ ...................18

Dep't of Interior, *DOI Handbook of NEPA Procedures*, Appendix 3, § 5,
    https://www.doi.gov/media/document/doi-nepa-appendix-3 ...............................29

Dep't of Interior, *DOI Handbook of NEPA Procedures*, Appendix 3, § 6(5),
https://www.doi.gov/media/document/doi-nepa-appendix-3 ................................................26

Dep't of Interior, *DOI Handbook of NEPA Procedures*,
http://doi.gov/media/document/doi-nepa-handbook ............................................................26

Dep't of Interior, *DOI Handbook of NEPA Procedures*, § 1.2(b)(1) & (2),
https://www.doi.gov/media/document/doi-nepa-handbook....................................................26

Dep't of Interior, *DOI Handbook of NEPA Procedures*, § 1.2(b)(2)(iii),
https://www.doi.gov/media/document/doi-nepa-handbook....................................................27

Dep't of Interior, *New Department of the Interior NEPA Procedures*,
https://www.doi.gov/oepc/national-environmental-policy-act-nepa .....................................26

*Develop*, Merriam-Webster.com, https://www.merriam-
webster.com/dictionary/develop ........................................................................................20

*Development*, Am. Heritage Dictionary,
https://www.ahdictionary.com/word/search.html? q=development .......................................20

Fed. R. Civ. P. 65(c) ................................................................................................................40

National Trust for Historic Preservation, Press Center,
https://savingplaces.org/press-center ................................................................................35

NATO Secretary-General Mark Rutte, YouTube,
https://www.youtube.com/watch?v=kT8w6f5k2u4.........................................................12, 16

NCPC, How to Comment https://www.ncpc.gov/participate/guidelines/#written ........................8

*NEPA and NHPA - A Handbook for Integrating NEPA and Section 106,* Council
On Environmental Quality (2013), https://ceq.doe.gov/docs/ceq-
publications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf....................................26

*U.S. Const. Art. IV, § 3, Cl. 2................................................................................................31

White House, Press Secretary Karoline Leavitt Briefs Members of the Media, Oct.
23, 2025, YouTube, https://www.youtube.com/watch?v=lLRc5r9msso...................13, 16, 19

**INTRODUCTION**

In late October 2025, the Defendants in this action, at the behest of President Donald J. Trump, demolished the East Wing of the White House to make room for a 90,000-square-foot ballroom ("Ballroom") on the site. They did so without submitting their plans for the project ("Ballroom Project") to the two federal commissions—the National Capital Planning Commission ("NCPC") and the Commission of Fine Arts ("CFA")—that are required by federal statute and regulations to review federal development projects in the District of Columbia. They did so without seeking or obtaining the approval of Congress, which must expressly authorize any project built on federal parkland in the District. And they did so without conducting an adequate environmental review of the Ballroom Project, which has so far involved, among other things, major physical disruption to federal parkland of tremendous national significance and the dumping of potentially contaminated debris from the East Wing at another public park.

The Defendants have not only violated the law in many separate ways; they have also deprived the public of the critical opportunity to comment and provide input on perhaps the most substantial exterior alteration to the country's most recognizable and historically significant building since it was reconstructed after being burned during the War of 1812. This illegal activity continues today, and further harm mounts unabated: In recent days, ready-to-install construction materials and heavy construction machinery have been moved onsite to begin active building. *See* Declaration of Gregory B. Craig ("Craig Decl."), Ex. A at 8; Ex. B at 3. The site now features a towering construction crane anchored to a concrete paddock. *See* Craig Decl., Ex. A at 8. On December 2, President Trump told his cabinet that the pile drivers operate "all night." *Id.*

Plaintiff, the National Trust for Historic Preservation in the United States ("National Trust"), is a private charitable, educational non-profit corporation chartered by Congress in 1949.

Declaration of Elizabth S. Merritt ("Merrit Decl."), ¶ 2. The statutory purpose of the National Trust is unambiguous: to further the historic preservation policy of the United States and to promote the public's awareness of and ability to comment on any activity that might damage or destroy our nation's architectural heritage. *See* 54 U.S.C. § 312102. To that end, the National Trust works to advance historic preservation efforts and public involvement in historic preservation across the country. *See* Merritt Decl. ¶¶ 3-8. That work has involved participating in public commentary with and bringing historic preservations suits across—and against—numerous Presidential administrations. *See id.* ¶¶ 3-7.

The National Trust brought this action to compel the Defendants to at minimum comply with the procedural requirements that inform and protect the public's opportunity to comment on the Ballroom Project. The National Trust requests a temporary restraining order ("TRO") and, thereafter, a preliminary injunction preventing the Defendants from continuing work on the Ballroom Project until they have (1) submitted plans to the NCPC and the CFA, and received comments and approval from the agencies, as required by law, (2) conducted and published adequate environmental reviews, as required by law, (3) permitted public comment on both the project plans and the environmental reviews, as required by law, and (4) received express authorization from Congress to construct the Ballroom, as required by law.

The Court should grant the National Trust's motion. The National Trust is likely to succeed on the merits of its claims. *First*, federal law is clear: the NCPC and the CFA must review (and the NCPC must also affirmatively approve) proposed federal development projects *before* the project plans are finalized or work has begun. *See* 40 U.S.C. §§ 8721-8722, 9102; *see also* 45 C.F.R. §§ 2101.1-2101.2. In accordance with those requirements, projects of much lesser significance— including projects to improve the White House grounds undertaken by each of the two prior

administrations—have routinely been timely submitted to the NCPC and the CFA. Construction on the Ballroom Project is now well underway, yet no plans for the project have been submitted to either commission. *See* Craig Decl., Ex. A at 8; Ex. B at 3.

Additionally, to the extent the Defendants contend there was no need to obtain NCPC and CFA review of the East Wing demolition because it did not involve any affirmative construction, this is both incorrect as a matter of law and irrelevant in light of the continued construction work currently underway at the former site of the East Wing.

*Second*, continued construction at the East Wing site violates the statutory prohibition on any "building or structure" being "erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. There is no dispute that the Defendants have not obtained such approval.

*Third*, the National Trust is likely to succeed on its NEPA claims. For any major federal action that has the potential to significantly affect the "human environment," 42 U.S.C. § 4332(2)(C), NEPA requires the federal government to follow certain procedures before it can take the proposed action. These include at minimum publishing an environmental assessment, and for most large projects also publishing a more detailed environmental impact statement. *See id.* §§ 4332(2)(C), 4336(b). Despite the large scale of the Ballroom Project—and the obvious attendant environmental impacts from the destruction of an historic urban building, the effects of its demolition and potential replacement on the historic federal parkland surrounding the White House, and the dumping of potentially contaminated building materials dating from as early as the beginning of the twentieth century at a public park—the Defendants have not published either report.

The remaining factors—irreparable injury, balance of equities, and the public interest—also favor granting the National Trust's motion. Depriving the NCPC and the CFA of access to project plan information whose disclosure is mandatory—and foreclosing any opportunity for the public to comment on or participate in those plans—are injuries already being suffered by the National Trust and the American people. That denial continues today without interruption. The public has a compelling interest in being able to comment on the Ballroom Project before it progresses further; being denied the opportunity to be heard is injury enough—notwithstanding the devastating aesthetic, cultural, and historical harms flowing from the Defendants' actions. These injuries will only be exacerbated if the Defendants' continued disregard of their statutory obligations results in an unreviewed and radical transformation of the White House caused by the addition of a palatial ballroom that dwarfs all that surrounds it.

The equities weigh overwhelmingly against these Defendants. The Defendants have already caused irreversible damage to the White House and its grounds without respecting or complying with standard review processes that are both applicable and routine. The Defendants have no legally cognizable or protected interest in maintaining the current illegitimate course. Preliminary relief would merely require the Defendants to do what they should have done in the first place: request review and approval of the Ballroom Project from the appropriate authorities, prepare and publish an adequate environmental assessment and environmental impact statement, and give the public an opportunity to comment.

## **BACKGROUND**

### I.    **The East Wing of the White House.**

The White House is the official residence of the President of the United States. Conceived by the capital's initial planner, Pierre Charles L'Enfant, as a grand presidential palace, the White

House owes its modest yet iconic profile to James Hoban, whose winning submission to an architectural competition served as the plans for the new building. *See* Craig Decl., Ex. C at 70. Construction of the White House according to Hoban's plans began during the presidency of George Washington. *See id.* In 1800, President John Adams moved into the still-unfinished building; the next year, he was succeeded in the presidency—and in the White House—by Thomas Jefferson. *See id.* at 70-71. President Jefferson took an active interest in the building, and he oversaw the addition of early versions of the White House's east and west colonnades. *See id.*; Craig Decl., Ex. D at 45, 48-49.

