**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, <br><br> *Plaintiff,* <br><br> v. <br><br> **NATIONAL PARK SERVICE,** *et al.,* <br><br> *Defendants.* | Civil Action No. _____ |

## DECLARATION OF ELIZABETH S. MERRITT

1.    My name is Elizabeth S. Merritt, and I am Deputy General Counsel at the National Trust for Historic Preservation in the United States ("National Trust"). I have served in the National Trust's Law Department for more than 41 years, focused on advocacy to protect historic places throughout the nation, in both the administrative and judicial arenas.  As a result, I am very familiar with the National Trust's programs, and especially its advocacy and litigation activities. The facts set forth in this declaration are based upon my personal and professional knowledge and, if called as a witness in this proceeding, I could and would testify competently thereto under oath.

2.    The National Trust is a private charitable, educational, nonprofit corporation chartered by Congress in 1949 to further the historic preservation policies of the United States, and to facilitate public participation in the preservation of historic properties. See 54 U.S.C. § 312102(a).

3.    As part of the National Trust's public interest advocacy program, the National Trust has often participated in litigation to enforce federal, state, and local laws that protect historic places.  Since 1970, the National Trust has formally participated in hundreds of cases in

state and federal courts around the country, both as a plaintiff and as *amicus curiae*, and occasionally as an intervening defendant.

4.      The National Trust has a long history of active involvement in the federal project and planning review processes conducted by the National Capital Planning Commission ("NCPC"). For example, the National Trust has previously submitted testimony or comments to the NCPC over the course of many years regarding the following matters:

- Opposing demolition of historic officers' housing at Fort McNair (Feb. 2, 2023);
- Adverse impacts of McMillan Park development on President Lincoln's Cottage (Nov. 7, 2014);
- Comments regarding the Height Act (Oct. 25 and Nov. 19, 2013);
- Master Plan for Homeland Security Department headquarters at St. Elizabeths Hospital campus (Nov. 1, 2007 and Jan. 8, 2009);
- Proposed Vietnam Veterans Memorial Visitor Center (Dec. 6, 2007);
- Courtyard roof for Old Patent Office Building (June 2, 2005); and
- Closing of Pennsylvania Avenue in front of the White House (Mar. 12, 2003).

5.      In addition, I personally have submitted written or in-person testimony to NCPC on behalf of the National Trust regarding the following matters:

- Redevelopment of the McMillan Park site (Nov. 6, 2014);
- Proposed Vietnam Veterans Memorial Visitor Center (Aug. 3, 2006 and June 3, 2009);
- Courtyard roof for Old Patent Office Building (Sept. 8, 2005); and
- Washington Monument security and visitor facilities (May 1, 2003).

6.      The National Trust is also routinely and actively involved in review of environmental assessments ("EA") and environmental impact statements ("EIS") prepared by federal agencies pursuant to the National Environmental Policy Act ("NEPA").

7.      The National Trust frequently submits comments on NEPA documents, and is often involved in enforcing federal agency compliance with NEPA. *See, e.g., National Parks*

2

*Conservation Ass'n, et al. v. Semonite,* No. 18-5179 (D.C. Cir. Mar. 1, 2019); *Coalition Against a Raised Expressway (CARE), et al. v. Dole,* 835 F.2d 803 (11th Cir. 1988); *Druid Hills Civic Ass'n, et al. v. Federal Highway Admin.,* 772 F.2d 700 (11th Cir. 1985); *Citizen Advocates for Responsible Expansion, Inc. (I-CARE), et al. v. Dole,* 770 F.2d 423 (5th Cir. 1985); *City of South Pasadena, et al. v. Slater,* 56 F. Supp. 2d 1106 (C.D. Cal. 1999).

8.      In my decades of personal experience at the National Trust, the National Trust's commentary and advocacy before the NCPC and other governmental entities (whether federal, state, or local) has been highly influential. The National Trust's advocacy often results in modifications to proposed projects.

