# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

     v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**<u>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS
## TABLE OF CONTENTS

INTRODUCTION ........................................................................**Error! Bookmark not defined.**

BACKGROUND ........................................................................**Error! Bookmark not defined.**

    I.     Factual Background ................................................**Error! Bookmark not defined.**

    II.    Procedural History ................................................**Error! Bookmark not defined.**

STANDARD OF REVIEW ........................................................**Error! Bookmark not defined.**

ARGUMENT ............................................................................**Error! Bookmark not defined.**

    I.     Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits........... **Error! Bookmark not defined.**

        A.    Plaintiff Lack Standing to Sue. ...................**Error! Bookmark not defined.**

        B.    The Court Cannot Enjoin the President for Official Conduct............ **Error! Bookmark not defined.**

        C.    The President and the Park Service Have Statutory Authorization to Modify the White House............................**Error! Bookmark not defined.**

        D.    Plaintiff's NCPC and CFA Claims are Unripe or, Alternatively, Meritless. ....................................................**Error! Bookmark not defined.**

        E.     NPS Complied with NEPA.......................**Error! Bookmark not defined.**

        F.    Plaintiff Cannot Obtain Relief Against the GSA and Acting Administrator Rigas. ........................................................**Error! Bookmark not defined.**

    II.    Plaintiff Will not Suffer Imminent Irreparable Harm Absent Entry of a Temporary Restraining Order. ..............................**Error! Bookmark not defined.**

    III.   The balance of harms and the public interest weigh against injunctive relief. ....................................................................**Error! Bookmark not defined.**

    IV.   If an injunction is granted, Plaintiff should be required to post a bond......... **Error! Bookmark not defined.**

CONCLUSION............................................................................**Error! Bookmark not defined.**

## **TABLE OF AUTHORITIES**

**Cases**

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) .................................................................. 24

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) .................................................................. 17

*Aid for Women v. Foulston*,
  441 F.3d 1101 (10th Cir. 2006) ................................................................ 27

*Alcresta Therapeutics, Inc. v. Azar*,
  318 F. Supp. 3d 321 (D.D.C. 2018) ......................................................... 25

*Am. Fed'n of Gov't Emps. v. Trump*,
  318 F. Supp. 3d 370 (D.D.C. 2018) ......................................................... 17

*Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*,
  217 F.3d 393 (5th Cir. 2000) ................................................................... 20

*Brown v. District of Columbia*,
  888 F. Supp. 2d 28 (D.D.C. 2012) ........................................................... 26

*Bulova Watch Co. v. United States*,
  365 U.S. 753 (1961).................................................................................. 16

*California v. Trump*,
  613 F. Supp. 3d 231 (D.D.C. 2020) ......................................................... 25

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) .................................................................... 9

*Chem. Weapons Working Grp. v. U.S. Dep't of Army*,
  963 F. Supp. 1083 (D. Utah 1997) ........................................................... 21

*Cisneros v. Alpine Ridge Grp.*,
  508 U.S. 10 (1993).................................................................................... 16

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983).................................................................................... 11

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ................................................................... 24

*Climate United Fund v. Citibank, N.A.*,
  154 F.4th 809 (D.C. Cir. 2025) ................................................................ 27

*Dalton v. Specter*,
  511 U.S. 462 (1994).................................................................................. 14

*Data Systems Fed. Corp. v. Gen. Servs. Admin.*,
629 F. Supp. 350 (D.D.C. 1986) ..................................................................... 9

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety and Homeland Sec.*,
104 F. 4th 194 (3d. Cir. 2024) ........................................................................ 9

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004) ....................................................................................... 22

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ............................................................... 13

*Ethyl Corp. v. E.P.A.*,
51 F.3d 1052 (D.C. Cir. 1995) ....................................................................... 21

*Fisheries Survival Fund v. Jewell*,
236 F. Supp. 3d 332 (D.D.C. 2017) ......................................................... 24, 25

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................. 10, 11

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ....................................................................................... 13

*Fund For Animals v. Norton*,
281 F.Supp.2d 209 (D.D.C. 2003) ................................................................. 25

*Fund for Animals, Inc. v. Lujan*,
962 F.2d 1391 (9th Cir. 1992) ....................................................................... 21

*Garcia v. Acosta*,
393 F. Supp. 3d 93 (D.D.C. 2019) ................................................................. 11

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......................................................................... 14

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
383 F.3d 1082 (9th Cir. 2004) ....................................................................... 20

*Grunewald v. Jarvis*,
776 F.3d 893 (D.C. Cir. 2015) ....................................................................... 20

*Harris Cnty., Texas v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) ................................................................. 8

*Imagine Medispa, LLC v. Transformations, Inc.*,
999 F. Supp. 2d 862 (S.D. W. Va. 2014) ....................................................... 22

*In re Navy Chaplaincy*,
534 F.3d 756 (D.C. Cir. 2008) ....................................................................... 12

*Info. Ctr. v. Dep't of Justice*,
15 F. Supp. 3d 32 (2014) ............................................................................... 24

*Int'l Coal. for Religious Freedom v. Maryland,*
    3 Fed. App'x 46 (4th Cir. 2001) ...................................................................... 20

*K.G. ex rel. Garrido v. Dudek,*
    839 F. Supp. 2d 1254 (S.D. Fla. 2011) ........................................................... 27

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) ........................................................................................ 18

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................ 12

*Mississippi v. Johnson,*
    71 U.S.  (1867) ............................................................................................... 13

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ........................................................................................ 24

*Mountain States Legal Found. v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002) ...................................................................... 16

*Munaf v. Geren,*
    553 U.S. 674 (2008) .......................................................................................... 8

*Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.,*
    779 F. Supp. 3d 53 (D.D.C. 2025) .................................................................. 10

*Nat'l Parks Conservation Ass'n v. Semonite,*
    282 F. Supp. 3d 284 (D.D.C. 2017) ................................................................ 25

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ...................................................................... 12

*Nevada v. Dep't of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) .......................................................................... 21

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ...................................................................... 14

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................................... 9

*NRDC v.EPA,*
    658 F. Supp. 2d (2nd Cir. 2011) ................................................................ 13, 20

*R.J. Reynolds Tobacco Corp. v. U.S. FDA.,*
    810 F.3d 827 (D.C. Cir. 2016) ........................................................................ 11

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
    605 U.S. 128 (2025) ...................................................................... 19, 20, 22, 25

