UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * *     )
NATIONAL TRUST FOR HISTORIC          )     Civil Action
PRESERVATION IN THE UNITED STATES, )     No. 25-04316
                                     )
              Plaintiff,             )
                                     )
   vs.                               )
                                     )
NATIONAL PARK SERVICE, et al.,       )     Washington, D.C.
                                     )     December 16, 2025
              Defendants.            )     3:40 p.m.
                                     )
* * * * * * * * * * * * * * *     )


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:        THADDEUS A. HEUER, ESQ.
                          JACK S. SMITH, ESQ.
                          MATTHEW CASASSA, ESQ.
                          FOLEY HOAG, LLP
                          155 Seaport Boulevard
                          Boston, Massachusetts 02210

                          GREGORY B. CRAIG, ESQ.
                          FOLEY HOAG, LLP
                          1717 K Street, Northwest
                          Suite 1200
                          Washington, D.C. 20006

FOR THE DEFENDANTS:       ADAM R.F. GUSTAFSON, ESQ.
                          MARISSA A. PIROPATO, ESQ.
                          MICHELLE M. RAMUS, ESQ.
                          GREGORY M. CUMMING, ESQ.
                          MARK J. WIDERSCHEIN, ESQ.
                          DEPARTMENT OF JUSTICE
                          ENVIRONMENT AND NATURAL RESOURCES
                            DIVISION
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530

REPORTED BY:            LISA EDWARDS, RDR, CRR
                        Official Court Reporter
                        United States District Court for the
                          District of Columbia
                        333 Constitution Avenue, Northwest
                        Room 6706
                        Washington, D.C. 20001
                        (202) 354-3269

THE COURTROOM DEPUTY:  Your Honor, we are on the record in Civil Matter 25-4316, *National Trust for Historic Preservation in the United States versus National Park Services, et al.*

Beginning with Plaintiff's counsel, please approach the podium and identify yourself for the record.

MR. CRAIG:  Your Honor, my name is Gregory Craig. I'm a senior counsel at the law firm of Foley Hoag.

I'd like to introduce Tad Heuer, who will be arguing today, a partner at Foley Hoag; Jack Smith; and Matt Casassa.

THE COURT:  Welcome, everyone.

MR. CRAIG:  And with your permission, I'd also like to introduce the president of the National Trust For Historic Preservation who is here with us today, Carol Quillen, Q-U-I-L-L-E-N.

Would you stand?

Thank you, your Honor.

THE COURT:  Thank you.

MR. GUSTAFSON:  Good afternoon, your Honor.  Adam Gustafson for the federal Defendants.  I'm joined at counsel table by Marissa Piropato, Michelle Ramus, Greg Cumming and Mark Widerschein.

THE COURT:  Are they all from Main Justice?

MR. GUSTAFSON:  Yes, sir.

THE COURT:  And where are you from in Main Justice?

MR. GUSTAFSON:  The Environment and Natural Resources Division.

THE COURT:  Thank you, sir.

All right.  We're here for the hearing on the TRO. The moving party goes first.  They have 15 minutes.  And they can have a five-minute rebuttal later.  Okay?

MR. HEUER:  Thank you, your Honor.

Tad Heuer on behalf of the National Trust.

This is a simple motion about a fundamental principle, that even federal agencies --

THE COURT:  Simple?

MR. HEUER:  It is.

THE COURT:  That's a matter of opinion, my friend.

MR. HEUER:  Indeed.

But it's a simple motion --

THE COURT:  I guess I'll write the opinion.

MR. HEUER:  We believe it may be able to be briefed, your Honor.

Even federal agencies and even the president need to follow the law.

So Congress chartered the National Trust in 1949 to facilitate public participation in the preservation of sites, buildings and objects of national significance and

interest.  The Trust has done so for 76 years.  And the White House is perhaps the most nationally significant building in the country.

The Trust has used legislation, which is instrumental in creating the National Register of Historic Places.  It has used persuasion, saving hundreds of historic buildings by raising public awareness through the annual list of America's Eleven Most Endangered Places.

And on dozens of occasions, it has successfully used litigation against administrations of both parties to compel federal agencies to comply with the federal laws protecting historic resources.

The Trust is here today in defense of the White House and in furtherance of the institutional mission that Congress entrusted it with over 75 years ago.

