# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,** | |
| *Plaintiff,* | |
| v. | Civil Action No. 25-4316 |
| **NATIONAL PARK SERVICE**, *et al.*, | |
| *Defendants.* | |

## SUPPLEMENTAL BRIEF IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

  1. The Defendants' Belated Disclosure of an EA for the Ballroom Project............................ 3

  2. OER and EOP Have Taken Control of the Ballroom Project. ............................... 4

  3. The Defendants' Continued Failure to Obtain Review and Approval from CFA and
    NCPC.......................................................................................................... 5

ARGUMENT .......................................................................................................... 7

  I.  Past Presidents Have Obtained Congressional Authorization and, Where Applicable,
    Regulatory Approval for Construction and Modifications to the White House and
    Structures on its Grounds................................................................................ 8

  II.  The President Does Not Have Constitutional or Statutory Authority to Construct the
    Ballroom. ................................................................................................... 9

    A.  The President has no constitutional authority to construct the Ballroom. .................. 10

    B.  No statute delegates congressional authority to the President to construct the
      Ballroom. ............................................................................................... 12

  III. OER and NPS are Agencies Within the Meaning of the Administrative Procedure Act. . 16

    A.  The National Park Service is an "agency" for purposes of the APA. ......................... 16

    B.  Because the Office of the Executive Residence is in charge of the Ballroom
      Project, it is an "agency" for purposes of the APA. ...................................... 17

    C.  The Executive Office of the President is not an "agency" for purposes of the APA. . 21

  IV. The National Trust Is Likely to Succeed on Its Claims Against EOP, OER, the Chief
    of Staff, and the Chief Usher............................................................................. 21

    A.  The National Trust is likely to succeed on the merits of its constitutional claims
      against OER, EOP, the Chief of Staff, the Chief Usher, and the President................. 22

      i.  EOP, OER, the Chief of Staff, the Chief Usher, and the President are
        violating the Property Clause by constructing the Ballroom without any
        constitutional authority............................................................................ 23

      ii.  Even if authority to construct the Ballroom had been delegated by Congress, the
        usurpation of NPS's responsibilities by EOP, OER, the Chief of Staff, the Chief
        Usher, and the President would violate the separation of powers. ........................ 23

    B.  The National Trust is likely to succeed on the merits of its APA claims against OER
      and the Chief Usher................................................................................... 26

C.  The President's involvement in the Ballroom Project does not prevent injunctive relief from issuing against the Defendants................................................................. 27

V.  The Belatedly Released EA Confirms that the Defendants' NEPA Review Was Arbitrary and Capricious.................................................................................... 29

VI. The National Trust Will Be Irreparably Harmed Without a Preliminary Injunction. ....... 36

A.  The National Trust has suffered, and will continue to suffer, severe and legally cognizable injuries from the Ballroom Project. ........................................................ 36

B.  The National Trust's injuries are imminent and require a preliminary injunction...... 39

CONCLUSION.................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. Dep't of Labor*,
766 F. Supp. 3d 105 (D.D.C. 2025) .................................................................20

*Am. Oversight v. Biden*,
No. 20-00716, 2021 U.S. Dist. LEXIS 183397 (D.D.C. Sept. 24, 2021) .........18, 21

*Am. Rivers v. FERC*,
895 F.3d 32 (D.C. Cir. 2018) .........................................................................33

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................37

*Circuit City Stores v. Adams*,
532 U.S. 105 (2001) .....................................................................................14

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) .......................................................................33

*Citizens for Responsibility & Ethics in Washington v. Office of Admin.*,
566 F.3d 219 (D.C. Cir. 2009) ...............................................................17, 18, 21

*Clinton v. City of New York*,
524 U.S. 417 (1998) .....................................................................................25

*Competitive Enter. Inst. v. Podesta*,
643 F. Supp. 3d 121 (D.D.C. 2022) ................................................................18

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .....................................................................................34

*Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence*,
466 F. Supp. 3d 100 (D.D.C. 2020) ................................................................18

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371
(D.C. Cir. 2017) ...............................................................................17, 18, 19, 21

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .....................................................................................33

*Fed. Educ. Ass'n v. Trump*,
No. 25-1362, 2025 U.S. Dist. LEXIS 157767 (D.D.C. Aug. 14, 2025) ...............39

*Fisheries Survival Fund v. Jewell*,
   236 F. Supp. 3d 332 (D.D.C. 2017) ............................................................. 38

*Found. on Econ. Trends v. Heckler*,
   756 F.2d 143 (D.C. Cir. 1985) ..................................................................... 37

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ...................................................................................... 25

*Immigr. & Naturalization Serv. v. Chadha*,
   462 U.S. 919 (1983) ...................................................................................... 26

*Jones v. District of Columbia Redev. Land Agency*,
   499 F.2d 502 (D.C. Cir. 1974) ..................................................................... 41

*\*Kleppe v. New Mexico*,
   426 U.S. 529 (1976) ...................................................................................... 10

*Lemon v. McHugh*,
   668 F. Supp. 2d 133 (D.D.C. 2009) ............................................................. 35

*Manzanita Band of the Kumeyaay Nation v. Wolf*,
   496 F. Supp. 3d 257 (D.D.C. 2020) ............................................................. 38

*Marin Audubon Soc'y v. FAA*,
   121 F.4th 902 (D.C. Cir. 2024) ..................................................................... 16

*\*Marsh v. Ore. Nat. Res. Council*,
   490 U.S. 360 (1989) ...................................................................................... 31

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ................................................................... 17

*Myers v. United States*,
   272 U.S. 52 (1926) ........................................................................................ 25

*Nat. Res. Def. Council v. Dep't of State*,
   658 F. Supp. 2d 105 (D.D.C. 2009) ............................................................. 28

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) ..................................................................... 35

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
   595 U.S. 109 (2022) ...................................................................................... 25

*Nat'l Parks Conservation Ass'n v. Semonite*,
   916 F.3d 1075 (D.C. Cir. 2019) ................................................................... 34

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ..........................................................................28

*\*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
896 F.3d 520 (D.C. Cir. 2018) ..........................................................30, 34, 37, 41

*\*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ...................................................................37

*Perlmutter v. Blanche*,
No. 25-5285, 2025 U.S. App. LEXIS 23435 (D.C. Cir. Sept. 10, 2025).................28

*\*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .................................................................................41

*\*Rushforth v. Council of Econ. Advisers*,
762 F.2d 1038 (D.C. Cir. 1985) ..............................................................18, 21

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .................................................................................30

*Sierra Club v. FERC*,
145 F.4th 74 (D.C. Cir. 2025) .....................................................................33

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971) ..................................................................19

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .................................................................................38

*Susman Godfrey LLP v. Exec. Office of the President*,
789 F. Supp. 3d 15 (D.D.C. 2025) ...............................................................28

*Sweetland v. Walters*,
60 F.3d 852 (D.C. Cir. 1995) .........................................................4, 19, 20, 21

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .................................................................................15

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*,
784 F. Supp. 3d 127 (D.D.C. 2025), *modified in part by* 2025 U.S. Dist.
LEXIS 144385 (D.D.C. June 26, 2025)......................................................21, 28

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008).......................................................................................6

*Yates v. United States*,
574 U.S. 528 (2015).................................................................................14

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ................................................................................10, 11

**Statutes**

3 U.S.C. § 301 ......................................................................................................25

5 U.S.C. § 552(f) ............................................................................................17, 18

*5 U.S.C. § 701 ............................................................................................ *passim*

5 U.S.C. § 701(b) ...........................................................................................16, 17

5 U.S.C. § 706 ......................................................................................................27

18 U.S.C. § 105(d) ..............................................................................9, 12, 13, 14

18 U.S.C. § 1519 ..................................................................................................14

40 U.S.C. § 68 ........................................................................................................8

*40 U.S.C. § 8106 ..............................................................................................8, 12

*40 U.S.C. § 8722(b). ............................................................................................12

42 U.S.C. § 4331(b) ..............................................................................................34

*42 U.S.C. § 4332(2)(C) ............................................................................4, 29, 33

*42 U.S.C. § 4336 ...................................................................................................2

42 U.S.C. § 4336(b) ..................................................................................... *passim*

43 U.S.C. § 1334 ..................................................................................................12

43 U.S.C. § 1752 ..................................................................................................12

54 U.S.C. §§ 100101 ............................................................................................24

54 U.S.C. § 100101(a) ..........................................................................................24

Act of August 24, 1912, Pub. L. 62-302, 37 Stat. 417 (Aug. 24, 1912) .........8

Further Consol. Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460 (Mar.
  23, 2024) ....................................................................................................9, 13, 14

An Act concerning the White House and providing for the care and preservation
  of its historic and artistic contents, Pub. L. 87-286, 75 Stat. 586 (Sept. 22,
  1961) ...........................................................................................................14, 24

An Act Codifying Title 40, United States Code – Public Buildings, Property, and
Works, Pub. L. 107-217, 116 Stat. 1206 (Aug. 21, 2002) ........................................8

An Act to Enact Title 54, United States Code, "National Park Service and Related
Programs", as positive law, Pub. L. 113-287, 128 Stat. 3094 (Dec. 19, 2014). ....................24

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 12 ........................................................................................11

U.S. Const. art. I, § 8, cl. 14 ........................................................................................11

U.S. Const. art. II, § 3, cl. 3 ............................................................................10, 11, 12

*U.S. Const. art. IV, § 3, cl. 2 ..........................................................................8, 10, 23

**Other Authorities**

Sen. Rep. No. 115-381 (2018) ......................................................................................26

Commission of Fine Arts, Who We Are, https://www.cfa.gov/about-cfa/who-we-
are ..........................................................................................................................6

Dep't of Interior, *DOI Handbook of NEPA Procedures* § 1.2(b),
http://doi.gov/media/document/doi-nepa-handbook ........................................31, 35

Housing & Urban Devlpt., A GUIDE TO DECONSTRUCTION (2000)
https://www.huduser.gov/publications/pdf/decon ...................................................32

National Park Service, NEPA Policy,
https://www.nps.gov/subjects/nepa/policy.htm ......................................................16

Henry B. Hogue, Cong. Research Serv., R44909, *Executive Branch
Reorganization* (2017) ............................................................................................26

National Capital Planning Commission, "Tentative Agenda Items for the January
8, 2026 Commission Meeting," (updated December 22, 2025),
https://www.ncpc.gov/docs/Tentative_
Agendas/TentativeAgenda_January2026.pdf ........................................................40

National Capital Planning Commission, Project Information, 8733 East Wing
Modernization Project, https://www.ncpc.gov/review/project/8733/ .....................27

*The British Royal Visit*, Franklin D. Roosevelt Presidential Library and Museum,
https://www. fdrlibrary.org/royal-visit ...................................................................11

