UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

         Plaintiff,

  v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**DEFENDANTS' SUPPLEMENTAL RESPONSE BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ...........................................................................................................4

   I.   THE NATIONAL TRUST LACKS ARTICLE III STANDING. .............................................. 4

       A.   The National Trust Does Not Have Organizational Standing Because the East Wing Project Does Not Threaten Its Statutory Mission. ........................... 5

       B.   The National Trust Does Not Have Associational Standing, Including Because Its Member-Declarant Faces No Cognizable Aesthetic Injury. .......... 8

   II.   THE NATIONAL TRUST HAS NO CAUSE OF ACTION. ................................................. 12

       A.   The Entity Directing the Project Is Not Subject to the APA. ........................... 13

       B.   The National Trust's "Constitutional" Claims Are Merely Statutory Ones. ..... 17

  III.   IN ANY EVENT, THE NATIONAL TRUST'S CLAIMS FAIL ON THE MERITS. .................. 19

       A.   Defendants Are Consulting with the NCPC and the CFA. ............................. 20

       B.   Defendants Produced a Satisfactory Environmental Assessment, and a NEPA Deficiency Would Not Support an Injunction Regardless. ................... 22

       C.   The President Does Not Need Express Congressional Approval for the Project. ........................................................................................... 28

       D.   The "Constitutional" Claims Fail for the Same Reasons. ............................... 35

  IV.   THE BALANCE OF EQUITIES WEIGHS IN THE GOVERNMENT'S FAVOR. ..................... 37

       A.   The National Trust Fails to Establish Imminent Irreparable Harm. ................ 37

       B.   Halting Construction Would Harm Defendants and the Public Interest. ......... 40

CONCLUSION .....................................................................................................42

## TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama,*
  753 F.3d 193 (D.C. Cir. 2014) ................................................................. 37

*Acting Comptroller Gen. Elliott to the Sec'y of War,*
  18 Comp. Gen. 489 (1938) ....................................................................... 34

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,*
  121 F.4th 1314 (D.C. Cir. 2024) .............................................................. 38

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019) ..................................................................................... 9

*Appalachian Voices v. U.S. Env't Prot. Agency,*
  No. CV 25-1982, 2025 WL 2494905 (D.D.C. Aug. 29, 2025) ................. 17

*Armstrong v. Bush,*
  924 F.2d 282 (D.C. Cir. 1991) ................................................................. 29

*Armstrong v. Exec. Off. of the President,*
  90 F.3d 553 (D.C. Cir. 1996) ............................................................. 14, 15

*Arpaio v. Obama,*
  27 F. Supp. 3d 185 (D.D.C. 2014) .......................................................... 40

*Ateba v. Leavitt,*
  133 F.4th 114 (D.C. Cir. 2025) ............................................................... 29

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................. 17

*Blassingame v. Trump,*
  87 F.4th 1 (D.C. Cir. 2023) ..................................................................... 29

*Citizens Against Burlington, Inc. v. Busey,*
  938 F.2d 190 (D.C. Cir. 1991) ................................................................. 27

*Citizens for Resp. & Ethics in Wash. v. Off. of Admin.,*
  566 F.3d 219 (D.C. Cir. 2009) ................................................................. 13

*CityFed Fin. Corp. v. Off. of Thrift Supervision,*
  58 F.3d 738 (D.C. Cir. 1995) ................................................................... 37

*Nuclear Reg. Comm'n v. Texas,*
  605 U.S. 665 (2025) ................................................................................. 35

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
144 F.4th 296 (D.C. Cir. 2025) ............................................................ 11

*\*Dalton v. Specter,*
511 U.S. 462 (1994) ...................................................... 13, 17, 18, 19

*Def. Arlington v. U.S. Dep't of Def.,*
No. 23-441, 2023 WL 8600567 ............................................................ 23

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ............................................................................ 24

*Dong v. Smithsonian Inst.,*
125 F.3d 877 (D.C. Cir. 1997) ............................................ 13, 15, 16

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988) ............................................................................ 30

*\*Envt'l Def. Fund v. FERC,*
2 F.4th 953 (D.C. Cir. 2021) .................................... 9, 10, 11, 38

*\*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .................................................................... 5, 7

*Fisheries Survival Fund v. Jewell,*
236 F. Supp. 3d 332 (D.D.C. 2017) .................................................... 37

*Food & Water Watch v. FERC,*
28 F.4th 277 (D.C. Cir. 2022) .............................................................. 9

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) ...................................................... 5, 11

*\*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ............................................................................ 29

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ............................................................................ 36

*Glob. Health Council v. Trump,*
153 F.4th 1 (D.C. Cir. 2025) .............................................................. 18

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
383 F.3d 1082 (9th Cir. 2004) ............................................................ 22

*Haddon v. Walters,*
43 F.3d 1488 (D.C. Cir. 1995) ............................................................ 15

*Holloway v. Bristol-Myers Corp.*,
  327 F. Supp. 17 (D.D.C. 1971) ........................................................................... 9

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ........................................................................................... 8

*Indian River Cnty. v. Rogoff*,
  201 F. Supp. 3d 1 (D.D.C. 2016) ......................................................... 23, 25, 26

*Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
  466 F. Supp. 3d 100 (D.D.C. 2020) ................................................................. 13

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ......................................................................................... 35

*Liberty Mar. Corp. v. United States*,
  928 F.2d 413 (D.C. Cir. 1991) ......................................................................... 32

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................... 21, 30

*Lowman v. Fed. Aviation Admin.*,
  83 F.4th 1345 (11th Cir. 2023) ........................................................................ 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................... 4

*Manzanita Band of Kumeyaay Nation v. Wolf*,
  496 F. Supp. 3d 257 (D.D.C. 2020) ................................................................. 37

*Mayo Found. v. Surface Transp. Bd.*,
  472 F.3d 545 (8th Cir. 2006) ........................................................................... 27

*McKinney v. Caldera*,
  141 F. Supp. 2d 25 (D.D.C. 2001) ................................................................... 13

*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993) ................................................................. 13, 16

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ......................................................................................... 28

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ......................................................................................... 32

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) ....................................................................... 35

*Nat. Res. Def. Council v. U.S. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) .......................................................... 22, 23

*Nat'l Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017) ................................................................ 38

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) ......................................................................... 7

*Nat'l Trust for Historic Pres. v. Blanck*,
938 F. Supp. 908 (D.D.C. 1996) .................................................................... 27

*O'Reilly v. U.S. Army Corps of Eng'rs*,
477 F.3d 225 (5th Cir. 2007) ......................................................................... 26

*Pac. Legal Found. v. Council on Env't Quality*,
636 F.2d 1259 (D.C. Cir. 1980) ............................................................... 14, 16

*Pollack v. U.S. DOJ*,
577 F.3d 736 (7th Cir. 2009) ......................................................................... 11

*Public Citizen v. Dep't of Justice*,
491 U.S. 440 (1989) ...................................................................................... 30

*Rushforth v. Council of Econ. Advisers*,
762 F.2d 1038 (D.C. Cir. 1985) ......................................................... 14, 15, 16

*Russell Motor Car Co. v. United States*,
261 U.S. 514 (1923) ...................................................................................... 33

*Santos v. Collins*,
No. 24-1759, 2025 WL 1823471 (D.D.C. Feb. 26, 2025) ............................... 38

*\*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......................................................................... 24, 25, 28

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) ....................................................................... 27

*Sierra Club v. Andrus*,
581 F.2d 895 (D.C. Cir. 1978) ................................................................. 14, 15

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016) ........................................................................... 9

*Sierra Club v. Lynn*,
502 F.2d 43 (5th Cir. 1974) ........................................................................... 27

*Sierra Club v. U.S. Army Corps of Engr's*,
  No. 2:20-cv-00396-LEW, 2020 WL 7389744 (D. Me. Dec. 16, 2020)................................... 28

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976).............................................................................................................. 5

*Soucie v. David*,
  448 F.2d 1067 (D.C. Cir. 1971) ........................................................................... 13, 14, 16

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998).............................................................................................................. 11

*Sugarloaf Citizens Ass'n v. FERC*,
  959 F.2d 508 (4th Cir. 1992) ............................................................................................. 23

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)............................................................................................................ 8

*Sweetland v. Walters*,
  60 F.3d 852 (D.C. Cir. 1995) ....................................................................................... 13, 14

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ........................................................................................... 24

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) ........................................................................................... 25

*United States v. Espy*,
  145 F.3d 1369 (D.C. Cir. 1998) ......................................................................................... 17

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) ............................................................................................. 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)............................................................................................................ 17

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015)......................................................................................................... 29, 31

## Statutes

28 U.S.C. § 458............................................................................................................................ 29

3 U.S.C. § 105(a)(1)..................................................................................................................... 14

3 U.S.C. § 105(b)(1) .................................................................................................................... 36

*3 U.S.C. § 105(d) ...................................................................................................... 16, 18, 19, 32

3 U.S.C. § 109 ................................................................................................ 14

31 U.S.C. § 1535 ...................................................................................... 32, 34

31 U.S.C. §1321(a)(17) ............................................................................ 31, 34

40 U.S.C. § 8106 ........................................................................ 18, 28, 32, 42

40 U.S.C. § 8722(b)(1) ............................................................................. 20, 21

42 U.S.C. § 4336(b)(1) ............................................................................. 24, 25

42 U.S.C. § 4336a(c) ....................................................................................... 24

54 U.S.C. § 100101(a) ..................................................................................... 35

54 U.S.C. § 101101(2) ............................................................................. 31, 34

54 U.S.C. § 307104 .................................................................................... 7, 27

54 U.S.C. § 312102(a) ....................................................................................... 5

54 U.S.C. § 312105(g) ....................................................................................... 6

Pub L. No. 81-408, 63 Stat. 927, 929 (1949) ................................................... 6

Pub. L. No. 113-287, 128 Stat. 3094 (2014) ..................................................... 7

Pub. L. No. 80-25, 61 Stat. 26, 28 (1947) ...................................................... 34

Pub. L. No. 87-286, 75 Stat. 586, 586 (1961) ...................................... 19, 35, 36

Pub. L. No. 89-665, 80 Stat. 915, 917 (1966) ................................................... 6

Pub. L. No. 95-570, 92 Stat. 2445, 2446 (1978) ............................................ 32

**The Constitution**

U.S. Const. art. IV, § 3, cl. 2 .................................................................... 18, 35

**Regulations**

45 C.F.R. § 2101.2(b) ..................................................................................... 20

**Other Authorities**

112 Cong. Rec. 25942 (Oct. 10, 1966) ............................................................. 7

89th Cong. P. 67 (Aug. 9, 1966) ....................................................................... 7

