**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**NATIONAL TRUST FOR HISTORIC**
**PRESERVATION IN THE UNITED STATES,**

       *Plaintiff,*

  v.

**NATIONAL PARK SERVICE,** *et al.,*

       *Defendants.*

Civil Action No. 25-4316

**REPLY BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

I.    The National Trust Has Standing. ............................................................................... 1

   A.   The National Trust Has Organizational Standing. ........................................... 2

   B.   The National Trust Has Associational Standing. ............................................. 4

II.   The National Trust is Likely to Succeed on Its APA Claims. ...................................... 5

   A.   The National Trust Can Advance APA Claims Against EXR Because EXR Is an
      Agency. ............................................................................................................. 5

   B.   The Ballroom Project Must Be Expressly Authorized by Congress. ............... 8

   C.   The Defendants Have Violated NEPA. .......................................................... 15

   D.   The Defendants Have Continued to Fail to Engage in Adequate Commission
      Review. ........................................................................................................... 20

III.  The National Trust Is Likely to Succeed on Its Constitutional Claims. ...................... 22

IV.   The Other *Winter* Factors Favor Preliminary Injunctive Relief. ............................... 24

Conclusion ........................................................................................................................ 25

i

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dep't of Labor*,
  766 F. Supp. 3d 105 (D.D.C. 2025) .......................................................................6, 8

*Armstrong v. Exec. Off. of the President*
  90 F.3d 553 (D.C. Cir. 1996). ....................................................................................7

*Cabinet Mtns. Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*,
  685 F.2d 678 (D.C. Cir. 1982) ..................................................................................18

*Ctr. for Biological Div. v. U.S. Fish & Wildlife Serv.*,
  145 F.4th 1144 (D.C. Cir. 2025) .................................................................................5

*Chamber of Com. of the U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................................13, 15

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ..................................................................................18

*Climate United Fund v. Citibank, N.A.*, 2025 U.S. App. LEXIS 33454 (D.C. Cir.
  Dec. 17, 2025). ........................................................................................................23

*Cmty. for Creative Non-Violence v. Carvino*,
  654 F. Supp. 827 (D.D.C. 1986), *aff'd*, 865 F.2d 382 (D.C. Cir. 1988)...................14

*\*Dalton v. Specter*,
  511 U.S. (1994)...................................................................................................22, 23

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ..............................................................................6, 7

*Envt'l Def. Fund v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021) ......................................................................................4

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..............................................................................................3, 19

*Friends of Animals v. Bernhardt*,
  961 F.3d 1197 (D.C. Cir. 2020) ..................................................................................2

*In re FTX Trading Ltd.*,
  91 F.4th 148 (3d Cir. 2024) .......................................................................................9

*Jackson Hole Conservation All. v. Babbitt*,
  96 F. Supp. 2d 1288 (D. Wyo. 2000).........................................................................7

*Global Health Council v. Trump,*
    152 F.4th 1 (2025)........................................................................................22, 23

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024)...............................................................................17

*Marsh v. Ore. Nat. Res. Council,*
    490 U.S. 360 (1989)...............................................................................18

*\*Massachusetts v. Watt,*
    716 F.2d 946 (1st Cir. 1983)...............................................................21

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993)...........................................................7

*Nat'l Parks Conservation Ass'n v. Semonite,*
    916 F.3d 1075 (D.C. Cir. 2019)......................................................2, 7

*Nat'l Treas. Empls. Union v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025), *vacated by* 2025 U.S. App. LEXIS 33453
    (D.C. Cir. Dec. 17, 2025)...................................................................22

*Nat. Res. Def. Council v. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009)....................................................15

*Oglala Sioux Tribe v. NRC,*
    896 F.3d 520 (D.C. Cir. 2018).............................................................19

*PETA v. USDA*, 797 F.3d 1087, 1093-95 (D.C. Cir. 2015)...............................2

*\*Rushforth v. Council of Econ. Advisers,*
    762 F.2d 1038 (D.C. Cir. 1985)....................................................6, 7, 8

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
    605 U.S. 168 (2025)...............................................................................17

*\*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)...........................................................................4, 5

*Sweetland v. Walters,*
    60 F.3d 852 (D.C. Cir. 1995)..........................................................6, 8

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001)...............................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)...............................................................................23

**Statutes**

*3 U.S.C. § 105(d) ..................................................................................8, 9, 11, 12

31 U.S.C. § 1321(b) ..............................................................................................12

31 U.S.C. § 1535(a) ..........................................................................................6, 9

40 U.S.C. § 68 .......................................................................................................13

*40 U.S.C. § 8106 ......................................................................................... *passim*

40 U.S.C. § 8722(b) .............................................................................................20

42 U.S.C. § 4336(b) ........................................................................................18, 19

42 U.S.C. § 4336e(10) ..........................................................................................19

54 U.S.C. § 100101(a) .....................................................................................9, 15

54 U.S.C. § 100101(b) ...............................................................................9, 15, 16

54 U.S.C. § 302101 .................................................................................................3

54 U.S.C. § 307104 .............................................................................................3, 4

54 U.S.C. § 312102(a) ............................................................................................2

54 U.S.C. § 312102(b) ............................................................................................2

54 U.S.C. § 312105(g) ............................................................................................3

Act of August 24, 1912, 37 Stat. 417 (1912) ......................................................11

Pub. L. 73-67, 48 Stat. 195 (1933) ......................................................................10

Pub. L. 89-665, 80 Stat. 915 (1966) ......................................................................3

Pub. L. 94-129, 89 Stat. 683 (1975) ....................................................................13

Pub. L. 99-591, 100 Stat. 3341 (1986) ................................................................13

Pub. L. 103-111, 107 Stat. 1051 (1993) ..............................................................13

Pub. L. 118-47, 138 Stat. 460 (2024) ...............................................................9, 12

**Constitutional Provisions**

U.S. Const. Art. II, § 3, cl. 3 ................................................................................14

U.S. Const. Art. IV, § 3, cl. 2 .................................................................................23

**Other Authorities**

40 C.F.R. § 1508.1(w) ...........................................................................................20

45 C.F.R. § 2101.1(a)............................................................................................20

48 C.F.R. § 2.101 ....................................................................................................6

National Park Service, *Comprehensive Design Plan: White House & President's Park* (2000), *available at* https://babel.hathitrust.org/cgi/pt?id=umn.31951p009596291&seq=3 (last accessed Jan. 20, 2026) ...............................................................................17

National Park Service, *Foundation Document: The White House and President's Park* (Sept. 2014), available at https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_2015-508-accessible-resize.pdf (last accessed Jan. 20, 2026)...................................17

NPS Director's Order 12...........................................................................................19

NPS Director's Order 21...........................................................................................20

USASpending.gov, https://www.usaspending.gov/agency (last accessed Jan. 20, 2026) ....................................................................................................................6

The Defendants' supplemental brief confirms the obvious: They have no legal authority whatsoever for the Ballroom Project. Not from the Constitution—they have now affirmatively abandoned that argument. Not from Congress—the statute on which they rely authorizes the President to pay for air conditioning, repairs, and minor improvements, not to build a $400 million, 90,000-square-foot ballroom (much less to do so with private funds). And their transparent bid to evade review by shuffling project responsibility to the Office of the Executive Residence ("EXR"[1]) in a high-stakes game of musical chairs only highlights the absence of legal authority.