The East and West Wings were built at the ends of reconstructed colonnades in 1902. Craig Decl., Ex. E at 2-3. The West Wing was constructed as an executive office building, *see id.* at 2; today, it houses the Oval Office, the Cabinet Room, and office space for the President and executive staff. The East Wing initially served as a receiving area for visitors and guests attending functions at the White House. *See id*. at 2-3. By the 1930s, it had taken on its principal modern role as the center of operations for the First Lady, with Eleanor Roosevelt using the space for official functions and news conferences, and subsequent presidential spouses likewise keeping staff and offices in the building. Craig Decl., Ex. F at 5-6; Ex. G at 5. Renovations in 1942 enlarged the East Wing by adding a second story and an underground bunker, and converted some of the existing space into a small movie theater. *See* Craig Decl., Ex. E at 3; Ex. G at 2-4. For eighty-three years, the East Wing's function and exterior appearance remained unchanged until—without warning or notice—the Defendants demolished the building in its entirety in October 2025. *See* Craig Decl., Ex. H.

The East Wing abutted the Jacqueline Kennedy Garden, which was originally constructed in 1903 and dedicated to the former First Lady in 1965. *See* Craig Decl., Ex. I at 2. The Jacqueline

Kennedy Garden balanced the Rose Garden on the west side of the White House and was used to host receptions. *See id.* Along with the entirety of the East Wing structure, the Defendants demolished the Jacqueline Kennedy Garden in October 2025. *See* Craig Decl., Ex. H at 2.

## II.    President Trump Announces Plans to Build the Ballroom.

On July 31, 2025, the White House issued a press release (the "July 2025 Press Release") announcing plans to build a large ballroom ("Ballroom"), long desired by the President, on the White House grounds. *See* Craig Decl., Ex. J; *see also* Ex. K at 6. The press release stated that the Ballroom would be located on the site of the East Wing, which it described as a "small, heavily changed, and reconstructed" building that had been "renovated and changed many times." Craig Decl., Ex. J at 2. The Ballroom would be "approximately 90,000 total square feet"—much larger than the 55,000-square-foot White House, *see* Craig Decl., Ex. L at 2—and would have "a seated capacity of 650 people." Craig Decl., Ex. J at 1. Included with the press release were six images, five of which depicted a massive structure, presumably the Ballroom, on the site of the East Wing. *See id.* at 2-3. As shown in the renderings, the Ballroom was substantially larger than the East Wing and overshadowed the central residence. *See id.* The sixth image depicted what was presumably the interior of the Ballroom—a large room with oversized windows and gold trim on the ceiling. *See id.* at 3.

The July 2025 Press Release also announced that an architect, lead contractor, and lead engineer—McCrery Architects, Clark Construction, and AECOM, respectively—had been hired. *Id.* at 1-2. It stated that construction on the Ballroom Project would "begin in September 2025" and was "expected to be completed long before the end of President Trump's term" in January 2029. *Id.* at 2.

6

Although the renderings of the Ballroom clearly depicted a new structure on the site of the East Wing, the July 2025 Press Release did not specify whether the East Wing would be razed to accommodate the Ballroom or would instead be integrated into the larger structure. *See id.* However, at a press conference held the same day that the press release was issued, President Trump stated that the Ballroom "wo[uldn't] interfere with the current building," of which he was "the biggest fan." Craig Decl., Ex. M at 2. The President further stated that the Ballroom would "pay[] total respect to the existing building" and would "be near it, but not touching it." *Id.*

III.    **The Defendants Fail to Submit the Ballroom Project to the NCPC, the CFA, and Congress for Review, and Fail to Prepare an Environmental Impact Statement.**

Like nearly all major federal development projects in the District of Columbia, the Defendants' Ballroom Project was required to be submitted to two federal commissions for review. The first of those commissions, the NCPC, serves as the central planning agency in the District of Columbia and reviews proposed federal projects for consistency with the NCPC's comprehensive plan for development in the capital district and its environs. *See* 40 U.S.C. §§ 8711(e)(2), 8722(b), 8722(d). The second, the CFA, was established by Congress to advise on matters of fine art and reviews proposed projects' visual appearance. *See* 40 U.S.C. § 9102(a); 45 C.F.R. § 2101.1(a)(1).

Both the NCPC and the CFA require federal agencies to present their proposed projects for review *before* project plans are finalized, and *before* any work on the project is begun. *See* 40 U.S.C. § 8722(b) (requiring the agency to "advise and consult" with the NCPC about its proposed project "before preparing construction plans."); 45 C.F.R. § 2101.1(a)(1) (requiring the agency to seek the CFA's advice "on the plans and on the merits of the designs" before the plans' "final approval"); *id.* § 2102.10(a) (requiring "submission when concept plans for the project are ready but before detailed plans and specifications or working drawings are prepared").

During these review processes, the public is given the opportunity to express its opinions about the proposed project. Members of the public may, for instance, submit comments on pending projects on the commissions' websites; attend the commissions' meetings, which are open to the public; and speak at those meetings to present their views. *See* 45 C.F.R. §§ 2102.1, 2102.4; NCPC, How to Comment https://www.ncpc.gov/participate/guidelines/#written (last accessed Dec. 11, 2025); Commission of Fine Arts, Submit a Comment, https://www.cfa.gov/submit-public-comment (last accessed Dec. 11, 2025). This robust forum for public input prior to and during the review by the commissions ensures that the public has an opportunity to make its concerns about a project known to the NCPC, the CFA, and the agency proposing the project, and enables those entities to take those concerns into account before work on the project has begun.

In addition to review by the NCPC and the CFA, the Ballroom Project was subject to at least two other review requirements. First, federal projects that propose to "erect[]" a "building or structure" on any federal "reservation, park, or public grounds" within the District of Columbia must be "express[ly] author[ized]" by Congress. 40 U.S.C. § 8106. Because President's Park, in which the White House and its grounds are located, is a federal park managed by defendant the National Park Service, *see* Craig Decl., Ex. N, Ex. O, the Defendants were required to obtain separate and express Congressional approval for the Ballroom Project. 40 U.S.C. § 8106. Second, the Ballroom Project, like all "major Federal actions," must be reviewed by the agency responsible for the project under NEPA for its "effects on the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The July 2025 Press Release gave no indication that the Defendants planned to ignore these required review processes. Rather, the press release announced that "President Trump ha[d] held several meetings with members of the White House Staff, the National Park Service, the White

House Military Office, and the United States Secret Service to discuss design features and planning," Craig Decl., Ex. J at 1—meetings which, in the normal course, would be followed by the legally required submission of design plans for the Ballroom Project to the NCPC and the CFA. It also quoted the White House Chief of Staff, Susie Wiles, as saying that "[t]he President and the Trump White House are fully committed to working with the appropriate organizations"—which would include, at minimum, the NCPC, the CFA, and Congress—"to preserv[e] the special history of the White House." *Id.* at 2.

Despite these assurances, and despite construction on the Ballroom Project being proposed to start in September 2025, *see id.*, none of the individuals or agencies responsible for the Ballroom Project submitted plans for the project to the NCPC or the CFA, or sought Congressional approval, during the months following the July 2025 Press Release. Instead, the Defendants proceeded to develop the Ballroom Project without the required reviews. In July 2025, President Trump appointed William Scharf to be Chairman of the NCPC. *See* Craig Decl., Ex. P at 1. Mr. Scharf, a lawyer and aide to President Trump, lacked any apparent architectural or city-planning experience, but opined in September 2025 that the NCPC "deal[t] with . . . essentially construction, vertical build"—not demolition. Craig Decl., Ex. Q at 1; *see* Craig Decl., Ex. R. At a dinner for donors on or about October 15, 2025, President Trump said that he had been told by "two men" that he did not need any approvals or permits but rather, as President, could "do anything [he] want[ed]" to the White House. Craig Decl., Ex. S at 1-2.

During this time, the planned size of the Ballroom, already out of proportion to the rest of the White House, appeared to increase substantially. On September 13, 2025, President Trump stated in an interview with NBC News that he was "making [the Ballroom] a little bigger." Craig Decl., Ex. T at 1. Under the President's new plan, the Ballroom would accommodate 900 people—

more than a 30 percent increase from the 650-person capacity announced in the July 2025 Press Release. *Id.* The size of the proposed new Ballroom increased further in October 2025, as the President, while speaking to a group of donors, stated that it would now be capable of accommodating nearly 1,000 people. Craig Decl., Ex. U at 1.