9.      The National Trust follows developments in preserving and interpreting the White House through, among other things, the White House Historical Association, and a representative of the National Trust serves as an ex officio member of the board of the Association.  The White House Historical Association is also co-steward, with the National Trust, of Decatur House. Decatur House, located adjacent to President's Park in Lafayette Square and owned by the National Trust since 1956, is itself a historic building and the first private residence built in the White House neighborhood. When the National Trust conducts board meetings in Washington, D.C., they are frequently held at Decatur House.

10.      On October 21, 2025, in response to the initiation of demolition of the White House East Wing, the National Trust's President and CEO, Carol Quillen, sent a letter to the Chair of the NCPC, the Acting Director of the National Park Service, and the Chair of the CFA. The letter expressed serious concerns about the failure to comply with the public review process for the Ballroom Project, and urged the Administration and the National Park Service to cease

3

demolition until after the required review procedures for the Ballroom Project had been completed.

11.    Because of the National Trust's concern regarding the failure to initiate review by the NCPC, I personally reached out to Meghan Hottel-Cox, General Counsel and Secretary at the NCPC, to inquire as to whether the NCPC had received any submissions regarding the White House Ballroom Project. And on December 3, 2025, I specifically mentioned my concern by email that construction of the Ballroom has already been initiated. Ms. Hottel-Cox responded by email on December 5, 2025 that "NCPC has not yet received a submission for the Ballroom project."

12.    Assuming that the Defendants do submit plans for the Ballroom Project to the NCPC and CFA, the National Trust intends to participate actively in the public comment process. In addition, the National Trust intends to submit comments in response to any NEPA document that is released to the public regarding the Ballroom Project. Among other things, the National Trust intends to express a concern that the massing and height of the proposed new construction will overwhelm the White House itself and may also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings, and to urge the NCPC and CFA to take these concerns into consideration. The ongoing demolition and construction activities severely harm the interests of the National Trust by foreclosing alternatives and modifications to the Ballroom Project that could avoid, minimize, and/or mitigate the adverse effects of the Project on the historic significance of the White House.

13.    In connection with the National Trust's request for injunctive relief in this case, the National Trust requests a waiver of any security bond requirement.

4

14.    Because of the National Trust's nonprofit status and limited funds, we have a policy against paying attorneys' fees, other than out-of-pocket expenses, when we participate in advocacy litigation.  Instead, we rely on *pro bono* representation when outside counsel is needed, as in this case, or public interest lawyers whose discounted fees can be covered by other organizations.

15.    When the National Trust seeks injunctive relief in a case, the Trust has always requested (and virtually always received) a waiver of the security bond requirement based on the "public interest" nature of our litigation.  The National Trust's litigation program is aimed at enforcing and vindicating the rights of the public as a whole, which are reflected in federal, state, and local laws protecting historic properties.  This policy is in furtherance of the National Trust's congressional charter, directing the Trust to "facilitate public participation" in historic preservation. 54 U.S.C. § 312102(a).

16.    The doctrine allowing a waiver of the security bond is based on the recognition that organizations such as the National Trust, acting as private attorneys general, have no personal or financial stake in the enforcement litigation and therefore prosecute lawsuits that benefit the public as a whole.

17.    The imposition of a security bond—as a condition for obtaining injunctive relief to temporarily delay construction or demolition activities that would harm historic resources— would have a direct chilling effect on the ability of the National Trust, and other public interest plaintiffs, to advance the public interest and enforce compliance with historic preservation laws through litigation.  If the financial burden of vindicating public rights were to fall on nonprofit organizations that bring enforcement actions, such as the National Trust, then the incentives intentionally created by Congress to encourage citizen suits and private attorney general actions,

(*see, e.g.,* 54 U.S.C. § 307105 (NHPA); 28 U.S.C. § 2412 (EAJA)), would be significantly reduced or eliminated.

18.     The National Trust could not post a substantial injunction bond without diverting funds intended for other historic preservation programs.

19.     Alternatively, the National Trust would simply not be able to post such a bond at all, and would be unable to secure the injunction on which it was conditioned.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 11th day of December, 2025.

*Elizbeth S. Meritt*
Elizabeth S. Merritt

6