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015) .......................................................................... 19

v

*Stanley Co. of Am. v. McLaughlin*,
  195 F. Supp. 519 (D.D.C) ................................................................... 19

*United States v. 0.95 Acres of Land*,
  994 F.2d 696 (9th Cir. 1993) ............................................................. 23

*United States v. Chemical Found., Inc.*,
  272 U.S. 1 (1926) ............................................................................... 11

*Utah Ass'n of Cntys. v. Bush*,
  316 F. Supp. 2d 1172 (D. Utah 2004) ................................................ 20

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
  302 F. Supp. 2d 672 (S.D. Tex. 2004) ............................................... 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................. 8

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................... 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ........................................................................... 15

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ............................................................................... 17

**Statutes**

3 U.S.C. § 105 ........................................................................................ 16

40 U.S.C. § 104 ...................................................................................... 19

40 U.S.C. § 8106 ........................................................................ 15, 16, 17

40 U.S.C. § 8711 .................................................................................... 15

40 U.S.C. § 8711(a) ............................................................................... 15

40 U.S.C. § 8722 .................................................................................... 15

40 U.S.C. § 8722(b)(1) .......................................................................... 18

42 U.S.C. § 4331 ...................................................................................... 5

42 U.S.C. § 4331(b)(4) .......................................................................... 22

42 U.S.C. § 4332(2)(C)(i) ...................................................................... 22

42 U.S.C. § 4332(C) .............................................................................. 19

42 U.S.C. § 4336(a)(3) ........................................................................... 23

42 U.S.C. § 4336(b)(2) ..................................................................... 20, 21

42 U.S.C. § 4336a(c) ............................................................................. 21

54 U.S.C. § 101101 ................................................................................................ 16

54 U.S.C. § 307104 .......................................................................................... 16, 23

**Rules**

Fed. R. Civ. P. 65(c) .............................................................................................. 27

**Regulations**

45 CFR 2101.1 ................................................................................................. 18, 19

**Other Authorities**

Pub. L. No. 87-286 (1961) ...................................................................................... 17

## INTRODUCTION

The Constitution makes the President of the United States the head of the Executive Branch and the sole organ of American foreign policy, and it requires the President to "receive Ambassadors and other public Ministers." It is entirely fitting, then, that the presidential residence and workplace be equipped for that purpose. Given modern needs, the White House is not. For want of an appropriate facility, beginning with President Eisenhower presidents have been forced to host state dinners in temporary tents pitched on the White House grounds. To rectify that untenable situation, President Trump set about to adapt the White House to the evolving needs of the presidency. That project, the East Wing Modernization and State Ballroom Project ("the Project"), follows in a long line of major presidential renovations of the White House—President Monroe's South Portico, President Jackson's North Portico, President Theodore Roosevelt's West Wing, President Taft's Oval Office, President Wilson's Rose Garden, President Franklin D. Roosevelt's East Wing and bomb shelter, President Truman's balcony, and President Nixon's briefing room. All changed the look and function of the President's residence, sometimes substantially so. Many were controversial in their day. None was circumscribed by Congress or constrained in the manner Plaintiff seeks.

Plaintiff the National Trust for Historic Preservation seeks an emergency injunction to prevent further work on the Project and asserts a panoply of statutory challenges against the President and Federal agency Defendants.[1] But there is no basis for the emergency relief Plaintiff seeks because its claims fail at the threshold of justiciability. Plaintiff's claims

---

[1] The Federal agency Defendants are the Department of the Interior, the National Park Service, the General Services Administration, the Secretary of the Interior, the Acting Director of the National Park Service, the Superintendent of the White House and President's Park, and the Acting Administrator of the General Services Administration.

1

concerning demolition of the East Wing are moot because the demolition has already occurred and cannot be undone.  As for future construction, Plaintiff's claims are unripe because plans are not final. Plaintiff cannot establish irreparable harm because there will be no above-ground construction until April.  And Plaintiff cannot obtain redress from this Court, because the sole relief they seek—consultation with the National Capital Planning Commission and the Commission of Fine Arts—although not required by law, will soon be underway without this Court's involvement.

Even if Plaintiff could overcome the threshold barriers of mootness, ripeness, and lack of standing, Plaintiff would fail to meet each of the stringent requirements necessary to obtain such extraordinary preliminary relief.

First, Plaintiff cannot show a likelihood of success on the merits.  Congress did not circumscribe the power presidents have always exercised to control and modify the structure of the White House.  Indeed, the Supreme Court, the D.C. Circuit, and this Court have all recognized repeatedly that "the President is not an 'agency'" "under the APA," and thus his actions are not subject to review under that statute or the National Environmental Policy Act ("NEPA").  The President possesses statutory authority to modify the structure of his residence, and that authority is supported by background principles of Executive power.  Moreover, the Court cannot enjoin his official conduct.  And Defendants have not failed to comply with various environmental and planning requirements even assuming they apply.  The National Capital Planning Act ("NCPA") covers plans originated by an agency for construction.  Neither the NCPC nor the Commission of Fine Arts ("CFA") is required to review demolition or site preparation.

Second, Plaintiff cannot show it is likely to suffer imminent irreparable harm absent a 14-day injunction.  As an initial matter, the Project has been public for months; Plaintiff's delay in seeking emergency relief is fatal to its request now.  And because Defendants will solicit input from the NCPC and CFA before above-grade construction occurs, Plaintiff's entire theory of harm fails.

Third, the equities patently favor permitting current below-grade work to continue, given the security concerns inherent in leaving the East Wing foundation area unfinished.

The Court should deny Plaintiff's request for a temporary restraining order.

## BACKGROUND

### I.    <u>Factual Background</u>

The White House has been the home and office of every President of the United States after George Washington. Ex. 1A, Project Environmental Assessment ("EA") at 1.  It has been expanded multiple times and has been subject to many major and minor renovations since construction began in 1792.  *Id.*, Table 1 ("Notable Changes to the White House") at 12; *see also* Ex. 1B, Finding of No Significant Impact ("FONSI") at 1.  Many of those projects were highly controversial in their time yet have since become accepted—even beloved—parts of the White House.