So I have three points to make this afternoon. The first is to summarize the five laws that we believe the Defendants are ignoring, which explains why we are likely to succeed on the merits.

The second is to explain why the Trust will suffer irreparable injury without an immediate order to cease construction and why the equities in public interest are in our favor.

And third, to explain why the relief requested is narrow, tailored and proportionate with appropriate

accommodation for presidential safety and security.

First, the Trust is likely to succeed on the merits because even federal agencies and even the president have to follow the law.  And here, those laws are the following:  the National Capital Planning Act; the regulations of the Commission on Fine Arts; the National Environmental Policy Act, NEPA; the federal statute prohibiting the erection of buildings in D.C. parks without express congressional approval; and the U.S. Constitution's Property Clause.

The president has said that he and his administration don't need any approvals or permits for the ballroom project because as president he can, quote, "do anything I want to the White House."  In other words, the government doesn't have to follow the law.

That's simply wrong.  As the Parks Service's own website states, quote, "The White House is owned by the American people and stewarded by the National Trust -- or the National Park Service.  It is more than the president's residence.  It's a site for protest and national discourse on what it means to be American."

The fact that their opposition goes on for pages and pages about the need for a ballroom underscores that they are, with respect, missing the point.  The case is not about the need for a ballroom; it's about the need to follow

the law if you want one.

It is emphatically the province and the duty of the judicial department to say what the law is.

And here, the law is clear:  first, following the National Capital Planning Act.  Every federal agency contemplating construction in D.C. must consult the NCPC before preparing construction plans and must obtain NCPC approval for location, height, bulk, number of stories and size.

Presidents of both administrations, including this one in his first term, twice, have gone to the NCPC and routinely complied.

The project also undermines a separate section of the NCPC, the comprehensive plan provision of the Act, which discourages projects that, quote, "permanently alter symbolic views of the White House."

Revising the plan so it allows what it currently proscribes and allows this project would require public hearing and a consultation project.

THE COURT:  What year was the NCPC?

MR. HEUER:  Pardon?

THE COURT:  What year was the NCPC passed?

MR. HEUER:  1952.

THE COURT:  So the various projects that you list here that other presidents have initiated to change the

White House, did they all comply with the NCPC?

MR. HEUER: They either complied with NCPC or the Commission on Fine Arts, and they all had congressional approval if they were using federal funds.

THE COURT: I assume that they all were using federal funds.

MR. HEUER: I believe the tennis pavilion, although opposing counsel will correct me, was done with private funds. But even then, they went through NCPC. That was in 2019.

THE COURT: Which president did that?

MR. HEUER: President Trump did.

THE COURT: The tennis court approval?

MR. HEUER: He did both the tennis court approval in 2019 and the fence approval in 2016. Those were both during his first term.

THE COURT: I see.

MR. HEUER: So the government makes a few claims. One is that the plans are coming, so there's no need for an injunction.

Yet their affidavit submitted yesterday evening concedes that the first the NCPC heard from them was yesterday, the day they filed. And it's clear the construction is ongoing now.

Their second claim is that the review is limited

to --

THE COURT:  They said they were going to do it this month.  There's only two weeks left in the month.

MR. HEUER:  That's true.  But if you look at the Stidham affidavit, it says, "The first I heard of this was yesterday," the 15th of December.

I agree.  That's very different things.  That's what --

THE COURT:  Well, let me assure you of something: The Court will hold them to that.

MR. HEUER:  Okay.  We appreciate it.

THE COURT:  They've got till the end of this month before we have our PI hearing, which will be in January. They have until then to get it done.

MR. HEUER:  Well, we'd also notice -- note that again this is ongoing.  That's why we're here on the temporary restraining order.  We appreciate that.  It's the temporary restraining order because the construction is ongoing.

And they claim that NCPC review is limited to vertical construction.  Those words don't appear in the NCPC statute.  That's a gloss.

We've cited a number of dictionary definitions that say that construction includes essential demolition and site preparation.  This makes intuitive sense.  The more

site you clear, the more concrete you pour, the more piles you drive, the more irrevocably you lock in the footprint, the size and the scope of what gets built above it, rendering subsequent public comment symbolic rather than substantive.