*Toasts of the President and Queen Elizabeth II of the United Kingdom at a Dinner Honoring the Queen in San Francisco, California*, Ronald Reagan Presidential Library & Museum (Mar. 3, 1983) https://www.reaganlibrary. gov/archives/speech/toasts-president-and-queen-elizabeth-ii-united-kingdom-dinner-honoring-queen-san ...................................................................................11

U.S. Dep't of State, *Camp David Accords and the Arab-Israeli Peace Process*, available at https://history.state.gov/milestones/1977-1980/camp-david (last accessed Dec. 29, 2025)...........................................................................................11

White House, *President Bush Meets with Crown Prince of Saudi Arabia* (Apr. 25, 2002), https://georgewbush-whitehouse.archives.gov/ news/releases/2002/04/20020425-4.html.................................................................11

*Trump meets Argentina's president at Mar-a-Lago—his first meeting with a foreign leader*, WLRN (Nov. 15, 2024), https://www.wlrn.org/americas/2024-11-15/trump-argentinas-at-mar-a-lago......................................................................11

## **INTRODUCTION**

Pursuant to the Court's December 17, 2025 memorandum order, ECF 17, the National Trust for Historic Preservation in the United States ("National Trust") submits this supplemental brief in further support of its motion for a preliminary injunction ("Motion"), ECF 2. The National Trust responds to the three questions posed by the Court's December 17 order. ECF 17 at 4; *see infra* at 8-21. The National Trust also addresses several other issues raised by the Defendants' recent filings and by certain representations of counsel at the December 16, 2025 hearing. *See id.* (permitting the parties to address "any other issues [they] wish to raise"); *see infra* at 21-42.

Along with its supplemental brief, the National Trust has filed an amended complaint, which revises the National Trust's original complaint in two principal ways. First, it adds four new defendants: (1) the Executive Office of the President ("EOP"); (2) Susie Wiles, in her official capacity as White House Chief of Staff; (3) the Office of the Executive Residence ("OER"); and (4) Robert B. Downing, in his official capacity as White House Chief Usher.[1]

The National Trust has added these defendants because the Defendants have represented that the Ballroom Project is now being directed by EOP and OER—and *not* by NPS, the entity that should be responsible for the project under federal law. *See* ECF 15-1 at 6; *see also* Dec. 16, 2025 Hrg. Tr. 24:5-9, 17-20. The National Trust asserts constitutional claims against all the newly added defendants, and also brings claims under the Administrative Procedure Act ("APA") against defendants OER and the Chief Usher. For the reasons set forth herein, the National Trust is likely to succeed on those claims, and a preliminary injunction against EOP, OER, the Chief of Staff, and the Chief Usher is necessary to prevent irreparable harm to the National Trust.

---

[1] The Chief of Staff and the Chief Usher are the heads of EOP and OER, respectively.

Second, the amended complaint sets forth additional facts in support of Count IV, which alleges that the Defendants prepared an inadequate environmental assessment ("EA") under the National Environmental Policy Act ("NEPA"), and Count V, which alleges that the Defendants failed to prepare the environmental impact statement that would have been required if their EA had been adequate. *See* 42 U.S.C. § 4336.

When the National Trust filed its complaint, it had not yet seen the EA because the Defendants—despite having completed the EA in August 2025—had unlawfully failed to release the EA to the public. *See* ECF 14-2, 14-3; 42 U.S.C. § 4336(b)(2) (providing that an EA "shall be a concise *public* document" (emphasis added)). The National Trust was therefore constrained to plead that the EA was inadequate based on the result it had reached, without full knowledge of its particular defects. *See, e.g.* ECF 1 ¶¶ 137, 144.

The Defendants released the EA for the first time at 5:00 p.m. on December 15, 2025, when they attached it to their opposition to the National Trust's Motion, *see* ECF 14-3. With the benefit of actual review, the Trust has now been able to confirm the EA's inadequacy. The amended complaint details the deficiencies in the newly disclosed EA, and revises Counts IV and V accordingly. Because the EA, despite its numerous flaws, does purport to analyze the environmental effects of the Ballroom Project as a whole, the National Trust has omitted its improper-segmentation claim (Count VI) from the amended complaint.

## <u>BACKGROUND</u>

To assist the Court, the National Trust sets forth the following additional facts relevant to the Trust's Motion, which are drawn principally from the Defendants' recent filings and from representations made by their counsel at the December 16, 2025 hearing.

On December 12, 2025, the National Trust filed its complaint and moved for a temporary restraining order and a preliminary injunction. *See* ECF 1, 2. The Court set a hearing on the National Trust's Motion for December 16, 2025, and ordered the Defendants to file a response to the Motion by December 15, 2025, at 5:00 p.m. *See* Dec. 12, 2025 Minute Order. On December 15, 2025, approximately an hour before the Defendants' response deadline, counsel for the Defendants informed counsel for the National Trust via email of the government's position that certain unspecified national-security issues would arise were the Trust's Motion to be granted.

The Defendants subsequently filed their opposition to the National Trust's Motion, as well as a motion for leave to file an *ex parte*, *in camera* declaration regarding those national security issues. *See* ECF 13, 14, 15-1.[2] Those filings, and the documents attached to the Defendants' opposition—which consisted of declarations from government officials and six previously unpublished analyses of aspects of the Ballroom Project—revealed the following three important and previously undisclosed facts.

*1. The Defendants' Belated Disclosure of an EA for the Ballroom Project.* Among the attachments to the Defendants' opposition were an EA and a Finding of No Significant Impact ("FONSI") regarding the Ballroom Project, both of which had been prepared by NPS in August 2025. *See* ECF 14-2, 14-3. Despite NPS having been required by law to publish those assessments, neither had previously been made available to the public.[3] 42 U.S.C. § 4336(b)(2) (requiring the

---

[2] Shortly after filing their opposition, the Defendants submitted a corrected version of their brief. *See* ECF 15-1. Because the Defendants re-filed only their brief, and not its attachments, the National Trust cites to ECF 15-1 when referring to the Defendants' brief, but cites the documents attached to ECF 14—the original opposition brief—when referring to its attachments.

[3] In their opposition, the Defendants asserted that the EA and the FONSI had "recently" been published, ECF 15-1 at 20; however, it is the National Trust's understanding that neither document had been made available to the public until the day the Defendants filed their opposition.

EA to "be a concise *public* document . . . set[ting] forth the basis of such agency's finding of no significant impact" (emphasis added)).

NPS's failure to timely publish the EA and the FONSI was particularly troubling because, as explained further herein, *see infra* Part V, both assessments were woefully inadequate. Among other defects, the EA describes a different project than the one which the Defendants are in the process of carrying out. *See, e.g.*, ECF 14-2 at 2 (describing planned "renovation" of the East Colonnade to add a second story); *see also* ECF 14-3 at 4 (detailing the proposed "deconstruction" of the East Wing). The EA also defined the needs of the project in such narrow terms as to foreclose any alternative to a massive ballroom on the site of the East Wing. *See* ECF 14-2 at 1. And although NPS determined that the Ballroom Project would have numerous significant adverse effects, *see infra* Part V, NPS nevertheless concluded that there was no significant impact from those adverse effects because it balanced them against purported positive effects—ignoring or misunderstanding its statutory obligation to prepare an EIS if it found ***any significant adverse effects at all***. *See* ECF 14-3 at 13; 42 U.S.C. §§ 4332(2)(C)(ii), 4336(b)(1).

***2. OER and EOP Have Taken Control of the Ballroom Project.*** Although NPS prepared the EA, the FONSI, and several other reviews in connection with the Ballroom Project, *see* ECF 14-2, 14-3, 14-4, 14-5, the Defendants' opposition asserted—for the first time—that the Ballroom Project was *not* being directed by NPS. *See* ECF 15 at 6. The Defendants informed the Court that the project was instead "now proceeding under the leadership of the Office of the Executive Residence," a unit of EOP responsible for assisting the President in the routine maintenance of the White House and other housekeeping functions like catering and floral arrangements. *Id.*; *see* ECF 14-1 ¶ 13, 14-6 ¶ 8; *see also Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995) (detailing housekeeping and ceremonial duties of OER). The Defendants did not explain how or when OER

took control of the Ballroom Project, or what legal authority authorized the takeover. Furthermore, the Defendants seemed to contend that OER and EOP's control over the Ballroom Project relieved the Defendants of any obligation to comply with the law and obtain certain required reviews and approvals, including review and approval by NCPC. *See, e.g.*, ECF 15-1 at 6-7, 19.

      *3. The Defendants' Continued Failure to Obtain Review and Approval from CFA and NCPC.* The Defendants' opposition also revealed that they had made essentially no effort to seek the mandated reviews of the Ballroom Project's plans from the NCPC and the CFA, or to obtain the required approval from the NCPC.

      The Defendants admitted both that the Ballroom plans were ***not*** complete and that no plans had yet been submitted to either commission. *See id.* at 6-7. And although the Defendants asserted that EOP "intend[ed] to commence the statutory consultation process" with NCPC and CFA "this month," *id.* at 11, declarations submitted with the Defendants' opposition reflected that the Defendants had made little, if any, any progress at all in this respect, *see* ECF 14-6 ¶ 22, 14-9 ¶ 4.

      As for the NCPC, one of its members (who is also an employee of the defendant NPS) stated that, on December 15, 2025—again, the same day the Defendants filed their opposition— she had "received notification" from two White House officials "expressing interest in meeting to discuss plans for the Project." ECF 14-9 ¶ 4. However, those efforts had not progressed beyond the White House and NCPC "working to set up this initial meeting." *Id.*

      As for review by the CFA, defendant John Stanwich, Superintendent of President's Park, offered the highly hedged and qualified statement that he "underst[oo]d" that EOP "intend[ed] to engage with the [CFA] at its discretion when [CFA] ha[d] a quorum" and that "plans [we]re underway to appoint" new CFA members to replace those fired by President Trump in October 2025. ECF 14-6 ¶ 22. The Defendants offered no timeframe for the replacement of the CFA

members or the submission of plans, and as of the filing of this supplemental brief, no new CFA appointments had been announced. *See* CFA, Who We Are, https://www.cfa.gov/about-cfa/who-we-are (last accessed Dec. 29, 2025) (listing all current seats as "vacant").

*    *    *

On December 16, 2025, the Court held a hearing on the National Trust's Motion. At the hearing, the government reiterated that OER and EOP had taken charge of the Ballroom Project, *see* Dec. 16, 2025 Hrg. Tr. 24:17-20, and again suggested that OER and EOP's management of the project largely foreclosed judicial oversight, *see id.* at 23:7-18, 24:17-25:1. The government also affirmed that the Defendants would submit materials concerning the Ballroom Project to the NCPC by the end of the month. *Id.* 19:20-20:14.