Black's Law Dictionary (5th ed. 1979)........................................................................ 33

Black's Law Dictionary (12th ed. 2024)...................................................................... 33

*East Wing Modernization Project – Frequently Asked Questions*, NCPC,
    (last visited Jan. 14, 2026),
    https://www.ncpc.gov/files/projects/2025/8733_East_Wing_Modernization_Project_
    Project_FAQs_Jan2026.pdf........................................................................................ 21

H.R. Rep. No. 855, 81st Cong. (June 20, 1949) ........................................................... 6

Oxford English Dictionary, (2d ed. 1989) ................................................................. 33

Philip Bump, *What We Know About the White House's Secret Bunkers and Tunnels*,
    Washington Post, (June 1, 2020) .............................................................................. 41

Richard E. Farley, *The Fascinating History of the White House Press Room*,
    Town & Country Magazine (Jan. 17, 2017),
    https://perma.cc/B62V-PAVV .................................................................................. 31

Stewart McLaurin, *An Ever-Changing White House*, White House Historical Ass'n,
    (last visited Jan. 14, 2026),
    https://www.whitehousehistory.org/an-ever-changing-white-house ......................... 1

William Safire, *Essay*: *Inside the Bunker*, N.Y. Times, (Sep. 13, 2001)..................... 41

*William Seale, *The President's House: A History,* (Jan. 1, 1986)............................. 10

## INTRODUCTION

When the President set out to replace the historic East Wing with a larger building, demolition proceeded under a "storm of public protest" and "the opposition denounc[ed] the construction as extravagant and wasteful." William Seale, The President's House: A History 980 (1986). Congress neither earmarked appropriations for the project nor approved the President's design. After some preliminary work by the National Park Service (NPS), the President took control, personally approving plans and overseeing the work. *Id.* at 979-80. The National Capital Park and Planning Commission was not even consulted. The new East Wing was completed—in 1942, by President Franklin Delano Roosevelt.

President Roosevelt's design and construction followed a pattern set by generations of his predecessors and repeated by every subsequent President who added a structure to the White House complex, including President Donald J. Trump. Indeed, since the construction of the White House over two centuries ago, Presidents have engineered and executed renovations large and small to reflect the evolving demands of the presidency. From the beginning, Congress has almost exclusively entrusted these renovations to the President's discretion, as it does expressly to this day. Congress's deference to the President on the design and composition of the White House is no historical accident—it reflects the fact that the President lives and works in the White House, the "office for the president and his staff" and "the ceremonial stage upon which our nation welcomes its most important visitors."[1] Congress recognizes that the President, in his constitutional roles as head of State and commander-in-chief, uniquely understands how the White House can best meet the demands of his singular office.

---

[1] S. McLaurin, *An Ever-Changing White House*, White House Historical Ass'n, https://www.whitehousehistory.org/an-ever-changing-white-house (last visited Jan. 14, 2026).

This case presents a dispute over the President's construction of a new East Wing that will bring much-needed modernization, operational flexibility, and improved security to the entire complex.  The National Trust for Historic Preservation, a congressionally chartered non-profit, objects to the planned construction, and seeks a preliminary injunction to stop the project in its tracks.  It says the President failed to consult with regulatory bodies, has not completed an adequate environmental assessment (EA), and must secure approval from Congress before erecting a new structure on White House grounds.  The Court should decline to enjoin the project, because the National Trust cannot succeed on the merits for multiple fundamental reasons, and further cannot show that the balance of harms favors halting the project at this juncture.

A plaintiff needs three basic things to secure relief from a federal court: Article III standing, a cause of action, and a meritorious claim.  The National Trust has none of them.

*First*, its briefs conspicuously omit any discussion of standing—and for good reason.  The National Trust as an organization is not itself injured by the East Wing project, because its statutory mission specifically *excludes* the White House—an intentional congressional decision to keep this entity out of the President's affairs.  The Trust's charge is to preserve and administer historic sites that are donated to its care, but the White House is plainly not among them.  Nor can the National Trust establish associational standing through the single member who submitted a declaration.  Her alleged "aesthetic" injury is neither germane to the National Trust's purposes nor a cognizable Article III injury in its own right.  As the D.C. Circuit has made clear, aesthetic harm is sufficient only if a plaintiff establishes significant personal use of the property; mere fear about intermittent exposure to an "eyesore" is only a generalized grievance.  And, as a factual matter, the East Wing was barely visible from public spaces and will remain so, further reducing any genuine aesthetic harm.  Simply put, the East Wing project is none of the National Trust's business.

*Second*, the National Trust has no cause of action. Almost all its claims invoke the APA—but the Executive Residence at the White House (EXR), which is managing the East Wing project under the President's direction, is not an "agency" under the APA any more than the President himself. The D.C. Circuit so held thirty years ago. In a bid to evade that precedent, the National Trust argues that the President has "added" duties to EXR's mandate by tasking it with overseeing the East Wing project. Not at all—EXR's role is to assist the President in managing the Executive Residence, and that is exactly what it is doing. Nothing about that task converts EXR into an APA agency. The National Trust also asserts two "separation of powers" claims, but neither is a genuine constitutional claim; they are simply challenges to the President's statutory authority to undertake the project. Under Supreme Court precedent, those are statutory claims, not constitutional ones, so the National Trust needs a statutory cause of action to pursue them. None exists.

*Third*, even looking past these threshold problems, the National Trust's claims fail on the merits. Consistent with its representations, the White House has begun consultations with the National Capital Planning Commission (NCPC) and Commission of Fine Arts (CFA), well in advance of above-ground construction. The EA has also been properly completed; the National Trust's objections are meritless and would not support injunctive relief regardless. That leaves the claim that the President requires express congressional approval to make improvements to the White House. Statutory text says otherwise, and historical practice drives the point home. Congress has enacted an appropriations framework giving the President discretion for improvements to the Executive Residence, notwithstanding any other law. And practice bears out that understanding—the National Trust's own historical annex represents that Presidents have not secured congressional approval for *any* new structure erected on White House grounds since 1912 (when Congress first enacted the statute ostensibly requiring its approval).

The balance of harms independently precludes preliminary relief. For its part, the National Trust cannot show it will suffer irreparable harm absent a preliminary injunction. It concedes that bare procedural injury is insufficient. And any aesthetic harms remain hypothetical (if cognizable at all), because plans for the East Wing are still in development, months remain until the start of above-ground construction, and the work that must proceed below-grade will not lock in the scope of the above-grade construction. On the other side of the balance, halting work at this time would leave an unsightly hole in the ground indefinitely and pose serious national security threats. There is no world in which equity supports ceasing construction mid-stream and holding up a crucial presidential project simply because a non-profit's member worries she will be offended by the President's architectural choices if she cranes her neck on periodic strolls by the White House.

## ARGUMENT

### I.    THE NATIONAL TRUST LACKS ARTICLE III STANDING.

The National Trust cannot sue to stop the East Wing project without first establishing that it has Article III standing: a concrete, particularized injury-in-fact that is caused by the defendant's conduct and redressable by the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Incredibly, the National Trust never bothers to address its standing—even in its supplemental brief after Defendants flagged the issue. And that is not because standing is obvious: After all, this is a non-profit seeking to stop a presidential construction project on White House grounds.

The closest the National Trust comes to identifying injury is in its discussion of irreparable harm. There, it argues that the project threatens the National Trust's organizational interests and its members' aesthetic interests. ECF 20 (Supp. Br.) at 36–37. Neither theory works as a basis for Article III standing. The National Trust's mission *excludes* the White House, which defeats both forms of standing. And its only member declaration describes an aesthetic harm that, under D.C. Circuit precedent, is nothing more than a (hypothetical) generalized grievance.

A.    **The National Trust Does Not Have Organizational Standing Because the East Wing Project Does Not Threaten Its Statutory Mission.**

In determining whether an organization has standing in its own right, courts conduct the same inquiry as in the case of an individual plaintiff. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). "An organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Rather, an organization must show that the defendant's conduct "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

The National Trust argues that the East Wing project renders it unable "to execute the mission for which it was expressly chartered by Congress." Supp. Br. 36. It never explains why—the National Trust is free to make its views known, and Congress did not give the Trust veto rights over construction at historic sites. More fundamentally, this standing theory fails because statutory and legislative history establish that the National Trust's purpose and purview specifically *exclude* the White House and its grounds. That is fatal.

The National Trust describes its statutory mission in sweeping terms, as to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. § 312102(a). That is not what the statute (or charter) actually says. The quoted language in subsection (a) offers a general account of why *Congress established* the National Trust. It is subsection (b) that then enumerates the National Trust's specific "purposes," and they are far more narrow: as relevant here, they are to "receive donations of sites, buildings, and objects significant in American history and culture," and to "preserve and administer" those donated sites "for public benefit." *Id.* § 312102(b). The White House was obviously not donated to the National Trust, so the Trust has no statutory interest in its preservation or administration.

Even if the National Trust had a broader statutory mandate dealing with preservation of historic sites more generally, the White House is *excluded* from that mandate.  Congress chartered the National Trust in 1949, when the task of preserving historic sites became too burdensome for the National Park Service (NPS) to handle on its own.  *See* Pub L. No. 81-408, 63 Stat. 927, 929 (Oct. 26, 1949).  The National Trust was designed to supplement, not supplant, the Secretary of the Interior's preservation role under the 1935 Historic Sites Act.  *See* H.R. Rep. No. 855, 81st Cong. (June 20, 1949) ("Realizing that the Federal Government cannot do the whole job," … "[t]he purpose of this bill, as amended, is to supplement the Federal program for the preservation of important historic sites and buildings of America, as provided in the Historic Sites Act, by authorizing the establishment of a National Trust for Historic Preservation in the United States.").  Accordingly, Congress passed an amendment that became Section 4(f) of the National Trust's charter, excepting "property within the exterior boundaries of national parks and national monuments" from its mandate.  63 Stat. 927, 929.  (That language has been updated to reflect modern terminology; it now carves out property within NPS "System unit[s]."  54 U.S.C. § 312105(g).)  The Committee on Public Lands explained that the bill was not intended "to permit a trust to go into the National Parks and acquire property."  Hr'g, H.R. Comm. on Public Lands (June 16, 1949).  From the start, the Trust's charter thus reflected Congress's view that national parks—which now include White House grounds (Supp. Br. 24)—were outside its purview.