The Defendants' position reduces to this: an insistence that they can and will keep building the Ballroom simply because the President wants it, notwithstanding their ongoing violations of the Property Clause and an ever-increasing number of federal laws. And having now announced their intention to add a new visitors' center plus a second story to the *West* Wing colonnade, it is clear they will not stop here.[2] The Court should not endorse this continued, brazen misconduct. For the reasons set forth here and in the National Trust's prior submissions, it should reject the Defendants' arguments and grant the requested preliminary injunction.

## I. The National Trust Has Standing.

The Defendants' supplemental brief contends for the first time that the National Trust lacks organizational standing because it has no more than an "abstract concern" in the Ballroom Project, ECF 30 at 5 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)), and lacks associational standing because the Ballroom Project will not cause its members cognizable harm, ECF 30 at 8-12. The Defendants are wrong on both counts. Their argument misunderstands not

---

[1] The National Trust previously referred to the Office of the Executive Residence by its initials. The Defendants refer to it as "EXR," and for consistency the National Trust does the same here.

[2] At a January 8, 2026 National Capital Planning Commission ("NCPC") meeting, the Defendants revealed their intention to build a "visitor security screening center" and a potential "future addition, a one-story addition, to the West Wing." ECF 30-2 at 99:12-18, 108:7-19, 111:20-112:6.

only basic principles of standing, but also the nature of the harm that the Ballroom Project continues to cause the National Trust and its members.

A. The National Trust Has Organizational Standing.

Like any organization, the National Trust has standing to sue on its own behalf if the challenged action has injured or threatened to injure its interests. *See, e.g.*, *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1208 (D.C. Cir. 2020). That standard is met here: The National Trust was established by Congress "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest," 54 U.S.C. § 312102(a), and has since done so for decades by (among other things) suing to protect numerous historic sites, ECF 2-2 ¶ 3, and providing comments on projects before the NCPC and on National Environmental Policy Act ("NEPA") analyses, *see* ECF 2-2 ¶¶ 4-7. *See PETA v. USDA*, 797 F.3d 1087, 1093-95 (D.C. Cir. 2015). As the National Trust has explained, because the White House is perhaps the country's most important historic building, the Trust has a strong organizational interest in ensuring that any substantial modification to the White House follows the law, engages the public, and respects its architectural heritage and historic significance. *See* ECF 2-1 at 1-2.

Dismissing the National Trust's well-established historic-preservation interests, the Defendants contend that the National Trust has standing to sue only for harms to specific enumerated purposes (pertaining principally to the acquisition and management of historic properties) with which the Trust is charged under its charter, *see* 54 U.S.C. § 312102(b). *See* ECF 30 at 5. The Defendants cite no authority that supports this curious proposition, and they never explain why the National Trust would lack an interest in advancing the very historic-preservation goals that caused Congress to establish it in the first place, *see* 54 U.S.C. § 312102(a). Nor could they. As the Defendants' own authority makes clear, *see* ECF 30 at 7, the correct question is

whether the Ballroom Project, the most significant exterior change to perhaps the country's most historically significant building since it was burned during the War of 1812, affects the National Trust's "core business activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)— that is, preservation of the country's historically significant places. Plainly, it does.

The Defendants next contend that the National Trust's organizational standing is negated by two statutes that purportedly make "clear" that the Trust "has no role with respect to the White House and its grounds," ECF 30 at 7 (internal quotations omitted). The Defendants badly misread both statutes, neither of which do any such thing. The first, 54 U.S.C. § 312105(g), authorizes the National Trust to acquire, hold, and dispose of any real property except for land within an existing NPS unit.  The White House is located within President's Park, an NPS unit.  But the National Trust is obviously not seeking to acquire or dispose of the White House. And equally as obvious, the mere fact that neither the National Trust nor anyone else can *acquire* the White House does not mean the National Trust lacks an organizational interest in the *preservation* of the important historic and architectural features of the White House and its grounds.

The second statute—the National Historic Preservation Act, Pub. L. 89-665, 80 Stat. 915 (1966) ("NHPA")—is even further afield. The NHPA advances historic preservation interests by establishing the National Register of Historic Places, among other things. *See id.* (codified in relevant part at 54 U.S.C. §§ 302101 *et seq.*). Yet the National Trust did not assert an NHPA claim for an obvious reason: The NHPA expressly exempts the White House (and the Capitol, the Supreme Court, and their grounds) from its ambit, *see* 54 U.S.C. § 307104. The Defendants nonetheless present an extended disquisition of the NHPA's legislative history, contending it somehow proves that the National Trust is barred from bringing *any* claim concerning the White House under *any* statute. ECF 30 at 6-7. It does not. Whatever the utility of the NHPA's legislative

3

history for understanding the NHPA, it is irrelevant to the National Trust's standing to vindicate its rights under either the Constitution or the entirely distinct statutes (e.g., NEPA) at issue here.[3]

B.  <u>The National Trust Has Associational Standing.</u>

The Defendants' argument that the National Trust lacks associational standing, ECF 30 at 8-11, fares no better. Treating the Ballroom Project as if it were a common public nuisance, *see id.* at 9-11, the Defendants contend that Dr. Alison Hoagland—a trustee and longtime member of the National Trust—has suffered no aesthetic injury because *her* property has not been harmed and she "is not suffering discomfort from the project in the way that a public nuisance plaintiff might be if she were exposed to an offensive odor or toxic smog," *id.* at 10. This entirely misses the point: The White House is not a *nuisance*, causing cognizable harm only to those who have the misfortune of living near it, *see Envt'l Def. Fund v. FERC*, 2 F.4th 953, 968-70 (D.C. Cir. 2021). It is instead an *attraction*, which when damaged harms those who use and enjoy it, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

The fact that Dr. Hoagland, and other members of the National Trust, are harmed by the Ballroom Project is beyond reasonable dispute. The Defendants mischaracterize Dr. Hoagland's declaration as detailing merely "incidental viewership" of the White House, *see* ECF 30 at 9 (quoting *Envt'l Def. Fund*, 2 F.4th at 970), but Dr. Hoagland—a professional historian and historic preservation expert, author of six books on American architecture, and former senior NPS historian at the Historic American Buildings Survey, ECF 2-3 ¶¶ 4-5—lives in the District, regularly visits

---

[3] The Defendants contend that by virtue of the 2014 recodification of NHPA Section 107 (which as codified provides "[n]othing in this division applies to the White House and its grounds," 54 U.S.C. § 307104) in *Division A* of Subtitle III, this prohibition now extends to the Trust, whose charter is in *Division B*. ECF 30 at 7 n.2. It does not. Section 307104's plain text refers to a different division; further, since recodification is presumed not to change a law's substantive scope (as the Defendants admit) there is no basis to ignore that text and extend § 307104 to a separate statute (the Trust's charter) to which Section 107 did not apply even *before* its recodification as § 307104.

the White House area for professional and personal reasons, walks in President's Park and its environs, and plans to continue doing so, *id.* ¶¶ 9, 12. She has explained, both from her perspective as a historian and as someone who cares deeply about the White House and the historic President's Park, how she will be harmed by the construction of a ballroom of the size and scale the Defendants propose. *Id.* ¶¶ 9-14. That is not "incidental viewership" or an abstract objection. It is precisely the particularized, concrete, and continuing use of a specific public place that supports aesthetic injury and, at this stage, irreparable harm—especially when tethered, as here, to procedural violations, *see* ECF 20 at 36-41; ECF 2-3 ¶¶ 15–16.