The size and shifting plans for the proposed Ballroom, along with the lack of review by the NCPC and the CFA, caused concern among architectural groups and the public. In an August 5, 2025 letter, the American Institute of Architects urged defendant John Stanwich, Superintendent of President's Park and Executive Secretary of the Committee for Preservation of the White House, "to allocate the time necessary for a rigorous process" and "ensur[e that] decisions" concerning the White House were "made with the utmost care and consideration." Craig Decl., Ex. V at 2. Similarly, in an October 16, 2025 statement, the Heritage Conservation Committee of the Society for Architectural Historians "expresse[d] great concern" over the proposed ballroom addition to the White House, and requested that a comprehensive preservation review be undertaken; that the impacts of the Ballroom Project on the White House grounds be evaluated; and that the broader national impacts on historic preservation be considered. Craig Decl., Ex. W at 1-2.

## IV.    **The Defendants Demolish the East Wing.**

The Defendants did not submit a plan for the Ballroom Project to the NCPC for review and approval; they did not seek review from the CFA; they did not consult or seek approval from Congress; they deprived the public of any opportunity to comment; they published no environmental studies. They forged ahead nonetheless.

On October 20, 2025, President Trump posted a statement to social media announcing that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." Craig Decl., Ex. X. President Trump stated that "the East Wing"—which he

characterized as "[c]ompletely separate from the White House itself"—was "being fully modernized as part of this process, and will be more beautiful than ever when it is complete!" *Id*. During a press conference in the East Room of the White House that same day—while destruction of the East Wing was actually underway—President Trump confirmed that the demolition of the East Wing was happening "right behind us" and "might [be] hear[d] periodically." Craig Decl., Ex. Q at 1.

The East Wing has now been demolished. Photographs have been published depicting heavy machinery tearing down the East Wing's façade. *See* Craig Decl., Ex. Y. Reports appeared detailing how portions of the East Wing's roof had been destroyed and heavy machinery had torn through its interior. Craig Decl., Ex. H, M.

The unexpected and previously unannounced demolition of the East Wing heightened public concern about the Ballroom Project. *See, e.g.*, Craig Decl., Ex. Z. The Defendants did not, however, pause the demolition to seek, however belatedly, the required reviews. Rather, on October 21, 2025, the White House issued a press release ("October 2025 Press Release") minimizing and dismissing the public's concerns. *See* Craig Decl., Ex. AA. The October 2025 Press Release asserted that critics were "manufactur[ing] outrage" over President Trump's "visionary addition of a grand, privately funded ballroom to the White House." *Id.* The press release did not explain why the Defendants had begun work on the Ballroom Project without submitting plans for review and public comment, as they were required to do by law, or specify when—if at all—the Defendants intended to submit plans for such review and comment. *See id.*

The next day, October 22, while the destruction of the East Wing continued, President Trump showed renderings of the Ballroom to members of the press and other persons gathered in the White House for a separate meeting. *See* Craig Decl., Ex. BB; *see also* Associated Press, LIVE:

Trump holds meeting with NATO Secretary-General Mark Rutte, YouTube, https://www.youtube.com/watch?v=kT8w6f5k2u4 (last accessed Dec. 11, 2025) [hereinafter "October 22 Oval Office Video"]. A three-dimensional model of the White House appeared on a table in front of President Trump displaying the Ballroom on the former site of the East Wing. *See* Craig Decl., Ex. M. While showing the renderings of the Ballroom to reporters, President Trump stated that the East Wing was "a very small building" that was "never thought of as being much." October 22 Oval Office Video, at 14:53. "Over the years, many presidents have made changes," President Trump claimed. *Id.* at 16:23. "This," he continued, referring to the ongoing razing of the East Wing, "obviously would be the biggest change." *Id.* President Trump did not explain why it had been determined that the East Wing would have to be razed to accommodate the Ballroom except to say that, "[i]n order to do it properly, we had to take down the existing structure." *Id.* at 17:20. Again, he gave no explanation for why the required planning processes had not been followed; nor did he give any date as to when the project's plans would be submitted for review. *See id.* at 14:00-18:27.

The updated renderings of the Ballroom displayed by President Trump in October 2025 showed marked differences from the images in the July 2025 Press Release, including the number of large exterior windows, the number of columns in the proposed northeast portico, and the design of the staircase leading from the Ballroom to the South Lawn. *See* Craig Decl., Ex. BB at 3-5. Other aspects of the October renderings suggested a haphazard design process—the exterior trim of two windows appeared to collide, for instance, and a set of stairs led to no apparent landing. *See id.* at 6.

Within days, the Defendants had demolished the entirety of the East Wing. Aerial photographs taken on October 23, 2025, depicted cleared space where the East Wing previously

stood, and photographs from the White House grounds taken at around the same date showed the demolition of nearly the entire East Wing and east colonnade. *See* Craig Decl., Ex. H at 5-6. Debris from the demolished East Wing was dumped at a public park in Washington, D.C., with no apparent efforts taken to address the possible hazards that the material might pose to the environment. *See id.* at 4.

Press Secretary Karoline Leavitt reinforced that the demolition of the East Wing was an essential and integral part of the Ballroom Project, stating that "the President heard counsel from the architects and the construction companies who said that in order for this East Wing to be modern and beautiful for many, many years to come, for it to be a truly strong and stable structure, this phase one that we're now in"—presumably a reference to the demolition of the East Wing— "was necessary." *See id.*; *see also* The White House, Press Secretary Karoline Leavitt Briefs Members of the Media, Oct. 23, 2025, 22:48, YouTube, https://www.youtube.com/watch?v= lLRc5r9msso (last accessed Dec. 11, 2025) [hereinafter "October 23 Press Conference Video"].

## V.    The Defendants Continue Construction of the Ballroom Without Submitting Plans to the NCPC, the CFA, or Congress for Review.

Although more than a month has passed since the demolition of the East Wing, the Defendants have still not submitted plans to the NCPC, CFA, or Congress for review and approval. The Ballroom Project was not reviewed at the NCPC's December, 4 2025 meeting. The Ballroom Project is also absent from the NCPC's published list of projects anticipated for review over the next six months. *See* Craig Dec., Ex. CC at 4. Nor have the Defendants submitted the Ballroom Project to the CFA; instead, on or about October 28, 2025, President Trump dismissed all six of the CFA's sitting members. *See* Craig Decl., Ex. DD. He has appointed no replacements. *See* Craig Decl., Ex. EE at 1-2. The Defendants have never acknowledged their obligation to obtain express approval for the Ballroom Project from Congress, let alone taken steps to do so.

Rather, the Defendants have continued work at the site of the East Wing. Public reporting describes the location of the former East Wing as "a bustling project site . . . almost entirely fenced off from public view contain[ing] dozens of workers and materials ready to be installed, including reinforced concrete pipes and an array of cranes, drills, pile drivers and other heavy machinery." Craig Decl., Ex. B at 3. And President Trump continues to play a hands-on role in the Ballroom Project, "holding frequent meetings about its design and materials," *id.* at 2, clashing with the project's lead architect over his desired size of the ballroom, *id.*, and reportedly telling people working on the project "that they did not need to follow permitting, zoning or code requirements because the structure is on White House grounds," Craig Decl., Ex. K at 4.

In recent days, heavy construction machinery and construction materials, including concrete pipes, pile drivers, and drills, have been installed at the site. Craig Decl., Ex. B at 3; Ex. A at 8. A construction crane anchored to a concrete paddock now towers above the fences surrounding the site of the former East Wing. Craig Decl., Ex. A at 8. On December 2, President Trump told his cabinet that the pile drivers operate "all night," and that he had rebuffed requests from the First Lady to cease the pounding, telling her: "Sorry, darling, that's progress." *Id.* The Defendants now appear poised to construct the Ballroom, in a form known only to them and their contractors.

## ARGUMENT

"A TRO is a temporary measure to preserve the *status quo ante* during the pendency of proceedings for preliminary or permanent injunctive relief." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-5046, 2025 U.S. App. LEXIS 4611, at *3 (D.C. Cir. Feb. 26, 2025); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (holding that TROs serve "to preserve the relative positions of the parties" until a court can adjudicate the merits of a dispute). A preliminary

injunction, in turn, "preserve[s] the status quo pending the outcome of litigation." *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)).

To obtain either form of preliminary relief, the National Trust must show that: "(1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) that the preliminary relief sought "is in the public interest." *Bayer HealthCare, LLC v. U.S. FDA*, 942 F. Supp. 2d 17, 23 (D.D.C. 2013) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)); *see also id.* (noting that the legal standard governing the issuance of preliminary injunctions "also applies to temporary restraining orders"). The National Trust easily satisfies each of those requirements.