For example:

- In 1801, President Jefferson added the East and West Colonnades to connect the main residence to the service buildings, which "faced immediate criticism for their cost and perceived extravagance." *See*, An Ever-Changing White House, The White House Historical Association.[2]

---

[2]    *Available at* https://www.whitehousehistory.org/an-ever-changing-white-house (last visited Dec. 15, 2025)

- President Monroe added the iconic South Portico, and President Andrew Jackson added the North Portico in 1829-1830 to address "the building's lack of a formal entryway on its northern side." *Id*.; *see also* EA at 12.  The North Portico, too, was "controversial … [s]ome critics felt the portico's classical design was too ostentatious for a democratic republic.  Nevertheless, the North Portico became a defining feature, now synonymous with the public face of the White House." *Id*.

- President Chester Arthur undertook a "lavish redecoration of the White House interior in 1881-1883"; this too was met with criticism "calling it extravagant for a public building[.]" *Id*.

- In 1902, President Theodore Roosevelt removed Victorian-era greenhouses and replaced them with the West Wing, separating "the president's private residence from the growing administrative functions of the presidency[.]" *Id*.  This project "sparked outrage among preservationists and horticultural enthusiasts." *Id*.

- President Franklin D. Roosevelt added the East Wing in 1942; this "construction was highly controversial[.]" *Id*.

- Under President Harry Truman, "[p]erhaps the most significant renovation in White House history" took place; "a complete gutting of the interior from 1948 to 1952." *Id*. President Truman's "renovation shocked the public and drew intense scrutiny. Preservationists mourned the loss of original interiors, while media outlets questioned the project's cost during post-war economic recovery." *Id*.

- Under President John F. Kennedy, the Rose Garden was added in 1962, which "faced criticism at the time." *Id*.

4

- In 1970, President Richard Nixon built the press briefing room on the site of the White House's swimming pool, to allow the President to speak to the American people through modern media. *Id.* The pool itself had been built in 1933 for President Franklin D. Roosevelt. *Id.* This decision "was met with dismay by historians and preservationists." *Id.*

In 2000, the National Park Service's ("NPS") Comprehensive Design Plan for the White House and President's Park (the "Park") first identified the need for expanded event space to address growing visitor demand and provide a venue suitable for significant events. *Id.* Left unaddressed for over two decades, in 2025 President Trump determined that a secure event space was required. Accordingly, because the White House and President's Park are primarily managed by the Park Service, the Park Service engaged in a planning process under NEPA, 42 U.S.C. § 4331, *et seq.*

The Executive Office of the President ("EOP") outlined three functional goals for the Project: "(1) immediate adjacency to the Executive Mansion (2) a direct ceremonial procession from the East Room into the venue, and (3) secure second-story access from the Executive Residence." Ex. 1A. While the President is not subject to NEPA (or, indeed, the APA) NPS prepared an EA which supported the issuance of a FONSI. Ex. 1B. In addition, NPS documented compliance with the National Historic Preservation Act ("NHPA") for those limited portions of the Project which would take place outside the area exempted from application of the National Historic Preservation Act under Section 107 of that statute. Ex. 1C. In furtherance of the EOP's goals, the selected action in the August 2025 FONSI was the "replac[ement of] the existing East Wing of the White House with a new building that will house the White House State Ballroom." *Id.*

The Project is now proceeding under the leadership of the Office of the Executive Residence ("EXR"), with continued consultation by NPS.  The President has been intimately engaged in the implementation phase, including participation in discussions regarding design and footprint and personally selecting the architect for the Project.  *See* Ex. 2, Stanwich Decl.

In August 2025 the Superintendent of the Park and the White House Curator's Office began identifying and removing museum objects, including paintings and historic furniture, from the East Wing, East Colonnade, and the Ground Floor State Rooms of the White House to be stored or curated at the Executive Support Facility.  Stanwich Decl. 12.  That same month, NPS's Heritage Documentation Program completed Historic American Building Survey documentation of the East Wing and East Colonnade, including 3D/LIDAR scanning and photo documentation to create a digital twin of the East Wing and East Colonnade spaces for future preservation and interpretive purposes.  Stanwich Decl. 14.  And, in coordination with the Project contractor, historic material was salvaged and is being stored for future re-use, including the East Wing cornerstone and plaque, historic fencing, historic windows, light fixtures, and the IM Pei-designed pergola from the East Garden.  Stanwich Decl. 15.

After completion of those extensive preparatory activities, demolition of the historic East Wing structure by an outside contractor engaged by EXR began on October 20, 2025. Stanwich Decl. 16.  Above-grade demolition was completed on December 5, 2025 and as of the date of filing, below-grade demolition and excavation is still ongoing.  Stanwich Decl. 19.  The NPS anticipates that work on footings and below-grade structural concrete will begin in the East Colonnade area in January, and in the East Wing area in February.  Stanwich Decl. 19.  In an exercise of its discretion, EOP is preparing for submission of draft architectural drawings and other materials regarding the Project to the National Capital Planning Commission and the U.S.

Commission on Fine Arts.  Stanwich Decl. 21.  The designed of the Project is continuing and
will be informed by these consultations. Above-grade structural work is not expected to begin
until April 2026 at the earliest. Stanwich Decl.  20.

## II.    Procedural History

Plaintiff alleges eight causes of action. Compl. ¶¶ 105–69.  In Count 1, Plaintiff alleges
that the agency defendants have violated the Administrative Procedure Act ("APA") by failing to
advise and consult with the National Capital Planning Commission ("NCPC") about future
stages of the Project.  *Id.* ¶¶ 105–21.  In Count 2, Plaintiff alleges that the agency defendants
have violated the APA by failing to advise and consult with the NCPC prior to demolition of the
East Wing.  *Id.* ¶¶ 122–28.  In Count 3, Plaintiff alleges that the agency defendants have violated
the APA by failing to consult with the U.S. Commission of Fine Arts ("CFA") about future
stages of the Project.  *Id.* ¶¶ 129–34.  In Count 4, Plaintiff alleges that the agency Defendants
have violated the APA by initiating the Project before conducting an EA pursuant to the NEPA.
*Id.* ¶¶ 135–40.  In Count 5, Plaintiff alleges that the agency Defendants have violated the APA
by failing to prepare an EA or Environmental Impact Statement ("EIS").  *Id.* ¶¶ 141–47.  In
Count 6, Plaintiff alleges that, if an EA an EPA was prepared, the agency defendants have
violated the APA by conducting an EA limited to only portions of the Project.  *Id.* ¶¶ 148–53.  In
Count 7, Plaintiff alleges that the agency Defendants have violated the APA by failing to gain
congressional approval for the Project.  *Id.* ¶¶ 154–60.  And in Count 8, Plaintiff alleges that the
President has violated the Property Clause of the Constitution by demolishing the East Wing and
initiating the Project. *Id.* ¶¶ 161–69.  Plaintiff seeks declaratory and injunctive relief for these
alleged violations, including an "until an EIS has been prepared and published; the NCPC and
the CFA have reviewed the plans for the Ballroom Project; the NCPC has approved the plans for

7

the Ballroom Project; Congress has expressly authorized the Ballroom's construction; and the public has had time and opportunity to comment." *Id.* Prayer for Relief ¶ ii.