And the argument that construction hasn't started yet is even more difficult to take seriously.  There are massive construction cranes on the site.  There are pile drivers running around the clock.  There are materials being staged.

Even the White House's own website, as we cite in our brief, states the construction "kicked off," quote-unquote, in September.  This notion that you can construct first and provide plans later makes a mockery of that statute and the process that everyone else always has to follow.

Second --

THE COURT:  Couldn't -- depending upon the --

MR. HEUER:  Yes.

THE COURT:  -- size of the footprint that the construction below ground consists of, couldn't they always adjust the height of the building and the width of the building?

MR. HEUER:  We don't know.  That's one of the reasons you would want to have plans submitted to the

National Capital Planning Commission, so you could see and comment on it.  It's very possible that the pilings that you drive for a building of 90,000 square feet mean that you can't have a building in a certain place, a certain location.  It must be a certain size.  It must be a certain height.

We don't know that.  And that's the concern, that by completing underground construction you are creating a foundation on which they say:  We are locked into this location.  We're locked into this size.  We're locked into this shape.  Those are all things that are supposed to happen before you start constructing, not after.

As to the plain language of the Commission on Fine Arts regulations, those require that federal officers have a, quote, "duty to obtain CFA advice on the plans and the merits of the design of D.C. buildings before they are approved or action is taken and that the CFA receive public comment."

Now, the government's opposition claims this isn't true.  They seem to have not realized that --

THE COURT:  Slow down a little.

MR. HEUER:  Yes.

In addition --

THE COURT:  My reporter is trying to keep up with you.  And I'm trying to keep up with you as well.

MR. HEUER:  Indeed.

THE COURT:  So slow down.

MR. HEUER:  I shall.

The government's opposition doesn't appear to recognize that there is not only Section 2101 of those regulations, but if you turn the page there is a Section 2102, which says expressly that public comment is provided for under the CFA.

Now, rather than follow the law and submit plans to the CFA, the president fired all of its board members. The government again claimed yesterday that replacements are coming soon.  But construction is ongoing, and that's not soon enough.  That's why an injunction is needed.

Third, the plain language of NEPA requires the public publication of at least an environmental assessment, an EA, if not an environmental impact statement, an EIS, before either demolition or construction can commence.

Now, last night at 5:00 p.m. was the first time anyone saw the EA, since the government has hidden it from public view even though it was signed -- since August, when it was signed.

Had it been made public four months ago, like Section 4336 of NEPA requires, we would have sued to enjoin any demolition on the basis that it's woefully inadequate. The EA describes an entirely different project than the one

they are currently constructing.

Now, it's not just that the EA says that the East Wing is being, quote, "deconstructed" and, quote, "salvaged" or that the colonnade between the main building and the mansion is being, quote, "renovated" when we've all seen the pictures that show that's not true.

It's not just that it says the tower crane will be erected after final design documents. But there aren't any final design documents, as we know, and the crane is there now, suggesting perhaps that those documents do exist.

The most egregiously arbitrary component is around the central purpose of an EA: whether the proposed action is significant.

Defendants expressly agree. On Page 4 of that EA, they quote: Significance is determined solely in relation to the reasonably foreseeable adverse effects. "Solely based on adverse effects."

It then goes on to state on the next page that the effect on the Olmsted landscape of the White House will, quote, "result in long-term adverse effects on the cultural landscape." That's Page 5.

It will, quote, "disrupt the historical continuity of the White House grounds and create a visual imbalance with the more modestly scaled West Wing and executive mansion."

THE COURT:  Why don't you focus in the next five minutes you have left --

MR. HEUER:  Sure.

THE COURT:   -- on the irreparable harm argument.

MR. HEUER:  Of course.

In terms of irreparable harm, the Plaintiffs do have irreparable harm here because the construction is ongoing.  And their harm is that they are entitled under all of these statutes to be able to comment on all of these plans before that happens.  That's an information-forcing mechanism that Congress designed to make better projects.

These are things that they can do, that the Plaintiffs can -- that the Defendants can do as long as they follow the rules.

And here, they are injured by the fact that there is ongoing construction.  Every day you have more concrete, more footprint, more establishing what this structure is going to look like.  That means that the comment is going to be less and less valuable when it occurs.  It should all be occurring before anything goes into the ground.