At the hearing's conclusion, the Court denied the National Trust's Motion insofar as it sought a temporary restraining order. The Court concluded that the National Trust had "failed to show irreparable harm so great and certain" that a temporary restraining order was "warranted over the next 14 days." *Id.* at 35:12-16. Noting that "below-ground structural construction . . . [would] not begin until January 2026," the Court determined that, although the National Trust might "well have a right to participate in the construction process," that right "d[id] not warrant the extraordinary remedy of a temporary restraining order at this stage." *Id.* at 35:17-36:6.

The Court reserved judgment as to whether the National Trust might be able to show irreparable harm at the preliminary-injunction stage, and also reserved judgment as to the other *Winter* factors. *See id.* at 36:7-11; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). And the Court "put the government on fair notice" that if there was "any below-ground construction in the next few weeks that dictate[d] the above-ground footprint [or] the size of the ballroom, then the

government should be prepared to take it down if it causes irreparable injury" to the National Trust. Dec. 16, 2025 Hrg. Tr. 36:17-22.

The Court memorialized its decision in a memorandum order issued the next day. *See* ECF 17. The Court noted that the government "ha[d] committed to commencing the consultation processes with the [NCPC] and the [CFA] by the end of the month," and stated that it would "hold the Government to its word." *Id.* at 2. The Court also reiterated that it took "seriously the Government's representations that its plans [were] not yet final, that it [would] commence consultations with the NCPC and CFA by the end of this month, and that no above-grade construction [would] take place before April 2026." *Id.* at 3. And the Court again stated that if there was "any below-grade construction that dictates the size or scale of the proposed ballroom *before* the Court [could] act on [the Trust's] motion," "the Government should be prepared to take it down depending on the Court's resolution of the merits" of the case. *Id.* (emphasis in original).

The Court's December 17 order deferred the National Trust's Motion insofar as it sought a preliminary injunction. *Id.* at 3-4. It scheduled a preliminary-injunction hearing for January 15, 2026, and set a briefing schedule in connection with that hearing.

## <u>ARGUMENT</u>

This supplemental brief proceeds in six parts. The National Trust first responds to the three questions posed by the Court in its December 17, 2025 order. *See* Parts I-III. The National Trust then addresses several additional relevant issues. Part IV explains why the National Trust is likely to succeed on its claims against EOP, OER, the Chief of Staff, and the Chief Usher. Part V explains why the Defendants' belated publication of an inadequate EA does not change the fact that the National Trust is likely to succeed on its NEPA claims against all the agency defendants. Finally,

Part VI details why the National Trust will be irreparably injured if a preliminary injunction is not granted.

I.   **Past Presidents Have Obtained Congressional Authorization and, Where Applicable, Regulatory Approval for Construction and Modifications to the White House and Structures on its Grounds.**

The Court asked "[w]hether and to what extent, past Presidents ha[d] obtained congressional authorization and/or regulatory approval for construction and modifications to the White House structure and grounds." ECF 17 at 4.

The National Trust attaches as "Annex 1" a chart of the projects of which it is aware involving either the construction or the modification of the White House or structures on its grounds, dating back 235 years to the Residence Act of 1790.

Those projects have almost uniformly been authorized by Congress, as is required by the Property Clause and, since 1912, by 40 U.S.C. § 8106 and its predecessor statutes. *See* U.S. Const. art. IV, § 3, cl. 2; 40 U.S.C. § 8106.[4] The only exceptions of which the National Trust is aware are a pool and cabana built during the Ford administration, and a tennis changing room built during the first Trump administration. To the Trust's knowledge, both of these projects were de minimis in size, were for the personal use of the President's family and guests, were not visible from any public way—and most importantly, were not subject to legal challenge regarding their lack of congressional authorization. As is obvious, a 90,000 square foot Ballroom on the former location of the East Wing is none of these things.

---

[4] The prohibition that now appears in § 8106 was first enacted in 1924. *See* Act of August 24, 1912, Pub. L. 62-302, 37 Stat. 417, 444 (Aug. 24, 1912) ("Hereafter there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress."). For most of the twentieth century, the August 24, 1912 Act was codified as 40 U.S.C. § 68. *See, e.g.,* 40 U.S.C. § 68 (1946); 40 U.S.C. § 68 (1988). In 2002, as part of a comprehensive recodification of Title 40, the Act was repealed and replaced by the substantively identical § 8106. *See* Pub. L. 107-217, §§ 1, 6, 116 Stat. 1062, 1206 (new § 8106), 1306 (repealer) (Aug. 21, 2002).

With respect to regulatory oversight (specifically the CFA since 1910 and the NCPC since 1952), based on records reasonably available to the National Trust, past presidents have also sought regulatory review (and where required, received regulatory approval) of construction and modifications of structures on the White House grounds. Both the pool and cabana and the tennis changing room were reviewed and, where applicable, approved by the relevant regulators.

Because federal law has long permitted the President to undertake minor repairs, maintenance, and improvements to the White House and its grounds with funds appropriated by Congress for those purposes, the National Trust's chart does not include interior redecoration or minor interior renovations of the White House, exterior maintenance projects (like repainting), landscaping of the White House grounds, or other similar projects. *See* 3 U.S.C. § 105(d); Further Consol. Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 532 (Mar. 23, 2024) (appropriating $2.475 million specifically for "required maintenance, resolution of health and safety issues, and continued preventative maintenance"). As the Trust explains further below, § 105(d) and the appropriations made thereunder constitute congressional approval for the President to expend those appropriated funds—and ***only*** those funds—for the express purposes set forth in the statute and in the subject appropriation. *See infra* Part II. Section 105(d) is ***not*** a freestanding authorization for the President to spend any amount of funds, from any source, for any purpose involving the White House, *see infra* Part II, and has never been understood as such.

## II.    <u>The President Does Not Have Constitutional or Statutory Authority to Construct the Ballroom.</u>

The Court asked "[w]hether the President has independent constitutional and/or statutory authority to construct a ballroom on White House grounds." ECF 17 at 4. The President does not have such authority.

A.  <u>The President has no constitutional authority to construct the Ballroom.</u>

Article IV of the Constitution vests all power over federal property, including the White House, with Congress. *See* U.S. Const. art. IV. § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."). The President, effectively a tenant of the White House during his term of office, lacks plenary authority over the building or its grounds. And the Defendants fail to identify *any* authority that supports the President's supposed implied constitutional power to demolish and/or reconstruct the White House at his whim. ECF 15-1 at 2. The Defendants' failure to do so is unsurprising, because the Constitution is clear that the President has no such power.

Start with the Constitutional text. As the National Trust explained previously, ECF 2-1 at 31-34, the Property Clause of the U.S. Constitution definitively vests exclusive authority over federal property with Congress. U.S. Const. art. IV, § 3, cl. 2. The Supreme Court has "repeatedly observed that '[the] power over the public land thus entrusted to Congress is without limitations.'" *Kleppe v. New Mexico,* 426 U.S. 529, 539 (1976) (quoting *United States v. San Francisco,* 310 U.S. 16, 29 (1940)) (alteration in original).

The Property Clause is a concrete, express, and affirmative grant of power over federal property to a particular branch of our government. In contrast, the only constitutional support the Defendants can muster for the President's putative ballroom-building authority is a constitutional *non sequitur*: the president's duty to "receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3, cl. 3 (the "Reception Clause"); *see* ECF 15-1 at 1, 15 n.6. But the Reception Clause is a *what* clause, not a *where* clause. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13 (2015) ("[T]he Reception Clause provides support, although not the sole authority, for the

10

President's power to recognize other nations.").[5] Along with other foreign-affairs provisions, the Reception Clause authorizes the President to *recognize foreign sovereigns* by receiving their ambassadors; *where* the President chooses to receive those ambassadors, however, is entirely beside the point. *See id.*

Unsurprisingly, then, nothing in the Reception Clause specifies whether a President must receive ambassadors of the sovereigns he has recognized in a ballroom, at a campground,[6] at a cattle ranch,[7] at a private club,[8] in a museum,[9] or at a picnic.[10] This silence provides no implicit ancillary grant of constitutional authority to *construct* spaces in which to receive ambassadors, just as the President's role as commander-in-chief provides no freestanding authority to raise and fund his own army. *See* U.S. Const. art. I, § 8, cl. 12 ("The Congress shall have Power . . . To raise and support Armies."); *id.* § 8, cl. 14 ("The Congress shall have Power . . . To make Rules for the

---

[5] Citing *Zivotofsky*, the Defendants argue that "Congress has consistently recognized the President's singular control over the White House, given its status as the Executive residence." ECF 15-1 at 17. This assertion is puzzling to say the least: *Zivotofsky* is a case concerning passports, and has absolutely nothing to do with the White House.

[6] *See* United States Department of State, *Camp David Accords and the Arab-Israeli Peace Process*, available at https://history.state.gov/milestones/1977-1980/camp-david (last accessed Dec. 29, 2025) (recounting the signing of the Israeli-Egyptian peace treaty framework brokered by President Carter between Prime Minister Begin and President Sadat at Camp David).

[7] *See* The White House, *President Bush Meets with Crown Prince of Saudi Arabia*, (Apr. 25, 2002), available at https://georgewbush-whitehouse.archives.gov/news/releases/2002/04/20020425-4.html (detailing Crown Prince Abdallah's visit to President Bush's ranch in Texas).

[8] *See Trump meets Argentina's president at Mar-a-Lago—his first meeting with a foreign leader*, WLRN, (Nov. 15, 2024), available at https://www.wlrn.org/americas/2024-11-15/trump-argentinas-at-mar-a-lago.

[9] *See Toasts of the President and Queen Elizabeth II of the United Kingdom at a Dinner Honoring the Queen in San Francisco, California*, Ronald Reagan Presidential Library & Museum, (Mar. 3, 1983), available at https://www.reaganlibrary.gov/archives/speech/toasts-president-and-queen-elizabeth-ii-united-kingdom-dinner-honoring-queen-san (remarks delivered at reception hosted by President Reagan for Queen Elizabeth II at the M.H. de Young Museum in San Francisco).

[10] *The British Royal Visit*, Franklin D. Roosevelt Presidential Library and Museum, https://www.fdrlibrary.org/royal-visit (last accessed Dec. 29, 2025) (picnic hosted at President Roosevelt's Hyde Park, New York home for King George V).

Government and Regulation of the land and naval Forces."). No court has ever permitted the President to use the Reception Clause to arrogate other constitutional powers vested in Congress to himself, and the Defendants have given this Court no reason to be the first.