Congress reinforced this carveout in the National Historic Preservation Act (NHPA), Pub. L. No. 89-665, 80 Stat. 915, 917 (Oct. 15, 1966), which provided the National Trust with matching funds and created an Advisory Council on Historic Preservation to work with it.  Again, Congress worried that the National Trust would inject itself into matters under NPS's purview.  To prevent that, Congress adopted an amendment: "Nothing in this Act shall be construed to be applicable to

the White House and its grounds[.]" *Id.*  As the legislative history makes plain, Congress sought

to clarify again that the National Trust has no role with respect to the White House and its grounds.

In the words of the bill's lead proponent in the House (Rep. John Saylor), the law was not meant

to apply to the "homes" of the "three branches of government."  *To Establish a Program for the*

*Preservation of Additional Historic Properties throughout the Nation, and for Other Purposes*,

Hr'g on S. 3035 Before the Comm. on Interior and Insular Affs., 89th Cong. P. 67 (Aug. 9, 1966).

Indeed, the exception was "of great significance" because "[m]any people who were in favor of

this legislation were fearful that … the [National Trust] would busy itself not only with the things

which the committee intended but also busy itself with *the White House*, the Supreme Court, and

the Capitol."  112 Cong. Rec. 25942 (daily ed. Oct. 10, 1966) (emphasis added).[2]

The East Wing project is thus at least two steps removed from "directly affect[ing]" or

"interfer[ing] with" the National Trust's "core business activities."  *All. for Hippocratic Med.*, 602

U.S. at 395.  The Trust's core statutory duties concern only specific historic sites that are donated

to the non-profit for preservation and administration; historic preservation beyond those sites is

merely "the type of abstract concern that does not impart standing."  *Nat'l Taxpayers Union, Inc.*

*v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  But even if the National Trust had a broader

mission, Congress has made clear it has no role with respect to "the White House and its grounds."

Either way, the East Wing project does not threaten the National Trust's core business activities,

and that defeats organizational standing.

---

[2] In 2014, Congress recodified the 1966 Act, and the operative language was changed to: "Nothing in this division applies to the White House and its grounds[.]" 54 U.S.C. § 307104.  That change was not intended to have substantive effect: "In the codification of laws by this Act, the intent is to conform to the understood policy, intent, and purpose of Congress in the original enactments." Pub. L. No. 113-287, 128 State. 3094 (Dec. 19, 2014).  So even though the Trust's charter appears in Division B rather than Division A of Title 54 Subtitle III, the original intent of the 1966 Act—to carve the White House out of the National Trust's jurisdiction—holds.

**B.      The National Trust Does Not Have Associational Standing, Including Because Its Member-Declarant Faces No Cognizable Aesthetic Injury.**

The National Trust's apparent gesture toward associational standing is equally unavailing. An association has standing to sue on behalf of its members if, among other requirements, "its members would otherwise have standing to sue in their own right" and "the interests it seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the National Trust rests on a single member, Alison K. Hoagland, whose declaration attests that she would suffer injuries "to [her] aesthetic, cultural, and historical interests, if a ballroom of the proposed form and scale were constructed on the site of the former East Wing." ECF 2–3 (Hoagland Decl.) ¶ 14. But those interests are not germane given the White House's exclusion from the National Trust's mission. Regardless, the aesthetic injuries Hoagland invokes are insufficient under D.C. Circuit precedent, and too speculative to boot.

**1.** As to germaneness, the National Trust is a congressionally chartered entity whose purpose excludes "busy[ing] itself with the White House." 112 Cong. Rec. 25942 (Oct. 10, 1966). Yet the allegations raised in this suit and in Hoagland's Declaration solely concern the White House. Given that the National Trust's organizational purpose does not include—and, indeed, specifically excludes—the White House and its grounds, Hoagland's alleged injuries are not germane to the National Trust's purpose and cannot establish associational standing.

In all events, those aesthetic injuries do not constitute an injury-in-fact necessary for her to sue in her own right, and thus cannot ground Article III standing for the National Trust. They fail both Article III's particularization requirement and its imminence requirement.[3]

---

[3] Hoagland also asserts procedural injuries, but as this Court previously noted, standalone procedural injuries are insufficient. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). The National Trust thus properly acknowledges that any procedural injuries must be "tethered to concrete interests." Supp. Br. 37. Here, those concrete interests are alleged aesthetic harms. The alleged procedural injury thus rises or falls with the aesthetic injury.

**2.** When a plaintiff alleges aesthetic harm from construction, she must show that "her specific aesthetic interests" are harmed, by describing her particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and she must further identify how she will have to "alter[] her behavior." *Envt'l Def. Fund v. FERC*, 2 F.4th 953, 969–70 (D.C. Cir. 2021) (*EDF*). Thus, standing existed where a plaintiff alleged that construction of a pipeline over property where he frequently fished, boated, and hunted would diminish his ability to do those things. *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *see also Food & Water Watch v. FERC*, 28 F.4th 277, 283–84 (D.C. Cir. 2022) (finding standing where construction would cause noise and pollution that would impair "financial value" and "peaceful enjoyment" of nearby property). On the other hand, the D.C. Circuit concluded that a plaintiff lacked standing to vindicate an aesthetic interest when she did "not even allege that she c[ould] see the new [construction] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week when driving past." *EDF*, 2 F.4th at 969–70.[4] She had "neither altered her behavior nor explained why she has any particularized connection to the land," thus reducing her "alleged aesthetic injuries" to "nothing more than generalized grievances, which cannot support standing." *Id.*; *cf. Holloway v. Bristol-Myers Corp.*, 327 F. Supp. 17, 24 (D.D.C. 1971), *aff'd*, 485 F.2d 986 (D.C. Cir. 1973) (explaining that a public nuisance plaintiff must show "special damage, distinct from that common to the public," which turns on "the probable extent of the plaintiffs' discomfort, the [presence or] lack of physical damage to any property, the plaintiffs' ability to avoid some of the discomfort, and the nature of the interferences with property rights").

---

[4] The D.C. Circuit found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *EDF*, 2 F.4th at 970; *see also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 84 (2019) (Gorsuch, J., concurring in the judgment) ("Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III.").

Hoagland has not alleged that she uses or enjoys the White House in a way that is unique from the general public.  This is not a lake where she swims, or a park where she plays pickleball.  She has suffered no financial harm to her property.  She is not suffering discomfort from the project in the way that a public nuisance plaintiff might be if she were exposed to an offensive odor or toxic smog.  Furthermore, Hoagland can easily avoid any alleged aesthetic discomfort, as she lives "about 2 miles from the White House," Hoagland Decl. ¶ 9, several times further away than the plaintiff in *EDF*.  Indeed, like that plaintiff, she "does not even allege that she can see the new [construction] from her property."  *EDF*, 2 F.4th at 970.  She says she expects to continue to visit the White House area about "once a month," Hoagland Decl. ¶ 12, much less frequently than the *EDF* plaintiff who planned to visit "several times a week," 2 F.4th at 969–70.  Hoagland says she "regularly view[s] the White House from the south side," Hoagland Decl. ¶ 12, but "incidental viewership" "while driving past" a site is insufficient, *EDF*, 2 F.4th at 969–70.  Nor has Hoagland alleged that she will be required to "alter[] her behavior."  *Id.*  The closest she comes is a generic statement that "[t]he White House affects my own research," Hoagland Decl. ¶ 11, but she provides no information on how the construction would interfere with her research.

Moreover, the East Wing has never been clearly visible from the south side (or other public areas), and the new East Wing will not materially change that fact.  Ex. A (Fisher Decl.) ¶ 11; *see also* William Seale, The President's House: A History 982 (1986) ("Like the [West Wing], the East Wing was unobtrusive; only close inspection revealed the large scale.").  By design, the public view of the White House is drawn to the Executive Mansion, not the West or East Wing.  From the south, pedestrians on the Ellipse and commuters on Constitution Avenue can see President Monroe's curved South Portico and the Truman balcony.  But the East and West Wings are almost entirely obstructed by gently sloping hillocks that frame the central building.  Fisher Decl. ¶ 11(a).

The effect is completed by massive trees on each side of the South Lawn that will continue to obscure the East Wing. *Id.* And from the north, the view from Pennsylvania Avenue and Lafayette Square features the prominent North façade and the columns of the North Portico, but the East and West Wings are almost entirely shielded from view by the Jefferson terraces and dense trees. *Id.* ¶ 11(b); *see also* William Seale, The President's House: A History 982 (1986).

 "Viewed in full frame," Hoagland's "alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 969–70; *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 310 (D.C. Cir. 2025) (rejecting standing declaration where plaintiffs claimed "visible blights" from new gas wells but made "no effort to identify which permitted wells' effects would be visible from which locations"); *Pollack v. U.S. DOJ,* 577 F.3d 736, 742 (7th Cir. 2009) (rejecting aesthetic injury as "too generalized").[5]

**3.** Any aesthetic injury is also too speculative—and thus not sufficiently imminent—given that the East Wing plans are not finalized. An injury is "actual or imminent" when it "is certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Food & Water Watch*, 808 F.3d at 914. In Hoagland's own words, her aesthetic injury is entirely conditional: It will only occur "*if* a ballroom of the proposed form and scale *were* constructed on the site of the former East Wing." Hoagland Decl. ¶ 14 (emphasis added). Architectural design for the above-grade elements of the East Wing project—the only part that could be visible—is still in progress, however; plans have not been finalized. Fisher Decl. ¶ 13. It thus remains hypothetical whether Hoagland will suffer any aesthetic injury at all.

---

[5] Insofar as Hoagland claims aesthetic injury from demolition of the old East Wing, that is also insufficient because any such harms are no longer redressable given that the demolition has already occurred and cannot be undone. Where a plaintiff "seeks not remediation of its own injury … but vindication of the rule of law, … that psychic satisfaction … does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

\*     \*     \*

Article III standing requirements serve a crucial function in protecting the separation of powers. Federal courts do not decide in the abstract whether executive actions are lawful. Instead, courts may adjudicate only concrete controversies, brought to them by plaintiffs who are suffering cognizable injuries. Here, the National Trust wants this Court to weigh in on significant issues surrounding a high-profile project. But neither the Trust nor its member is threatened with real injury. At best, they assert abstract concerns and generalized grievances. That is reason enough to deny a preliminary injunction and, ultimately, dismiss this case entirely—leaving these disputes over the validity of the President's actions to the political branches, where they belong.

## II.     THE NATIONAL TRUST HAS NO CAUSE OF ACTION.

Even assuming the National Trust has Article III standing, it does not have a cause of action through which to pursue its claims. Nearly all of the claims in the Amended Complaint invoke the APA. But, as the Trust now accepts, the entity running the East Wing project is the Executive Residence at the White House (EXR, although the National Trust calls it OER), under the direction of the President. The D.C. Circuit has already squarely held that EXR is not an "agency" within the meaning of the APA, any more than the President himself. That means the Trust cannot employ the APA to seek relief against the only Defendants who could provide it.