Nor are those injuries speculative or conjectural. ECF 30 at 11. The Defendants admit that they demolished the East Wing specifically to construct a massive ballroom, and absent relief from this Court, that construction is nearly certain. Although the Defendants assert that the Ballroom's "plans have not been finalized," *id.*, their *own architect* told the NCPC less than two weeks ago that the location is set and foundational work is underway on a Ballroom of the size and massing that affects Dr. Hoagland, ECF 30-2 at 112:10-113:16. Their own anonymous engineer appears to doubt the possibility of anything more than "modest changes" to the above-grade dimensions, ECF 30-4 ¶ 10. And their own environmental assessment ("EA"), despite its many flaws, acknowledges and expressly admits that the Ballroom Project *will* have the adverse effects that Dr. Hoagland asserted in her affidavit, ECF 14-2 at 6; *see* ECF 20 at 29-36.[4]

## II.    **The National Trust is Likely to Succeed on Its APA Claims.**

### A.    The National Trust Can Advance APA Claims Against EXR Because EXR Is an Agency.

---

[4] While the assertion that a 90,000 square foot Ballroom will be largely obscured by trees and "hillocks" warrants skepticism, ECF 30 at 10-11, it is also irrelevant. A plaintiff need not see every façade from the street to suffer an aesthetic and professional injury from harm to a place they use and enjoy. *See Ctr. for Biological Div. v. U.S. Fish & Wildlife Serv.*, 145 F.4th 1144, 1157 (D.C. Cir. 2025) (holding researcher's professional and aesthetic interest in beetle he searches for and observes only while on family vacations sufficient for associational standing).

The Defendants contend that the National Trust cannot advance APA claims because EXR—to which they have illegally reassigned the Ballroom Project in a transparent attempt to evade APA review—is not an agency under the statute. *See* ECF 30 at 13-17. Relying principally on *Sweetland v. Walters*, 60 F.3d 852 (D.C. Cir. 1995), in which the D.C. Circuit, based on EXR's then-responsibilities—such as "prepar[ing] and serv[ing] meals" and "greet[ing] visitors," *id.* at 854—found that it was not an agency, the Defendants assert it is not an agency now. ECF 30 at 13-15. But an entity that was not previously an agency can become one if the President augments its responsibilities, *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 n.5 (D.C. Cir. 1985), and, as the National Trust has explained, ECF 20 at 17-21, and the Defendants' supplemental submissions confirm, that is exactly what has happened here. Consider EXR's present responsibilities:

- EXR undertook the Ballroom Project after concluding that "demolition of the existing East Wing structure and reconstruction of a new East Wing provided the lowest total cost of ownership and the most effective long-term risk reduction." ECF 30-1 ¶ 10.

- EXR is itself carrying out that determination by "managing the [Ballroom Project]," ECF 14-6 ¶ 8, because—by the Defendants' telling—it is "best-positioned to coordinate *with other agencies* (such as the USSS and NPS)," ECF 30-1 ¶ 7 (emphasis added).

- EXR is "developing contractual requirements, contracting for, and managing the Project," and is "the signatory on all contracts associated with the Project," ECF 30-1 ¶ 8, thereby "control[ling] the allocation" of the reported $400 million of project funds, *Dong v. Smithsonian Inst.*, 125 F.3d 877, 882 (D.C. Cir. 1997)—which exceeds the budget of many federal agencies, *see* USASpending.gov, https://www.usaspending.gov/agency.

- EXR retains "control of all aspects of the day-to-day execution of the [Ballroom] Project, including its scope, schedule, budget, design, and completion." ECF 14-1 ¶ 13; *cf. Rushforth* 762 F.2d at 1041 ("In a word, [the Office of Science and Technology] could take direct action and thus was deemed to be an administrative agency.").

- EXR receives funds for the Ballroom Project from NPS "pursuant to the Economy Act," ECF 30-1 ¶ 12, which permits only *inter-agency* transfers, 31 U.S.C. § 1535(a); *see also* 48 C.F.R. § 2.101 (defining "interagency acquisition" as "a procedure by which an agency needing supplies or services (the requesting agency) obtains them *from another agency* (the servicing agency)" under, *inter alia*, the Economy Act (emphasis added)). EXR is therefore necessarily and at minimum an Economy Act agency. *See AFL-CIO v. Dep't of Labor*, 766 F. Supp. 3d 105, 112 (D.D.C. 2025).

The Defendants contend that all this amounts to no more than "assist[ing]" the President. ECF 30 at 3, 15. But "[e]very action taken by any executive branch official can be described as 'assisting' the President," *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993), and what matters is not whether the entity assists in this capacious sense, but whether it is exercises its own substantial authority, *see* ECF 20 at 17-21. *Rushforth* and *Armstrong*, relied upon by the Defendants, ECF 30 at 14-15, are therefore readily distinguishable; the former concerned the Council of Economic Advisors, which simply gave advice to the President, 762 F.2d at 1042, and the latter concerned the National Security Council, which likewise made recommendations to the President, in addition to coordinating certain agencies' national-security activities, 90 F.3d 553, 561-64 (D.C. Cir. 1996). And while the Defendants, citing *Dong*, observe that EXR does not engage in formal rulemaking, adjudication, or investigation, *see* ECF 30 at 16, not even *Dong* held that to be necessary, *see* 125 F.3d at 881-82, and in any case (and as detailed above) EXR has authority to the take the sort of "final and binding" action that characterizes an agency, *id.* at 881.[5]

Each agency will, of course, look somewhat different from the next. But any distinctions between EXR and its compatriots should not distract from the important point: Managing and directing the funding and construction of a massive structure in a national park is a task for an agency. *Cf. Jackson Hole Conservation All. v. Babbitt,* 96 F. Supp. 2d 1288 (D. Wyo. 2000).