## I.    The National Trust Is Likely to Succeed on the Merits of its Claims.

"A movant may show a likelihood of success on the merits by demonstrating that it is 'more likely than not' that [the movant] will prevail." *Advance Am. Cash Advance Ctrs., Inc. v. FDIC*, Civ. Action No. 14-953, 2017 U.S. Dist. LEXIS 27887, at *8 (D.D.C. Feb. 23, 2017) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011)).[1] Where, as here, "multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." *Kirwa v. United States DOD*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017).

---

[1] Under the D.C. Circuit's sliding-scale approach, a movant who demonstrates "a strong showing on one factor could make up for a weaker showing on another," such that where other factors weigh heavily in favor of the plaintiff, they need only raise a "serious legal question" on the merits. *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011). Because the National Trust's claims easily satisfy each of the four prongs, it need not rely on the D.C. Circuit's sliding scale to prevail on this motion. Even if the National Trust had not made a strong showing of success on the merits, the other factors—specifically the irreparable harm and the injury to the public interest caused by the construction of a massive ballroom on the grounds of perhaps the most recognizable public building in the United States without any public input—would favor preliminary relief.

The National Trust meets that standard here. Indeed, while the National Trust need only demonstrate a likelihood of success on a single claim, it is "more likely than not" to prevail on *all* of its claims.

### A.     The Defendants' Failure to Submit Plans for the Ballroom Project to the National Capital Planning Commission for Review Violates the APA.

The Defendants have razed the East Wing of the White House. They have developed plans to construct a significant structure on federal public land, implicating statutorily mandated consultations and reviews. And, proceeding with alacrity to carry out the President's demands, they have flouted those statutory obligations, including consultation with the NCPC. The APA provides for judicial review of such "agency action unlawfully withheld," 5 U.S.C. § 706(1), and action "not in accordance with law," *id.* § 706(2)(A).[2] The Defendants have argued that the NCPC's jurisdiction is limited to "construction"—which they have unilaterally defined as "vertical build"—disclaiming any jurisdiction to review *demolition*. That distinction defies logic and is entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). The Defendants have themselves acknowledged that destroying the East Wing was and is a central and requisite element of the plan to build the Ballroom. *See, e.g.* October 22 Oval Office Video, at 17:20; October 23 Press Conference Video, at 22:48.

### 1.     The Defendants' demolition and construction at the White House may not proceed without NCPC review.

Federal agencies that "originate[ plans] for proposed developments and projects" that "affect the plan and development of the National Capital" must "advise and consult" with the NCPC with respect to those plans. 40 U.S.C. § 8722(b)(1). Specifically, such federal agencies must

---

[2] The National Trust does not assert APA claims against President Trump, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and uses "Defendants" in sections I.A.-D. to refer only to those defendants against which it asserts APA claims.

"advise and consult with the Commission" both "*before* preparing construction plans" and "*as the* agency prepares plans and programs in preliminary and successive stages." *Id.* (emphases added). Moreover, beyond the requirement to consult, the agency must also secure the NCPC's *approval* of various aspects of the project, namely its "location, height, bulk, number of stories, and size . . . and the provision for open space in and around" the proposed development. *Id.* § 8722(d).

These statutory obligations plainly apply to the Ballroom Project. The Defendants are federal agencies, heads or senior officials thereof, and an executive department (the Department of the Interior) having authority over a defendant agency (the National Park Service). The Ballroom is a major building—a "proposed development[]" or "project"—that will be located in the heart of the District of Columbia and will "affect the plan and development of the National Capital." *Id.*

Nevertheless, the Defendants have commenced work on the Ballroom Project without submitting a plan to the NCPC, much less obtaining the approval required by § 8722(d). They have therefore deprived the NCPC of the opportunity to review and provide input on the project and planning phases of the Ballroom Project. Even more critically, by evading NCPC review, they have also deprived the National Trust and the general public of the opportunity to participate in the reshaping of one of America's most treasured and iconic cultural landmarks.

The NCPC's review of the Ballroom Project is statutorily required for a second, separate reason. The Defendants' Ballroom Project alters the NCPC's Comprehensive Plan for the capital district. *See* 40 U.S.C. § 8721(a) (requiring that "the [NCPC] shall prepare and adopt a comprehensive, consistent, and coordinated plan for the National Capital"). And "before . . . any revision [to the Comprehensive Plan] is adopted," the NCPC "shall present the . . . revision" for comment by affected government bodies. *Id.* § 8721(e)(1). The NCPC may provide for public

17

input through any of "public hearings, meetings, or conferences, exhibitions, and publication of its plans." *Id.* § 8721(e)(2). It must also act "jointly" with the Mayor to "establish procedures for appropriate meaningful continuing consultation" regarding the revision to the Comprehensive Plan. *Id.* § 8721(h)(1).

The Ballroom Project is an attempt to revise the Comprehensive Plan by fiat, without any of these processes having taken place. The White House is a key element of the Comprehensive Plan. The Comprehensive Plan explains that the capital district's "iconic cityscape is distinguished through the close relationship between its form and the functional and visual symbols of national civic life." Comprehensive Plan for the National Capital: Federal Elements, 50 (2024), available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 11, 2025). This "symbolic identity," the Comprehensive Plan states, "expresses itself in a number of ways," including a visual hierarchy "that emphasizes symbols and structures, particularly the . . . White House" and several other major monuments. *Id.* The Comprehensive Plan thus cautions against "infrastructure solutions" that would "permanently alter[]" "symbolic views of . . . the White House" and other significant structures. *Id.* at 18. And it instructs that "the preeminence of the . . . White House" and other significant structures should be "[v]isually reinforce[d]" "by protecting the visual frame around them." *Id.* at 55.

Demolishing the East Wing and erecting the Ballroom is not just a "project" or a "proposed development"—it is also a "revision" of basic principles underpinning the Comprehensive Plan. Such a change in the Comprehensive Plan triggers the statutory requirement for review and opportunity for public input. 40 U.S.C. § 8721.

2.    <u>The Defendants may not segment the Ballroom Project to evade NCPC review.</u>

The Defendants claim that NCPC review has not been required because the demolition of the East Wing did not involve "vertical build," placing it outside the NCPC's jurisdiction. *See, e.g.*, Craig Decl., Ex. Q at 1. In September 2025, Commissioner Scharf—who, as noted, is also a member of the White House staff working directly for President Trump—stated that, in his opinion, what the Commission "deal[t] with [wa]s essentially construction, vertical build"—not demolition. *Id.* At a press conference held on October 23, 2025, Press Secretary Karoline Leavitt, when asked by another reporter if the President could "tear down anything he wants" at the White House "without oversight," referenced a "legal opinion" at NCPC to the effect that approval was needed only for vertical construction, not demolition. October 23 Press Conference Video, at 13:58. Similarly, at a dinner for donors on or about October 15, 2025, President Trump said that he had been told by two men that he did not need any approvals or permits and that, as President, he could "do anything [he] want[ed]" to the White House. Craig Decl., Ex. S at 1-2.

The notion that NCPC review is not required for demolition, but only for vertical construction, is just plain wrong.

The NCPC is the zoning authority for federal public buildings in the District of Columbia. *See* 40 U.S.C. § 8722(d). "In order to ensure the orderly development" of the capital district," "the location, height, bulk, number of stories, and size of federal public buildings," as well as "the provision for open space in and around federal public buildings" are subject to its approval. *Id.* To that end, the NCPC requires proponents of new construction to submit "construction plans" for its review. *Id.* § 8722(b).

Where, as here, construction of a new building is proposed to take place in the same physical location already occupied by an existing building, "development" and "construction

19

plans" for the new building necessarily include demolition of the existing building. *Cf. Development*, Am. Heritage Dictionary, https://www.ahdictionary.com/word/search.html? q=development (last accessed Dec. 11, 2025) (definitions include "[t]he business of constructing buildings *or otherwise altering land for new use*") (emphasis added); *Develop*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/develop (last accessed Dec. 11, 2025) (definitions include, "to make available or usable" and "to lead or conduct (something) through a succession of states or changes each of which is preparatory for the next").

The statute establishing the NCPC supports the commonsense understanding that the NCPC's review authority necessarily precedes the commencement of vertical construction. Section 8722(b)(1) specifically requires consultation "*before* preparing construction plans," and even "before making a commitment to acquire land"—which necessarily precedes any demolition on acquired land. 40 U.S.C. § 8722(b)(1). Section 8722(c)(2) requires the NCPC's input "before acting on any general plan" that would "involve a major change in the character or intensity of an existing use in the environs." *Id.* § 8722(c)(2). There can be no serious question that demolishing the East Wing involves "a major change in the character" of that structure, regardless of whatever is proposed to be built in its place (though here, that new building itself also represents a decided "change in the character or intensity of an existing use"). *Id.* Section 8722(d) even vests the NCPC with authority to review plans that would involve *no vertical construction at all*, because its statutory purview includes "the provision for open space in and around federal public buildings in the District of Columbia." *Id.* § 8722(d).