On December 12, 2025, Plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction. Pl.'s Mot. for Temp. Restraining Order and Prelim. Inj. ("Pl.'s Mot."), Dkt. No. 2. Plaintiff seeks relief based on all counts in its Complaint. Pl.'s Mem. In Supp. of Mot. for T. R. O. and Prelim. Inj. ("Pl.'s Mem."), Dkt. No. 2-1. Plaintiff seeks the same relief in its Motion as in its Complaint. *Compare* Compl., Prayer for Relief ¶¶ i–v, *with* Pl.'s Mem. at 51.

On December 12, 2025, the Court entered a Minute Order setting a December 15, 2025, 5:00 PM deadline for Defendants to response to the Motion and scheduling a hearing on the Motion for December 16, 2025.

## STANDARD OF REVIEW

A temporary restraining order, as with a preliminary injunction, is "an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To obtain a preliminary injunction, the moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-22 (2008). "The last two factors merge when the government is a party." *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[3]

---

[3]    Although Plaintiff advocates for use of a "sliding scale" standard, the D.C. Circuit has recently questioned whether that approach remains valid considering recent Supreme Court precedent. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). Plaintiff's Motion fails under either approach.

"In the context of the limited purpose of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure preservation of the status quo." *Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986). Said differently, "[c]ase preservation is … the main reason that the benefits of a preliminary injunction may outweigh its risks"; consequently, "[c]ourts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F. 4th 194, 201 (3d. Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (Mem.) (2025).

## ARGUMENT

As described below, there is no basis for Plaintiff to obtain emergency relief. To the extent Plaintiff seeks to challenge the demolition of the East Wing, it plainly fails to request the type of *prospective* injunctive relief this Court may order. If Plaintiff instead complains of ongoing below-grade construction activities, it fails to demonstrate a risk of imminent irreparable harm, or that its concerns outweigh the substantial security equities that favor permitting construction to continue. If Plaintiff challenges Defendants' compliance with various procedural requirements, its claims are either moot or unripe, given the NPS conducted a NEPA review and planning submission is forthcoming. To the extent Plaintiff challenges the actions of the President, specifically, under those statutes, they miss the mark because his actions are not subject to review under them. And, finally, if Plaintiff challenges the prospective construction of the Ballroom, its suit is premature given no plans have been finalized and above-grade work will not begin until April, long after any temporary restraining order has expired. In sum, there is no reason Plaintiff needs emergency relief *now*.

## I. Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits.

Plaintiff raises a panoply of challenges to the Project, but for none can it show a likelihood of success.  Some of Plaintiff's challenges are improper attempts to circumscribe the President's authority through statutes that bear on agency, rather than Presidential, action.  Some are facially unripe.  And some are moot by virtue of the environmental analysis conducted by the NPS.  Regardless of the specific rationale, none supports a grant of extraordinary emergency relief given the misfit between when Plaintiff chose to sue and the actions (past and prospective) it seeks to enjoin.

**A.  Plaintiff's Claims Variously Fail for Lack of Standing, as Unripe, and as Moot.**

"To obtain a preliminary injunction, '[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction', including standing to sue."  *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 60–61 (D.D.C. 2025) (alterations in original) (citation omitted).  The burden of proving standing falls on Plaintiff, who "must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).  Here, Plaintiff seeks emergency relief based on injuries that are either: (a) moot; or (b) prospective, and thus definitionally unripe.

As to the first, to the extent Plaintiff seeks to establish standing based upon the demolition of the East Wing, that action has already occurred and cannot be undone.  It therefore fails to meet the basic requirement that "that the injury likely would be redressed by the requested judicial relief."  *Id.* at 368; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

So too, if Plaintiff's standing is premised on a claimed procedural injury stemming from Defendants' alleged noncompliance with NEPA, those claims are moot.[4]  The Park Service prepared an EA and FONSI and recently posted those on the Project website.  *See* Ex. 1, Bowron Decl. ¶ ¶ 9-10.

As to the second, Plaintiff's alleged prospective injuries are unripe. "The ripeness doctrine subsumes two inquiries: first, the Article III requirement of standing, which requires a plaintiff to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending,' and, second, 'prudential reasons for refusing to exercise jurisdiction.'" *Garcia v. Acosta,* 393 F. Supp. 3d 93, 103 (D.D.C. 2019) (citation modified); *R.J. Reynolds Tobacco Corp. v. U.S. FDA.*, 810 F.3d 827, 830 (D.C. Cir. 2016) ("Both doctrines address the imminence issue, using the same focus on contingencies that may render the risk of harm too slight.").  To the extent Plaintiff complains of harms stemming from submission to the National Capital Planning Commission or Commission on Fine Arts, EOP intends to commence the statutory consultation process this month.  Ex. 3, Stidham Decl.  4; Stanwich Decl.  22.  Thus, Plaintiff can point to no "actual and imminent" deprivation of procedural rights.  In fact, with the imminent commencement of these processes and the completion of the NEPA process, Plaintiff is suffering no procedural injury at all, and their speculation that Defendants will circumvent the appropriate processes have runs contrary to basic tenets of administrative law.  *See United States v. Chemical Found.*, *Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers,

---

[4]     Plaintiff alleges a variety of procedural injuries. Plaintiff complains about the denial of procedural rights under "[t]he National Capital Planning Act, the CFA's enabling statute, and NEPA," Pl.'s Mem. at 44, and deprivation of "'information that it relies on'" in its stewardship mission'" because of not having "access to the statutorily mandated reviews and reports." *Id*. at 45 (citation omitted).

and, in the absence of clear evidence to the contrary, courts presume that they have properly

discharged their official duties.").