Yet here, we have a situation where the government is saying:  Wait and find out, and then you can comment, but we might not be able to make any changes.

That's exactly what these statutes prohibit.  And what we --

THE COURT:  I think the -- isn't the work that's going to be conducted as represented by the government over the next few weeks, when the TRO would be in effect, all below the surface?

MR. HEUER:  That's what they assert, that it's going to be below the surface.

There's nothing in the NCPC statute that says it's below-ground construction in the same way it doesn't say it applies only to vertical construction.  It says "before construction plans."  And construction plans, as anyone who has a house knows, include the foundation.  If you build a house without a foundation, it's not a very good house.

THE COURT:  The purpose of the NCPC and the CFA, is it not, is principally to focus on what's above ground?

MR. HEUER:  We don't believe it is.  Maybe the CFA is.  They're talking about aesthetics.  But not the NCPC.  The NCPC says "before construction."

And the reason that you would want to have this plan before construction is so you know what it will look like when it does go above ground.  The more you lock it in, the more your comments afterwards are symbolic.  It will be a *fait accompli*.

We would also say that NEPA requires this before any construction occurs.  It's not just NCPC and it's not just CFA; it's NEPA.

And the one item I would further note -- and we can discuss it afterwards -- is this statute Section 8106. 8106 says that if you want to build a federal building in the District of Columbia, in a park, you need express congressional approval.

This is a building. It is in President's Park. It does not have congressional approval.

We don't care which order these things go in. But they all need to occur before you are constructing, not after.

We also would say that the balance of equities favor the Trust. The Defendants have already caused irreversible damage to the White House and its grounds without complying with these review processes and approval processes.

And they're continuing this construction without complying with the laws and without this express approval I just mentioned from Congress. They can't claim that they have a cognizable interest in protecting an illegitimate course of action.

I think we would also note briefly that we believe that this is both something for the president and for the agencies. We fully concede the president is not an agency for purposes of the Administrative Procedures Act. We have never claimed that.

We've set aside our claims separately, some for the agencies and another for the president.  But they get to the same place.  The agencies need to comply with all these rules because they are subject to the APA; and the rules say do this before you construct, not after.

And our argument about the president is simple: The Property Clause vests all power over federal lands with Congress.  It's an Article I power.  The president is asserting an Article II authority over the White House, which he simply does not have.

If he wants to act as to the White House, he needs to get congressional approval, not just because 8106 says so, but because Congress hasn't delegated him anything out of its Article I authority.

Finally, I would note that our preliminary relief here is narrow.  It already accommodates the temporary security interests that have been raised by the Defendant.  We would merely ask the Defendants to do what they should have done in the first place:  Request review and approval of the project from the appropriate authorities, including Congress; prepare and publish an adequate environmental impact statement; and give the public an opportunity to comment.

And I do want to make a note about national security.  Given the belated statement of the government

yesterday afternoon that the project includes a subterranean national security component, we do not object to modifying the requested relief in our proposed orders to exclude limited actions -- again, as we note, with the express written approval of this Court -- that are necessary for the sole purpose of ensuring safe physical conditions, which is what we originally had asked for, but also the safety of the president, of course, while the injunction is in effect.

However, we would continue to request an injunction over subterranean construction that would have that effect of predetermining the location, the height, the bulk, the number of stories, the size, all other features of ballroom construction that would occur before the required reviews are conducted and before required approvals have been obtained.

We would ask that the Court enter a temporary restraining order.  And we are here also because we have moved at the same time for a preliminary injunction -- we believe it's appropriate -- requiring the Defendants to cease work on the ballroom project until they follow the law.

THE COURT:  Thank you.

MR. HEUER:  Thank you, your Honor.

MR. GUSTAFSON:  Good afternoon.

This case involves --

THE COURT:  Say your name again.

MR. GUSTAFSON:  Adam Gustafson, your Honor, for the federal Defendants.

THE COURT:  Thank you.

MR. GUSTAFSON:  This case involves interesting questions about federal power and statutory interpretation. Fortunately, this Court does not have to address any of them in order to resolve the motion at hand.

Plaintiffs fail at the threshold because they cannot establish a ripe claim that this Court can redress.

Above-ground demolition concluded on December 5, a week before the complaint was filed in this case.  It cannot be undone.