    B.  <u>No statute delegates congressional authority to the President to construct the Ballroom.</u>

Congress, having the constitutional authority over the nation's property, may delegate some of that authority by statute—as it has on numerous occasions. *See, e.g.*, 43 U.S.C. §§ 1334, 1752. But none of those delegations give the President authority to construct the proposed Ballroom. To the contrary, the statutory evidence indicates that Congress intends to reserve and maintain its control over this place of incomparable national significance. Title 40, § 8106 of the U.S. Code—affirmatively recodified most recently in 2002 and dating in substance to 1912—states that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

The proposed Ballroom is indisputably a building. It is indisputably located within President's Park, a unit of NPS in the District of Columbia. *See* ECF 14-1 ¶ 3. And Congress has indisputably not provided "express authority" to erect the Ballroom. 40 U.S.C. § 8106.

Faced with the plain language of a statute that specifically applies here, and which both predates *and* postdates the National Capital Planning Act ("NCPA"),[11] the Defendants grasp for an *implied* statutory authority, settling on 3 U.S.C. § 105(d) and the 1961 statute placing President's

---

[11] The Defendants' argument that § 8106 was implicitly superseded, *sub silentio*, by the "later-in-time, and more specific" NCPA, ECF 15-1 at 15 n.7, is wrong. Not only is § 8106 the later statute, owing to its 2002 recodification, but § 8106—not the NCPA—is the "more specific" of the two. Section 8106 establishes a narrow requirement for express congressional approval of buildings or structures erected on federal parkland in the District, whereas the scope of the NCPA is broader, requiring commission review and approval of a wide range of projects both within and outside the District, whether on federal parkland or not. *Compare* 40 U.S.C. § 8106 *with id.* § 8722(b)(1).

Park under the control of NPS. *See* ECF 15-1 at 16-17. Neither can bear the weight that the Defendants place on it.

Section 105(d) is the statute that establishes the President's annual maintenance allowance from Congress. It provides that "[t]here are authorized to be appropriated each fiscal year to the President such sums as may be necessary for . . . the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House," which sums "may be expended as the President may determine, notwithstanding the provision of any other law." 3 U.S.C. § 105(d). In 2024, Congress appropriated an allowance of $2.475 million under this statute. *See* Further Consol. Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 532 (Mar. 23, 2024).

The Defendants contend that this appropriation provision affords the President plenary authority to spend ***any*** amount of money, however obtained, on ***any*** construction project relating to the White House. ECF 15-1 at 16. They further contend that the phrase "notwithstanding the provision of any other law" means that no other law limits the President's discretion over any action that ***could*** be funded by this statute, regardless of the source of funding, and regardless of whether, as here, the proposed expenditure ($400 million) is over 160 times greater than amount actually appropriated by Congress under § 105(d) ($2.475 million). The statute does no such thing.

First, § 105(d) is a general appropriations statute. It expressly restricts scope of the President's authority to the specific listed activities, and even then, only when appropriated funds are being utilized to carry out those activities. It provides no authorization for projects funded by other sources. Further, the ceiling on the sums available for those specific listed activities is determined *by Congress* through an annual appropriations, *not* by the President. The Defendants have not even attempted to argue that the Ballroom Project qualifies as "required maintenance,

resolution of safety and health issues, and continued preventative maintenance"—the language Congress used in setting the parameters on the President's 2024 allowance. *See* Further Consol. Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 532 (Mar. 23, 2024).

Second, the list of actions that can be funded by § 105(d) must be read together, under the familiar canons of *ejusdem generis* and *noscitur a sociis*, such that the broadest terms and more specific terms in the list must be construed to encompass actions of a kind with one another. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 545-46 (2015) (holding that the broad term "tangible object" in 18 U.S.C. § 1519 must be read in conjunction with the statute's more specific enumerated examples of "record" and "document" and thus could not encompass "objects of any kind and every kind"); *Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001). Accordingly, § 105(d)'s references to "alteration" and "improvement"—embedded as they are within a list that begins with "care, maintenance, [and] repair," and which features such mundane exemplar improvements as "refurnishing," "air-conditioning, heating, and lighting"—cannot plausibly be understood to encompass *demolition* of one-third of the White House, or work so substantial as to require legions of cement trucks, pile drivers, and construction cranes.

The only other statutory authority the Defendants cite for plenary Presidential control over the White House is a narrow exception to the 1961 statute placing the White House and President's Park under the management and oversight of NPS, *see* ECF 15-1 at 17 (citing Pub. L. 87-286, 75 Stat. 586 (1961)). It is no stronger that their claim under § 105(d).

The exception provides that in administering the White House and President's Park, NPS is to avoid conflicts with "the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." Pub. L. No. 87-286, 75 Stat. 586 (Sept. 22, 1961). The existence of this

exception reinforces the National Trust's point: ***Congress*** has plenary control over the White House, which is what allows it to grant exceptions in the first place. Congress exercised that control in part by designating the White House as a unit of NPS, and by carving out a narrow exception for conflicts relating to the President's residence or official acts. *See id.*

The context of the 1961 statute makes clear that at most, this exception was intended to grant the President is a veto over NPS's exercise of control over existing spaces within either the White House or President's Park if and when certain specific types of conflicts occur. For example, if the President objects, the NPS could not insist on bringing tours through the East Room while he is conducting press conferences there, or prevent him from landing Marine One on the South Lawn, or require him to furnish the private family quarters solely with colonial-era antiques.

Yet the Defendants contend that when Congress affirmatively vested the stewardship of the White House with NPS, and then carved out a narrow exception in the event conflicts arose involving the President's residential and official uses of the White House and its grounds, Congress was actually granting the President plenary and "singular control over the White House." ECF 15-1 at 17. Of course, if Congress truly wanted to recognize this supposed plenary and "singular control," it would have done so in much more direct fashion than through a savings clause in NPS legislation. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In reality, by expressly limiting the exception to conflicts involving administration, use, and occupancy of the White House, Congress has retained all *other* rights of control—such as structural demolition or construction—for itself.

\*     \*     \*

In sum, the Defendants have no legal basis for their assertions of independent constitutional or statutory Presidential authority over the White House. They identify no source that even

purports to grant the President the claimed authority. By contrast, the National Trust has identified specific and concrete constitutional and statutory authority under which Congress has (and retains) express authority over whether buildings or structures can be built on White House grounds.

### III.    OER and NPS are Agencies Within the Meaning of the Administrative Procedure Act.

The Court asked "[w]hether the entities directing the ballroom construction, including [OER], are 'agencies' within the meaning of the [APA]." ECF 17 at 4. Under the APA, "agency" is defined as "each authority of the Government of the United States, whether or not it is subject to review by another agency," with certain statutory exceptions not applicable here. 5 U.S.C. § 701(b)(1). The government has identified three federal entities that have been involved with the Ballroom Project: (1) NPS; (2) EOP; and (3) OER. *See* Dec. 16, 2025 Hrg. Tr. 20:20-21, 22:2-6, 24:17-20; ECF 14-1 ¶¶ 9-13. As explained below, NPS and OER are agencies for the purposes of the APA. 5 U.S.C. § 701(b)(1). EOP is not an agency for the purposes of the APA. As explained in Part IV, however, *every* entity involved in the Ballroom Project, whether an agency or not, may be enjoined by this Court.

### A.   The National Park Service is an "agency" for purposes of the APA.

NPS is an "agency" for the purposes of the APA because it is an "authority of the Government of the United States" and falls within no exception to § 701. *See* 5 U.S.C. § 701(b)(1). Reflecting its status as an "agency," NPS is routinely sued under the APA and, where it has violated the APA, relief is issued against it under the statute. *See, e.g.*, *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 905, 915 (D.C. Cir. 2024). NPS also regularly conducts NEPA analyses and carries out other obligations imposed on agencies under federal law. *See, e.g.* ECF 14-2, 14-3, 14-5, 14-5; *see also* NPS, NEPA Policy, https://www.nps.gov/subjects/nepa/policy.htm (last accessed Dec. 29,

2025) ("NEPA requires federal agencies like the NPS to evaluate the environmental impacts of its actions and to involve the public in the decision-making process.").

    B.  <u>Because the Office of the Executive Residence is in charge of the Ballroom Project, it is an "agency" for purposes of the APA.</u>

OER has taken control of the Ballroom Project from NPS, and for that reason is an "agency" for purposes of the APA.[12] 5 U.S.C. § 701. Like NPS, OER is an "authority of the Government of the United States," and it falls within none of the statutory exceptions to § 701. 5 U.S.C. § 701(b)(1). And although OER is housed within EOP, because it has assumed the day-to-day responsibility for constructing the new Ballroom, it does not fall within the non-statutory exception to § 701 that courts in this circuit have applied to "certain bodies within [EOP that] are sufficiently close to the President as to also be excluded from APA review." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 315 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017) [hereinafter "*EPIC*"].

The considerations relevant to the application of the non-statutory exception—which have variously included (1) "whether the entity exercises substantial independent authority," (2) "whether the entity's sole function is to advise and assist the President," (3) "how close operationally the group is to the President," (4) "whether it has a self-contained structure," and (5) "the nature of its delegated authority"—direct the conclusion that OER is an agency. *Id.* (quoting *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 222, (D.C. Cir. 2009) [hereinafter "*CREW*"]); *see also Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993).[13]

---

[12] The National Trust has asserted APA claims against OER and the Chief Usher in its Amended Complaint. In this section, the National Trust explains why OER is an agency. The National Trust separately explains why it is likely to succeed on its claims against OER below. *See infra* Part IV.
[13] *CREW* and *Meyer* concerned whether EOP units were agencies for the purposes of the similar, albeit slightly broader, definition in the Freedom of Information Act ("FOIA"). *Compare* 5 U.S.C.

Start with the "most important" factor—OER's "substantial independent authority." *EPIC*, 266 F. Supp. 3d at 315. Where an entity "has a mandate to do more than advise or coordinate," it "wield[s] substantial authority independent of the President." *Competitive Enter. Inst. v. Podesta*, 643 F. Supp. 3d 121, 128 (D.D.C. 2022); *see also CREW*, 566 F.3d at 223 (noting that the Office of Management and Budget had been held to be an agency under FOIA because "it ha[d] a statutory duty to prepare the annual federal budget, which aids both Congress and the President"). OER has taken control over an agency function: namely, NPS's authority to manage projects involving the White House and President's Park, which NPS has routinely exercised without incident on numerous previous (and recent) occasions, including the installation of the new White House fence and the construction of the tennis pavilion.

Managing and directing a $400-million-plus federal construction project is not only quintessentially agency action, but is also plainly beyond the sort of "advis[ing]" or "coordinat[ing]" with the President that characterizes the portfolio of a non-agency EOP entity. *See, e.g., CREW*, 566 F.3d at 221 (concluding that the Office of Administration, an EOP entity that provided services including "personnel management; financial management; data processing; library, records, and information services" and various office services was not an "agency" under FOIA). Where, as here, an entity has assumed agency duties, it must be treated as an agency. *See Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 n.5 (D.C. Cir. 1985).