The National Trust also purports to press "constitutional" claims, and invokes an implied cause of action under the Constitution. But, on closer examination, its claims are not constitutional in nature. The National Trust is not alleging violation of a specific constitutional provision. Nor is the President relying here on constitutional authority; he is relying on a delegation of authority from Congress. The Trust simply thinks the President is exceeding the scope of that statutory authority. Such a dispute amounts to an ordinary statutory claim—and thus requires a statutory cause of action. The National Trust does not have one.

12

### A.    The Entity Directing the Project Is Not Subject to the APA.

The APA supplies a cause of action in favor of persons aggrieved by agency action, but not all federal officials or entities are "agencies" under the APA.  "The President is not an 'agency' under that Act." *Dalton v. Specter*, 511 U.S. 462, 476 (1994).  Neither are staff components of the Executive Office of the President (EOP) that lack "substantial independent authority" and exist merely to assist the President in carrying out his responsibilities.  *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 566 F.3d 219, 222-23 (D.C. Cir. 2009); *see also Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 107 (D.D.C. 2020) (calling "substantial independent authority" the "touchstone").

Whether an agency possesses "substantial independent authority" turns on the "structure, function, and mandate" of the administrative unit at issue.  *McKinney v. Caldera*, 141 F. Supp. 2d 25, 32-33 (D.D.C. 2001).  For EOP entities, the D.C. Circuit considers how "close operationally the group is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure."  *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993); *see also Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("[I]t seems logical that for an entity to *be* an authority of the government it must *exercise* some governmental authority.").

The National Trust brings its APA claims against EXR and its head (the Chief Usher), because that is the entity managing the East Wing project (at the President's direction).  Fisher Decl. ¶ 8.  But there is no need to undertake a first-principles analysis of whether EXR is an agency under the APA.  The D.C. Circuit has squarely held that EXR is *not* an "agency."  *Sweetland v. Walters*, 60 F.3d 852, 854-55 (D.C. Cir. 1995) (per curiam).  That precedent controls.[6]

_____

[6] Although *Sweetland* is a FOIA case, the definition of an "agency" under FOIA is broader than under the APA.  *Elec. Priv. Info. Ctr.*, 466 F. Supp. 3d at 107 ("all APA agencies are FOIA agencies, but not vice-versa").  Accordingly, if an agency is beyond the scope of FOIA, it is also necessarily beyond the scope of the APA—as the National Trust admits.  Supp. Br. 17 n.13.

As the D.C. Circuit explained, EXR has no "substantial" authority that is "independent" of the President. Its employees are "dedicated to assisting the President in maintaining his home." *Id.* at 854; *see, e.g.*, 3 U.S.C. § 109 (employees of EXR shall "under the direction of the President, have the charge and custody of and be responsible for the plate, furniture, and public property therein"). Their duties are "mutable at the [President's] whim." *Sweetland*, 60 F.3d at 854; *see, e.g.*, 3 U.S.C. § 105(a)(1) ("Employees so appointed [at the EXR] shall perform such official duties as the President may prescribe."). EXR does not "oversee and coordinate federal programs," or "promulgate binding regulations." *Sweetland*, 60 F.3d at 854.

As *Sweetland* explained, these features make EXR analogous to other EOP entities that are not APA agencies. *See, e.g.*, *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (National Security Council lacks "meaningful non-advisory authority" and is therefore not an "agency"); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042–44 (D.C. Cir. 1985) (Council of Economic Advisors is not an agency because its "statutory duties" are "directed at providing … advice and assistance to the President"). Also supporting a lack of independence is the fact that, unlike the Office of Management and Budget (OMB), EXR's leadership is not Senate-confirmed. *See Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) ("Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided … for Senate confirmation of the Director and Deputy Director of OMB."), *rev'd on other grounds,* 442 U.S. 347 (1979). Meanwhile, EXR is fundamentally dissimilar to EOP entities that are "agencies" under *Soucie*. For example, the Office of Science and Technology had "the function of evaluating federal programs" and exercised investigatory power delegated by Congress. *Soucie*, 448 F.2d at 1075. The Council on Environmental Quality, at the time of the D.C. Circuit's decision, issued guidelines and regulations to federal agencies. *Pac. Legal Found.*

*v. Council on Env't Quality*, 636 F.2d 1259, 1262–63 (D.C. Cir. 1980).  OMB "has a statutory duty to prepare the Budget, in addition to its multitudinous other management, coordination, and administrative functions." *Andrus*, 581 F.2d at 902.

In short, and as *Sweetland* recognized, EXR is "simply is not the kind of center of gravity in the exercise of administrative power to which [the APA] refers," *Dong*, 125 F.3d at 882; *see also Haddon v. Walters*, 43 F.3d 1488, 1490 (D.C. Cir. 1995) (holding that EXR "is not an executive agency within the meaning" of Title VII of the Civil Rights Act).

In a futile effort to circumvent *Sweetland*, the National Trust argues that because the President tasked EXR with managing the East Wing project, it must be an APA agency.  Supp. Br. 26–30.  That does not follow.  Having duties—even statutory duties—is not sufficient to turn an EOP component into an agency.  *See Armstrong*, 90 F.3d at 555–56 (concluding that NSC is not an agency even though it has "statutory mandate"); *Rushforth*, 762 F.2d at 1043 (concluding that CEA is not an agency even though it has "enumerated statutory duties").  Rather, the question is whether an EOP component exercises substantial authority independent of the President, or merely assists the President (who is not subject to the APA) with his own duties.  EXR is managing the East Wing project "at the direction of President Donald J. Trump."  ECF 19 (Am. Compl.) ¶ 1; *see also, e.g.*, *id.* ¶ 16 ("President Trump … is planning and directing the construction of the Ballroom"); Fisher Decl. ¶ 7 ("[T]he President determined that he would manage the Project through EXR."); *id.* ¶ 8 ("EXR is . . . managing the Project at the direction of the President.").  So even when managing the project, EXR plays a "coordinating role on behalf of the President," rather than "a substantive role apart from that of the President."  *Armstrong*, 90 F.3d at 565.  This is no different than the NSC coordinating foreign policy efforts or the CEA assisting and advising the President in an economic report—those are important tasks, but they are undertaken at the

15

direction of the President.  For the same reason, the National Trust is wrong to suggest that the statutory authority for the project turns EXR into an APA agency.  Supp. Br. 28.  As discussed below, Congress has conferred authority on the "President," 3 U.S.C. § 105(d), and EXR is simply assisting the President in exercising that authority.  Given his involvement, any direction from EXR should be assumed to reflect the "President's wishes."  *Meyer*, 981 F.2d at 1294.  Nothing about EXR's role in this project is inconsistent with its role as an assistant to the President.

The National Trust's argument also fails for a second reason.  Any power EXR exercises in managing the project is not "administrative power" in the manner that the APA contemplates. *Dong*, 125 F.3d at 881-82 (defining an "agency" as, in part, an entity "which by law has authority to take final and binding action affecting the rights and obligations of individuals").  The D.C. Circuit has already rejected the notion that exercise of "power" alone renders an entity an agency. *See id.* (rejecting agency status for Smithsonian despite "broad, Congressionally-granted latitude over spending its federally allocated funds and over its own personnel and collections" because "every private organization possesses the power to order its own affairs and carry out transactions with others within the limits set by law").  EXR is not taking "final and binding action affecting the rights and obligations of individuals" through rule-making or adjudication. *Id.* at 881.  It does not possess any "regulatory power," *Rushforth*, 762 F.2d at 1043, and cannot "issue guidelines to federal agencies" or "coordinate federal programs," *Pac. Legal Found.*, 636 F.2d at 1262.  And unlike the entity at issue in *Soucie*, EXR does not wield the "power of investigation."  448 F.2d at 1075 n.27.  Instead, it is doing the same thing a private party could do—managing a construction project. *Cf. Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) ("The term 'action' as used in the APA is a term of art that does not include …, for example, *constructing a building*." (emphasis added)).

The National Trust offers no sound basis to deviate from *Sweetland*'s holding.  EXR is not an agency subject to the APA, and the APA claims therefore fail at the threshold for lack of a cause of action.[7]

**B.    The National Trust's "Constitutional" Claims Are Merely Statutory Ones.**

Without any APA cause of action, the National Trust is left with its purported constitutional claims.  *See* Am. Compl. ¶¶ 179–96.  It invokes a non-statutory cause of action to vindicate the "separation of powers."  Supp. Br. 23.  But because these claims rest on the argument that the President is exceeding his statutory authority, no implied cause of action is available.

In *Dalton v. Specter*, the Supreme Court rejected the proposition "that every action by the President … in excess of his statutory authority is *ipso facto* in violation of the Constitution."  511 U.S. at 472; *see also Appalachian Voices v. U.S. Env't Prot. Agency*, No. CV 25-1982, 2025 WL 2494905, at *8–9 (D.D.C. Aug. 29, 2025) (Leon, J.) (applying *Dalton*).  *Dalton* "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  511 U.S. at 472.  The Constitution is implicated if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution.  *See Dalton*, 511 U.S. at 473 & n.5.  But if a claim "simply alleg[es] that the President has exceeded his statutory authority," it is not a "constitutional" claim, and a plaintiff needs a statutory right of action.  *Id.* at

---

[7] The National Trust admits that the Executive Office of the President (EOP) and White House Chief of Staff are not subject to the APA.  *See* Supp. Br. 30; *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998) ("[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency.").  To the extent that the National Trust is still maintaining APA claims against NPS, those claims go nowhere: While NPS is an APA agency, it is indisputably not directing the East Wing project.  *See* ECF 14-1 (Bowron Decl.) ¶ 13; ECF 14-6 (Stanwich Decl.) ¶ 8.  There is thus no NPS action that the Court could set aside under the APA to redress injuries stemming from "continued work" on the project.  Am. Compl. at 52.  Injuries from that work, to the extent cognizable at all, are not "fairly traceable" to NPS but instead are "the result of the independent action of" EXR.  *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

473. The D.C. Circuit recently applied *Dalton* to a claim asserting that the government impounded funds in violation of the separation of powers. *See Glob. Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025). Despite its styling, the dispute was "fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations," *i.e.*, whether the failure to spend the funds violated the appropriations acts or the Impoundment Control Act. *Id.* at 15 n.11.