The Ballroom Project began under the control of an agency (NPS), and only when the Defendants needed to evade APA review did they discover an entity that had not been considered an agency within which to hide it. Even now, they offer no other sensible reason for why the project is being directed by EXR—which, to the knowledge of former NPS Director Jonathan Jarvis, has

---

[5] The Defendants' suggestion that a $400 million construction project implicates no final agency action, *see* ECF 30 at 16, is simply wrong; among other such actions, the decision to proceed with the project at all is itself a final agency action.

"little if any experience managing construction projects of any size" and "no experience at all managing a project [of this] size and importance," Declaration of Jonathan B. Jarvis ("Jarvis Decl.") ¶ 27; *cf. Sweetland*, 60 F.3d at 854. EXR does not need to direct the Ballroom Project to address its household management and ceremonial-use interests, ECF 30-1 ¶ 7, just like it did not need to manage the construction of the tennis pavilion, and just like the Chief Usher (EXR's head) did not need to manage various White House projects throughout the twentieth century, *see generally* ECF 20-1. Rather, EXR only "needs" to direct the Ballroom Project because the Defendants "need" the project not to be subject to APA review.

The APA cannot be circumvented so easily. Lodging agency tasks in what was formerly a non-agency entity does not mean that entity's actions can evade APA review; it means that entity *becomes an agency*. *Rushforth*, 762 F.2d at 1042 n.5. The Court should not allow EXR "to escape the obligations that accompany agencyhood"—including APA review of the Ballroom Project— "while reaping only its benefits." *AFL-CIO*, 766 F. Supp. 3d at 112.

B. <u>The Ballroom Project Must Be Expressly Authorized by Congress.</u>

As the Defendants acknowledge, no "building or structure" may "be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress," 40 U.S.C. § 8106. The Defendants admit the Ballroom is a "structure," and that President's Park is a federal park in the District of Columbia. ECF 30 at 29.

That leaves only express authorization from Congress. Rather than admit that none exists, the Defendants invent a Rube Goldberg machine. Their theory, or so it goes, is that (1) by enacting 3 U.S.C. § 105(d)—which only authorizes appropriations for "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House"—and (2) by appropriating

$2.475 million under that statute for the President to spend consistent with § 105(d) and the even *narrower* appropriation language ("for required maintenance, resolution of safety and health issues, and continued preventative maintenance"), Pub. L. 118-47, 138 Stat. 460, 532 (2024), Congress was implicitly (3) authorizing both the demolition of the East Wing and construction of a 90,000-square-foot ballroom using (4) $400 million or more in private funds accepted through NPS's separate statutory authority to receive donations, 54 U.S.C § 101101(2), which were to be (5) funneled to EXR from NPS under the Economy Act, 31 U.S.C. § 1535, then (6) deposited in the same bank account as the $2.475 million appropriated under § 105(d), so those funds could (7) be used in a way that neither § 105(d) nor Congress has ever contemplated. ECF 30 at 34-35. Even setting aside that this convoluted process is illegal, *see infra*, one obvious and essential thing is missing: *express authority of Congress for Ballroom construction*.

Likely recognizing this fatal flaw, Defendants focus on attempting to evade § 8106's clear prohibition. Not only are their attempts unavailing, but their new affidavits ironically highlight a *second* statute requiring affirmative congressional authorization before the Ballroom can proceed: 54 U.S.C. § 100101(b)(2), which bars NPS from "impair[ing]" "historic objects," *id*. § 100101(a), within a National Park—like the East Wing or the White House complex—"***except as directly and specifically provided by Congress***," *id.* § 100101(b)(2) (emphasis supplied).

**1.** The Defendants' principal contention is that despite the plain language of § 8106, "historical practice" shows that express authorization for the Ballroom Project is not required. ECF 30 at 30. But this gets the Defendants nowhere. To start, the statute plainly prohibits construction of the Ballroom without express Congressional authorization. Even if the evidence showed that the executive branch had historically failed to abide by § 8106, there would still be no basis to ignore the text of the statute now. *Cf. In re FTX Trading Ltd.*, 91 F.4th 148, 155 n.7 (3d Cir. 2024)

("[C]ourts must 'give effect to [a] plain command, even if doing that will reverse the longstanding practice under the statute.'" (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998))). But in fact, the evidence demonstrates remarkably consistent compliance with § 8106.[6] Congress has followed the statute by routinely and expressly authorizing White House modifications, usually (but not always) in earmarked appropriations. *See* ECF 20-1. And, with two *de minimis*, never-challenged exceptions, the executive branch has altered the White House or structures on its grounds only when and as permitted by Congress. *See id.*

The four projects cited by the Defendants (ECF 30 at 31) offer no meaningful evidence to the contrary. As for the 1934 West Wing renovations, Congress expressly directed the Public Works Administration, "under the direction of the President," to "prepare a comprehensive program of public works," including "[c]onstruction, repair, and improvement of . . . public buildings," excluding *only* buildings under the jurisdiction of the Architect of the Capitol, and appropriated $3.3 billion for the task. Nat'l Indus. Recovery Act §§ 1, 201(d), 202, 220, 48 Stat. 195, 201, 210 (1933). One such project included was the West Wing renovation. ECF 20-1 at 7-8. Congressional authorization of unfettered discretion vested expressly and personally in the President to expend up to $3.3 billion to construct, repair, or improve *any* public buildings (other than the Capitol buildings and grounds), suggests § 8106 *was* satisfied, not the opposite. Similarly, any opacity in the congressional approval of the 1942 East Wing bunker and renovations was almost certainly in the interest of wartime national security. (Defendants surely agree some secrecy

---

[6] The Defendants assert that the National Trust "does not claim that a *single*" new structure erected since 1912 "was approved by Congress." ECF 30 at 28. This badly misrepresents the National Trust's position, and not for lack of clarity. The National Trust has repeatedly stated that "Congress authorized almost every project—and every *major* project—constructing or modifying the White House or structures on its grounds," with the *only* exceptions being President Ford's swimming pool/cabana and President Trump's tennis pavilion. ECF 20-1 at 2; ECF 20 at 8 (similar).

often accompanies the building of presidential bunkers. *See* ECF 30 at 41.) And the fact that a swimming pool/cabana and tennis changing room were built without congressional authorization (and crucially, without having to survive a legal challenge) no more proves the inapplicability of § 8106 than driving 60 miles per hour in a 55 mile-per-hour zone without getting a ticket proves the inapplicability of the speed limit.[7]

**2.** Alternatively, the Defendants contend that "the President does not need congressional approval for specific projects, because he has already been delegated sufficiently broad authority over any improvements to the White House" under 3 U.S.C. § 105(d). ECF 30 at 32. This argument simply does not hold up. Section 105(d) authorizes "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1). Reading "alteration" and "improvement" as express authorization to demolish an entire wing of the White House and construct a 90,000-square-foot entertainment venue in its place strains § 105(d) well beyond what the Defendants' attempts to contort it can bear, ECF 30 at 33-34. ECF 20 at 13-14.