Finally, apart from the NCPC's general zoning authority, demolition of structures that are featured in the NCPC's Comprehensive Plan for the capital district—as the White House indisputably is—are subject to the NCPC's independent review under § 8721. *See id.* § 8721.

Insofar as the Defendants rely on the opinion of Commissioner Scharf (or other legal opinions previously produced by the NCPC) that "construction" for purposes of NCPC review encompasses only vertical build, and not demolition, such opinions are not supported by the plain text or structure of the statutory scheme, and are entitled to no deference. *See Loper Bright*, 603 U.S. at 400-01 (holding that it is the duty of the courts to determine the "single, best meaning" of statutes, in part because, even where ambiguous, "agencies have no special competence in resolving statutory ambiguities").

The Court should therefore grant a TRO and preliminary injunction enjoining the Defendants from any further work on the site of the Ballroom Project until they have submitted a plan to the NCPC and obtained its approval in accordance with their statutory obligations.

**B.  The Defendants' Failure to Consult with the Commission of Fine Arts Violates the APA.**

Independently from the required NCPC reviews, the Defendants have also flouted their obligations to consult with the CFA. The Defendants have therefore further unlawfully withheld this separate agency action, and by proceeding unabated with the destruction of the East Wing and development of the Ballroom Project, their action is "not in accordance with law" for this reason as well. *See* 5 U.S.C. §§ 706(1), 706(2)(A).

Federal agencies intending to undertake development or construction projects in the capital district are required to seek the advice of the CFA on matters concerning fine arts. 40 U.S.C. § 9102(a). "[F]or public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the design" "*before*" the plans are "final[ly] approv[ed]" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1) (emphasis added).

The Ballroom Project is subject to this CFA review because it is a "public building[] to be erected in the District of Columbia." *Id.* And substantial exterior renovations to the White House—perhaps the most recognizable building in the entire District—undoubtedly "affect the appearance of the city." *Id.* The Defendants have nevertheless commenced work on the Ballroom Project without submitting a plan to the CFA, or otherwise advising and consulting with the CFA in connection with the project. Had they done so the National Trust and other members of the public could—and would—have provided comments. Merritt Decl. ¶¶ 4-12; Declaration of Alison K. Hoagland ("Hoagland Decl."), ¶¶ 15-16. Instead, President Trump terminated the entire CFA. The Defendants have therefore shielded the Ballroom Project from transparency in this venue as well. The Court should therefore grant a TRO and preliminary injunction enjoining the Defendants from any further work on the site of the Ballroom Project until they have submitted a plan to the CFA.

### C.    Construction of the Ballroom Without Express Authorization of Congress Violates the APA.

In demolishing the East Wing of the White House and beginning construction of the Ballroom, Defendants have also violated the mandate requiring them to secure prior, express Congressional approval under 40 U.S.C. § 8106. Without that authority, they engaged in agency action "not in accordance with law," 5 U.S.C. § 706(2). *See McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182, 1186 n.1 (D.C. Cir. 2004) (concluding that agency action that violated a separate federal statute was contrary to law under the APA)*; McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995) (similar). Absent a TRO, The Defendants' activities will continue, and they will be in violation of the law.

Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia ***without express authority of Congress***." *Id.* (emphasis added).

President's Park comprises the White House and its grounds, and is the planned site of the Ballroom. President's Park is owned by the Federal Government, managed by the National Park Service, and located in the District of Columbia. *See* Craig Decl. Ex. N, O. It is within the statutory meaning of a "reservation, park, or public grounds." 40 U.S.C. § 8106.

The Defendants intend to "erect[]" the Ballroom—a "building or structure"—on the grounds of President's Park. *Id.* That work has already begun: recent reporting has revealed that the site of the East Wing is a "bustling project site" filled with "dozens of workers" and materials pertaining to construction, not demolition. Craig Decl., Ex. B at 3.

Yet Congress has not authorized anyone to build a Ballroom on President's Park— expressly or otherwise. The Defendants have therefore plainly violated § 8106 and must be enjoined from constructing the Ballroom, or any other similar structure, unless and until they receive express authorization by Congress to do so.

### D.    The Defendants Have Flouted NEPA's Procedural Safeguards.

The Defendants' failure to complete sufficient environmental reviews with opportunity for public comment violates NEPA and represents a further violation of the APA, demonstrating both unlawfully withheld agency action and agency action not in accordance with law.

NEPA is a fundamentally procedural statute; it requires agencies to follow a certain process, not to make a certain substantive determination. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989). Yet it is crucial that agencies follow NEPA's legally mandated procedures. The Defendants' failures here are several: (1) Even if an environmental assessment ("EA") was completed, it could not have been legally sufficient; (2) The Defendants failed to prepare and release an environmental impact statement ("EIS"), which a properly-conducted EA would have required; and (3) To the extent the Defendants bifurcated demolition from vertical

construction for purposes of preparing an EA or EIS, that decision is arbitrary, capricious, and unsupportable.

        1.    <u>Any EA prepared by the Defendants was inadequate, as a proper EA would have been published and followed by the preparation and publication of an EIS.</u>

Defendants were required to prepare an EA in connection with the Ballroom Project. The project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." 42 U.S.C. § 4336e(10)(a). An EA must be prepared for all major federal actions except for those which fall into certain limited exceptions. *See id.* §§ 4332(2)(C), 4336(a). The Ballroom Project falls within no such exception, and the Defendants have never argued otherwise.

An EA is required to be a "concise *public* document," *id.* § 4336(b)(2) (emphasis supplied). The Defendants have not published an EA in connection with the Ballroom Project. Thus, the Defendants have violated NEPA—either by failing to prepare an EA for the Ballroom Project, *see id.* §§ 4332(2)(C), 4336(b), or by preparing an EA for the project but failing to publish it, *see id.* § 4336(b).

If the Defendants *did* prepare an EA for the Ballroom Project—and there is no evidence that they have—there is no evidence that an EIS was subsequently prepared. As a matter of law, this would mean the Defendants' EA found that the Ballroom Project had "no significant impact" on the quality of the human environment. *See id.* §§ 4332(2)(C), 4336. But any such finding would be factually unsupported, and thus arbitrary and capricious.

To start, in determining whether a project's impacts warrant an EIS, NEPA requires the reviewing agency to consider the effects of the proposed federal action on the "human environment," which includes effects on the "historic [and] cultural" "aspects of our national

heritage." *Id.* § 4331(b)(4); *id.* § 4332(2)(C). Under the framework long applied by the federal courts, "[w]hether a project has significant environmental impacts, thus triggering the need to produce an EIS, depends on its 'context' (region, locality) and 'intensity' ('severity of impact')." *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (quoting 40 C.F.R. § 1508.27).[3] There can be no question that the historically incomparable site of the White House qualifies as "significant," so any inquiry would inevitably turn on the "intensity" element. While the regulations enumerated ten factors to consider, courts recognized that "[i]mplicating any one of the factors may be sufficient to require development of an EIS." *Id.* Here, the significance of the Ballroom Project's impact on multiple factors is so obvious that the Court need not dwell on each of the ten. Specifically, significant intensity is apparent from factors: (3) "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, [or] park lands"; (4) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"; and (8) "[t]he degree to which the action may adversely affect . . . sites, . . .structures, or objects listed in . . . the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(b)(3), (4), & (8); *see also* 40 C.F.R. § 1508.1(i)(4) (defining "effects" or "impacts" to include, among others, "aesthetic, historic, cultural, economic, social, or health" effects).