Plaintiff's alleged aesthetic injuries likewise fall short, particularly in the context of a 14-

day temporary restraining order.  *See* Pl.'s. Mem. at 45 (alleging Plaintiff's members "have

suffered aesthetic, cultural, and historic harms from the Defendants' demolition of the East

Wing; and will continue to suffer further mounting harms from the construction of the Ballroom

in the manner proposed.").  Work completed to-date involves the demolition of prior above-

grade East Wing structure, with below-grade demolition expected to be completed in December.

Stanwich Decl. ¶ 20. From December through March work will solely consist of below-grade

foundational and related work (such as support of excavation and deep foundation work) in

preparation for above-grade work.  *Id*. ¶ 19-20.

Indeed, above-grade structural work will not occur until April 2026, at the earliest.  *Id*. ¶

20-21.  And critically, the architectural design for the above-grade elements is still in progress.

Conjecture about the end-result of the ongoing design and consultation processes does not

provide a legally cognizable basis for standing, and is instead the sort of "remote, speculative,

conjectural or hypothetical" injuries that cannot give rise to standing.  *In re Navy Chaplaincy*,

534 F.3d 756, 760 (D.C. Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992)).  Ultimately, depending upon the final configuration and architectural elements of the

Project, Plaintiff may have different objections or no objections at all, which would eliminate the

need for future judicial intervention altogether.  *See Nat'l Treasury Emps. Union v. United

States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("[T]he usually unspoken element of the rationale

underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to.").

In sum, Plaintiff's claims are constitutionally and prudentially unripe, given the lack of an actual or imminent injury.

**B. The Court Cannot Enjoin the President for Official Conduct.**

Plaintiff has not and cannot succeed on its claims against the President because no court may award injunctive and/or declaratory relief against the President for his official conduct. Further, as Plaintiff recognizes, *see* Pls.' Mem. at 25, fn. 2, APA claims cannot be stated against the President, as the President is not subject to the APA.[5]  What Plaintiff pervasively fails to recognize, however, is that as a result, the President is not subject to review under the relevant procedural statutes. *See, e.g.*, *NRDC v. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009). As a result, its undifferentiated arguments about "Defendants" complying with NEPA, NHPA, and APA requirements miss the mark every time as applied to the President.

In naming the President, Plaintiff seeks an order enjoining the President from taking a non-ministerial action.  As this Court has explained, however, "[s]ound separation-of-power principles counsel the Court against granting these forms of relief against the President directly." *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)).  In *Franklin*, the Supreme Court affirmed that injunctive relief is presumptively unavailable against the President for performance of his official duties, noting that "in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" 505 U.S. at 802–03 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

---

[5]    Because relief is not available against the President, Defendants intend to move to dismiss the President as a named Defendant to this action by separate motion.

This conclusion applies with particular strength where, as here, Plaintiff ascribes no particular statutory duty to the President but instead cites the Property Clause of the Constitution and gestures at duties imposed by statute on agencies, not the President. *See* Pl.'s. Mem. at 40-43. Plaintiff may not transform statutory claims into constitutional ones simply by applying a constitutional label to them. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) ("[I]f every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* would be broadened beyond recognition"); *see also Glob. Health Council v. Trump*, 153 F.4th 1, 16–17 (D.C. Cir. 2025) (finding that "statutory claims cannot be transformed into constitutional ones" and that a claim of the President's violation of the Constitution is not reviewable where "the constitutional claim is predicated on underlying statutory violations"). Plaintiff cannot bootstrap the President into this case simply by alleging that the Project is unauthorized by statute and thus *must* be based on an indeterminate assertion of executive power.

### C. The President and the NPS Have Statutory Authorization to Modify the White House.

Though Plaintiff stridently argues to the contrary, Congress has not statutorily constrained the President's authority to modify the White House grounds to suit Executive needs and functions.

Plaintiff's argument begins with the premise that because the Constitution vests control over federal property in Congress through the Property Clause, the President lacks authority to unilaterally build or demolish anything on federal land. Pl.'s Mem. at 40. Accordingly, Plaintiff makes the sweeping claim that "the President can point to no statute that provides him with authority—discretionary or otherwise—to demolish the East Wing or construct a ballroom in its

place."[6]  *Id.* at 42.  Plaintiff disregards, however, that not only does the President have statutory authority for the Project, but that his statutory authority is buttressed by longstanding background principles of Executive power.  Together, both sources of authority render Plaintiff's argument meritless.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.").

Plaintiff's argument hinges on 40 U.S.C. § 8106, enacted in 1912, which states that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."  If § 8106 remains operative at all following passage of the National Capital Planning Act ("NCPA"),[7] it has no application to the President.  Instead, the President possesses affirmative

---

[6]    Plaintiff also suggests that the Project is not an "official act," Mem. at 43, such that the President can be enjoined.  But as the NPS has explained, the Project is being pursued to develop "a secure event space to host large events, such as State Dinners." Stanwich Decl. at (7). This purpose accords with the President's express constitutional duty to "receive Ambassadors and other public Ministers."  U.S. Const. art. II, § 3, cl. iii.  Plaintiff's disagreement over the necessity of the Project does not render it "unofficial" such that the Court could take the extraordinary step of enjoining the President.

[7]    Long after passing § 8106, Congress passed the NCPA, a detailed scheme for authorizing buildings on federal land in the District of Columbia (along with the broader region in Maryland and Virginia).  40 U.S.C. § 8711 *et seq*.  The NCPA created the NCPC, "the central federal planning agency for the Federal Government in the National Capital, created to preserve the important historical and natural features of the National Capital."  40 U.S.C. § 8711(a).  The NCPA mandates that "[a]gencies of the Federal Government responsible for public developments and projects shall cooperate and correlate their efforts by using the [NCPC] as the central planning agency for federal activities in the National Capital region."  40 U.S.C. § 8722. This later-in-time, and more specific, statute controls as to Congress's regulatory scheme for development in the District of Columbia, as "a specific statute controls over a general one[.]" *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961).