As for future construction, there is no final plan for the ballroom.  Above-ground construction won't even begin until April at the earliest.  And Defendants have committed to voluntarily undergoing the NCPC and CFA consultation that Plaintiffs have been requesting.

Moreover, the national --

THE COURT:  Is your client going to submit the materials to NCPC and CFA by the end of the month, as they've said they would in their brief?

MR. GUSTAFSON:  Your Honor, they have already initiated outreach to the NCPC.

THE COURT:  That's an interesting choice of words.

Explain what you mean. "Initiated outreach." Did they pick up a phone and call somebody or did they hand somebody a document?

MR. GUSTAFSON: There's a declaration that points out that the Executive Office of the President has made contact with an *ex officio* member of the National Capital Planning Commission and requested a meeting. So that meeting is I understand in the process of being scheduled imminently. But I don't have a date to report for that meeting yet.

But --

THE COURT: But you've said it'll be done by the end of the month?

MR. GUSTAFSON: That's correct, your Honor.

The Commission on Fine Arts does not have a quorum yet. And so there's an intermediate step that has to happen. Those members have to be appointed. But the Defendants are committed to seeking consultation from the Commission on Fine Arts as well.

The National Park Services already complied with NEPA for both demolition and construction.

And the below-ground work that's occurring now has nothing to do with Plaintiff's asserted aesthetic injury, and that work must continue for national security reasons.

This Court can deny the injunction based on

Plaintiff's failure to establish irreparable harm.  The procedural injuries that they've alleged standing alone do not constitute irreparable harm.  There must be a concrete injury.

And given the speculative nature of the claims, there is none.  Their asserted aesthetic injury is conjectural.  The plans are not final and the consultation process hasn't yet commenced.

THE COURT:  Is it possible or likely from your point of view that the concrete work that's being done below ground will dictate the height and the width of the building above ground?

MR. GUSTAFSON:  Your Honor, I'm not an engineer. I couldn't speak to that with specificity, although I would point out that it's the Plaintiff's burden here to show an irreparable injury.  There's nothing here to suggest that it would be impossible to change the size of the ultimate structure because concrete has been poured.  Plaintiffs haven't suggested that there's anything irreversible about this process.

The architectural design remains in progress.  And Plaintiffs can't know the result of the NCPC and CFA consultation before it's finished.

So for all of these reasons, Plaintiffs cannot show irreparable harm.  And that can be the end of this

Court's consideration.

But Plaintiff's motion also fails because there is no agency action for this Court to enjoin.  President Trump's White House renovation is being planned, directed and executed by the Executive Office of the President using architects and contractors that he hired.

Plaintiffs would have this Court enjoin executive action by the chief executive relating to the executive residence for a core executive function, namely receiving ambassadors and other ministers.

THE COURT:  The president changed horses recently, didn't he?  He changed architects?

MR. GUSTAFSON:  That's correct, your Honor.  That demonstrates that this process is not complete, that it's ongoing, that any injury is speculative and that the exact --

THE COURT:  Are you aware of whether or not the new architect that he has picked has finalized his or her plans?

MR. GUSTAFSON:  The plans have not been finalized. That is clear from the declarations that we have submitted. The plans are not final.  And that -- and so the NCPC and CFA process will give an opportunity for those bodies to provide their views on the plans -- the tentative plans as they exist.

THE COURT:  So the size of the building is still an open question?

MR. GUSTAFSON:  Your Honor, there's nothing final about this building.  It would be premature to conclude that -- anything about what the final product is going to look like.

Because there is no final agency action and because the president himself has been directly involved in this, the separation of powers counsels against judicial supervision of such a project.

The state -- the statutes that Plaintiffs seek to enforce do not apply to the president.  They have just conceded that the president is not an agency.  That's critical to this question.  NEPA, the NCPC and CFA's organic statute are only enforceable through the APA.  That is their -- only enforceable against agencies.

But the president is not an agency and the president himself cannot be enjoined.

Your 2009 decision in *NRDC versus Department of State* is really helpful on this question.  That's the Keystone XL Pipeline case.  In that case, you held that the agency's participation in presidential action does not change the analysis.  It's still presidential action.