---

§ 552(f), *with id.* § 701; *see also Am. Oversight v. Biden*, No. 20-00716, 2021 U.S. Dist. LEXIS 183397, at *15-16 (D.D.C. Sept. 24, 2021) (explaining that "FOIA incorporates and expands on the APA's definition of agency"). Notwithstanding the two sections' somewhat different definitions of the term "agency," the same functional test applies in determining whether an entity located within the White House is an agency for FOIA and APA purposes, and thus FOIA precedent regarding such entities is informative here. *See Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence,* 466 F. Supp. 3d 100, 107-08 (D.D.C. 2020).

That OER's purported authority to direct the Ballroom Project does not derive from, and is independent of, the President is further confirmed by the fifth factor—the nature and source of the authority that OER is claiming. *See EPIC*, 266 F. Supp. 3d at 315. As the National Trust has explained, the President has no constitutional authority to construct the Ballroom. *See* ECF 2-1 at 31-34 and *supra* Part II. Any authority that OER has to construct the Ballroom must therefore derive from Congress. As a result, if OER had authority to construct the Ballroom (which it does not), it would be carrying out the prerogative of *Congress* to manage and dispose of federal property—not that of the *President. Cf. Soucie v. David,* 448 F.2d 1067, 1075 (D.C. Cir. 1971) (concluding that an executive branch entity that exercised certain congressionally delegated powers was an agency under FOIA). The authority claimed by OER is therefore not only substantial but, being derived entirely from Congress, is also independent of the President.

Both factor one—the "most important" factor—and factor five therefore weigh heavily in favor of finding that OER is an agency for purposes of the APA. *EPIC*, 266 F. Supp. 3d at 315. And because OER's exercise of putative substantive authority over the Ballroom Project means its "sole function" is no longer merely advising and assisting the President, factor two supports the conclusion that OER is an agency as well. *See id.*

Nor do the remaining two factors tip the scales the other way. OER is not a temporary or *ad hoc* entity; rather, it has long had a well-defined "self-contained structure," headed by the Chief Usher. *See Sweetland*, 650 F.3d at 854 (describing staff and duties of OER); *cf. EPIC*, 266 F. Supp. 3d at 315 (concluding that an entity that would "disband shortly after it delivers a report to the President" was not an APA agency). The fourth factor therefore favors the conclusion that OER is an agency for these purposes. And although OER is operationally close to the President, the third factor warrants little weight under the circumstances. The Defendants have contrived to lodge

agency functions in an entity located close to the President in order to enable the President to exercise undue control over those same functions; that they have done this does not change the fact that OER, by running the Ballroom Project, is operating as an "agency." 5 U.S.C. § 701.

To be clear, the fact that OER is in charge of the Ballroom Project—and is an "agency" as a result—does not mean that OER has *actual authority* to construct the Ballroom. It does not, both because Congress has not granted or delegated authority to the executive branch to construct the Ballroom, *see supra* Part II, and because NPS, not OER, would be responsible for exercising any such authority that Congress had delegated, *see infra* Part IV. Nevertheless, OER has usurped duties properly vested in NPS, and as a result is now exercising agency functions. OER cannot "escape the obligations that accompany agencyhood"—including review of its actions under the APA—"while reaping only its benefits." *AFL-CIO v. Dep't of Labor*, 766 F. Supp. 3d 105, 112 (D.D.C. 2025). OER must be treated as an agency under the APA.

The D.C. Circuit's decision in *Sweetland v. Walters*, 60 F.3d 852 (D.C. Cir. 1995), is not to the contrary. In *Sweetland*, the D.C. Circuit held that OER "[wa]s not an agency as defined in FOIA." *Sweetland*, 60 F.3d at 854-55. But *Sweetland*'s holding was premised upon OER exercising no "independent authority" of its own. *See id.* at 854. The D.C. Circuit explained that OER was "exclusively dedicated to assisting the President in maintaining his home and carrying out his various ceremonial duties," with responsibilities including "general housekeeping," "prepara[tion] and serv[ice] of meals," "greet[ing] visitors," and "mak[ing] repairs, minor modifications, and improvements" to the residence's "rooms and mechanical systems." *Id.* That is no longer the case: OER is now charged with managing a massive $400 million construction project and, consequently, the character of OER's responsibilities has fundamentally changed.

OER's change in duties renders *Sweetland* inapplicable. As the D.C. Circuit has explained, "[i]f the President adds duties to an entity" which results in it no longer having the "sole function . . . to render advice and assistance to the President," "Congress would want the entity" to be considered an "agency." *Rushforth*, 762 F.2d at 1042 n.5. That is exactly what the Defendants have done here, and *Rushforth*'s reasoning applies equally in the context of the APA. *See EPIC,* 466 F. Supp. 3d at 107-08. Having been charged with the responsibility to direct and manage the Ballroom Project, OER has become an "agency" for the purposes of the APA. 5 U.S.C. § 701.

    C.  <u>The Executive Office of the President is not an "agency" for purposes of the APA.</u>

EOP, in which OER is housed, is not itself an "agency" for the purposes of the APA. *See Am. Oversight*, 2021 U.S. Dist. LEXIS 183397, at *16 (noting that the D.C. Circuit "has rejected the claim that the Executive Office of the President, as such, is an agency under the APA"). However, the fact that EOP is not an APA agency does not prevent its component units—such as OER—from being agencies. *Cf. CREW*, 566 F.3d at 222-24. Nor, as explained more fully below, *see infra* Part IV.C, is the Court prevented from enjoining EOP from violating the Constitution. *See, e.g.*, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, 784 F. Supp. 3d 127, 171-72 & n.35 (D.D.C. 2025) (Leon, J.), modified in part by 2025 U.S. Dist. LEXIS 144385 (D.D.C. June 26, 2025) (issuing injunction against, *inter alios*, EOP after concluding that an executive order violated various provisions of the Constitution, and refusing to dismiss EOP).

**IV.   The National Trust Is Likely to Succeed on Its Claims Against EOP, OER, the Chief of Staff, the Chief Usher, and the President.**

In its amended complaint, the National Trust asserts constitutional claims against EOP, OER, the Chief of Staff, the Chief Usher, and the President (Counts VIII-IX), and APA claims against OER and the Chief Usher (Counts I-V, VII). The National Trust brings these additional

claims because the Defendants, in a transparent effort to evade legally required reviews, are forcing the National Trust and this Court to play legal whack-a-mole with the Ballroom Project.

Before unpacking the variants of the Defendants' unconstitutional shell game, it is crucial to emphasize a central overarching point: *this Court has the authority to enjoin the unlawful actions of both OER and EOP **regardless** of whether they are agencies or not*. If they are agencies, they are enjoinable under the APA. If they are not, they are enjoinable because Article II does not authorize either OER or EOP to unilaterally arrogate Article I power that Congress has delegated, if at all, specifically to NPS.

The Defendants' opposition now asserts for the first time that control over the Ballroom Project no longer rests with the entity originally in charge (NPS), but has instead been unilaterally assigned to a different entity (OER)—not coincidentally, one they contend is practically exempt from judicial review by virtue of its proximity to the President. *See* ECF 15-1 at 6; Dec. 16, 2025 Hrg. Tr. 24:17-25:1. Yet notwithstanding the Defendants' unconstitutional shell game, every road leads to the same place. Regardless of who is in charge of the Ballroom Project on any given day, no further construction work can occur on the Ballroom Project unless and until the required reviews have been completed, and until approvals from the NCPC and Congress have been secured. Because none of those things have occurred, and for the further reasons set forth below, the National Trust is likely to succeed as to its claims against the newly added defendants.

A. <u>The National Trust is likely to succeed on the merits of its constitutional claims against OER, EOP, the Chief of Staff, the Chief Usher, and the President.</u>

The National Trust is likely to succeed on its two constitutional claims against EOP, OER, the Chief of Staff, the Chief Usher, and the President. First, the Defendants[14] have violated the

---

[14] The National Trust uses "Defendants" in this sub-part to refer to those defendants against which it asserts constitutional claims: President Trump, EOP, OER, the Chief of Staff, and the Chief Usher.

Property Clause by beginning to construct the Ballroom without any constitutional authority, and without any delegation of authority from Congress. Second, even if Congress had delegated authority to construct the Ballroom (which it has not), the Defendants *still* would have violated the separation of powers because Congress has charged *NPS*, not EOP or OER, with the management of federal projects in national parks.

      i.   *EOP, OER, the Chief of Staff, the Chief Usher, and the President are violating the Property Clause by constructing the Ballroom without any constitutional authority.*

As the National Trust has explained, the President, acting unilaterally, has no constitutional authority to undertake the Ballroom Project. *See* ECF 2-1 at 31-34 and *supra* Part II. And EOP, OER, the Chief of Staff, and the Chief Usher have no greater constitutional authority than the President. As a result, the Defendants must rely on some delegation of authority from *Congress's* Property Clause powers. *See* ECF 2-1 at 31. But, as the National Trust has also explained, Congress has not delegated any of its constitutional authority to the President to carry out the Ballroom Project. *See id.* at 31-34 and *supra* Part II. Nor has Congress delegated such authority to EOP, OER, the Chief of Staff, or the Chief Usher. Without either inherent or congressionally delegated authority to carry out the Ballroom Project, the Defendants' construction of the Ballroom is simply unconstitutional. *See* ECF 2-1 at 31-34 and *supra* Part II. The National Trust is therefore likely to succeed on the merits of its first constitutional claim against EOP, OER, the Chief of Staff, the Chief Usher, and the President.

      ii.   *Even if authority to construct the Ballroom had been delegated by Congress, the usurpation of NPS's responsibilities by EOP, OER, the Chief of Staff, the Chief Usher, and the President would violate the separation of powers.*

Because Congress has not delegated any of its authority under the Property Clause to carry out the Ballroom Project, the Court can and should end its analysis here. *See supra* Part II, ECF 2-1 at 31-34. But if the Court nevertheless concludes that Congress has somehow delegated authority

to undertake the Ballroom Project, the Defendants' unilateral and unlawful shifting of control from NPS to OER would still violate the separation of powers.

Congress has exercised its constitutional power by vesting certain of its authority over the management and regulation of the National Park System in the NPS, within the Department of the Interior. *See* 54 U.S.C. §§ 100101 *et seq.*; *see also* Pub. L. No. 87-286, 75 Stat. 586 (Sept. 22, 1961) (placing President's Park within the control of NPS). Specifically, Congress has charged NPS with "promot[ing] and regulat[ing] the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). Together, these provisions reflect a deliberate congressional choice to vest management of national parks, and any associated regulatory obligations, in a specific agency (NPS) within a specific department (the Department of the Interior). Congress reaffirmed that choice in its comprehensive recodification of Title 54 in 2014. *See* Pub. L. 113-287; 128 Stat. 3094 (Dec. 19, 2014).