These precedents control here. Count VIII asserts a violation of the Property Clause. Am. Compl. ¶¶ 184–85; *see* U.S. Const. art. IV, § 3, cl. 2 ("Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). But the Property Clause is a grant of authority to Congress. The Executive cannot violate the Property Clause; it can only act without congressional authority. And although the National Trust insists that statutory approval is required, *see* 40 U.S.C. § 8106, and that "no statute … provides the President with the authority" to undertake the project (Am. Compl. ¶ 184), Defendants respond that the necessary statutory authority is found in 3 U.S.C. § 105(d), *see infra* Part III.C. The Trust's attempt to "enforce [a] statute[]," *Glob. Health Council*, 153 F.4th at 15, and the President's claim to hold statutory authority, both confirm that this is a statutory dispute and so a statutory cause of action is necessary. Unlike in *Youngstown*, this is not a case involving the "conceded *absence* of *any* statutory authority." *Dalton*, 511 U.S. at 473.

So too for Count IX, which claims that Defendants "have attempted to unconstitutionally reorganize the Executive Branch" by vesting control of the project in EXR rather than NPS. Am. Compl. ¶ 194. That amounts to an argument that Defendants are violating statutory parameters over control of the White House. *See id.* ¶ 190 ("Congress has exercised that constitutional power by vesting certain of its authority over the management and regulation of the National Park System

in the National Park Service, within the Department of the Interior.").   But, for their part, Defendants contend that Congress has given the President primacy over NPS when it comes to the White House.  *See infra* Part III.D; Pub. L. No 87-286, 75 Stat. 586, 586 (1961) (proscribing NPS from doing anything that would "conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes").   Viewed in this light, the Trust's claim is that Defendants violated the terms of the statute assigning control to NPS.  Under *Dalton*, that too is a statutory claim, and it cannot proceed without a statutory cause of action.  511 U.S. at 474.

*        *        *

The National Trust tries to wave away the absence of a cause of action, calling this a "shell game."  Supp. Br. 22.  That fundamentally misunderstands the role of the federal courts.  Although courts are presumptively authorized to remedy constitutional violations, *statutes* can be enforced only as Congress permits—by creating a cause of action.  Put another way, Congress can decide which plaintiffs can enforce statutory rights and obligations.  Mindful of the separation of powers, Congress has not subjected the President to review under the APA.  And the National Trust points to no other statutory cause of action that would allow it to vindicate its views about the scope of 3 U.S.C. § 105(d) or the division of power between NPS and the White House.  Once more, the consequence is that these disputes, over whether the President has exceeded the authority conferred by Congress, must be adjudicated at the political level, not by federal courts.

## III.    IN ANY EVENT, THE NATIONAL TRUST'S CLAIMS FAIL ON THE MERITS.

Even assuming both standing and a cause of action, the National Trust's claims are unlikely to succeed.  Its claims about the need for certain regulatory reviews are based on outdated factual assertions; those processes have already begun and there is no reason to believe they will not be completed.  Likewise, its claim under the National Environmental Policy Act (NEPA) fails because

19

the required EA has already been completed; the National Trust's objections to that assessment are meritless, particularly accounting for the substantial deference that applies. The notion that the President requires express congressional approval before erecting any structure on White House grounds is wrong as a matter of text and dead-wrong as a matter of history; the Trust itself describes an unbroken history of contrary practice ever since enactment of the statute on which the Trust relies. Finally, the "constitutional" claims are merely repackaged versions of the statutory claims, as discussed above, and therefore fail for the same reasons.

### A. Defendants Are Consulting with the NCPC and the CFA.

The National Trust's first three counts argue that Defendants have failed to (i) consult with and secure approval from the NCPC; and (ii) consult with the CFA about the plans for the project. Am. Compl. ¶¶ 118–20, 130–35, 137–40; *see also* 40 U.S.C. § 8722(b)(1) (requiring agencies to "advise and consult with" NCPC "as the agency prepares plans and programs in preliminary and successive stages"); *id.* § 8722(d) (requiring NCPC approval for certain features of "federal public buildings"); 45 C.F.R. § 2101.2(b) (requiring submission of project plans to CFA for "advice and comments"). These claims are not likely to succeed on the facts, because Defendants voluntarily initiated consultations with both regulatory agencies in December 2025—just as they committed to this Court—and intend to secure approvals before plans are implemented.

More specifically: On December 15, EXR staff contacted a sitting member of the NCPC to begin scheduling discussions. ECF 14-9 (Stidham Decl.) ¶ 4. Since that outreach, EXR and others involved in the project have conducted initial consultations with NCPC and CFA staff. *First*, on December 19, Heather Martin, a White House official, met separately with NCPC and CFA staff to present initial concepts. *See* Ex. B (Martin Decl.) ¶¶ 5, 14. *Second*, on December 22, EXR submitted the project to the NCPC. *Id.* ¶ 6. *Third*, the NCPC placed the project on its agenda for the January 8, 2026 public meeting, and that meeting occurred as scheduled, with the

project's architect presenting to the NCPC and taking questions. *Id.* ¶ 7; *see also id.* Ex. 1 (excerpts

from NCPC transcript). Looking forward, Martin is working to schedule a public information

meeting with CFA during the next week. *Id.* ¶ 17. She is set to meet with CFA and NCPC staff

on January 20 and January 27. *Id.* ¶¶ 8, 15. Defendants anticipate that further documents will be

submitted to the NCPC and CFA in light of the feedback at the initial meetings, and the project

will be presented for public review to the CFA in February and March, and to the NCPC on March

5. *Id.* ¶¶ 10, 18. Defendants understand that NCPC will vote on the project after the March 5

meeting, which is before any above-ground construction is scheduled to commence. *Id.* ¶ 11-12.[8]

In light of these developments, the National Trust is reduced to objecting that Defendants

should have engaged in consultation before demolition of the old East Wing. Supp. Br. 26. That

is mistaken: The statute requires consultation only for "construction plans" and approval only for

"the location, height, bulk, number of stories, and size of federal public buildings." 40 U.S.C.

§ 8722(b)(1), (d). The "plans" for the "construction" have not yet been finalized, and are being

shared with the NCPC in an iterative process. And the features of the project that arguably require

approval have not been finalized, let alone executed. Consistent with this statutory text, NCPC's

"longstanding practice" is "not to review demolitions or site preparation activities, including

below-grade work." *East Wing Modernization Project – Frequently Asked Questions*, NCPC,

https://www.ncpc.gov/files/projects/2025/8733_East_Wing_Modernization_Project_Project_FA

Qs_Jan2026.pdf (last visited Jan. 14, 2026); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369,

---

[8] To be clear, Defendants do not believe that the statute requires NCPC approval for this
project. As discussed above, EXR is not an "agency," and the only statutory definition of "public
building" allows the President to exempt buildings from its scope. 40 U.S.C. § 3301(a)(5)(C)(ix).
But because Defendants are seeking that approval regardless and intend to secure it, there is no
need for the Court to adjudicate this question, and certainly no basis to enjoin the project at this
time based on speculation that approval will not be forthcoming.

394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."). Regardless, given that the demolition has already occurred, the only remedy that the Court could offer would be an order to consult going forward—which Defendants are already doing.[9]

In its supplemental brief, the National Trust observed that the CFA had no members after the President terminated them last year. But the President has since appointed new CFA members to fill a majority of the open seats. Martin Decl. ¶ 16. And even before the appointment of any new members, Defendants consulted with CFA's career staff. *Id.* ¶ 14.

In short, Defendants are doing exactly what the National Trust argues they must do. Even if that process started later than the Trust would have liked, at this point there is no basis for any injunctive relief to enforce the NCPC and CFA regulatory processes.

### B. Defendants Produced a Satisfactory Environmental Assessment, and a NEPA Deficiency Would Not Support an Injunction Regardless.

**1.** To start, because the Project is a presidential one, the National Trust's NEPA claim is not cognizable. *See supra* Part II.A; *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1088 (9th Cir. 2004) ("NEPA's procedural requirements do not apply to presidential action."). NPS's preparation of an EA and FONSI does not alter that conclusion. What "distinguishe[s] reviewable agency action from unreviewable presidential action [is] the nature of the President's authority over agency decisions, not … how the President exercised that authority." *Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 110 (D.D.C. 2009) (*NRDC*) (Leon, J.). That NPS was involved in fulfilling the President's directives does not make

---

[9] In its original brief, the National Trust also argued that the East Wing project constitutes a revision of the NCPC's Comprehensive Plan, triggering additional procedural duties for NCPC. *See* ECF 2-1 (TRO Br.) at 17-18. That point is not repeated in the supplemental brief. In all events, it is misdirected. NCPC is not a defendant in this action. The National Trust cannot seek to enjoin Defendants here based on an anticipated violation by non-party NCPC.

its NEPA analysis reviewable. *See id.* at 111 ("To expose permitting decisions, which are unreviewable if exercised by the President himself, to judicial review under the APA just because the President assigned this power to a subordinate agency would [create] … separation of powers concerns[.]"). The touchstone, then, is "the President's exercise of significant discretionary authority over" the project, "which is shielded from judicial review under the APA out of concern for the separation of powers." *Id.* at 110.

NPS has no significant discretionary authority over the Project. Its actions were limited to determining that use of the transferred funds was consistent with its statutory authority, Ex. C (Bowron Supp. Decl.) ¶ 9; completing ancillary historic preservation and maintenance functions, Stanwich Decl. ¶¶ 10-17; and addressing incidental effects on the White House tour program, *id.* ¶ 18. NPS's NEPA analysis and NPS's rationale supporting the transfer of funds make plain that "presidential priorities" are the genesis of the Project. *See* ECF 14-2 (FONSI) at 1; *id.* at 12 (EOP "identified the selected action as the only alternative that meets its functional goals and operational needs"); Bowron Supp. Decl. ¶ 9. Because NPS had (and has) no role in directing the Project, its environmental analysis is not subject to APA review. *See, e.g.*, *Def. Arlington v. U.S. Dep't of Def.*, No. 23-441, 2023 WL 8600567, at * (D.D.C Dec. 12, 2023) (explaining that agency not involved in "making, reviewing, or altering" the final action was not subject to suit under the APA).[10]

**2.** Even if some aspect of the Project constituted final agency action reviewable under the APA, the NEPA claim is unlikely to succeed. *See also* ECF 14 (TRO Opp.) at 19-23.

---

[10] In an analogous circumstance, courts have found that decisions to fund non-federal projects do not trigger environmental review obligations where "the agency cannot materially influence the project or require a project's proponent to take environmental mitigation measures." *Indian River Cnty. v. Rogoff*, 201 F. Supp. 3d 1, 19 (D.D.C. 2016); *see also Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir. 1992).