But even if "alteration" and "improvement" could be read to authorize the sort of construction the Defendants are undertaking (they cannot), it would not be enough. Section § 8106 requires *express* authorization for the Ballroom Project, and this requires the Defendants to make an even more extravagant assertion: that § 105(d)'s "notwithstanding" clause *supersedes* § 8106's

---

[7] Several other points can be disposed of briefly. There is no "open-ended delegation," ECF 30 at 29-30, in the statute enacting what is now § 8106; it appropriated (like many appropriations since) a specific sum of money to be spent for specific purposes, *see* 37 Stat. 417, 444 (1912). President Nixon's interior renovation of the press room was funded from his annual allowance, as the cited statute shows, *see* ECF 30 at 31 n.12. The Truman Balcony was also funded from the President's annual allowances, and qualifies an "alteration" or "improvement," if a comparatively substantial one; while the Defendants accuse the National Trust of trying to "have it both ways," *id.* at 34, the difference between a new *balcony* and a new *building* should not need explanation.

express-authorization requirement and permits the President to spend any money in the White House Repair and Restoration Account for any construction project he wishes. ECF 30 at 32.

The "notwithstanding" clause does no such thing. It applies only to "[s]ums *appropriated under this subsection*," that is, subsection (d). 3 U.S.C. § 105(d). The only funds "appropriated under" § 105(d) for this fiscal year are the $2.475 million. *See* Pub. L. 118-47, 138 Stat. at 532 ("For the repair, alteration, and improvement of the Executive Residence at the White House *pursuant to 3 U.S.C. 105(d)*, $2,475,000 . . . ." (emphasis added)). As for the other $400 million, the Defendants admit it is private funding that will be funneled through NPS's gift authority, and therefore can only be "appropriated to be disbursed" under an entirely different statute, 31 U.S.C. § 1321(b)(1)—*not under § 105(d)*. ECF 30 at 34. Thus, even if the $400 million ends up in the same account as the appropriate $2.475 million, *see id.*, the most generous reading of § 8106 is that the most the President is congressionally authorized to use for Ballroom construction is the original $2.475 million. 3 U.S.C. § 105(d). And even that argument fails, as explained above.

In short, § 105(d) can hardly expressly authorize a project it fails to mention, and its "notwithstanding" clause only underscores that the President's flexibility with respect to the White House is circumscribed by the limits of his annual congressional housing allowance. The Defendants need express congressional approval for the Ballroom under § 8106. They have none.

**3.** The Defendants speculate that § 8106 might not "require[] approval for a particular structure" but could be satisfied by "authorization to build *generally* on a piece of land."[8] ECF 30 at 28 n.11. Setting aside that they cite no *general* authorization either, the assertion is also untrue.

---

[8] The Defendants previously argued that § 8106 was "superseded" by purportedly "more specific" statutes like the National Capital Planning Act ("NCPA"), ECF 15-1 at 15 n.7. The National Trust explained why § 8106 is more specific than the NCPA and has not been superseded by it or any other statute, *see* ECF 20 at 12 n.11, and the Defendants make no response, *see* ECF 30 at 28 n.11.

When Congress wants to authorize the erection of privately funded structures on D.C. federal parkland, it knows precisely how to do so. Take Congress's authorization of the erection of privately funded bonsai facilities in the National Arboretum. *See, e.g.*, Pub. L. 99-591, 100 Stat. 3341, 3341-5 (1986) ("[F]acilities to house Bonsai collections at the National Arboretum may be constructed with funds accepted under the provisions of Public Law 94-129 (20 U.S.C. 195) ***and the limitation on construction contained in the Act of August 24, 1912 (40 U.S.C. 68) shall not apply to the construction of such facilities***." (emphasis supplied)); Pub. L. 103-111, 107 Stat. 1051 (1993) (similar). In each, Congress specified the private funds that could be used. It specified the purpose—the erection of bonsai facilities—to which they could be put. And it expressly specified that the facilities could be built *notwithstanding* § 8106 (then 40 U.S.C. § 68).

It defies belief that Congress would recognize the necessity to expressly authorize the building of privately funded bonsai facilities under § 8106, but would hide the "express" authorization for a massive, privately funded White House ballroom in a labyrinth of statutes that takes the Defendants themselves nearly a page to fully detail, *see* ECF 30 at 34-35. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). In short, the Defendants need express congressional authorization for the Ballroom Project—and they do not have it.

**4.** Unable to muster the requisite express authorization for the Ballroom Project, the Defendants are reduced to arguing that the Court "should not read § 8106 to restrain the President in the absence of a clear statement." ECF 30 at 29. But the Court does not need to read § 8106 as restraining the President to enter a preliminary injunction. The section also restrains the agency carrying out the project (EXR), and the agency that by law should be in charge of it (NPS). As the National Trust has explained, *see* ECF 20 at 27-28, the fact that the President has some role in a project does not put the project beyond judicial review. *Cf. Chamber of Com. of the U.S. v. Reich*,

74 F.3d 1322, 1327 (D.C. Cir. 1996). Nor does it prohibit injunctive relief against executive entities carrying out the President's unlawful orders. *See* ECF 20 at 28 (citing *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, 784 F. Supp. 3d 127 (D.D.C. 2025)).

The Defendants also invoke constitutional avoidance, but this is a red herring. *See* ECF 30 at 29. The President *has* no "constitutional prerogative[]," ECF 30 at 29, to build the Ballroom. The Property Clause gives plenary control over federal property to Congress, not the President. ECF 20 at 10-12. And although the Defendants nod at the argument that the President needs a ballroom to perform his duties under the Reception Clause, U.S. Const. art. II, § 3, cl. 3, they fail to respond to the National Trust's detailed explanation of why the Reception Clause gives the President no power over federal property, ECF 20 at 10-11.[9] The only "serious constitutional problems" here, ECF 30 at 30 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)), are the President's continued usurpations of *Congress's* constitutional powers, ECF 20 at 10-12, 23-26; ECF 2-1 at 31-33. That counsels in favor of injunctive relief, not against it.

**5.** Finally, in attempting to structure the Ballroom's funding to evade § 8106, the Defendants have walked straight into another legal roadblock: the statutory requirement that Congress "directly and specifically" approve transfers of private gift funds from NPS to EXR. 54 U.S.C. § 100101(b)(2). In her new affidavit, the NPS Acting Director observes that the Secretary of the Interior, through the NPS Director, must "conserve the . . . historic objects . . . in the System

---

[9] The Defendants also suggest that constitutional concerns would arise if § 8106 prevented the President from erecting temporary tents on the White House grounds. ECF 30 at 30. Although that is not at issue in this case, the limited decisions addressing § 8106 suggests that the statute may have previously been read to permit inherently temporary structures erected for a short period of time. *See Cmty. for Creative Non-Violence v. Carvino*, 654 F. Supp. 827 (D.D.C. 1986), *aff'd*, 865 F.2d 382, 386 n.6 (D.C. Cir. 1988) (noting Capitol Police's "interest in avoiding permanent structures" under the statute).

units . . . in such a manner and by such means ***as will leave them unimpaired for the enjoyment of future generations***." ECF 30-3 ¶ 5 (quoting 54 U.S.C. § 100101(a) (emphasis supplied)).