Accordingly, courts have long recognized that NEPA protects distinct cultural and historic interests that must be independently satisfied, even where other statutes with specific historic

---

[3] Historically, such assessments utilized the considerations enumerated in NEPA's implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), including those at 40 C.F.R. § 1508.27, which had been in force in some form since the Carter administration. These regulations were rescinded in April 2025, *see* 90 Fed. Reg. 10610, and are thus no longer binding. Nonetheless, they illustrate the concerns long-held and long-applied by the courts in implementing NEPA's statutory requirements, and illustrate why the Defendants' conduct here so plainly violated NEPA.

preservation aims overlap in part. *See Lemon v. McHugh*, 668 F. Supp. 2d 133 (D.D.C. 2009) (holding NEPA's requirements for review of historic and cultural impacts are not satisfied by separate requirements for the National Historic Preservation Act ("NHPA")); *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851 (9th Cir. 1982) (recognizing that NEPA "requires federal agencies to preserve important historic and cultural aspects of our nation's heritage" and holding that "compliance with the NHPA, even when it exists, does not assure compliance with NEPA. Each [statute] mandates separate and distinct procedures, both of which must be complied with when historic buildings are affected").[4]

Since the rescission of the prior NEPA regulations, the defendant Department of the Interior has developed guidance for implementing NEPA through a "DOI NEPA Handbook." Dep't of Interior, *New Department of the Interior NEPA Procedures*, https://www.doi.gov/oepc/national-environmental-policy-act-nepa (last accessed Dec. 11, 2025); Dep't of Interior, *DOI Handbook of NEPA Procedures*, available at http://doi.gov/media/document/doi-nepa-handbook (last accessed Dec. 11, 2025). That handbook includes certain similar considerations for the level of NEPA review as in the prior NEPA regulations, including "the proposed scope of the affected area (national, regional, or local) . . . and the affected area's natural and cultural resources" and "[e]ffects on the quality of life of the American people." *DOI Handbook of NEPA Procedures*, § 1.2(b)(1) & (2); *see also DOI Handbook of NEPA Procedures*, Appendix 3, § 6(5) (June 2025),

---

[4] Because "the 'affected human environment reviewed under NEPA includes aesthetic, historic, and cultural resources,'" "agencies must still fulfill the requirements under" NEPA in conjunction with other "independent statutes" governing preservation, including NHPA. *NEPA and NHPA – A Handbook for Integrating NEPA and Section 106,* Council On Environmental Quality 12-13 (2013), available at https://ceq.doe.gov/docs/ceq-publications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf (last accessed Dec. 11, 2025) (further clarifying that "[c]ultural resources that are not eligible for or listed in the National Register may be considered as part of the NEPA review").

https://www.doi.gov/media/document/doi-nepa-appendix-3 (further illustrating the "quality of life of the American people" factor to include, among other things, "[e]ducation and knowledge, which may include evaluation of learning, interpretation, and research opportunities related to cultural, historic, and natural resources"). This guidance applies to actions of both the defendant Department of Interior and the defendant National Park Service.

Of course, apart from the significant adverse cultural, aesthetic, and historic impacts on the human environment of Lafayette Square, President's Park, and the White House, the demolition of the East Wing raises further physical environmental and public health concerns. *See* 40 C.F.R. § 1508.27(b)(2) (considering among 10 "intensity" factors, "[t]he degree to which the proposed action affects public health or safety"); *DOI Handbook of NEPA Procedures*, § 1.2(b)(2)(iii) (DOI's consideration of effects must include "[e]ffects on public health and safety"). When the East Wing was demolished, it was over 120 years old, and many buildings of similar age contain recognized health-impacting environmental hazards—such as asbestos and lead paint—that must be properly handled. Yet debris from the East Wing demolition has been dumped in at least one public park, and perhaps elsewhere, with no apparent treatment or regard for its potential hazards.

Under all of these circumstances, a finding of no significant impact cannot be supported. Without conducting the requisite, sufficient environmental analysis, the Defendants could not (and did not) "consider every significant aspect of the environmental impact of a proposed action," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978), or "take a 'hard look' at environmental consequences," *Robertson,* 490 U.S. at 350 (citation omitted). NEPA expressly requires that for any major Federal action, the EIS provide a "detailed statement" of both "a reasonable range of alternatives to the proposed agency action" and "any irreversible and

27

irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C)(iii) & (v).

And without publishing any such analysis, the Defendants have robbed the public of any opportunity to comment on these activities. Public participation is a core pillar of NEPA, and the public cannot be excluded where activities will have a significant effect. *See Vt. Yankee*, 435 U.S. at 553; *Marsh v. Ore. Nat. Res. Council,* 490 U.S. 360, 371 (1989). Given that NEPA is at its core a procedural statute, it is crucial that those procedures—including sufficient environmental analysis and public participation—take place *before* the Defendants implement any actions. Otherwise, the Defendants may "act on incomplete information, only to regret [their] decision after it is too late to correct." *Marsh*, 490 U.S. at 371.

Until the Defendants prepare and publish sufficient environmental analyses, they cannot proceed with the Ballroom Project. Their failure to complete a sufficient EA or EIS is an agency action unlawfully withheld, and their proceeding with the demolition of the East Wing and development of the Ballroom Project is action contrary to law. 5 U.S.C. §§ 706(1), 706(2)(A). This Court should thus compel the Defendants to undertake the first step of NEPA's procedural requirements. To the extent that the Defendants have conducted any analysis, "without observance of procedure required by law," their conduct is arbitrary and capricious. *Id.* § 706(2)(A), (C).

2.     <u>If the Defendants considered only the demolition of the East Wing or only the construction of the Ballroom in preparing an EA, they improperly segmented NEPA review.</u>

Finally, to the extent the Defendants found that the Ballroom Project had no significant impact on the human environment because they artificially divided the EA process by either (1) assessing the demolition of the East Wing *alone*, without regard for the disposal of debris from the East Wing, the impacts of the construction of the Ballroom, or both; or (2) assessing the impacts

of the construction of the Ballroom without consideration of the impacts of the demolition of the East Wing or the disposal of its debris, such decisions constituted impermissible "segmentation." Such actions are arbitrary, capricious, and contrary to law. *See DOI Handbook of NEPA Procedures*, Appendix 3, § 5 (NEPA review must consider "reasonably foreseeable effects" resulting from the "project at hand" and may segregate review only of "other projects" that are "separate in time or place from the project at hand"); *see also* 40 C.F.R. § 1508.27(b)(7) (NEPA's intensity "[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts").

An agency cannot "segment[]" its NEPA review by dividing "connected, cumulative, or similar federal actions into separate projects." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (separate NEPA reviews are inappropriate where agency was "undeniably aware that the previous and following projects were also under construction or review, and that each phase of the development fit with the others like puzzle pieces to complete an entirely new [project]"). "The justification for the rule against segmentation is obvious: it 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (quoting *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)) (alteration in original). The rule also prevents agencies from evading NEPA review with respect to one or more portions of a larger and ostensibly separate project for which the agency has prepared, or will prepare, an EIS.

The Ballroom Project is a single project for the purposes of NEPA review: It involves the demolition of a significant portion of an existing building, the disposal of debris from that demolition, and the construction of a new structure in the same physical location. *See Stewart Park & Reserve Coalition, Inc. v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003) ("A project has been

improperly segmented, on the other hand, if the segmented project has no independent utility, no life of its own, or is simply illogical when viewed in isolation.") (citing *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763-64 (2d Cir. 1988)); *Vieux Carre Property Owners, Residents & Assocs., Inc. v. Pierce* 719 F.2d 1272 (5th Cir. 1983) ("Regardless of funding sources, integrally related activities designed to accomplish, in whole or in part, a specific goal are to be grouped together for consideration as a single project. Moreover, closely related and proposed or reasonably foreseeable actions that are related by timing or geography also must be considered together.").

Finally, while any decision by the Defendants to conduct a NEPA review of only the East Wing demolition would violate their statutory obligations, such a decision would also necessarily fail regardless of the basis: The demolition of the East Wing occurred *before* any public EA was released. As such, the Defendants can point to no reasoned explanation for any such decision. *See Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. . . . [W]here the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.").

The Court should therefore enter a TRO and preliminary injunction enjoining the Defendants from any further work until they complete and publish an appropriate EA and EIS for the Ballroom Project.

E.    **The President's Unilateral Action Violates the Constitution.**

The Constitution both prescribes and proscribes the respective powers of the President and Congress. As between those two branches, the Property Clause of the U.S. Constitution definitively vests exclusive authority over federal property with Congress. U.S. Const. Art. IV, § 3, Cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). The Supreme Court has "repeatedly observed that '[the] power over the public land thus entrusted to Congress is without limitations.'" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (quoting *United States v. San Francisco*, 310 U.S. 16, 29 (1940) and collecting cases). That power is exclusive: Nothing in the Constitution gives the President overlapping authority to dispose of federal property. As a result, only *Congress* may authorize the construction of federal buildings; the President, acting unilaterally, is wholly without constitutional authority to build or demolish anything on federal grounds.

President Trump's actions in directing and coordinating the Ballroom Project are therefore without authority, constitutional or otherwise. In usurping the role ascribed to Congress via the Property Clause, he has violated the separation of powers.

The Supreme Court has continued to recognize the availability of "implied equitable actions 'directly under the Constitution.'" *LULAC v. Exec. Off. of the President*, No. 25-0946, 2025 U.S. Dist. LEXIS 215411, at *76 (Oct. 31, 2025); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). The National Trust is likely to succeed on such a claim, and it therefore invokes this Court's equitable authority to prevent the President's further derogation of constitutional roles. *See LULAC*, 2025 U.S. Dist. LEXIS 215411, at *82; *see also Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation

occurs, any aggrieved party with standing may file a constitutional challenge."); *cf. Freytag v. C.I.R.*, 501 U.S. 868, 880 (1991) ("The structural interests protected by" the separation of powers "are not those of any one branch of Government but of the entire Republic.").