statutory authority to alter and improve the White House—authority that expressly overrides other laws like § 8106.[8]  In 3 U.S.C. § 105 (first enacted in 1948), Congress authorized appropriations to be made "*to the President*" on an ongoing basis *"*such sums as may be necessary for . . . the care, maintenance, repair, *alteration*, refurnishing, *improvement*, air-conditioning, heating, and lighting … of the Executive Residence at the White House." *Id.* §105(d) (emphasis added).  Critically, Congress vested *in the President* the authority to "expend[]" "[s]ums appropriated under this subsection . . . as the *President* may determine, *notwithstanding the provisions of any other law*." *Id.* (emphasis added).[9]   As the Supreme Court has explained, "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp*., 508 U.S. 10, 18 (1993).  Taken in its totality, the specific grant of authority in 3 U.S.C. § 105 authorizes the President to make changes to the White House regardless of any generic bar on constructing buildings without specific authorization in 40 U.S.C. § 8106.  *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002) (Congress may delegate authority to the Executive under the Property Clause).  The Project thus represents a natural application of the authority Congress granted to the President to alter and improve the White House; *see also AFL-CIO v. Kahn*, 618 F.2d 784, 788 (D.C. Cir. 1979) ("[B]y emphasizing the leadership role of the President in setting

---

[8]      Congress has regularly recognized the unique nature of the White House and the inherent separation of powers concerns that arise with interference with the day-to-day management of the property. For example, the National Historic Preservation Act imposes requirements on the management of federal property nationwide, but specifically exempts the White House and its grounds, along with the Supreme Court. *See* 54 U.S.C. § 307104.

[9]      In a recent federal appropriations bill, Congress appropriated funds to the President pursuant to this provision. *See* Further Consol. Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 532 (2024).

Government-wide procurement policy on matters common to all agencies, Congress intended

that the President play a direct and active part in supervising the Government's management

functions."); *cf. Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370, 414 (D.D.C. 2018)

(finding that a "combination of statutory authority and constitutional authority provides the

President with sufficient power" to regulate Executive functions), *rev'd and vacated on other*

*grounds by* 929 F.3d 748 (D.C. Cir. 2019).

      Finally, while the administrative park unit known as "the White House and President's

Park" is managed as a unit within the National Park System, Congress has consistently

recognized the President's singular control over the White House, given its status as the

Executive residence.  *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015)

(explaining "accepted understandings and practice" may provide "strong support" for resolving

separation-of-powers question).  Indeed, when Congress designated "the White House and

President's Park" as part of the National Park System unit, it clarified that "nothing done under

this Act shall conflict with the administration of the Executive offices of the President or with the

use and occupancy of the buildings and grounds as the home of the President and his family and

for his official purposes."  Pub. L. No. 87-286, 75 Stat. 586 (1961).

      For all these reasons, Plaintiff's claims under the Property Clause and 40 U.S.C. § 8106

are unlikely to succeed on the merits.

### D.  Plaintiff's NCPC and CFA Claims are Unripe or, Alternatively, Meritless.

      Plaintiff argues that Defendants have violated the APA by failing to submit the Project to

the NCPC and CFA.  However, as discussed above, Defendants intend to submit plans before

commencing construction on the above-grade elements.  *See* Stidham Decl. ¶4; Stanwich Decl. ¶

17

22.  Accordingly, Plaintiff is unlikely to succeed on its claims as to the CFA and NCPC because they are patently unripe for the reasons already explained.[10]

Regardless, and as to the NCPC, Plaintiff argues that review is required before commencing *any* activity, including demolition.  But the plain text of the NCPA illustrates the fallacy of this argument.  Under the NCPA's scheme, "before preparing *construction plans* the agency originates for proposed developments and projects … shall advise and consult with the Commission." 40 U.S.C. § 8722(b)(1) (emphasis added).  For this reason, the NCPC "has long denied that it has jurisdiction over demolition and site preparation work for federal buildings on federal property."[11]

For the same reason, Plaintiff is unlikely to succeed on its claims as to the CFA.  The CFA's jurisdiction is limited to "public buildings to be erected in the District of Columbia[.]" 45 CFR 2101.1.  In such instances, "the Commission comments and advises on the plans and on the merits of the designs before final approval or action."  *Id.*  The plain text of the operative regulations thus makes clear the CFA has jurisdiction only over whatever will eventually be erected, not prior demolition.  *See Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (As with statutory interpretation, proper regulatory interpretation starts with the plain meaning of the regulation, because if a regulation "just means what it means—[ ] the court must give it effect, as the court would any law.").  And because review of construction plans is ongoing, there has not been any triggering event for Commission review.

---

[10]    The appointment of the new CFA board to review any submission is underway. Stanwich Decl. ¶ 21.

[11]    *See* https://www.ncpc.gov/docs/open_gov_files/transcripts/2025/2025_09_04_NCPC.pdf (Accessed Dec. 15, 2025).

Even if Plaintiff's claims were not premature, they have at least two threshold problems. First, Congress created the CFA to be composed of judges of the fine arts, whose duty was to advise on the location "in the public squares, streets, and parks" of "statutes, fountains, and monuments, (but not buildings) and to advise "generally upon questions of art when required to do so by the President, or by any committee of either House of Congress." 40 U.S.C. § 104; *see also Stanley Co. of Am. v. McLaughlin*, 195 F. Supp. 519, 520 (D.D.C), *aff'd sub nom. Stanley Co. of Am. v. Tobriner,* 298 F.2d 318 (D.C. Cir. 1961). Because EOP is managing this project, *see* Bowron Decl.,  the President is the only entity that may initiate Commission review for this Project.  Thus, nothing in the statute takes away discretion from the President or requires the President to engage with the CFA. 45 C.F.R. § 2101.1.  Second, Plaintiff envisions a CFA review process that lacks textual support.  Plaintiff argues that if Defendants had submitted "a plan to the CFA," they and "other members of the public could—and would— have provided comments." Pls.' Mem. at 22.  But there is no statutory or regulatory requirement that the CFA's review include public comment, whether from the Plaintiff or others.

In sum, Plaintiff has failed to demonstrate a likelihood of success on either their NCPA or CFA claims.

**E.  NPS Complied with NEPA.**

Plaintiff is similarly unlikely to succeed on its NEPA claim.  Under NEPA, federal agencies are required to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  In determining whether an EIS is required, an agency may prepare an EA, which is "a preliminary consideration of potential environmental effects in a 'concise public document' designed to

'provide sufficient evidence and analysis for determining whether' an EIS is needed." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (citation omitted).

Earlier this year the Supreme Court clarified that broad principles of deference apply to a court's review of an agency's analysis under NEPA. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025) (explaining that the "bedrock principle" governing review in NEPA cases is "deference"). In particular, the Court explained, an agency's "predictive and scientific judgments" are entitled to "substantial deference." *Id.* at 181; *see also id.* at 183 ("[A]n agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" to which "[c]ourts should afford substantial deference" and which they "should not micromanage"). As such, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (citation omitted).