And this is a quote from that case on Page 110 of 657 F. Supp. 2d 105 at 110:  The president's exercise of

significant discretionary authority over agency decisions constitutes presidential action, which is shielded from judicial review under the APA out of concern for the separation of powers.

The agency action -- the agency's involvement in this matter has been in support of direct -- direction and planning from the Executive Office of the President.  There is no separate and distinct agency action in this case that would allow APA review.

But even if there were agency action here, it is doubtful that the procedural statutes Plaintiffs seek to enforce could govern an action at the president's residence. *Franklin v. Massachusetts* teaches that textual silence is not enough to subject the president -- and I would say by extension the president's mansion -- to the provisions of a procedural statute.

THE COURT:  Isn't it the Office of the Executive Residence that's spearheading and overseeing this project?

MR. GUSTAFSON:  That's correct; within the Executive Office of the President.

THE COURT:  Isn't that a federal agency?

MR. GUSTAFSON:  No, your Honor.  The executive residence is a component of the Executive Office of the President.  It is for all practical purposes the president. And the president himself is directing this action through

the Executive Office --

THE COURT:  Is this a new organization?  I don't remember hearing of that organization.

MR. GUSTAFSON:  The executive residence is a component of the executive -- of the Executive Office of the President.  I couldn't give you much more detail than that from here.  But I'm happy to provide more information.

THE COURT:  You don't know when it was founded?

MR. GUSTAFSON:  I don't know when it was first given that name, your Honor.  But as -- ever since Adams, presidents have been residing at the White House and their staff have been effecting their will, their executive will, in that role.

Even if Plaintiffs could overcome their justiciability problems and identify agency action, it would still fail to establish a likelihood of success.

As to Plaintiff's NEPA claims, the National Park Service has already conducted an environmental assessment. And so there's nothing left for this Court to do, and certainly nothing that would justify a preliminary injunction.

*Seven County* teaches that when a court identifies a NEPA deficiency, it should not interfere with the agency's ultimate approval of a project at least absent reason to believe that the agency might disapprove of the project if

it had more information.

Plaintiffs have offered no reason to think that any different NEPA analysis than the National Park Service produced would result in a different ballroom.

Turning to the National Capital Planning Act, that Act applies to agencies again, not the president, and it requires consultation before preparing construction plans the agency originates.

And that statute has no application here.  There is no agency that has originated plans.  There are no plans that have been finalized.  And moreover, Defendants have committed to consult with the NCPC and the CFA.  Again, there's nothing left for this Court to do.

Turning to the last statute that Plaintiffs rely on, 40 USC 8106 -- it is the congressional approval statute -- that statute cannot support the weight that Plaintiffs place on it.  It was supplanted -- that 1912 statute was supplanted when Congress passed the National Capital Planning Act and provided an administrative process for consultation on building projects in the District.

THE COURT:  So did President Roosevelt, Teddy Roosevelt, when he created the West Wing, did he comply with that?

MR. GUSTAFSON:  If I'm remembering correctly, your Honor, the West Wing predated the National Capital Planning

Act.  But the East Wing was built by Franklin Delano Roosevelt.  And there's no evidence of compliance with the -- with this -- oh, I'm sorry, your Honor.  I take -- now I understand your question.  Pardon me.

Plaintiffs have provided no evidence and we're aware of no evidence that Congress has ever approved any White House construction projects.  Of course, Congress has sometimes appropriated money for such projects.  But in cases where there was no appropriation, we're not aware of any congressional approval.

For example --

THE COURT:  Well, what makes this one really unique -- I was under the impression that what makes this one unique is that the money to underwrite the cost of the construction here is coming from private companies.

MR. GUSTAFSON:  That's right, your Honor.

THE COURT:  It's not coming from Congress.

MR. GUSTAFSON:  That's right, your Honor.  Congress has -- you know, this complies with the Appropriations Clause, of course, because Congress has allowed the National Park Service to have this gift authority.  Gifts that are received by the National Park Service become the funds of the government --

THE COURT:  Right.

MR. GUSTAFSON:  -- and then can be used for such

purpose.

But to get to your question, you know, the Truman Balcony, for example, was used -- used no congressional funds. That was a White House-funded project. We're aware of no evidence that Congress approved such a thing.