There are rational reasons for Congress to have made that choice. For one, NPS, as the federal agency with the greatest expertise concerning the country's national parks, is best suited to "promote and regulate" their use. 54 U.S.C. § 100101(a). Further, by placing control of the national parks within NPS—an "agency" for the purposes of the APA, 5 U.S.C. § 701—Congress knew that any major changes to those parks would have to comply with various procedural laws, including NEPA and, where applicable, the laws providing for NCPC and CFA review.

The President may not disregard Congress's choice—or attempt to evade that required review—by unilaterally assigning NPS's authority to manage federal parks to another executive office. It is a foundational principle of the separation of powers that *Congress*, not the President, determines which executive entity exercises statutory authority. Article I of the U.S. Constitution provides that Congress, under its legislative power, "is given the establishment of offices, [and]

24

the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Congress therefore "has plenary control over the salary, duties, and even existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010). As a result, the Constitution does not authorize the President to reorganize offices and agencies established by Congress, or transfer to one office obligations that Congress by statute has vested in another. *See id.*; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[T]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

But that is precisely what the Defendants have done here. OER, which manages the day-to-day housekeeping and ceremonial operations of the executive residence, lacks authority over the Ballroom Project. OER's lack of authority is evidenced by, among other things, (i) the affirmative congressional grant of authority over the White House building and grounds to NPS; (ii) the limited scope of OER's powers; (iii) the fact that the Defendants themselves claim the project is being funded through NPS's authority to accept private donations, *see* Dec. 16, 2025 Hrg. Tr. 27:12-28:1; and (iv) the fact that NPS, not OER, has previously managed construction projects (including the recent fence-replacement and tennis-pavilion projects) on the White House grounds. Congress has charged NPS with authority to manage such projects, and OER and EOP's usurpation of NPS's role violates the separation of powers.

While the President may delegate functions "vested in the President by law" to executive-branch entities, 3 U.S.C. § 301, he has no inherent power to revise *Congress's* intentional and express delegation of *Congress's* functions to executive-branch entities such as NPS. Rather, if the President is to transfer congressionally-delegated functions among executive-branch entities, he

must do so pursuant to a congressional authorization. *See Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 968-69 (1983) (White, J., dissenting) (detailing history of statutes delegating power to reorganize executive branch); *see generally* Sen. Rep. No. 115-381, at 4 (2018) (explaining that "[a]lthough the U.S. Constitution vests in Congress the authority to organize the Executive Branch, former presidential administrations have asked Congress to grant expedited government reorganization authority to allow it to execute cross-agency government reorganizations more efficiently," which Congress has granted sixteen times, to administrations of both parties (footnote omitted)); Henry B. Hogue, Cong. Research Serv., R44909, *Executive Branch Reorganization*, at 7 (2017) (noting that the most recent statutory authorization for a president to conduct a reorganization expired on December 31, 1984).

Congress has provided no such authorization here. The National Trust is therefore likely to succeed on this constitutional claim as well.

### B. The National Trust is likely to succeed on the merits of its APA claims against OER and the Chief Usher.

The National Trust is likely to succeed on its APA claims against OER and the Chief Usher for substantially the same reasons that the Trust is likely to succeed on its APA claims against the other agency defendants. *See* ECF 2-1 at 16-30.

If OER and the Chief Usher are directing the Ballroom Project, they must seek review of the project plans by the CFA, NCPC, and Congress, and obtain approval of the plans from the latter two entities. *See id.* at 16-23. They also needed to complete the reviews and secure those approvals *before* work on the Ballroom Project began. *See id.* They did not do so, and they have not done so. While construction on the Ballroom commenced months ago, *see* ECF 1 ¶ 72, the Defendants (including OER and the Chief Usher) still have neither finalized project plans nor

meaningfully consulted with the commissions.[15] And the Defendants have steadfastly refused to acknowledge that they must obtain approval from Congress at all. *See* ECF 15-1 at 15-16. Commencement of the work on the Ballroom Project (including the demolition of the East Wing) without first securing the necessary reviews and approvals is contrary to law, and OER and the Chief Usher's failure to seek the required reviews constitutes agency action unlawfully withheld. *See* 5 U.S.C. § 706(1)-(2).

The National Trust is also likely to succeed on the merits of its NEPA-based APA claims against OER and the Chief Usher. OER and the Chief Usher have conducted no environmental review whatsoever and, as the National Trust has explained previously, *see* ECF 2-1 at 23-30, and explains further herein, *see infra* Part V, the EA conducted by NPS was inadequate. Without a complete and sufficient environmental review, the Defendants cannot lawfully proceed with construction of the Ballroom.

        C.   <u>The President's involvement in the Ballroom Project does not prevent injunctive relief from issuing against the Defendants.</u>

The Court may remedy the Defendants' violation of federal law and the Constitution with a preliminary injunction. The government suggested at the December 16, 2025 hearing that the Court could not enjoin the Defendants from carrying out further work on the Ballroom Project—regardless, apparently, of whether that work violated federal law or the Constitution—because the project was being "planned, directed, and executed" by EOP. *See* Dec. 16, 2025 Hrg. Tr. 22:2-10, 23:7-24. The contention that the Defendants' unlawful actions are beyond judicial review is simply wrong.

---

[15] On December 19, 2025 the NCPC placed an "information presentation" about the Ballroom Project on the agenda for its January 8, 2026 meeting. However, as of the filing of this brief, the Ballroom Project's file on the NCPC website consisted only of a single document: a set of FAQs prepared by the NCPC. *See* Project Information, 8733 East Wing Modernization Project, NCPC, https://www.ncpc.gov/review/project/8733/ (last accessed Dec. 29, 2025).

EOP and its constituent offices are routinely enjoined where, as here, they are violating the Constitution. *See, e.g.*, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, 784 F. Supp. 3d 127, 172-74 (D.D.C. 2025) (Leon, J.), *modified in part by* 2025 U.S. Dist. LEXIS 144385 (D.D.C. June 26, 2025) (issuing injunction against EOP after concluding that an executive order violated various provisions of the Constitution); *Susman Godfrey LLP v. Exec. Office of the President*, 789 F. Supp. 3d 15, 57 (D.D.C. 2025) (similar); *Perlmutter v. Blanche*, No. 25-5285, 2025 U.S. App. LEXIS 23435, at *2 (D.C. Cir. Sept. 10, 2025) (issuing injunction pending appeal against, *inter alios*, EOP). And, where an EOP office is an "agency" for the purposes of the APA, APA-appropriate relief may issue accordingly.

That the Ballroom Project was conceived in part by the President makes no difference in this analysis. Regardless of whether the President himself can be enjoined—and as the National Trust has explained, he can be, *see* ECF 2-1 at 33-34—the Court may enjoin federal government entities from carrying out unconstitutional actions. *See, e.g.*, *Wilmer Cutler Pickering Hale & Dorr LLP*, 784 F. Supp. 3d at 172-74; *cf. Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("The Supreme Court has never excepted a final rule from APA review because it carried out a presidential directive."). Were it otherwise, wide swathes of executive-branch conduct would be placed wholly beyond judicial review. That is not the law, and the Defendants have cited no authority for the proposition that their actions cannot be enjoined.[16]

---

[16] *Nat. Res. Def. Council v. Department of State*, 658 F. Supp. 2d 105 (D.D.C. 2009), referenced by the government at the December 16, 2025 hearing, is inapposite. *See* Dec. 16, 2025 Hrg. Tr. 23:19-23:4. That case concerned a challenge to the State Department's execution of a presidential "permit" for a cross-border pipeline. 658 F. Supp. 2d at 111. The President had delegated approval authority to the State Department based on his "inherent constitutional authority over foreign affairs." *Id.* at 109. The Court concluded that subjecting the State Department's execution of the permit to APA review would have improperly placed an inherently executive power under judicial review. *See id.* at 112-13. Here, however, the President <u>has no</u> inherent constitutional authority to construct the Ballroom. *See supra* Part II.

V.      **The Belatedly Released EA Confirms that the Defendants' NEPA Review Was Arbitrary and Capricious.**

On the evening of December 15, 2025—hours before the TRO hearing in this case—the Defendants disclosed for the first time the EA prepared by NPS in August 2025. The Defendants claimed that this EA satisfied their obligations under NEPA by reaching a "finding of no significant impact." This EA was facially deficient, internally contradictory, and plainly designed to support a predetermined conclusion. The Defendants' preparation and publication of the EA does not moot the National Trust's NEPA claims. Indeed, the EA's patent inadequacy makes it even *more* likely that the Trust will succeed on the merits.

The Defendants have conceded that the Ballroom Project is subject to the requirements of NEPA, and that they were obligated to prepare an EIS if their analysis found that the project represented a "major Federal action[] [that] significantly affect[ed] the quality of the human environment." ECF 15-1 at 19 (quoting 42 U.S.C. § 4332(2)(C)). NPS claims to have satisfied its obligations through an EA and FONSI prepared on August 28, 2025. That finding was deficient for at least five reasons.

First, an EA is required to be a "concise *public* document," 42 U.S.C. § 4336(b)(2), but this EA was not made public when prepared in August, or for months afterward. The Defendants cannot claim they have complied with NEPA, because they did not meet their EA obligations *before* commencing demolition of the East Wing. Had the Defendants complied with the publication obligation, the National Trust would have sued to enjoin the demolition before it began.

With Kafkaesque irony, the Defendants now fault the National Trust for "speculat[ing] as to the analysis in the EA without review of its contents"—despite having concealed those contents for four months until compelled *by this litigation* to disclose them. ECF 15-1 at 29. The belated disclosure is far from harmless error, because the entire "action-forcing purpose" of NEPA is

"vitiate[d]" by disclosures that come too late to permit any meaningful consideration of input on decisionmaking processes. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 532, 534 (D.C. Cir. 2018).

Second, even putting aside the failure to publish this EA before commencing their project, the Defendants do not attempt to explain how this EA *substantively* satisfies any NEPA obligations. Instead, they invoke generally the deference owed to agencies' reasonable fact determinations and "predictive and scientific judgments," without identifying any such judgments made in this EA. ECF 15-1 at 20-22 (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 181 (2025)). Invoking the talisman of deference, the Defendants insist that this Court is powerless to do anything but look away. Again, the Defendants are wrong.