NPS's analysis was appropriately circumscribed by the limited scope of its statutory authority. "[A]gencies are not required to analyze the effects of projects over which they do not exercise regulatory authority." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 188 (2025); *see also id*. at 200 n.3 (Sotomayor, J., concurring) ("[T]he proper scope of an agency's NEPA review depends in part on the nature of the agency's statutory authority."). Said differently, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions … the agency need not consider these effects in its EA." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004). NPS's NEPA review was thus not a wide-ranging investigation into all aspects of the East Wing project, but instead a focused analysis of those factors relevant to the agency's limited role. *See* FONSI at 9-10; Bowron Supp. Decl. ¶¶ 9–13. With that background in mind, each of the Trust's arguments fails for the reasons described below.

*First*, because NPS's NEPA review is now public, the National Trust's alleged procedural injury stemming from a failure to publish the EA is moot. Regardless, NEPA does not impose any timing requirement on the publication of an EA. And because NEPA requires a public comment period for an environmental impact statement (EIS), *see* 42 U.S.C. § 4336a(c), but not for an EA, *see id.* § 4336(b)(2), no procedural injury attached from the timing of publication of the EA. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 519 (D.C. Cir. 2010) ("[T]he [agency] need not include the public in the preparation of every EA.").

*Second*, the National Trust argues that NPS should have prepared an EIS instead of an EA because, in the Trust's view, the relevant adverse impacts are "significant." Supp. Br. 30-31. But the NPS considered the Project's potential adverse effects and determined that none rose to the level of a "significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). That was reasonable. For example, the EA explains that the project would have "permanent

adverse effects on the cultural landscape," but that the "viewscape and axial relationships … would not be affected by the new building."   ECF 14-3 (EA) at 9; *see also id.* at 8 ("Views and vistas were among the most essential features of the first plan of Washington, DC drawn by Pierre Charles L'Enfant in 1791."); FONSI at 5 ("The selected action will not permanently alter the park's most critical view, the long vista connecting the White House, Washington Monument, and Jefferson Memorial."); *supra* Part I.B.2.   This is an entirely appropriate conclusion, and it demonstrates that not every adverse effect is significant under NEPA.  *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1125 (9th Cir. 2012) ("If the proposed action does not significantly alter the *status quo*, it does not have a significant impact under NEPA.").

This determination is entitled to "substantial deference."  *Seven Cnty.*, 605 U.S. at 183. Far from a mere "talisman" (Supp. Br. 30), the Supreme Court recently clarified that deference is the "bedrock principle" governing NEPA review.  *Seven Cnty.*, 605 U.S. at 185.  Courts "should not micromanage … agency choices so long as they fall within a broad zone of reasonableness."  *Id.* at 183.  Given NEPA's deferential standard of review, and NPS's thorough review of the project's anticipated effects, the National Trust fails to identify a NEPA violation.

The National Trust argues that NPS ignored adverse effects "by attempting to balance them against perceived beneficial effects."  Supp. Br. 31.  Not so.  NPS agreed that "[s]ignificance is determined solely in relation to reasonably foreseeable adverse effects."  FONSI at 4.  Instead, NPS reasonably determined that any adverse effects would not rise to the level of significance due to targeted *mitigation*.  For example, impacts on the "manicured environment" "would be offset in part by mitigation measures, such as replanting historically significant trees, salvaging and reusing historic materials, and preserving or reinstalling garden features."  EA at 10.  And "[s]alvage and storage of some of the existing historic building materials would be reused in the new modernized

East Wing, [] to ensure their availability for future preservation or renovation projects." *Id*. at 13; *see also* FONSI at 5 ("mitigation measures … will help maintain continuity between the site's historic character and its contemporary functions."). Courts routinely find that adequately supported mitigation may negate the need for an EIS. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007) ("We have consistently accepted the proposition that reliance on mitigation measures may reduce a project's impacts below the level of significance.").

*Third*, the National Trust contends that the EA overlooks effects on "the Executive Mansion itself." Supp. Br. 31. That is incorrect. The FONSI explains that "[l]imited portions of the east façade of the Executive Mansion will be carefully removed to tie in both levels; stones removed for this work will be cataloged and reinstalled." FONSI at 2.

*Fourth*, the EA and FONSI are not inconsistent regarding the anticipated effects on the East Colonnade. Instead, the FONSI explains that the Colonnade will be "renovated" to include "a second story." FONSI at 6. The EA says the same, while also explaining that the renovation process will first include "deconstruct[ion]" of the Colonnade. EA at 4. The National Trust similarly puts too much emphasis on changes to the project that occurred after the EA and FONSI were finalized. *See* Supp. Br. 32-33 (complaining about placement of a tower crane). An EA need not anticipate every minor change that occurs before completion of a project. "EA's and EIS's are forward-looking instruments … and we must remain mindful that we, of course, are reviewing them with the added benefit of hindsight." *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1361 (11th Cir. 2023). In any event, placement of a crane does not affect the EA's analysis of the project's environmental effects, and the National Trust does not argue otherwise.

*Fifth*, the National Trust argues that the project's purpose and need were drawn so narrowly as to support only one conclusion. Supp. Br. 33. But as then-Judge Thomas explained, "Congress

did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991). An agency need not consider alternatives that are inconsistent with the objectives of its proposal. *See Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974); *see also Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 550 (8th Cir. 2006) (agency need not consider alternatives that would "frustrate the very purpose of the project"). Not only is the EA's analysis sufficient, it shows that this is a presidential project, with criteria determined by EOP to meet the unique needs of the Presidency. *See Busey*, 938 F.2d at 196 ("when agency is asked to sanction a specific plan … the agency should take into account the needs and goals of the parties involved in the application."); *cf. Sherley v. Sebelius*, 689 F.3d 776, 785 (D.C. Cir. 2012) ("Bound as it is to carry out the President's directives, [the agency] thus reasonably limited the scope of its Guidelines to implement the Executive Order."). NPS had no authority to modify presidential needs and priorities, which reasonably circumscribed the scope of the agency's alternatives analysis.

*Finally*, the National Trust erroneously attempts expand the purpose of the EA beyond its inquiry into effects on the human environment. While an NEPA analysis is oftentimes performed alongside review under the National Historic Preservation Act ("NHPA"), here the White House is exempt from the NHPA. 54 U.S.C. § 307104. Thus, although NPS's EA voluntarily assessed impacts on certain historic and cultural resources, *see, e.g.*, FONSI at 6 (explaining that the "essential features that make [the White House] nationally significant, particularly its role in establishing the nation's capital and its resilience during the War of 1812, will remain unchanged"), the Court should resist the National Trust's effort to merge them. *See Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 919 (D.D.C. 1996) ("the NHPA and NEPA are not identical").

**3.** Last, "even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185. Accordingly, "[n]o … thumb on the scales is warranted" in determining whether "an injunction is the proper remedy for a NEPA violation." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Instead, "a court must determine that an injunction *should* issue under the traditional four-factor test set out" in *Winter*. *Id.* at 158; *see also Sierra Club v. U.S. Army Corps of Engr's*, No. 2:20-cv-00396, 2020 WL 7389744, at *8 (D. Me. Dec. 16, 2020) (noting that even a "likely NEPA violation does not automatically call for an injunction"). Here, where there is no indication that a revised NEPA analysis would alter the President's determination to proceed with the project, equity does not require an injunction.

### C.  The President Does Not Need Express Congressional Approval for the Project.

Next, the National Trust alleges a violation of 40 U.S.C. § 8106, which provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Am. Compl. ¶¶ 173–77. In the Trust's view, this provision obligates the President to secure congressional approval from Congress before erecting any building or structure on White House grounds. It does not, as even the Trust's historical narrative confirms. Indeed, since the enactment of this statute's predecessor in 1912, there have been multiple new structures erected on White House grounds— yet the Trust does not claim that *a single one* was approved by Congress. Rather, Congress has long understood White House design and construction to be within the President's discretion.[11]

---

[11] Even outside the White House context, it is dubious that § 8106 requires approval for a *particular* structure, rather than authorization to build *generally* on a piece of land. The historical practice of construction in D.C. over the past century without congressional approval strongly indicates otherwise, perhaps suggesting that § 8106 has been superseded by more specific statutes,

**1.** To start, the Court should not read § 8106 to restrain the President in the absence of a clear statement. To be sure, the new East Wing is a "structure" and the White House grounds are a federal "park." Supp. Br. 12. But the Supreme Court and D.C. Circuit have repeatedly held that a generally applicable statute should not be construed as restricting the President without a clear statement to that effect. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."); *Blassingame v. Trump*, 87 F.4th 1, 21 (D.C. Cir. 2023) (referencing "decisions [that] have construed statutes not to constrain presidential action absent clear indication of Congress's intent to do so"); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) ("When Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear."). These cases reflect "the well-settled principle that statutes that do not expressly apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives." *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 351 (Dec. 18, 1995).

This canon of interpretation has special purchase here given that the White House is the President's "official residence." *Ateba v. Leavitt*, 133 F.4th 114, 117 (D.C. Cir. 2025). Among other things, the President uses the White House to receive foreign dignitaries and conduct foreign policy, *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 12–13 (2015) (discussing Reception Clause), and to host large events with Cabinet members and members of Congress. The Congress that enacted the first iteration of § 8106 understood all this. On the very next line of the session

---

like the National Capital Planning Act. *See* TRO Opp. 15. Defendants are not aware of *any* public building on federal land in D.C. ever being challenged, let alone enjoined, under § 8106. But it suffices to resolve this case that the statute certainly does not constrain the President.

law, Congress included an appropriation for, among other things, the "ordinary care, repair, and refurnishing of Executive Mansion … to be expended by contract or otherwise, *as the President may determine*." 37 Stat. 417, 444 (1912) (emphasis added). That open-ended delegation confirms that Congress did not intend to force the President to seek express approval any time he wishes to renovate his own home to better equip him to fulfill his responsibilities.

Pointing in the same direction is a related canon of construction: constitutional avoidance. Courts are "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils." *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 466 (1989). Accordingly, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988). The President is not claiming inherent constitutional authority to undertake the East Wing project; he rests on statutory authority, as discussed below. Nonetheless, construing § 8106 to preclude the President from erecting any structure on White House grounds—including, as is customarily done, tents to host large gatherings—could invite a collision with the President's Article II powers, such as to receive ambassadors. There is no reason to give the statute that reading.

**2.** If any ambiguity remains, historical practice decisively resolves it. *See Loper Bright*, 603 U.S. at 386 ("[T]he longstanding practice of the government—like any other interpretive aid— can inform a court's determination of what the law is." (cleaned up)). The National Trust's historical annex is largely accurate, but the Trust misses its significance: It fails to identify "express authority" from Congress for *any* new "structure" added to the White House grounds since the enactment of § 8106's predecessor in 1912. That is fatal to this challenge.