What the Defendants fail to inform the Court is that Congress had more to say, in the very next subsection. If NPS wishes to *impair* historic objects within System units rather than *conserve* them, Congress was unambiguous: NPS is forbidden from doing so "***except as directly and specifically provided by Congress***." 54 U.S.C. § 100101(b)(2) (emphasis supplied).

It is axiomatic that using NPS gift funds to *demolish* the East Wing does not leave the White House "unimpaired for the enjoyment of future generations." *Id.* § 100101(a). Nor will using NPS gift funds to construct a 90,000-square-foot ballroom leave the historic White House complex "unimpaired for the enjoyment of future generations," *id.*; NPS's own (inadequate) EA admits the project will cause numerous permanent adverse impacts. As a result, NPS cannot use or transfer NPS gift funds for the Ballroom Project unless "directly and specifically provided by Congress." *Id.* § 100101(b)(2). As with § 8106, no such congressional authorization exists.

C. <u>The Defendants Have Violated NEPA.</u>

The Defendants' supplemental brief not only confirms that their EA is insufficient, but also reveals several additional, separate NEPA violations.

**1.** As a preliminary matter, Defendants cannot insulate the inadequacy of NPS's NEPA process (or the project as a whole) from judicial review simply by labeling it "presidential," ECF 30 at 22. The National Trust has explained that agency action is not exempt from APA review simply "because it carried out a presidential directive." ECF 20 at 28 (quoting *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)); *see Reich,* 74 F.3d at 1327. And the National Trust has already distinguished *Natural Resources Defense Council v. Department of State*, 658 F. Supp. 2d 105 (D.D.C. 2009), *see* ECF 20 at 28 n.16, on which the Defendants rely here, *see* ECF 30 at 22-23.

The Defendants do not respond to any of this; instead, they simply repeat that the project is unreviewable because it is "presidential," *see id.* at 22. That is not serious reasoning, and it should not be taken seriously.

The Defendants do add one new wrinkle to their old argument: that APA review is unavailable because NPS purportedly lacks "significant discretionary authority over the [Ballroom] Project." *Id.* at 23. But this is belied by even a cursory examination of NPS's actual role. In its EA and FONSI, NPS considered and weighed various aspects of the project—in other words, it exercised its discretion, *see* ECF 14-2; ECF 14-3. Further, the Defendants have now revealed that NPS holds sole disbursement authority over the sole source of funds being used to pay for the Ballroom Project, ECF 30 at 23. This means that regardless of whether EXR controls the project, NPS controls the purse strings, requiring NPS to comply both with NEPA as to any funding transfer, and with congressional mandates limiting how NPS may deploy donated funds, 54 U.S.C. § 100101(b)(2); *see also* Jarvis Decl. ¶¶ 35-36.

**2.** On the merits of NPS's EA, the supplemental brief simply confirms an environmental impact statement ("EIS") is required. *See* ECF 20 at 29-36; Jarvis Decl. ¶¶ 31, 6 ("[A]ny one of the adverse impacts identified by the NPS in the environmental assessment and FONSI is sufficient to trigger the preparation of an EIS."). Moreover, as Director Jarvis explains, the Ballroom Project so significantly "impair[s] the resources and values under the stewardship of the National Park Service as to prohibit NPS from proceeding with the project without being 'directly and specifically' authorized by Congress." *Id.* ¶¶ 8, 17-18. Since 1978, the so-called Redwood Amendment has prohibited NPS from taking any actions "***in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress***." 54 U.S.C. § 100101(b)(2) (emphasis added).

16

The NPS's own Foundation Document for President's Park, issued in 2014, declares that "the White House *and the Wings*" are "*[f]undamental resources . . . essential to achieving the purpose of the park and maintaining its significance*" (emphasis added).[10] And while the Defendants are correct that the NPS's Comprehensive Design Plan (issued in 2000) noted a need for expanded White House event space, ECF 15-1 at 5, the Plan proposed locating these spaces in "new *underground structures* to minimize any new intrusions on the surface," since "the integrity and character defining features of the White House and its grounds . . . *are [to be] preserved and maintained*" (emphases added).[11] Demolishing a National Park's "fundamental resources" is obviously inconsistent with the values for which the Park has been established.

Yet contrary to the Redwood Amendment, its own Foundation Document and Comprehensive Design Plan, and long-established NEPA principles, NPS determined that allowing demolition of the East Wing and construction of a 90,000-square-foot ballroom would have no significant impact. The Defendants assert this conclusion requires deference, but direct contradiction of an agency's own longstanding policy does not warrant deference under the APA. As the Defendants note, "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is," ECF 30 at 30 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024)). And while *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 183 (2025), warns against "micromanag[ing]" agency choices, it

---

[10] National Park Service, *Foundation Document: The White House and President's Park* (Sept. 2014), at 11-12, available at https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_2015-508-accessible-resize.pdf (last accessed Jan. 20, 2026).

[11] National Park Service, *Comprehensive Design Plan: White House & President's Park* (2000), at 92, 96, 103, *available at* https://babel.hathitrust.org/cgi/pt?id=umn.31951p009596291&seq=3 (last accessed Jan. 20, 2026). As the Plan was *itself* subject to a NEPA EIS and a Record of Decision that do not contemplate the Ballroom, *id.* at 9, the Ballroom Project cannot proceed without "a modification of the original EIS for the Comprehensive Plan," Jarvis Decl. ¶ 30.

does not endorse judicial abdication. Evaluating whether demolishing the East Wing and then building a massive ballroom has a significant impact on the human environment is hardly micromanagement.

Nor do the Defendants' supposed mitigation efforts change the conclusion. NEPA is clear: an EIS is required for any proposed agency action "that has ***a reasonably foreseeable significant effect*** on the quality of the human environment" 42 U.S.C. § 4336(b)(1) (emphasis added). A claim of a net benefit is insufficient: A "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." *Marsh v. Ore. Nat. Res. Council,* 490 U.S. 360, 374 n.20 (1989); *see* ECF 20 at 31. Instead of conceding that *Marsh* controls, the Defendants ignore it, searching for snippets from lower court cases more to their liking. Yet even those cases are unavailing; they at most credit reasoned showings that mitigation will *actually* reduce impacts below some significance threshold. They do not allow agencies to offset major and permanent adverse effects with a desire to (for example) "reduce the wear and tear on the lawn." ECF 14-3 at 9; *cf. Cabinet Mtns. Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982) ("[S]pecific mitigation measures" can avoid need for EIS only where they "*completely* compensate for *any possible* adverse environmental impacts." (emphasis added)).