The seminal separation-of-powers case, *Youngstown Sheet & Tube Co. v. Sawyer*, counsels that where a President acts "incompatibl[y] with the expressed or implied will of Congress, his power is at its lowest ebb." 343 U.S. at 637 (Jackson, J., concurring). On the relative attribution of power here, the Court has spoken clearly: "Congress exercises the powers both of a proprietor and of a legislature over the public domain," such that the Property Clause "permit[s] 'an exercise of *the complete power* which Congress has over particular public property entrusted to it." *Kleppe*, 426 U.S. at 540 (emphasis added). To act at this nadir of Executive power, the President must demonstrate that he has the inherent constitutional authority to unilaterally demolish the East Wing and to build a ballroom that will cast the remainder of the White House in its shade. He cannot do so.

The Supreme Court's clarification of the scope of separation-of-powers claims against the President in *Dalton v. Specter,* 511 U.S. 462 (1994) does not disturb the National Trust's claim. The *Dalton* analysis begins with determining whether the claim at issue is properly characterized as statutory or constitutional. *LULAC*, 2025 U.S. Dist. LEXIS 215411, at *77. In *Dalton*, the Supreme Court drew this distinction when reviewing the President's decision to close military bases without observing certain statutory procedural requirements. There, the Court observed that the procedural requirements whose violation the plaintiffs complained of arose *solely* from a statute, and one which explicitly granted the President the authority to close military bases within his discretion, with the result that judicial review was "not available." *See Dalton*, 511 U.S. at 469-472. By contrast, in *Youngstown*, President Truman asserted that his action in seizing steel mills

"should be implied from the aggregate of his powers under the Constitution," including the duties that he "shall take Care that the Laws be faithfully executed" and that he "shall be Commander in Chief." 343 U.S. 579, 586-87 (1952).

President Trump's actions here in coordinating and directing every aspect of the Ballroom Project fall decisively outside the realm of statutory claims. Indeed, the President can point to no statute that provides him with authority—discretionary or otherwise—to demolish the East Wing or construct a ballroom in its place. Any justification for this action must therefore rest on some unarticulated theory of inherent or implied executive authority—taking this action well outside of the relatively narrow circumstances foreclosing judicial review in *Dalton* and placing it comfortably within the ambit of *Youngstown* and its progeny.

President Trump's statements demonstrate that he believes—wrongly—that he has an independent, constitutional power to "do anything [he] want[s]" to the White House. Acting on that belief, he has reportedly personally met with and directed contractors, personally engaged (and replaced) architects, and personally revised plans. "The executive action we have here originates in the individual will of the President and represents an exercise of authority without law. . . . With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law." *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). President Trump's actions intrude on Congress's exclusive prerogatives over federal property and violate the separation of powers.

Due to the extraordinary and extralegal involvement of the President here, the National Trust requests that the Court include President Trump within the ambit of its TRO and injunction. The National Trust recognizes that courts generally "may not enjoin the President regarding the performance of his official acts." *Dellinger v. Bessent*, 2025 U.S. App. LEXIS 3987, *43 (D.C.

Cir. Feb. 15, 2025) (citing *Franklin*, 505 U.S. at 802-03 (Scalia, J., concurring in part)). But President Trump performs no "official act" in personally planning and unilaterally directing changes to federal buildings of immense national significance. *Cf. Trump v. United States*, 603 U.S. 593, 615 (2024) ("As for a President's *unofficial* acts, there is no immunity.") (emphasis added). The Supreme Court has recently clarified that, even though drawing the line between official and unofficial acts may be difficult in some cases, the inquiry must always begin with whether "the President acts pursuant to 'constitutional and statutory authority.'" *Id.* at 617. And here, although the President purports to act under some inherent presidential authority, he has no constitutional basis to carry out the Ballroom Project. He therefore may be enjoined from further unofficial acts in engaging contractors or architects, or issuing direct work orders to those personnel, pending authority from Congress.[5]

## II.    The National Trust Will Be Irreparably Harmed Absent a TRO.

No injunction can bring back the East Wing of the White House. Over a century of national significance has already been lost. And most critically, the American people had no opportunity to review or participate in the wholesale reformation of the People's House. Nonetheless, this Court can and should enjoin the Defendants from taking further actions that will—in the absence of orderly review and comment—irrevocably transform one of our nation's most cherished structures.

To obtain a TRO and preliminary injunction, the National Trust must show it is likely to suffer irreparable harm in the absence of relief. The injury must be "both certain and great; it must be actual and not theoretical," and "of such imminence that there is a clear and present need for equitable relief," and it must not be adequately compensable in money damages. *Wis. Gas Co. v.*

---

[5] Needless to say, those acting at the direction of the President also may be enjoined from executing on his orders to manifest the separation-of-powers violation.

*Fed. Energy Regul. Comm'n,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam); *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987); *Winter,* 555 U.S. at 22-23.

The National Capital Planning Act, the CFA's enabling statute, and NEPA all provide procedural rights designed to protect the nation's historic and aesthetic heritage—interests of such unique importance that no money damages would ever be adequate to compensate for their loss or destruction. Where an irreversible action is imminent, the denial of those procedures can itself be an irreparable injury. *See Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009); *Ctr. for Biological Diversity v. U.S. Dep't of Interior,* 563 F.3d 466, 479 (D.C. Cir. 2009). Section 8106, through its sharp and specific focus on federal parkland within the seat of the nation's capital, protects similar historical and cultural interests. The Defendants are carrying out the Ballroom Project with no proper NEPA review, no NCPC approval or consultation, no CFA review, and no congressional authority—depriving the National Trust of statutory and regulatory rights to information, comment, and participation before critical decisions are made.

The National Trust's harms, and the harms to the public interest here, are significant and concrete. Had the Defendants adhered to these well-established procedural requirements, the National Trust would have participated in each of the NCPC, CFA, and NEPA processes. Merritt Decl. ¶¶ 4-12. Such review and participation is at the heart of the National Trust's mission: "[W]e help preserve the places and stories that make communities unique. Through the stewardship and revitalization of historic sites, we help communities foster economic growth, create healthier environments, and build a stronger, shared sense of civic duty and belonging." National Trust for Historic Preservation, Press Center, https://savingplaces.org/press-center (last accessed Dec. 11, 2025). The National Trust's participation vindicates the interests of its members, including architectural historian Professor Alison K. Hoagland, who have been deprived of the use and

enjoyment of the East Wing in both their personal and professional capacities; have suffered aesthetic, cultural, and historic harms from the Defendants' demolition of the East Wing; and will continue to suffer further mounting harms from the construction of the Ballroom in the manner proposed. *See* Hoagland Decl. ¶¶ 9-16.

These harms are no mere abstractions. As Professor Hoagland explains, "The White House was designed to be a symbol of the new nation," and, with its intentionally modest stature for a building of its significance, "the White House in its current form embodies some of the ideals on which the nation was founded." Hoagland Decl. ¶ 10. But should the palatial Ballroom be built as proposed, the historical significance of this design will be physically overcome: "No longer would the eye be drawn to the jewel of the building in the center, declaring to viewers that our president lives in a *house*." Hoagland Decl. ¶ 13.

As courts routinely recognize, these aesthetic, cultural, and historical harms are compounded by the procedural harms inflicted by the Defendants' violations. Without access to the statutorily mandated reviews and reports, the National Trust has been "deprived of key information that it relies on" in its stewardship mission, and it has been "precluded from" preserving a historic site "through [the National Trust's] normal process" of participating in public fora for commentary on development and construction regarding historic sites in the United States, including those of the CFA, NCPC, and NEPA. *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093-95 (D.C. Cir. 2015) (recognizing organizational injury for denial of "access to information and avenues of redress they wish to use in their routine" activities which thereby "inhibit[s] . . . daily operations") (quoting *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937-38 (D.C. Cir. 1986)); *see* Merritt Decl. ¶¶ 4-8 (recounting the National Trust's decades of influential participation in such processes).

These interests are simultaneously the core of what Congress sought to protect with the procedural requirements of each of the NCPC, CFA, and NEPA. *See, e.g.*, 40 U.S.C. § 8711(a) ("The National Capital Planning Commission is . . . created to preserve the important historical and natural features of the National Capital."); 45 C.F.R. § 2101.1(a)(1) (providing for CFA review of building plans that "affect the appearance of the city"); 42 U.S.C. § 4331(b)(4) (declaring that "preserv[ing] important historic, cultural, and natural aspects of our national heritage" constitutes an important goal of NEPA).