Given the above, Plaintiff's claim fails. As an initial matter, NEPA is inapplicable to Presidential action. *See Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1088 (9th Cir. 2004) ("NEPA's procedural requirements do not apply to presidential action."); *see also Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1194 (D. Utah 2004). To the extent the actions Plaintiff challenges are those of the President, rather than Executive agencies, its NEPA claims fail at the threshold.

Second, Plaintiff alleges that even if any EA was prepared, it would be insufficient because it was not published. But, as Declarant Bowron explains, the NPS prepared an EA and attendant Finding of No Significant Impact ("FONSI") prior to ground disturbing activities for the Project, and recently published those documents. *See* Ex. 1. That EA is definitionally a

"concise public document prepared . . . to set forth the basis of [the] agency's finding of no

significant impact . . . ." 42 U.S.C. § 4336(b)(2).  Thus, Plaintiff's argument on this point is

moot.  *See Int'l Coal. for Religious Freedom v. Maryland*, 3 Fed. App'x 46, 47 (4th Cir. 2001)

(noting, in case challenging task force's preparation of report, that "request for injunctive relief

was mooted by issuance" of the report); *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*,

217 F.3d 393, 396 (5th Cir. 2000) ("We have consistently found that a request for injunctive

relief is moot when the event sought to be enjoined has occurred.").

 Alternatively, if what Plaintiff takes issue with is the *timing* of publication, that too does

not violate the statutory requirements.  *See* Pl.'s Mem. at 28 (claiming Defendants "have robbed

the public of any opportunity to comment on these activities.").  NEPA contains no such pre-

publication public comment requirement with respect to EAs.  *Compare* 42 U.S.C. § 4336a(c)

("Each notice of intent to prepare an environmental impact statement under section 4332 shall

include a request for public comment on alternatives or impacts and on relevant information,

studies, or analyses with respect to the proposed agency action"), *with* 42 U.S.C. § 4336(b)(2);

*see also Ethyl Corp. v. E.P.A.*, 51 F.3d 1052, 1061 (D.C. Cir. 1995) (explaining that "the familiar

maxim of statutory construction: *expressio unius est exclusio alterius*, mean[s], 'mention of one

thing implies exclusion of another thing.'" (citation omitted)).  Thus, there was never a public

comment requirement that publication would have triggered, and any concern regarding the

timing of publication is harmless error, at most.  *See Nevada v. Dep't of Energy*, 457 F.3d 78, 90

(D.C. Cir. 2006) ("We have applied the prejudicial error rule in the NEPA context where the

proposing agency engaged in significant environmental analysis before reaching a decision but

failed to comply precisely with NEPA procedures.").  Indeed, there is "no general presumption

that a NEPA violation will in all cases outweigh other public interests."  *Chem. Weapons*

*Working Grp., Inc. v. U.S. Dep't of Army*, 963 F. Supp. 1083, 1097 (D. Utah 1997) (citing *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992)).

Third, Plaintiff aver that any EA is definitionally insufficient, and that Defendants should have instead prepared a longer and more detailed EIS. But Plaintiff's argument in this respect is misplaced. Among other things, Plaintiff's speculative claims run headlong into the Supreme Court's recent instruction that:

> When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness. Thus, proper analysis of an agency's compliance with NEPA is necessarily a fact-specific and context-specific inquiry that gives due deference to agency expertise and judgement.

*Seven Cnty.*, 605 U.S. at 183. Plaintiff's speculation as to the analysis in the EA without review of its contents, such as its bald claim that "debris from the East Wing demolition has been dumped in at least one public park, and perhaps elsewhere, with no apparent treatment or regard for its potential hazards," Pl.'s Mem. at 27, does not amount to a cognizable challenge to the fact-dependent review an agency must perform under NEPA (and indeed that Defendants did perform here). *See Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 868 (S.D. W. Va. 2014) (plaintiff bears the burden of showing a "sufficient factual basis" for granting the injunction "beyond the unverified allegations in the pleadings").

And even if Plaintiff's arguments were sufficient at this juncture (and they patently are not), Plaintiff conflates NEPA's hortatory instruction that agencies "preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice," 42 U.S.C. § 4331(b)(4),

with the statute's "action-forcing" requirement that agencies assess the "reasonably foreseeable *environmental* effects of the proposed agency action."  42 U.S.C. § 4332(2)(C)(i) (emphasis added); *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) ("[A]gencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.") (citation omitted).  Thus, and setting aside that the EA *does* include analysis of the cultural and historic elements of the Project,  *see* Ex. 1A, Plaintiff would extend NEPA's requirement to assess environmental effects to elements beyond the strictures of the statute.  *See United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993) ("NHPA is similar to NEPA *except* that it requires consideration of historic sites, rather than the environment." (emphasis added)); *see also* 54 U.S.C. § 307104 (Section 107 of the NHPA exempts certain federal buildings, including the White House and its grounds, from operation of the NHPA).  Indeed, an agency need not prepare a NEPA review where "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law." 42 U.S.C. § 4336(a)(3).

Fourth and finally, Plaintiff's segmentation argument—*i.e.*, that the NPS improperly considered demolition and construction in separate NEPA documents—is moot by virtue of the fact the EA analyzed both.  *See* Ex. x at x.

Plaintiff is thus unlikely to succeed on the merits of its NEPA claims.

## F.  Plaintiff Cannot Obtain Relief Against the GSA and Acting Administrator Rigas.

While the General Services Administration ("GSA") and Acting Director Rigas are named as Defendants, they are not referenced or discussed anywhere in Plaintiff's briefing. This is not surprising, because GSA has played no role in the Project.  "GSA did not actively participate in the recent decision to demolish the East Wing or any contracting to obtain the

services of a demolition company," and GSA "has taken no actions, and does not plan to take

any actions, to contract for the planning, design, or construction of the proposed" Project.  *See*

Ex. 4, Heller Decl. 8-9.  Accordingly, Plaintiff is not likely to succeed on the merits as to any

claim against GSA or Acting Director Rigas.  Moreover, those defendants should be dismissed

from this action, and if Plaintiff does not voluntarily dismiss, Defendants intend to so move in

the ordinary course.