In any event, Congress has already approved presidential modification of the White House. The evidence for that is 5 USC Section 105(d), which authorizes and appropriates money to the president for, quote, "alteration" and, quote, "improvement" of the executive residence. Those funds may be expended in the president's discretion, notwithstanding the provision of any other law.

Clearly, Congress recognizes there's a separation-of-powers issue here and it recognizes that the president has control over the executive residence.

Unless your Honor has further questions, we respectfully request that the Court deny the motion.

THE COURT: Very good. Thank you.

Plaintiff can have five minutes.

MR. HEUER: Thank you, your Honor. A few points.

First, there seems to be a question about who is in charge here, which is concerning.

The NEPA review is conducted by the National Park Service. Congress has given the control over the White House and President's Park to the Park Service. Its attempt

to move the Park Service out of primacy and put it in this Executive Office of the President is rather constitutionally suspect, because there's nothing indicating that Congress put control of the White House in control of the Executive Office.

The executive branch cannot alter Congress's specific delegation of Article II -- of its Article I authority or the executive branch can't argue -- alter -- let me start again.

The executive branch can't alter Congress's specific delegation of Article II authority to another entity of the executive branch, and certainly not in an attempt to evade compliance with various statutes.

Congress thinks that the White House is in the control of the Park Service.  The Park Service is subject to NEPA and all these other statutes.

To the extent that they are now saying we have transferred it from the Park Service administratively within the executive branch to the Executive Office of the President potentially to evade these obligations, that's entirely improper.  And it is certainly something that should be enjoined.

But basically, it seems that everyone is trying to disclaim responsibility.  We want the work to stop and we want this Court to issue an injunction against whomever it

is who is directing the work.

The second point I would make is as to this 8106 argument.  8106 is a very express statute.  And it says "express congressional approval."  It's not an optional statute.  It's not one that is a statute the president may or may not comply with.  He must.  Everyone must.

And the fact that they have said that it -- the later statute, it's not -- their statute -- they say they cite the NCP Act -- is from 1952.  Ours is 2002.  It was created in 1912, but recodified in 2002.  It is the later statute.  Congress really does mean it when it says what they have said in 8106.

And the only substantive statute they cite is 3105, 3 United States Code 105, which is Congress's annual appropriation for White House maintenance.  That's not an express approval to build a 90,000-square-foot ballroom.

And the government doesn't say what the congressional appropriation was this year.  They provide a link, but not the number.  The number is $2.475 million.  And it's designated for, quote, "repair and restoration." Not for demolition, not for construction.

And it's not a freestanding delegation of unlimited construction authority from Congress to the president.

There is no statute, and they can cite none; they

do cite none.  There's no case -- and they can cite none and they do cite none -- about the president's authority in this respect over the White House.  The only case they cite is *Kerry*, which is a case about passports.  There has to be some connection.

Third, I would note that they've said that there is no concrete injury here.

The concrete injury for any of these statutes, including NEPA or NCPC, is the ability to comment.  As a matter of fact, if you can't comment under NEPA, there is no right.  There's no purpose of it.  It's not a statute that requires you to do -- to reach a specific result.  It's a statute that requires comment.

And to say that it's just the below-ground construction, that's essentially segmentation, saying, Don't look at the below-ground construction because you don't need to talk about that even though it affects your above-ground construction.

We know we can't segment under NEPA.  But that's precisely what they're saying to do -- that they want to do.  They want no comment on the first half until you get to the second half.

NEPA talks about projects.  And they talk about projects because from their EA, we know that they're considering demolition and construction as a whole.

THE COURT:  Well, if the architectural plans are still in flux, which apparently they still are, the work that's being done below ground can be used as a basis for the building above ground, which can be adjusted to -- in its height and its width.  It would seem to me that there would be adjustments possible depending upon the size of the below-ground foundation.

MR. HEUER:  We don't know that.  And the notion that it's unripe because we haven't seen the plans that they haven't produced is somewhat rich, because the National Capital Planning Commission Act says you need to consult with them before construction plans are produced.  Before, not after.

THE COURT:  But --

MR. HEUER:  It's not before construction; it's the plans.  Those are the things that have to happen.

THE COURT:  I think the point he was trying to make was that the architectural expertise that you needed to bring to the table to prove this point hasn't been brought to the Court's attention.  So you don't have a statement by an architect who said that, depending upon the size of the foundation, the building can be adjusted, either larger or smaller.