The Defendants have made no attempt to locate their EA within even "a broad zone of reasonableness," *Seven Cnty.*, 605 U.S. at 183, presumably because they recognize that doing so would be impossible. NEPA is clear that an EIS is required whenever an agency's preliminary analysis identifies any significant adverse impact. Ironically, the Defendants' own EA even concedes this point: "Significance is determined *solely* in relation to reasonably foreseeable *adverse* effects." ECF 14-2 at 4 (emphases added). And the EA and accompanying FONSI in fact reasonably foresaw—and indeed, expressly identified—many such impacts:

- The Ballroom Project's effect on the landscape "originally designed by Thomas Jefferson" "will result in long-term adverse effects on the cultural landscape." ECF 14-2 at 5.
- The deconstruction of the East Wing will "result[] in the permanent loss of a component that has been integral to White House operations since 1942." *Id.* at 6.
- The Ballroom will "disrupt the historical continuity of the White House grounds" and "creat[e] a visual imbalance with the more modestly scaled West Wing and Executive Mansion." *Id.*
- The Ballroom Project will "introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features." *Id.*

- The Ballroom Project "will result in a substantial change to one portion of the [National Historic Landmark]." *Id.*
- The Ballroom Project "will adversely affect the design, setting, and feeling of the White House and the grounds over the long-term." *Id.* at 6, 15.
- "The removal of the current East Wing will result in a permanent adverse impact for those who value the experience of this specific space." *Id.* at 7.

Identifying any *one* of these impacts was sufficient to foreclose a FONSI and compel the preparation of an EIS. *See* 42 U.S.C. § 4336(b)(1) (requiring EIS for any proposed agency action "that has ***a reasonably foreseeable significant effect*** on the quality of the human environment" (emphasis added)). Undeterred, the Defendants simply ignored these adverse effects by attempting to balance them against perceived beneficial effects. *See, e.g.*, ECF 14-2 at 6-7.

That is not how significance is determined as a matter of law. Even the Department of Interior's own NEPA guidance forecloses the balancing approach in "[d]etermin[ing] the appropriate level of NEPA review," because it instructs that "the Responsible Official will focus ***only*** on adverse environmental effects." Dep't of Interior, *DOI Handbook of NEPA Procedures* § 1.2(b)*,* available at http://doi.gov/media/document/doi-nepa-handbook (emphasis added). This approach accords with that applied by federal courts for decades, which recognizes that a "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 374 n.20 (1989) (quoting then-current 40 C.F.R. § 1508.27).

<u>Third</u>, the EA fails to acknowledge an additional significant impact in that the Ballroom Project will damage the Executive Mansion itself. The Ballroom Project contemplates "a direct ceremonial procession from the East Room in to the [ballroom] venue" and "enclosed second-story access from the Executive Mansion." ECF 14-3 at 2; *see also id.* at 4 ("The East Colonnade would be renovated to include an enclosed second story that would provide direct access from the East Room to the State Ballroom, while maintaining ground-floor access to and from the Executive

Mansion."). These aspects of the Project ***will require major construction involving the east wall of the Executive Mansion itself***, not just the East Colonnade or the former East Wing. *See id.* at 5 (noting that "portions of the east façade of the Executive Mansion" would need to be removed to accommodate the project). The EA and FONSI are arbitrary and capricious because they fail to acknowledge this physical impact to the central White House structure as a significant impact in its own right, distinct from the impacts involving later-added (yet still historically significant) features. This impact would by itself trigger the need to prepare an EIS.

Fourth, in several fundamental respects the EA and FONSI describe a different project from the Ballroom Project actually underway. Most notably, the FONSI states that the East Wing will be "deconstructed," but that the East Colonnade will merely be "renovated" to add a second story. ECF 14-2 at 1-2. The EA directly contradicts this description by stating in several places that *both* the East Wing and East Colonnade will be "deconstructed." ECF 14-3 at 4. Apart from the obvious fact that renovation is not synonymous with deconstruction, neither is deconstruction synonymous with demolition.[17] While the EA proposes "deconstruction," the government now concedes that what actually occurred was "demolition," Hrg. Tr. 19:11, 20:21, with debris dumped in a D.C. public park, *see* ECF 1 ¶ 63.

The FONSI also specifies that "[a] tower crane will be erected on site, with its final location determined *upon completion* of the final design documents." ECF 14-2 at 3 (emphasis added). The tower crane has now been erected, but the government continues to insist that there *are* no final

---

[17] According to the U.S. Department of Housing and Urban Development, "[i]n contrast to demolition where buildings are knocked down and materials are either landfilled or recycled, deconstruction involves carefully taking apart portions of buildings or removing their contents with the primary goal of reuse in mind." U.S. Dep't of Housing & Urban Devlpt., A GUIDE TO DECONSTRUCTION (2000), *available at* https://www.huduser.gov/publications/pdf/decon.pdf (last visited Dec. 29, 2025).

design documents. ECF 15-1 at 9, 12, 18. The EA and FONSI therefore rely on inaccurate factual premises regarding the construction planning process. This contravenes the foundational requirement that agency action be tethered to relevant facts and data. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agency must "examine the *relevant* data and articulate . . . a rational connection between the facts found and the choice made" (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added))).

Fifth, the face of the EA makes apparent that the EA was prepared for the improper purpose of ratifying a predetermined conclusion. Such pretextual inputs flout "NEPA's primary function" of "compelling federal agencies to take a hard *and honest* look at the environmental consequences of their decisions." *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018). The EA acknowledges the statutory requirement to conduct an alternatives analysis, *see* 42 U.S.C. § 4332(2)(C)(iii), but determines that no other alternative could satisfy the three criteria imposed on the project. *See* ECF 14-3 at 4, 29. These three criteria, however, were not supported by any rationale, and collectively serve no function other than to eliminate the possibility of any viable alternative. An agency may not define "the objectives of its action in terms so unreasonably narrow that only one alternative would accomplish the goals of its action." *Sierra Club v. FERC*, 145 F.4th 74, 88 (D.C. Cir. 2025) (quoting *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)) (citation modified).

According to the EA, EOP informed NPS that any alternatives to the Ballroom Project needed to satisfy each of: "[1] immediate adjacency to the Executive Mansion, [2] a direct ceremonial procession from the East Room into the venue, and [3] enclosed second-story access from the Executive Mansion." ECF 14-3 at 29. Neither the EA nor any of the Defendants' other

submissions to date provide a basis for any of these hyper-specific requirements. But the effect of these requirements, of course, is to foreclose alternative locations, heights, or structural forms that NPS otherwise would have considered. *See id.* (listing alternative forms eliminated by these requirements). Reverse-engineering agency analysis to justify a predetermined outcome is paradigmatic arbitrary and capricious agency behavior. As the Supreme Court recently observed:

> Our review is deferential, but we are "not required to exhibit a naiveté from which ordinary citizens are free." The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer *genuine* justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise.

*Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (emphasis added) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

    Finally, the Defendants contend that NEPA is not concerned with impacts on cultural or historical resources, but instead only with some other concept of harms to the environment. *See* ECF 15-1 at 22-23. This position is directly and emphatically contrary to both the statutory text and decades of judicial instruction.

    NEPA's express stated purpose includes direction to "preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b)(4). *See also Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) ("Congress has declared that 'preserv[ing] important historic, cultural, and natural aspects of our national heritage' constitutes an important goal of the statute." (quoting 42 U.S.C. § 4331(b)(4))); *Oglala Sioux Tribe*, 896 F.3d at 530 ("The environmental effects that must be assessed [under NEPA] include 'aesthetic, historic, cultural, economic, social, or health' effects." (quoting then-current 40 C.F.R. § 1508.8(b) and citing 42 U.S.C. § 4331(b)(4))). Accordingly, an EIS is required not just for significant impacts on the *natural* environment, as the Defendants suppose, but rather for

"reasonably foreseeable significant effect[s] on the quality of the *human* environment." 42 U.S.C. § 4336(b)(1) (emphasis added).

Even Defendant the Department of Interior apparently understands this, because *its own NEPA guidance* requires the agency to assess impacts on the "the affected area's natural and cultural resources" and on the "quality of life of the American people," which it then defines to include "evaluation of learning, interpretation, and research opportunities related to cultural, historic, and natural resources." Dep't of Interior, *DOI Handbook of NEPA Procedures* § 1.2(b)*, available at http://doi.gov/media/document/doi-nepa-handbook; *DOI Handbook of NEPA Procedures,* Appendix 3, § 6(5) (June 2025). And "[i]t is 'axiomatic' . . . that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)). Even NPS does not believe the Defendants' post hoc litigation position, since its own August 2025 EA purported to assess cultural and historic impacts (though that assessment amounted to identifying and then disregarding such adverse impacts). *See, e.g.*, ECF 14-3 at 9.

In support of their questionable assertion that NEPA does not mean what it says, Defendants cite to only one case that commented unremarkably on the similar information-forcing requirements of NEPA and another statute, the National Historic Preservation Act ("NHPA"). ECF 15-1 at 23 (citing *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993)). But nothing in that case—nor any other—identifies a *conflict* between the two statutes, nor states that either one governs historic or cultural concerns exclusively. To the contrary, courts have long recognized that NEPA and NHPA coexist in the historic preservation landscape. *See, e.g.*, *Lemon v. McHugh*, 668 F. Supp. 2d 133 (D.D.C. 2009); *see also* ECF 2-1 at 25-26.

For all of these reasons, the EA and FONSI prepared by NPS in August 2025 were arbitrary and capricious. The agency has therefore failed to comply with its statutory obligations under NEPA. The National Trust and the public have already suffered great harm from the demolition of the East Wing without the opportunity to see the Defendant's rationale or comment in advance, vitiating NEPA's information-forcing purposes. That injury is ongoing for as long as the project continues without proper NEPA disclosures and public input. This Court should enjoin the agency Defendants from further work at the site of the former East Wing until they have fully complied with their NEPA obligations and completed an EIS.

## VI.    The National Trust Will Be Irreparably Harmed Without a Preliminary Injunction.

The Defendants' actions have already caused grave and irreparable harm. In the Defendants' own words, the Ballroom Project "result[ed] in the permanent loss of a component that has been integral to White House operations since 1942." ECF 14-2 at 6. That harm—to a building that the defendant National Park Service states on its own website "is owned by the American people," ECF 2-18—occurred without any review by or input from the American people. That is egregious, wrong, and illegal. But the Project's harm is far from over, and it will only grow absent an injunction requiring the Defendants to comply with the law.

### A.    The National Trust has suffered, and will continue to suffer, severe and legally cognizable injuries from the Ballroom Project.

The National Trust has identified multiple overlapping injuries, both organizational and associational, both procedural and concrete, and to its identified aesthetic, cultural, and historic interests.