The National Trust identifies four projects since 1912 that could arguably qualify as new "structures" on White House grounds. It does not cite "express" approval for any.

- *First*, the Trust points to West Wing renovations in 1934, which included "expansion" beyond the existing footprint. ECF 20-1 (Annex) at 7. It says that project was carried out under the auspices of the Public Works Administration, which had general authority to undertake public works projects, but no express congressional authorization to build a new White House structure. *See id.* at 7-8.

- *Second*, President Roosevelt "expanded" the East Wing in 1942. The Trust says that project was funded by a general national-defense appropriation, and identifies no congressional authorization or approval for the new structure. *See id.* at 9.

- *Third*, President Ford built a pool and "poolside cabana" on White House grounds in 1975. The National Trust implicitly admits that there was no congressional approval for this project, which was funded "by private donations." *Id.* at 11.

- *Fourth*, President Trump constructed a tennis pavilion in 2019-2020. This project too was funded by private donations. Here too, the National Trust acknowledges the lack of any express congressional approval. *See id.* at 14.[12]

In short, the National Trust does not cite express congressional approval for any of the new structures that Presidents have erected on White House grounds since § 8106's enactment, only general appropriations not earmarked for particular projects. And in the cases of the pool and tennis pavilion, not even that, as those were funded by private donations that are authorized to be made for improvements to national parks. *See* 54 U.S.C. § 101101(2) (donation authority); 31 U.S.C. § 1321(a)(17), (b)(1) (donated amounts "are appropriated to be disbursed in compliance

---

[12] The other post-1912 projects that the National Trust identifies—a roof repair, West Wing repair, balcony project, structural renovation, and fence replacement (ECF 20-1, at 6-7, 9-10, 13)—did not involve a new "building or structure" and thus would not implicate § 8106 regardless. Of note, only in one of those instances (the 1949 renovation) did Congress exert any control over the details of the designs, by creating a Commission on Renovation of the Executive Mansion for that specific purpose. *See* 63 Stat. 45 (1949). This is the exception that proves the rule: When Congress wants to inject itself into White House architectural choices, it knows how to do so.

Although the Trust does not mention it, President Nixon also built a press facility on top of an existing pool in 1969, using funds from a general appropriation (83 Stat. 116). No statute authorized this work either. *See* Richard E. Farley, *The Fascinating History of the White House Press Room*, Town & Country Magazine (Jan. 17, 2017), https://perma.cc/B62V-PAVV.

with the terms of the trust"); 31 U.S.C. § 1535 (allowing for transfer of funds between agencies). This history is the most compelling refutation of the Trust's narrative that construction projects at the White House "have almost uniformly been authorized by Congress."  Supp. Br. 17.

**3.**  The implication of the history is that the President does not need congressional approval for specific projects, because he has already been delegated sufficiently broad authority over any improvements to the White House (for which appropriated funds are available).  And, in fact, that is exactly what Congress has done, which explains why § 8106 has never before posed an obstacle to the construction projects undertaken by prior Presidents.

Congress has authorized appropriation of funds to the President for "the care, maintenance, repair, *alteration*, refurnishing, *improvement*, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House."  3 U.S.C. § 105(d)(1) (emphasis added); Pub. L. No. 95-570, 92 Stat. 2445, 2446 (1978).  Any such appropriated sums "may be expended *as the President may determine*, *notwithstanding the provisions of any other law*."  3 U.S.C. § 105(d) (emphasis added).  This provision confirms that the President possesses operational control over the White House and vests in him, notwithstanding other statutes, the discretion to determine the necessary alterations and improvements.  Section 105(d) is more specific than 40 U.S.C. § 8106 and includes a "notwithstanding" clause; it therefore controls even if the latter statute could be read in isolation to restrain the President.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."); *Liberty Mar. Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) (citing precedents that have interpreted "notwithstanding" language to "to supersede all other laws").  By way of 3 U.S.C. § 105(d), the President has statutory authority to construct a ballroom on the White House grounds (just as he may erect temporary tents).

The Trust argues that the East Wing project is too substantial to qualify as an "alteration" or "improvement." Supp. Br. 23. That is not persuasive. The plain meanings of these terms are capacious. *See* Alter, Oxford English Dictionary (2d ed. 1989) ("To make (a thing) otherwise or different in some respect; to make some change in character, shape, condition, position, quantity, value, etc. without changing the thing itself for another; to modify, to change the appearance of."); Improve, Oxford English Dictionary, (2d ed. 1989) ("To advance or raise to a better quality or condition; to bring into a more profitable or desirable state; to increase the value or excellence of; to make better; to better, ameliorate."). Modernization of the East Wing to update infrastructure, increase capacity for hosting events, and bolster security features falls readily within both terms. Replacing a dilapidated wing of a structure would plainly bring it "into a more profitable or desirable state," just as adding a story to a home would "change [its] appearance." Indeed, in the context of real property, "improved" land means land that "has been developed" or is "occupied by buildings and structures." Land, Black's Law Dictionary (12th Ed. 2024); *see* Improved Land, Black's Law Dictionary (5th ed. 1979). This context-specific definition supports the proposition that, to "improve" a property ordinarily means to erect a new structure on it.

Invoking the canon of *noscitur a sociis*, the National Trust contends that "alteration" and "improvement" should be read narrowly, to capture only minor projects similar to "repair" or "refurnishing." But this canon is "not an invariable rule," as a "word may have a character of its own not to be submerged by its association." *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923). It applies where "words are of obscure or doubtful meaning." *Id.* at 520. There is no doubt or obscurity here. Indeed, the Trust admits elsewhere that the term "alteration" was sufficient—even when paired with words like "repair"—to authorize significant projects, such as construction of President Truman's balcony. *See, e.g.*, ECF 20-1 at 11 (explaining that Truman

built the balcony using a general appropriation for "[c]are, maintenance, repair, and alteration" of the "Executive Mansion and Grounds" (quoting Pub. L. No. 80-25, 61 Stat. 26, 28 (1947))). The Trust cannot have it both ways—if these words are not broad enough to cover the East Wing project then they cast doubt over numerous other presidential projects dating back decades.

The National Trust's other knock on § 105(d) is to call it a mere "appropriation provision." Supp. Br. 13. That is misleading. Section 105(d) is an *authorization* of appropriations: "There are authorized to be appropriated each fiscal year to the President such sums as may be necessary …." 92 Stat. 2455. It thus establishes a *framework* under which Congress can appropriate funds, and it presupposes that the President has authority to expend those sums as needed on improvements and alterations. The only way to read § 105(d) is as recognizing that the President has the freedom to expend money in the White House Repair and Restoration account for those purposes. And that understanding comports with the historical practice discussed above.

To be sure, the funds appropriated for the President's annual allowance for the Executive Mansion are not themselves enough to fund the East Wing project (which was not contemplated when that allowance was set). Supp. Br. 13-14. But the Trust does not dispute that Congress has authorized *other* funds to be appropriated for this purpose. *See* Supp. Br. 25. In particular, the Secretary of Interior may accept donations "for the purposes" of the National Park System, 54 U.S.C. § 101101(2); those funds are "appropriated to be disbursed" for such purposes, 31 U.S.C. § 1321(a)(17), (b)(1); and Interior may transfer them to the White House Repair and Restoration account for use on the project upon making certain findings, 31 U.S.C. § 1535. Such funds remain available for the purposes of the original appropriation (*i.e.*, to advance the National Park System), *see Acting Comptroller Gen. Elliott to the Sec'y of War*, 18 Comp. Gen. 489, 490-91 (1938), and that encompasses the East Wing project given that the White House falls within an NPS unit. *See*

54 U.S.C. § 100101(a) (empowering Secretary of Interior to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units"). This mechanism was used to supplement the funding for the East Wing project. Bowron Supp. Decl. ¶¶ 9, 12-13. It has a firm historical basis, having been blessed almost 50 years ago in connection with President Ford's pool. *The White House—The Vice President—Gifts*, 2 Op. O.L.C. 349, 350 (Apr. 27, 1977) ("[I]n our view, [the Gift Authority] constitutes authority for the acceptance of gifts in connection with the Department of Interior's general statutory responsibility under Pub. L. No. 87-286 for maintenance of the White House and its grounds.").

So, in the end, the President has both statutory authority and appropriated funds; nothing more is required. And even if the Court has any remaining doubts over the President's authority to undertake the East Wing project, it could not be clearer that he does not need express congressional approval—just as Presidents Roosevelt and Ford did not. That alone suffices to reject the National Trust's claim alleging a violation of § 8106.[13]

### D. The "Constitutional" Claims Fail for the Same Reasons.

As explained above, the National Trust's "constitutional" claims are really just the same statutory theories in new garb. *See supra* Part II.B. Count VIII rests on the Property Clause, which gives Congress "power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2; *see also Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976). But as the National Trust agrees, Congress can delegate "broad power" to the President. *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1135 (D.C. Cir. 2002). As covered above, Congress has done so.

---

[13] Notably, the National Trust does not press a non-statutory *ultra vires* claim alleging lack of authority; instead, it alleges a violation of § 8106. Had the Trust pursued the former theory, it would have been required to satisfy the extremely high bar associated with such a "Hail Mary" claim. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

Turning to Count IX, the National Trust alleges—in somewhat contradictory fashion—that Congress has placed NPS in charge of projects like this, and that Defendants "have attempted to unconstitutionally reorganize the Executive Branch" by placing EXR in control.  Am. Compl. ¶ 194.  Again, the answer to this (statutory) claim is found in (statutory) text: namely, the 1961 law that ousts NPS from anything that would "conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes."  Pub. L. No 87-286, 75 Stat. 586. Thus, when it comes to the President's use of the White House "for his official purposes," the President—not NPS—has primacy.  And the President is empowered to "prescribe" "official duties" for EXR staff, and here has done so by tasking EXR staff with leading the project.  3 U.S.C. § 105(b)(1); *see* Bowron Decl. ¶ 13.  Nor is the President bound to manage construction projects the same way they were managed in the past.  *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) (explaining that a President "cannot … bind his successors by diminishing their powers").  It is thus the National Trust, not Defendants, that seeks to stand the law on its head and "disregard Congress's choice."  Supp. Br. 24.

*    *    *

To secure a preliminary injunction here, the National Trust would need to show not only (i) that it likely has standing to pursue this challenge, and (ii) that it likely has an APA or implied constitutional cause of action, but also (iii) that it is likely to prevail on the merits of at least one of its claims, and to do so in a way that would merit injunctive relief rather than a narrower remedy like remand for more consultation or explanation.  It cannot make that showing.  The hurdles to relief—independently, but especially when considered together—make it highly unlikely that the National Trust will ultimately prevail on the merits.  And that requires denying the motion.