And the other problems in NPS's NEPA analysis remain. The "alternatives" analysis was predetermined by narrow criteria—"immediate adjacency" to the Executive Mansion, "a direct ceremonial procession" from the East Room to the Ballroom, and "secure second-story access" to the residence, ECF 14-2 at 1—that practically foreclosed any other option. As Director Jarvis explains, "[c]onsidering alternative ways of achieving a project's objective is a routine and required component of NEPA analysis at NPS," and defining the project so narrowly as to eliminate reasonable alternatives "contravenes the Park Service's stewardship mission and non-

impairment mandate." Jarvis Decl. ¶ 32. The Defendants' attempt to find refuge in *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991), *see* ECF 30 at 26-27, is misplaced. *Busey* permits agencies to consider an applicant's goals; it does not allow an agency to disregard the alternative options (1) already endorsed by that same agency (2) in an EIS-adopted Comprehensive Plan for (3) the same exact building, *see supra* pp. 16-17.

Finally, the Defendants' insistence that the EA adequately addressed environmental effects is refuted by the EA's own omissions. Director Jarvis identifies one example: the White House official in charge of the project attested in his affidavit to the presence of "highly toxic substances, including asbestos and lead paint" in the East Wing. Yet "there is no mention of either asbestos or lead paint in the NPS Environmental Assessment," a deficiency that "renders NEPA compliance incomplete." Jarvis Decl. ¶¶ 29, 6.

The Defendants' attempt to trivialize their own procedural violations only underscores the EA's insufficiency. NPS Director's Order 12 is unambiguous: "*all* NPS NEPA reviews must include '[m]eaningful participation by the public and other stakeholders,'" Jarvis Decl. ¶ 14 (quoting Director's Order 12). Director Jarvis is unaware of any instance of NPS "preparing an environmental assessment without *contemporaneously* making that document available for public review before any action was taken." Jarvis Decl. ¶ 25. The Defendants' deviation from both the statutory requirements of 42 U.S.C. § 4336(b)(2) and established agency policy deprived the National Trust of any opportunity to inform the analysis *before* demolition or *before* below-grade construction. Disclosure that comes too late to inform decisions vitiates NEPA's action-forcing function and is judicially reviewable. *Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 532-34 (D.C. Cir. 2018). And because the EA was inadequate and should have been followed by an EIS, the National Trust continues to be wrongfully deprived of its NEPA commenting rights.

**3.** The Defendants also appear unaware that the transfer of NPS gift funds to EXR for the Ballroom Project is itself an agency action that *independently* triggers NEPA review, to ensure those funds are used consistent with the statutory restrictions Congress imposed on NPS. 42 U.S.C. § 4336e(10); *cf.* 40 C.F.R. § 1508.1(w)(1)(iv), (vi). Deciding whether and on what terms to disburse NPS gift funds is a discretionary NPS action subject to NEPA, not a ministerial handoff insulated from judicial review. The Defendants' contention—that NPS's decision to transfer $200 million of NPS gift funds to EXR for the Ballroom Project was "no[t] significant discretionary authority over the Project," ECF 30 at 23—is hard to take seriously. Without NPS gift funds, there *is* no Ballroom Project, and NPS was under no statutory mandate to provide them. NPS not only retains complete legal authority to condition or withhold a transfer to prevent impairment and to ensure alignment with NPS purposes, but indeed *must* do so under the Redwood Amendment and NPS Director's Order 21 (the NPS donations policy, also issued by Director Jarvis, *see* Jarvis Decl. ¶¶ 35-36). Yet NPS has undertaken no NEPA review of the transfer whatsoever.

D.  <u>The Defendants Have Continued to Fail to Engage in Adequate Commission Review.</u>

The National Trust remains likely to succeed on its claims regarding NCPC and CFA review. The Defendants assert that because they have taken limited, preliminary steps toward obtaining commission review, they are now "doing exactly what the National Trust argues they must do." ECF 30 at 22. They are not. Of course, it is better that the Defendants are no longer *completely* flouting their obligation to seek commission review, as they were before the National Trust commenced this action. But the ongoing violation remains that the Defendants *continue to build the Ballroom* without having completed commission review, *see* ECF 23 at 1-4.

An important statutory purpose of commission review is for the agency to receive feedback from the commissions and the public early enough in the process to meaningfully consider and

address it. 40 U.S.C. § 8722(b)(1); 45 C.F.R. § 2101.1(a)(1). Yet the Defendants have asked NCPC to approve the Ballroom at or shortly after the March 5, 2026 hearing at which the public will have their first opportunity to comment. ECF 30-2 ¶¶ 9-10. Meanwhile, they continue to delay submitting actual plans to either NCPC or CFA (making merely "informational presentations" with no public comment). The reason is obvious: they want foundation construction to progress to a point where they can contend that changes of any substantial magnitude are financially and practically untenable. This is a transparent effort to vitiate the rights of the National Trust and the public to comment. *See Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (Breyer, J.) ("[S]et[ting] aside the agency's action at a later date will not necessarily undo the harm" since "[i]t is far easier to influence an initial choice than to change a mind already made up").

The Court rightly recognized the risk that below-grade work during ongoing commission review will improperly predetermine above-grade Ballroom features. ECF 17 at 3. As the former president of the American Institute of Architects William Bates explains, based on standard architectural practice, foundations fix column grids, cores, spans, and utilities, and thereby restrict above-grade options. ECF 20-2 ¶¶ 5-13. "Commencing foundation work before submitting plans for review, commentary, and approval" will therefore "likely cause any such review, commentary, or approval to be an empty exercise." *Id.* ¶ 13. Director Jarvis's experience confirms that proceeding with substantial work before meaningful NEPA analysis risks turning NEPA review into simple ratification as well. Jarvis Decl. ¶¶ 20-28.

The Defendants not only essentially concede this, but are so confident this Court will not stop them that they have continued construction apace. Their engineer confirms that "the below-grade elements of the [Ballroom] Project have been designed to support an above-grade Ballroom roughly the size and scale of that which was proposed at the January 8, 2026, [NCPC] meeting,"

ECF 30-4 ¶ 8. The engineer only anticipates the possibility of "***modest changes***" to above-grade features once the foundation is set. *Id.* ¶ 10; *see also id.* ¶¶ 12 ("[M[ov[ing] sub-surface utilities and infrastructure once the foundation is constructed . . . might be costly or time-consuming"). The Defendants' architect acknowledged the effects in "schedule and money" that substantial changes at this point in the process would incur, and resistance to change will only increase if the project continues. ECF 30-2 at 112:14. This is precisely why a preliminary injunction is required now.