These harms are irreparable. The Supreme Court has emphasized that environmental injury "can seldom be adequately remedied by money damages" and "is often permanent or at least of long duration." *Amoco,* 480 U.S. at 545. Building on that principle, courts routinely recognize that NEPA's duties are "more than a technicality" and that the lack of adequate environmental consideration itself "looms as a serious, immediate, and irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 24 (D.D.C. 2009) (quoting *Found. on Econ. Trends v. Heckler,* 756 F.2d 143, 157 (D.C. Cir. 1985)); *see also Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,* 896 F.3d 520, 534, 536 (D.C. Cir. 2018) (rejecting argument that failing to conduct NEPA review was harmless or "merely a 'procedural deficienc[y],'" because "such an approach would vitiate" the statute). And, "[w]hen a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." 612 F. Supp. 2d at 24–25 (citing *Fund for Animals v. Norton,* 281 F. Supp. 2d 209, 221 (D.D.C. 2003)). Collectively, the procedural injury combined with the aesthetic and environmental injuries plainly demonstrate a "clear and present need for equitable relief." *Wis. Gas,* 758 F.2d at 674.

III.    **The Balance of Hardships and the Public Interest Weigh Overwhelmingly in Favor of the National Trust.**

Where the government is the defendant, the balance-of-equities and public-interest factors "merge." *See All. for Retired Ams. v. Bessent*, No. 25-0313, 2025 U.S. Dist. LEXIS 42019, at *36 (D.D.C. Mar. 7, 2025); *Nken v. Holder*, 556 U.S. 418, 435 (2009). In weighing the balance of equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24 (quotation omitted); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982).

These statutory schemes vindicate their cultural, aesthetic, historic, and environmental interests through a transparency mandate that provides the public with the opportunity to assess agency decision making. *See Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) ("NEPA's primary function is 'information-forcing,' compelling federal agencies to take a hard and honest look at the environmental consequences of their decisions.") (quoting *American Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018)); *id.* ("[S]uch effects can be, among others, historic, aesthetic, or cultural."). Accordingly, the public has a strong interest in the government's "meticulous compliance" with the law. *See Fund for Animals, Inc. v. Espy,* 814 F. Supp. 142, 152 (D.D.C. 1993); *Fund for Animals v. Clark,* 27 F. Supp. 2d 8, 15 (D.D.C. 1998) ("[T]he public interest expressed by Congress was frustrated by the federal defendants not complying with NEPA."). Freezing the status quo to conduct these statutorily mandated reviews therefore upholds the public interest. *See Oglala Sioux Tribe*, 896 F.3d at 536.

Moreover, all an injunction would require the Defendants to do is follow the statutorily required processes with which they should have complied in the first place. Where, as here, a plaintiff faces permanent injury and the defendants can show at most slight delay due to a statutory obligation to comply with the law as written, these factors favor the plaintiff. The D.C. Circuit

rejects the notion that mere delay to complete required procedures harms the public, emphasizing that agencies have no rightful interest in acting contrary to federal statutes. *See generally, Marin Audubon Soc'y v. FAA,* 121 F.4th 902 (D.C. Cir. 2024); *see also League of Women Voters v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016). The government has no cognizable interest in avoiding compliance with the laws Congress has enacted: "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters,* 838 F.3d at 12. The Defendants' actions are therefore contrary to what "Congress, in enacting [the National Capital Planning Act], declared to be in the public interest." *Id.* at 13. And on the other side of the ledger, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* at 12 (citing *Washington v. Reno,* 35 F.3d 1093, 1103 (6th Cir. 1994)).

A TRO that maintains the status quo will therefore cause no cognizable injury to the Defendants. While much damage has already been inflicted on the public through the demolition of the East Wing, the injunctive relief sought will merely ensure that this harm cannot be compounded by the construction of a Ballroom incompatible with its historic surroundings while this case proceeds. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (preliminary relief is appropriate to "maintain the status quo pending a final determination of the merits"). Courts routinely hold that preserving the status quo pending the outcome of litigation is in the public interest, including where there may be irreparable environmental or cultural harm absent this preliminary relief. *See, e.g.*, *Brady Campaign to Prevent Gun Violence,* 612 F. Supp. 2d at 24–25.

To the extent the Defendants claim they will suffer harm because they have already begun planning, soliciting bids, or tentatively scheduling work on the Ballroom, any such harm is "self-

inflicted" and carries little equitable weight. *See, e.g., League of Women Voters,* 838 F.3d at 12-13 (government cannot invoke harm flowing from its own unlawful actions to defeat injunctive relief). Moreover, any such harm would itself provide evidence in support of the procedural violations that merit injunctive relief, because it would indicate that the Defendants have prepared construction plans without any review or input from the NCPC or CFA. The Defendants chose to move forward with a major project on one of the nation's most significant sites without first undertaking the procedures Congress mandates. They cannot now rely on the costs of that premature decision to outweigh the National Trust's concrete and irreparable harms.

**IV.    Any Security Bond Requirement Should Be Waived Due To the National Trust's Nonprofit Status and Pursuit of Litigation in the Public Interest.**

In connection with the National Trust's request for injunctive relief in this case, the National Trust requests that the Court waive any security bond requirement.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "[t]he language 'in such sum as the court deems proper' has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (affirming order waiving bond due to the "public service" rendered by the plaintiff's suit). This "include[es] the discretion to require no bond at all." *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020).

Because of the National Trust's nonprofit status and limited funds, it has a strong policy against paying attorneys' fees, other than out-of-pocket expenses, when it participates in advocacy litigation. Merritt Decl. ¶ 14. Instead, it relies on *pro bono* representation when outside counsel is

needed, as in this case, or public interest lawyers whose discounted fees can be covered by other organizations. *Id.*

When the National Trust seeks injunctive relief in a case, the Trust has always requested, and virtually always received, a waiver of the security bond requirement based on the "public interest" nature of the litigation. *Id.* ¶ 15. The National Trust's litigation program is aimed at enforcing and vindicating the rights of the public as a whole, which are reflected in federal and state laws protecting historic properties. This policy is in furtherance of the National Trust's congressional charter, directing the Trust to "facilitate public participation" in historic preservation. 54 U.S.C. § 312102(a); Merritt Decl. ¶ 15.

"A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)). Such a situation arises where a bond would "hold Plaintiffs hostage" for the harm from the government's own unlawful conduct. *Id.* (noting that defendants "will personally face no monetary injury from the injunction").

The imposition of a security bond—as a condition for obtaining injunctive relief to temporarily delay construction or demolition activities that would harm historic resources—would have a direct chilling effect on the ability of the National Trust, and other public interest plaintiffs, to advance the public interest and enforce compliance with historic preservation laws through litigation. Merritt Decl. ¶ 16. If the financial burden of vindicating public rights were to fall on nonprofit organizations that bring enforcement actions, such as the National Trust, then the procedural rights and historic and cultural interests that Congress sought to protect through its

statutes—including NEPA and those creating the NCPC and CFA—would effectively be vitiated. *Id.*

The National Trust could not post a substantial injunction bond without diverting funds from other purposes and therefore reducing its historic preservation programs. Merritt Decl. ¶ 18. Alternatively, the National Trust would simply not be able to post such a bond at all, and would be unable to secure the injunction on which it was conditioned. *Id.* ¶ 19.

## CONCLUSION

The National Trust respectfully requests that this Court grant its Motion for Temporary Restraining Order and Preliminary Injunction, and enter an order enjoining the Defendants and those working in concert therewith or under their direction and control from taking any and all actions in furtherance of the physical development of the Ballroom Project, including but not limited to any further demolition, site preparation work, subsurface work, removal of debris, removal of soil, landscape alteration, vegetation or tree removal, grading, excavation, digging, trenching, boring, filling, blasting, laying of foundations, laying of utilities, pile driving, construction equipment installation, or other construction or related work at the White House or within President's Park. The National Trust requests that the Order and Injunction specify that no such work shall proceed until the requisite reviews have taken place in accordance with the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; until the Ballroom Project has been reviewed and approved of by the National Capital Planning Commission, and reviewed by the Commission of Fine Arts, *see* 40 U.S.C. §§ 8721(e), (h), 8722(b), 8722(d), 9102; *see also* 45 C.F.R. § 2101.1(a)(1); until adequate environmental assessments and environmental impact statements have been prepared under the National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.*; and until Congress has expressly authorized the construction of the Ballroom, *see* 40 U.S.C. § 8106.

Respectfully submitted,

Dated: December 12, 2025

*/s/ Gregory B. Craig*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006.
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice* forthcoming)
Matthew F. Casassa (*pro hac vice* forthcoming)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000