## II.    Plaintiff Will not Suffer Imminent Irreparable Harm Absent Entry of a Temporary Restraining Order.

Plaintiff also cannot demonstrate, as it must, that it is "likely to suffer irreparable harm in

the absence of preliminary relief." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  Put

bluntly, Plaintiff's request fails,because construction of its above-grade elements will not occur

before April 2026.

 The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries*

*Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017).  If a party makes no showing

of imminent irreparable injury, the Court may deny the motion for injunctive relief without

considering the other factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747

(D.C. Cir. 1995); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)

(explaining that because movants could not establish irreparable harm, the court need not address

any of the other applicable factors).  In particular, "the party seeking injunctive relief must

demonstrate that the claimed injury is 'both certain and great' and that the alleged harm is 'actual

and not theoretical' . . . because 'the court must decide whether the harm will in fact occur[,]' a

party seeking injunctive relief must 'substantiate the claim.'" *Electronic Privacy Info. Ctr. v.*

*Dep't of Justice*, 15 F. Supp. 3d 32, 44 (2014) (citation omitted).  Plaintiffs fail to clear that bar.

First, Plaintiff's alleged procedural injuries are not enough to constitute irreparable harm. The Supreme Court has explained that "[n]o such thumb on the scales is warranted" in determining whether "an injunction is the proper remedy for a NEPA violation . . . ." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Thus, "[t]here is no doubt . . . that a plaintiff that is able to establish that an agency failed to comply with the notice and comment procedures of the APA would, nonetheless, have no recourse in an Article III court absent a showing that it suffered or will suffer a concrete injury as a result of policy produced through the allegedly flawed process." *California v. Trump*, 613 F. Supp. 3d 231, 243 (D.D.C. 2020). Courts in this jurisdiction have accordingly questioned whether a procedural injury standing alone would merit injunctive relief. *See Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) ("To establish irreparable harm under a NEPA claim, Plaintiffs must allege some concrete injury beyond the procedural injury caused by [the agency's] alleged failure to comply with NEPA when it conducted its environmental assessment . . . . Plaintiffs must present sufficient evidence that the purported injury is certain, great, actual, imminent, and beyond remediation."); *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327 (D.D.C. 2018) ("Courts generally will not base a finding of irreparable injury on a procedural violation standing alone." (citation modified)); *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 290 (D.D.C. 2017) (citing *Fund For Animals v. Norton,* 281 F.Supp.2d 209, 222 (D.D.C. 2003)) ("[E]ven if the Court were to assume a NEPA violation, that procedural harm standing alone is insufficient to constitute irreparable harm."). This accords with the Supreme Court's recent instruction in the context of NEPA that a procedural "deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more . . . ." *Seven Cnty.*, 605 U.S. at 185.

25

And even were this not the case, NPS has complied with NEPA, and Defendants will soon initiate consultation with NCPC and CFA. Thus, there is no procedural violation that could establish irreparable harm.

Beyond this, for the reasons already discussed above, Plaintiff has demonstrated no aesthetic injury that could give rise to irreparable harm. Above-grade construction will not commence for many months—April at the earliest—and, critically, the design process for the Project remains on-going. There is thus no immediate threat of irreparable injury warranting entry of a temporary restraining order. *See Brown v. District of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012) ("speculative, unsubstantiated contentions" of irreparable harm are insufficient).

To the extent Plaintiff may complain about other effects of ongoing below-grade construction, those are not sufficiently irreparable to merit relief. *See W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) (finding that "temporary effects" caused by construction "such as inconvenience, increased traffic, and increased noise and air pollution felt by both citizens who work and reside within proximity of the project and commuters" do not amount to irreparable harm because the time construction will occur is "is not permanent or of long duration.").

In sum, Plaintiff has failed to carry its heavy burden of demonstrating irreparable harm sufficient to warrant the exceptional relief of a preliminary injunction.

### III.   The balance of harms and the public interest weigh against injunctive relief.

Because Plaintiff has not shown a likelihood of success on the merits, this Court need not consider the balance of harms and the public interest in issuance of an injunction. However,

were the Court to do so, the equities favor Defendants in light of security concerns that warrant permitting the current below-grade construction to continue.

In particular, and as the Secret Service attests, continued "improvements to the site are still needed before the safety and security requirements can be met.  Accordingly, any pause in construction, even temporarily, would leave the contractor's obligation unfulfilled in this regard and consequently hamper the Secret Service's ability to meet its statutory obligations and protective mission." *See* Ex. 5.

In addition, and as one court has explained, "governmental action pursuant to a statutory scheme is 'taken in the public interest.'" *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006); *see also K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1279 (S.D. Fla. 2011).  Thus, actions taken to circumscribe the President's statutory authority to control the White House run contrary to the public interest.

Finally, the public interest support upholding the separation of powers under the Constitution. As the D.C. Circuit has noted, "[t]he public interest favors limiting federal courts to the jurisdiction and remedies provided by Congress." *Climate United Fund v. Citibank, N.A.,* 154 F.4th 809, 830 (D.C. Cir. 2025).  Further, Plaintiff's request that the Court intervene and insert itself into ongoing architectural and design processes for the East Wing ballroom is against the public interest in allowing the duly elected President to control improvements to the executive mansion.

For these reasons, the balance of the harms and the public interest also weigh against preliminary injunctive relief.

**IV.    If an injunction is granted, Plaintiff should be required to post a bond.**

Before a court may award preliminary injunctive relief, a plaintiff must post a compensatory security bond. Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). If the Court concludes that injunctive relief is warranted, the Court should require Plaintiff to post a security in an amount that the Court considers proper to reflect potential litigation and agency compliance costs.

<b>CONCLUSION</b>

Because Plaintiff cannot establish any of the four necessary factors to obtain emergency injunctive relief, Defendants respectfully request that this Court deny Plaintiff's Motion.

December 15, 2025                    Respectfully submitted,

                                    Adam R.F. Gustafson
                                    Principal Deputy Assistant Attorney General

                                    Marissa A. Piropato
                                    Deputy Chief

                                    Gregory Cumming
                                    Senior Attorney

                                    ***/s/ Mark J. Widerschein***
                                    Mark Widerschein
                                    Michelle Ramus
                                    Trial Attorneys
                                    Natural Resources Section
                                    Environment & Natural Resources Division
                                    United States Department of Justice
                                    P.O. Box 7611
                                    Washington, D.C. 20044-7611
                                    Michelle.Ramus@usdoj.gov
                                    Mark.Widerschein@usdoj.gov

                                    *Counsel for Defendants*