MR. HEUER:  We don't know if they have a foundation.  But it's not just height, up or down.  It's

width; it's size.  But they've already said in their NEPA EA that they've locked in the location.  Right?  They've said it has to be here and it has to be of this -- of some minimum size.

And they've said this proposed project will dwarf the more modestly sized executive residence.  That's their EA.  That's the Park Service talking.

I'm not sure I need to bring in an architect to say, Did they really mean it when they say it is going to overwhelm the executive mansion?  Because it's going to be right next to it.

Because the only things -- the only alternative we considered, the only NEPA alternative, was no build, and our options for what we needed, the things we had to have, were that it had to be immediately next to the executive mansion. It needed to have a ceremonial procession directly from the east room and it needed to have a second-story colonnade directly accessible from the executive mansion.

THE COURT:  What about the --

MR. HEUER:  And there's not very much else you can do.

THE COURT:  What about the fact that the plans are going to be brought to the attention in the next two weeks of NCPC?

MR. CRAIG:  "The next two weeks" is a common

refrain from this administration suggesting when they want to do things.  It's always going to happen in the next two weeks.

If they submit those plans in the next two weeks, that's fine.  But again, those plans need to be submitted before construction begins.  And they are continuing to construct.  Right?

This is a timing question.  And timing and procedure matter.  If they continue putting concrete in the ground, continue building, continue constructing, continue saying, Here's where the sewer pipes are going to have to go; here's where the electricity lines are going to have to go; here's where the gas lines are going to have to go, that will govern what you build above that foundation.

And that's why we are saying we need to know beforehand.  Because they are likely to come and say:  We're locked in.  We've got to build it here.  It's got to be this size; it's got to be this shape, because look at all the work that we've put in underground.

That's improper segmentation.  We have a right to comment before those decisions are made, not after.  And that's what NEPA requires.  That's what the CFA requires. That's what the National Capital Planning Commission requires.

And on top of it, Congress has to affirmatively

say, "Yes, you can."  And Congress has not.

Those first three statutes are the ones that we are looking to enjoin on, because we need to be able to comment; but we are also observing that there is another statute sitting out there that requires them to do something that they insist they don't have an obligation to do.  And that's why we've asked this Court to say that indeed is an obligation upon the president and the agencies if they want to build this project.

THE COURT:  Thank you.

MR. HEUER:  Thank you, your Honor.

THE COURT:  In light of the briefing and the argument of the parties today, I'm inclined to deny the TRO motion, because the Plaintiff in my judgment has failed to show irreparable harm so great and certain that an order is warranted over the next 14 days.

The government has represented that below-grade demolition and excavation is currently ongoing and any below-ground structural construction like pouring concrete will not begin until January of 2026.  Further, above-grade construction will not start until April of 2026 at the earliest.

As such, a temporary restraining order halting construction over the next 14 days is not required to alleviate any irreparable harm to the Plaintiffs.

Moreover, bare procedural injury standing alone is insufficient to demonstrate irreparable harm.

Plaintiff may well have a right to participate in the construction process, but any procedural rights do not warrant the extraordinary remedy of a temporary restraining order at this stage.

I reserve judgment, however, on whether the Plaintiff may be able to show irreparable harm at the preliminary injunction stage.  And I reserve judgment as to the other factors, including the Plaintiff's likelihood of success on the merits.

I expect to issue a decision within the next day. I will also issue an order scheduling a preliminary injunction hearing for the second week of January.  My order will set forth a briefing schedule and a few questions that I'd like the parties to address in their papers.

Before we close, I want to put the government on fair notice that if there is any below-ground construction in the next few weeks that dictates the above-ground footprint the size of the ballroom, then the government should be prepared to take it down if it causes irreparable injury to the Plaintiffs.

Based on your representations today, however, I do not anticipate that to happen.  But if it does, the Court will address it.  I can assure you of that.

See you in January, counsel.

Happy holidays.

MR. CRAIG:  Thank you, your Honor.

(Proceedings concluded.)

**<u>CERTIFICATE</u>**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 17th day of December, 2025.

<u>/s/ Lisa Edwards, RDR, CRR</u>
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269