The National Trust is suffering ongoing *organizational* injuries through its inability to execute the mission for which it was expressly chartered by Congress, and through obstruction of its regular operations. Without access to statutorily mandated reviews and reports, the National

Trust has been "deprived . . . of key information that it relies on" in its stewardship mission, and it has been "precluded . . . from" preserving a historic site through the National Trust's "normal process" of participating in public fora for commentary on development and construction regarding historic sites in the United States, including those of the CFA, NCPC, and NEPA. *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,* 797 F.3d 1087, 1093-95 (D.C. Cir. 2015); *see* ECF 2-2 ¶¶ 4-8.

The National Trust is also suffering ongoing *associational* injuries through the injuries to its members, including unrebutted, detailed, and direct injuries to its members' aesthetic, historic, and cultural interests, as well as procedural injuries through the deprivation of means to address those interests. *See* ECF 2-3 ¶¶ 9-16.

To be unambiguously clear: Courts have long and routinely recognized these injuries as both cognizable ***and*** irreparable. *See, e.g., Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 24 (D.D.C. 2009). In particular, "[w]hen a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Id.* at 24–25; *see also Oglala Sioux Tribe,* 896 F.3d at 534.

The Defendants' principal argument to the contrary is a strawman: that procedural injuries "standing *alone*" are insufficient to cause irreparable harm. *See* ECF 15-1 at 25 (emphasis added). Even if true, it is irrelevant: the National Trust has not pleaded "standalone" procedural injuries, but has instead pleaded procedural injuries tethered to concrete interests. And it is black-letter law that procedural injuries affecting a plaintiff's concrete interests cause immediate—and often irreparable—harm. *See Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985). It is only when the potential for injury to those interests is itself so speculative or remote in time that it is no longer *concrete* that an injunction is not warranted to avoid imminent procedural harms.

*See Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009) (acknowledging the sufficiency of plaintiffs' allegation that they "would have been able to oppose the project that threatened to impinge on their concrete plans," while observing  that in contrast, "deprivation of a procedural right *without* some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing" (emphasis supplied)).[18]

The Defendants' contrived conception of concreteness would require above-ground construction to be literally imminent before any enjoinable harm could exist from their failure to comply with a procedural statute like NEPA or the NCPA. Such a cramped and restrictive interpretation lacks any precedential basis, and for good reason: It would create a perverse incentive for agencies to evade orderly public review of their projects by intentionally refusing to release any plans until they were poised to proceed, and then springing the plans on the public as a *fait accompli*. NEPA and the other procedural statutes under which the National Trust seeks relief recognize that enjoinable harm exists at a much earlier stage: when an agency contends that its compliance with these statutes is based on construction plans that are either deficient or nonexistent.

---

[18] The cases cited by the Court in its December 16 order are not to the contrary. *See* ECF 17 at 4 (citing *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336-37 (D.D.C. 2017) (holding the interests affected by the procedural injury from inadequate NEPA review of a land lease were too attenuated to support a preliminary injunction where the "articulated injuries would result only from the construction and operation of a wind energy facility, but any construction of such a facility is years in the future and subject to further government approval") and *Manzanita Band of the Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 263-65, 269 (D.D.C. 2020) (holding Native American tribe's cultural and religious interests were too uncertain to support enjoining construction that they claimed would likely implicate native gravesites, where they had not identified any such gravesites within the contemplated construction area and protocols existed to avoid such sites)).

B.  <u>The National Trust's injuries are imminent and require a preliminary injunction.</u>

The National Trust's injuries do not become imminent only once visible above-ground construction commences. *Its injuries are already ongoing*.

<u>First</u>, the Defendants demolished an iconic and historic structure without initiating any of the required commission reviews, after conducting only the most superficial, arbitrary, and inadequate NEPA analysis, and without making that analysis public until compelled by litigation. The Government's defiance of the law to date has forfeited any ordinary entitlement they may have had to a presumption of regularity. *See Fed. Educ. Ass'n v. Trump,* No. 25-1362, 2025 U.S. Dist. LEXIS 157767, at *23 (D.D.C. Aug. 14, 2025) (explaining that "[t]he presumption can be rebutted with 'clear evidence' that the official did not discharge his or her official duties properly," and finding that the presumption had been rebutted (quoting *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024)). As a result, the mere belated *submission* of plans to NCPC or CFA—without *completing* the necessary reviews and approvals—is insufficient to ameliorate the National Trust's ongoing injuries. These injuries will continue as long as construction on the Ballroom Project can proceed without first securing all of the required reviews and approvals, including Congressional authorization.

<u>Second</u>, the National Trust's injuries are not remedied by the Defendants' untenable representations regarding future construction status (even setting aside the ongoing nature of the Ballroom construction, which the Defendants' *own website* states commenced with the demolition of the East Wing, *see* ECF 1 ¶ 72). The Defendants are right now continuing construction work at the East Wing site. Even taking them at their word, by the time the National Trust's Motion is heard on January 15, 2026, they will have already commenced (or intend to imminently commence) work on the East Colonnade that will irrevocably determine the location of key elements of the above-ground structure. *See* ECF 17 at 2-3 (noting that "the Government has

represented that below-grade structural work—i.e., 'footings and below-grade structural concrete'—will not begin until January 2026 for the colonnade and February 2026 for the ballroom."); ECF 14-3 at 2 (describing project criteria that include "immediate adjacency to the White House Executive Mansion" and "a direct ceremonial procession from the East Room into the venue").

Contrary to the Court's expectation at the TRO hearing, the Defendants still have not submitted any *plans* to the NCPC. *See* Hrg. Tr. at 8:19-9:14 (exchange beginning with Mr. Heuer addressing the government's claim that "*the plans* are coming," through the Court's statement that, "[t]hey've got till the end of this month before we have our PI hearing, which will be in January. They have until then to get it done." (emphasis added)). The Defendants' engagement with the NCPC since the TRO hearing has been the most minimal and nominal possible: placing the Ballroom Project on the January 8, 2026 NCPC meeting agenda as an "information presentation" only, without making any plans available. NCPC, "Tentative Agenda Items for the January 8, 2026 Commission Meeting," at 7 (updated December 22, 2025), available at https://www.ncpc.gov/docs/Tentative_Agendas/TentativeAgenda_January2026.pdf (last accessed Dec. 29, 2025) (listing "East Wing Modernization Project" as an "[i]nformation presentation" only, with "no action requested or taken"). The mere *discussion* of the *possibility* of submitting plans, or other making other abstract commitments, does not constitute compliance with any of the statutes the Defendants have violated, or allow the Defendants to proceed with construction (even if that work is subject to potential removal). *See* ECF 17 at 3. Nor does it vindicate the interests of the National Trust that are being harmed by that non-compliance.

Third, the point of the statutes and regulations requiring NCPC, CFA, and NEPA review is to permit meaningful public participation and considered review of projects ***before*** they begin, and

*before* the agency commits to irrevocable impacts. *See Oglala Sioux Tribe*, 896 F.3d at 532; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An opportunity to comment *after* the fact is simply insufficient: The practical reality is that comments suggesting substantial changes to a project are less likely to be taken seriously if the project is already well underway. *See Jones v. District of Columbia Redev. Land Agency,* 499 F.2d 502, 512-13 (D.C. Cir. 1974) ("So long as the *status quo* is maintained, so long as the environmental impact statement is not merely a justification for a *fait accompli,* there is a possibility that the statement will lead the agency to change its plans . . . .").

Time is therefore of the essence. As set forth in the Declaration of William J. Bates, the former National President of the American Institute of Architects, "planning and design activities for the construction of buildings always precede the commencement of below-grade construction of a foundation," because "the below-grade foundation system establishes the structural grid, load paths, and lateral-force resisting systems that dictate the size, spacing and location of columns, shear walls, structural cores, and load-bearing elements above-grade." Declaration of William J. Bates, ¶ 5; *see also id.* ¶ 11 (describing professional practice for architects and engineers to complete above-ground design elements first, and then calculate foundation design around those elements). Accordingly, "[w]ith respect to the proposed White House ballroom, once the foundation and related subsurface work are in place, the location, bulk, spans, bay sizes, and floor plate geometry (among other elements) of the building itself are fixed for all practical purposes." *Id.* ¶ 5.

The Defendants have entirely ignored these architectural realities. Rather than obtaining review and approval before the foundation is constructed, they have intentionally coordinated the construction process "***to allow the below grade elements to be constructed as planned while the***

41

*above grade design is finalized*." *See* ECF 14-6 ¶ 21 (emphasis supplied). Put simply, the process that the Defendants plan to follow will lock in key aspects of the plans for the Ballroom *before any review occurs at all*. As Mr. Bates explains in detail, a number of above-ground elements of the Ballroom Project will be established by the foundation, including:

- "life safety elements of the project such as stair and elevator cores, fire-rated shafts and points of access and exit," *id.* ¶ 7;

- "subsurface utilities and infrastructure," including for stormwater, "sanitary and water services, fire service mains, electric duct banks, fuel or water tanks, geothermal wells, and foundation drainage," *id.* ¶ 8;

- "the building's structural and support points which govern the building's façade," window spacing, support of cantilevers, and the anchoring of balconies, canopies, or other projections," *id.* ¶ 9;

If the Defendants proceed with construction of the foundation, any subsequent review will be a seriously diminished if not meaningless process. Mr. Bates explains that "[f]inalizing and constructing a foundation before completing the building design inevitably will constrain if not eliminate the flexibility to modify elements of the building design." *Id.* ¶ 11. Therefore, "[c]ommencing foundation work before submitting plans for review, commentary and approval"— which, without a preliminary injunction, is precisely what the Defendants plan to do—"*will likely cause any such review, commentary or approval to be an empty exercise* and preclude meaningful approvals." *Id.* ¶ 13 (emphasis added).

A preliminary injunction is necessary. The Court should enjoin the Defendants to vindicate the prerogatives and intent of Congress, to prevent the legally mandated review of the Ballroom Project from becoming an empty exercise, and to preserve the right to meaningful public participation in matters involving the People's House.

## CONCLUSION

For the reasons stated herein, and in the National Trust's Motion, the Court should grant the National Trust's Motion and enter the preliminary injunction requested.

Respectfully submitted,


*/s/ Gregory B. Craig*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006.
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000


Dated: December 29, 2025

## CERTIFICATE OF SERVICE

I certify that on December 29, 2025, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). I further certify that I have caused the foregoing document to be served by registered mail on newly added defendants who have not yet entered appearances, in connection with service of the Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 4. Those parties include:

Executive Office of the President
1600 Pennsylvania Avenue NW
Washington, DC 20500

Susie Wiles, in her official capacity as Chief of Staff
1600 Pennsylvania Avenue NW
Washington, DC 20500

Office of the Executive Residence
1600 Pennsylvania Avenue NW
Washington, DC 20500

Robert B. Downing, in his official capacity as White House Chief Usher
1600 Pennsylvania Avenue NW
Washington, DC 20500

*/s/ Jack C. Smith*