## IV.     THE BALANCE OF EQUITIES WEIGHS IN THE GOVERNMENT'S FAVOR.

Merits aside, the Court should independently deny a preliminary injunction because the balance of equities weighs heavily against relief.  The National Trust cannot demonstrate that it is "likely to suffer irreparable injury in the absence of preliminary relief," *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014), which is reason alone for denial of the motion, *see, e.g.*, *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  The Trust fails to clear that hurdle as to any of its claimed procedural, construction-related, or aesthetic injuries.

Even if it could, those marginal harms are plainly outweighed by the serious threats that would result from halting construction, leaving a large empty hole that would expose the Executive Mansion to damage and the President to harm.  On the equities, this is not a close call.

### A.  The National Trust Fails to Establish Imminent Irreparable Harm.

**1.**  To start, the National Trust cannot establish irreparable harm from the alleged violations of its procedural rights under the NCPA (Counts I-II), the CFA statute (Count III), and NEPA (Counts IV-V).  EOP is voluntarily consulting with the NCPC and the CFA, and the NEPA review has been issued, so the National Trust cannot support its claimed lack of "access to statutorily mandated reviews and reports."  Supp. Br. 36. Even if the Trust could identify some defect in Defendants' compliance with these purely procedural statutes, it would not amount to irreparable harm.  As this Court recognized and the National Trust now concedes (Supp. Br. 37), "bare procedural injury, standing alone, is insufficient to demonstrate irreparable harm." ECF 17 (Order) at 2 (citing *Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 268-69 (D.D.C. 2020); *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017)).

**2.**  The National Trust's assertion of future aesthetic injury from the East Wing's design fares no better.  As explained above, that injury is not cognizable under Article III.  *Supra* Part I.B.2.  But even if it sufficed for standing, "irreparable harm is a higher bar to clear than standing,"

as it "requires not only a concrete, particularized harm, but a harm that is sufficiently serious and irremediable so as to warrant the extraordinary relief of a court's intervention in a case before factual and legal development." *Santos v. Collins*, No. 24-1759, 2025 WL 1823471, at *6 (D.D.C. Feb. 26, 2025) (citing *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024)). Again, the D.C. Circuit has found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing"—much less the higher bar of irreparable harm. *EDF*, 2 F.4th at 970.

In any event, the National Trust's asserted injury is too conjectural to establish irreparable harm. Its declarants fear they will dislike the Project's final design. But several steps must take place before the design is finalized (let alone constructed), as the National Trust's own declarations make clear. For example, Deputy General Counsel Elizabeth Merritt expresses concern that "the massing and height of the proposed new construction will overwhelm the White House itself and may also permanently disrupt the carefully balanced classical design." ECF 2-2 (Merritt Decl.) ¶ 12. But the dimensions of the new East Wing have not yet been determined; plans will not be finalized until after consultation with the NCPC and CFA; construction will not begin on above-grade elements until April at the earliest; and the ongoing below-grade work does not lock in the size of the above-grade design. Martin Decl. ¶ 12; *id.* Ex. 1 at NCPC Tr. 112-13; Ex. D (Engineer Decl.) ¶¶ 9–13. "The standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm before a decision on the merits can be reached." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288-89 (D.D.C. 2017); *see id.* at 288 (finding injunction not warranted where "source of the plaintiff's alleged irreparable harm— 'mammoth towers'—won't begin to be built for at least another six months, leaving the parties' ample time to fully brief the merits of the case"). The Trust has not satisfied that standard.

Its argument to the contrary is based on the declaration of an architect with no connection to the project, who has never reviewed any plans for the project. Mr. Bates speculates based on "standard professional practice" that "commencing foundation work before submitting plans for review, commentary and approval will *likely* cause any such review, commentary or approval to be an empty exercise." ECF 20-2 (Bates Decl.) ¶¶ 11, 13 (emphasis added). He reaches this conclusion based on his heavily qualified perspective that "[d]ownsizing is *often* expensive and difficult, and *all else equal*, an overbuilt foundation makes changing plans to a smaller building significantly more difficult." *Id.* ¶ 6 (emphases added); *see also id.* ¶ 10 ("Building the foundation prior to approval of the final design *can* lock the project into noncompliant configurations and restrict above-grade loading and layout options." (emphasis added)).

But Mr. Bates's conclusion and supporting assumptions are all built on the false premise that the East Wing and its foundation will interact like the upper floors and basement of a conventional unsecured building. The White House is no conventional building, including due to its national security mission. Thus, Mr. Bates is mistaken in assuming that "once the foundation and related subsurface work are in place, the location, bulk, spans, bay sizes, and floor plate geometry (among other elements) of the building itself are fixed for all practical purposes." Bates Decl. ¶ 5. *Contra* Engineer Decl. ¶ 9 ("[T]he primary foundation system for the structure can accommodate potential design changes to the configuration of the above-grade structure."); *id.* ¶¶ 10–13; Martin Decl. Ex. 1 at 112. Indeed, the below-surface work is driven by national security concerns independent of the above-grade construction. *See* Supp. Classified Decl. (lodged with Court).

In sum, the National Trust has failed to carry its heavy burden of demonstrating irreparable harm sufficient to warrant the exceptional relief of a preliminary injunction.

**B. Halting Construction Would Harm Defendants and the Public Interest.**

On the other side of the scale, halting the project at this juncture would be untenable and detrimental to the public interest. The harms of pausing the ongoing below-grade work outweigh exponentially any cognizable injuries to the National Trust.

*First*, an injunction at this stage would exacerbate the National Trust's own stated aesthetic interest. Halting construction would prolong a gross imbalance between the West Wing and the former East Wing, and leave an unsightly excavation site lying uncovered in President's Park for indefinite duration. That does not make sense, because the below-ground work on waterproofing, security improvements, and utility infrastructure will have to take place at some point regardless of what is erected above-ground. The National Trust's goal of preserving the historic character of the White House and its environs is thus impaired by pausing the project, notwithstanding any future disagreement the Trust anticipates it may have with the eventual final design.

*Second*, as the Secret Service attests, halting construction would imperil the President and others who live and work in the White House. "[T]he current open construction site is, in and of itself, a coordinated and managed safety hazard and adds additional challenges to Secret Service operations." Ex. E (Quinn Supp. Decl.) ¶ 8. "For example, the site requires the Secret Service to redirect resources to account for the disruption to existing security procedures caused by construction activities." *Id.* For that reason alone, an injunction that suspends construction would expose the President to potential harm—placing a heavy thumb on the equitable scales. More generally, "[c]ontinued construction work is [ ] necessary to maintain and update the security infrastructure of the project site and the White House Complex." *Id.* ¶ 6. The East Wing's "modernization to today's technological standards will enable the Secret Service to more effectively achieve its protective mission." *Id.* ¶ 9. That cuts strongly against an injunction. *See*

*Arpaio v. Obama*, 27 F. Supp. 3d 185, 210 (D.D.C. 2014) (interference with agency's "statutorily proscribed" safety priorities counseled against issuance of injunction).

The East Wing project also implicates national security more broadly. Since World War II, the East Wing has hosted a security bunker that eventually became the Presidential Emergency Operations Center (PEOC). William Safire, *Essay*: *Inside the Bunker*, N.Y. Times at A27 (Sep. 13, 2001). PEOC was "designed to be a command center during emergencies, with televisions, phones, and communications facilities," Laura Bush, Spoken from the Heart (2010), and has reportedly been used as recently as 2020, Philip Bump, *What We Know About the White House's Secret Bunkers and Tunnels*, Washington Post (June 1, 2020). For reasons described in greater detail in a supplemental classified declaration, an injunction halting construction would endanger national security and therefore impair the public interest. *See* Supp. Classified Decl.

*Third*, more generally, continued progress on the project advances the public interest. The new East Wing's expanded capacity for receiving foreign dignitaries and visitors will substantially benefit the President, EOP, other governmental offices and agencies with a White House presence, and the American people. The past practice of pitching temporary tents on the South Lawn was costly and cumbersome, did not comport with the dignity due to the White House, and "caused substantial damage to NPS resources on the grounds," including the turf, irrigation systems, and other NPS infrastructure. Stanwich Decl. ¶ 7; Quinn Supp. Decl. ¶ 10. Eliminating trailers formerly used for security will improve the visiting experience, and allow for use of more advanced equipment. Quinn Supp. Decl. ¶ 10. Updated life-safety requirements will result in upgrades to critical infrastructure. Fisher Decl. ¶¶ 6, 9. And the project will resolve longstanding problems, such as an unstable roof, water infiltration causing mold and deterioration of structural and historic elements, out-of-date electrical infrastructure, and the presence of asbestos and lead-based paint.

*Id.* ¶ 9.  In this way, modernization of the East Wing will relieve strain on the more historic portions of the Executive Mansion and preserve the integrity of the entire complex.

*     *     *

The weighty public interest in this project far exceeds the National Trust's asserted aesthetic interest in halting progress—to the extent that interest is cognizable at all.  The new East Wing will be most visible to the foreign dignitaries who dine in it and the tourists who approach it from the East.  From those vantage points, it will be impossible to compare its dimensions with the West Wing, but the beauty and utility of the new East Wing will be readily apparent.  This Court should decline to insert itself into the ongoing architectural and design processes for the project, and instead allow the duly elected President to control improvements to the Executive Mansion as past Presidents have done, absent express intervention from Congress.

## CONCLUSION

The Court should deny a preliminary injunction.  The answers to the Court's questions are included above but, for clarity, are as follows: (1) past Presidents have not consistently obtained express congressional approval for construction on White House grounds, in particular for new "structures" erected since the 1912 enactment of 40 U.S.C. § 8106's predecessor; (2) Defendants have statutory authority to make improvements to the White House so long as appropriations are available; and (3) the entity controlling the East Wing project, EXR, is not an "agency" within the meaning of the APA.

Dated: January 15, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

MARISSA A. PIROPATO
Deputy Chief

BRANTLEY T. MAYERS
Counsel

*/s/ Gregory M. Cumming*
GREGORY M. CUMMING
Senior Attorney
MICHELLE RAMUS
MARK WIDERSCHEIN
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Gregory.Cumming@usdoj.gov
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov
(202) 598-0414

JOSEPH E. BORSON
Assistant Branch Director
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Eitan.R.Sirkovich@usdoj.gov
(202) 353-5525

*Counsel for Defendants*