III.  **The National Trust Is Likely to Succeed on Its Constitutional Claims.**

The National Trust is also likely to succeed on its constitutional claims. First, contrary to the Defendants' contention, *Dalton v. Specter*, 511 U.S. 462 (1994), does not foreclose them. At issue in *Dalton* was a detailed statutory scheme that *authorized* the challenged conduct (the President's closure of a shipyard) after he followed a certain process. *Id.* at 464-65. Consequently, the plaintiffs' "constitutional" claims (that this statutory process had not been followed) were properly considered as statutory claims. *Id.* at 464-65, 474. Similarly, in *Global Health Council v. Trump*, 152 F.4th 1, 15-17 (2025), also cited by the Defendants, *see* ECF 30 at 18, a federal statute (the Impoundment Control Act, 2 U.S.C. §§ 861 *et. seq.*) *authorized* the president to impound foreign-assistance funds after following a certain statutory process, with which he did not comply, 15 F.4th at 8. *See Nat'l Treas. Empls. Union v. Vought*, 149 F.4th 762, 821-22 (D.C. Cir. 2025) (Pillard, J. dissenting), *vacated by* 2025 U.S. App. LEXIS 33453 (D.C. Cir. Dec. 17, 2025).

Neither the Supreme Court nor the D.C. Circuit has applied *Dalton* to claims such as the National Trust's, which assert not that the President has failed to *discharge* his statutory authority in accordance with the process required by the delegating statute, but instead that he *lacks any authority whatsoever* to build the Ballroom or reorganize the Executive Branch. *See id.* And in the only two cases in which the government temporarily succeeded in convincing a panel of the D.C. Circuit to extend *Dalton*, the resulting decisions were vacated by the *en banc* circuit. *See Nat'l*

*Treas. Empls. Union*, 2025 U.S. App. LEXIS 33453; *Climate United Fund v. Citibank, N.A.*, 2025 U.S. App. LEXIS 33454 (D.C. Cir. Dec. 17, 2025).

It is not difficult to see why. The Defendants' expansive reading of *Dalton* would insulate a wide swath of genuinely constitutional claims from review simply because the executive has claimed some statutory authority for the challenged action. *See* ECF 30 at 17-18. And, perhaps more perversely, it would elevate the Defendants' gamesmanship here into a complete defense to their constitutional violations. The Defendants relied significantly in their initial brief on the President's supposed Reception Clause powers, U.S. Const. Art. II, § 3, cl. 2. *See* ECF 15-1 at 1, 15. Apparently realizing this argument lacks merit, *see* ECF 20 at 10-12, the Defendants have now disclaimed *any* constitutional authority, ECF 30 at 30, in order to assert that they are acting only pursuant to statutes—which, they contend, means that the National Trust's constitutional claims must be statutory too, *id.* at 17-18. While the Defendants may choose to *defend* against the National Trust's constitutional claims however they wish, neither *Dalton* nor *Global Health Council* supports making the *existence* of the claims turn on the government's self-serving characterization.

The National Trust's claims are therefore constitutional and properly pleaded. And the Trust is likely to succeed on those claims. The Defendants assert that the President "cannot violate the Property Clause," ECF 30 at 18, but plainly he can: the usurpation of one branch's constitutional powers by another is a quintessential violation of the separation of powers, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and describes exactly the President's efforts here to "dispose of . . . Property belonging to the United States," U.S. Const. Art. IV, § 3, cl. 2. *See* ECF 20 at 10-11; ECF 2-1 at 31-33; *see generally* ECF 20-1 (detailing congressional control over the White House). The only justification the Defendants can muster is that they have been delegated some of Congress's Property Clause powers—but as explained

above and in the National Trust's prior briefs, ECF 2-1 at 31-33; ECF 20 at 10-11, they have not. Nor can the President constitutionally reorganize the executive branch in an effort to insulate the Ballroom Project from review, ECF 20 at 23-26. And as the National Trust has explained, the fact that Congress has permitted the President and his family to use and occupy the White House gives him no authority to do more than that, *see id.* at 14-15. He is a temporary tenant, not the landlord.

## IV.   The Other *Winter* Factors Favor Preliminary Injunctive Relief.

The other *Winter* factors also favor a preliminary injunction. The National Trust will be irreparably harmed if an injunction is not entered. That harm is not just procedural. Demolition has already caused permanent loss, and as the National Trust has explained, below-grade work threatens to lock in the massing and layout of the Ballroom before lawful review. ECF 20-2 ¶¶ 5-13. Nor is it speculative. It is occurring now and will likely become irreversible if below-grade elements fixing the structural grid, cores, spans, and utility placements proceed.[12] *Id.* Director Jarvis explains why proceeding prematurely is fundamentally inconsistent with NPS's stewardship obligations and undermines public participation. Jarvis Decl. ¶¶ 20–28.  And the Defendants' engineer concedes that anything other than "modest" post-foundation changes would be "costly or time-consuming." ECF 30-4 ¶¶ 10, 12. That concession supports the Trust's core point: the Defendants' unabated progress is foreclosing alternatives and constraining design options *now*.

On the other hand, the Defendants will not be harmed by a temporary pause that preserves the status quo during litigation. They have no cognizable interest in continuing to violate the law. And their equitable argument is nothing short of astonishing: continued construction is necessary to avoid leaving an "unsightly excavation site." ECF 30 at 40-42. But a gaping hole only exists

---

[12] The Defendants' attempt to discredit Mr. Bates because he "has never reviewed any plans," ECF 30 at 39, is untenable. They cannot withhold plans and then fault an opposing expert for not having seen them—especially where their engineer not only fails to detail why Mr. Bates's evaluation is incorrect but concedes that substantial changes will be (at best) very difficult. ECF 30-4 ¶¶ 10-12.

*because* the Defendants demolished the East Wing without obtaining the necessary reviews and approvals. Equity does not reward a party for creating the problem it invokes to avoid relief. And allowing the Defendants to proceed with practically outcome-determinative below-grade work will only advance the *fait accompli* the Court warned against. ECF 17 at 3.

The Defendants again invoke national security concerns, ECF 30 at 40-41, but it bears reiterating: The National Trust *is not asking* the Court to halt safety-critical stabilization work or to compromise the protection of the President. The Court can allow that work, but enjoin the Defendants from undertaking any further construction work on the Ballroom Project, as the National Trust has proposed, *see* ECF 20-4.

## Conclusion

It is important to recognize what will happen if a preliminary injunction is not issued, and the National Trust later prevails on its claims (as it is likely to do). The Defendants will continue to build the Ballroom. When the National Trust and the public are belatedly allowed to offer comments, the Defendants will not seriously consider them—because too much concrete will have been poured to change course. And they will not tear the Ballroom down. Instead, they will identify some reason why they supposedly cannot, and why the Court cannot compel them to do so.

The stakes could not be higher. Without a preliminary injunction, the message will be crystal clear: if the President can demolish the East Wing without oversight or consequence and build anything he wants in its place, neither law nor logic stops him from doing the same to the West Wing, or even the Executive Mansion. The losers will be American public, who will be left with a massive ballroom that not only overwhelms what is perhaps the nation's most historically important building, but will have been built in violation of an astonishingly wide range of laws. The Court should grant the National Trust's motion and enter the requested preliminary injunction.

Respectfully submitted,


*/s/ Gregory B. Craig*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006.
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000

Dated: January 20, 2026

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 20, 2026, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent via first class mail to those indicated as non-registered participants.

*/s/Jack C. Smith*