# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**,

*Plaintiff*,

v.

**NATIONAL PARK SERVICE**, *et al.*

*Defendants*.

Civil Action No. 25-4316

## DECLARATION OF JONATHAN B. JARVIS

I, Jonathan B. Jarvis, declare as follows:

1.     The facts set forth in this declaration are based upon my personal and professional knowledge, and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.     I served with the National Park Service (the "Park Service" or "NPS") for 40 years, from 1976 to 2017. My decades of experience with the Park Service spanned a variety of roles, including park ranger, superintendent of multiple parks, and regional director. In 2009, I was nominated by President Barack Obama to serve as Director of the National Park Service. I held that role from my Senate confirmation in October 2009 until January 2017.

3.     During my time with the NPS, including my term as Director, I gained extensive experience in the preparation, public involvement, alternative evaluation and decision-making in the application of the National Environmental Policy Act ("NEPA") to NPS resources and projects.

4.     I submit this Declaration in connection with the case of *National Trust for Historic Preservation in the United States v. National Park Service*. I am aware of the administration's plans

to build a new ballroom in the vicinity of the White House (the "Ballroom Project"). I understand that the administration has begun construction but has not yet finalized or publicized plans for the proposed ballroom.

5.      The purpose of this Declaration is to respond to Defendants' representations and arguments in Defendants' Supplemental Response, to share my experience with past NPS projects in the White House and President's Park ("President's Park"), on the White House grounds, and in the Residence itself, and to express my expert opinion as to the need for—and the standard practice of preparing—environmental impact statements ("EIS") in connection with projects carried out by the NPS and by other entities or on lands and resources under the stewardship of the NPS.

6.      I have reviewed the environmental assessment prepared by NPS in August 2025 for the Ballroom Project, and I have read Defendants' arguments in their Supplemental Response relating to NEPA issues. Supplemental Response at pp. 22-28. Based upon my experience and expertise, it is my opinion that NEPA's environmental assessment is deficient for several reasons. For one, the size and scale of the Project is inconsistent with the Comprehensive Plan for the White House and President's Park adopted in 2000. The Comprehensive Plan may not be changed by the issuance of an environmental assessment; an EIS is needed. *See infra* ¶¶ 10-11, 30. For another, any one of the adverse impacts identified by the NPS in the environmental assessment and FONSI is sufficient to trigger the preparation of an EIS and the associated requirement to obtain public comment. *See infra* ¶ 25. Finally, the environmental assessment makes no mention of – and fails to address -- a serious adverse effect associated with the Ballroom Project, the need "to remove toxic substances spread throughout the [East Wing] including asbestos and lead-based paint." *See* Declaration of White House Director of Administration Joshua Fisher, at ¶ 9. The assessment's

failure to evaluate the impact on the Project of these hazardous materials renders NEPA compliance incomplete. *See infra* ¶ 29.

7.      I have reviewed NPS's description of the Ballroom Project as it appears in the environmental assessment and FONSI materials. Based upon my experience and expertise, it is my opinion that the demolition of the East Wing and the Ballroom Project represent the most significant modification and change in the structure of the White House—with an equally significant impact on its immediate surroundings—since the comprehensive interior renovations during the Truman Presidency. In my opinion, a project of such magnitude, scale and scope necessarily requires NPS to comply with the requirements of NEPA by preparing an Environmental Impact Statement.

8.      As already stated, I have taken note of the several adverse impacts that appear in the NPS environmental assessment of the East Wing demolition and Ballroom Project. Based on my experience and expertise, it is my opinion that the East Wing demolition and Ballroom Project as described in NPS's environmental assessment would cause such impairment to the resources and values under the stewardship of the National Park Service as to prohibit NPS from proceeding with the project without being "directly and specifically" authorized by Congress. *See infra* ¶¶ 19-20, 35.

9.      President's Park, established in 1933, includes the White House and its grounds, Lafayette Park and Ellipse. It is a unit of the National Park Service. The White House was designated a National Historic Landmark in 1960, the highest standard of recognition of historic property by the federal government. The East Wing, the associated gardens and the historic trees are contributing elements to that National Landmark. In 2000, NPS Director Robert Stanton signed the Record of Decision for the Comprehensive Design Plan for the White House and President's

Park. 65 Fed. Reg. 25,747. The Comprehensive Plan describes and details the existing setting, gardens, and architectural elements of the White House and President's Park, and lays out the procedures required for making changes in the Plan, including mandatory consultation with several federal agencies.

10.     The Comprehensive Plan was itself subject to an Environmental Impact Statement and to several formal reviews, approval, and public comment processes:

> A *Draft Environmental Impact Statement* that presented the proposed plan, three alternatives, and a no-action alternative, and that analyzed the environmental consequences of implementing the alternatives, ***was available for public review and comment from December 2, 1998 to March 11, 1999***. Public forums on the document were held at the White House visitor center on February 27 and 28, 1999***. A total of 100 comments were received—29 from governmental agencies, business, and organization; 2 from students at educational institutions; and 69 from individuals***. All substantive comments were addressed in the Final Environmental Impact Statement, which was released on December 13, 1999, for a 30-day no-action action. A "Record of Decision" approving the adoption of the proposed plan was signed by the director of the National Park Service on March 29, 2000. The plan was approved by the Commission of Fine Arts on April 19, 2000, and by the National Capital Planning Commission on May 4, 2000.

*The White House and President's Park, Comprehensive Design Plan*, National Park Service, 2000), https://parkplanning.nps.gov/document.cfm?documentID=40077. (Emphasis added).

11.     While serving as National Park Service Director, I also served as the Chair of the Committee for the Preservation of the White House from 2009-2017. In this capacity, I was involved, with others, in changes to the interior and grounds of the White House. While several of these changes were relatively modest, including the installation of a vegetable garden, the most significant of these was a project to upgrade the White House perimeter security fence. The White House fence project was the subject of frequent discussion with members of Congress, received

specific appropriations from Congress, and was submitted to both the Commission on Fine Arts and the National Capital Planning Commission.

12.    In 2011, as NPS Director, I issued Director's Order 12, *Conservation Planning, Environmental Impact Analysis, And Decision-Making* (https://www.nps.gov/subjects/policy/upload/DO_12_10-5-2011.pdf). Director's Order 12, in conjunction with NPS Management Policies and Handbook, provides detailed guidance—and sets forth specific procedures and practices—for the application of NEPA to NPS projects and resources.

13.    The background to Director's Order 12 sets forth the context for the order in harmonizing NEPA with the 1916 National Park Service Organic Act:

> NEPA requires all Federal agencies **to (1) prepare in-depth studies of the impacts of and alternatives to proposed "major Federal actions"; (2) use the information contained in such studies in deciding whether to proceed with the actions; and (3) diligently attempt to involve the interested and affected public before any decision affecting the environment is made**. The 1916 Service Organic Act (16 U.S.C. 1 et seq.) directs the National Park Service to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." (16 U.S.C 1) Read together, the provisions of NEPA and the National Park Service Organic Act are consonant and jointly commit the Service to make informed decisions that perpetuate the conservation and protection of park resources unimpaired for the benefit and enjoyment of future generations. Planning, environmental evaluation, and public involvement in management actions that may affect national park system resources are essential in carrying out the trust responsibilities of the National Park Service. Particularly in this era of heightened environmental concern, it is essential that NPS management decisions (1) be scientifically informed, and (2) insist on resource preservation as the highest of many worthy priorities.

*Id.* at 1-2. (emphasis added).

14.     Director's Order 12 requires that *all* NPS NEPA reviews must include "[m]eaningful participation by the public and other stakeholders"; "[d]evelopment and critical evaluation of alternative courses of action"; and "[r]igorous application of scientific and technical information in the planning, evaluation and decision-making processes." *Id.* at 3. This Order applies to environmental assessments as well as EIS.

15.     The August 2025 environmental assessment and FONSI prepared by the NPS for the demolition of the East Wing and construction of the White House Ballroom does not meet the standards of the National Park Service as stated in Director's Order 12.

16.     Director's Order 12 also includes a "Prohibition on Impairment," which bars the NPS from "taking or authorizing any action that would impair park resources or values *unless specifically authorized by Congress*." *Id.* at 4. (emphasis added).

17.     The "Prohibition on Impairment" in Director's Order 12 operationalizes a broadly applicable heightened threshold for NPS review of activities proposed to take place within NPS resources, including (but not limited to) activities that implicate NEPA. Congress mandated this heightened standard through what is colloquially known as the Redwood Amendment, a 1978 amendment to the NPS Organic Act. See Pub. L. 95–250, H.R. 3813, 92 Stat. 163 (recodified at 54 U.S.C. § 100101(b)(2)).

18.     The Redwood Amendment, now codified at 54 U.S.C. § 100101(b)(2), is unambiguous: "The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, **except as directly and specifically provided by Congress**." (Emphasis added).

19.     The National Park Service posts all NEPA documents on the Planning, Environment and Public Comment website (chttps://parkplanning.nps.gov/publicHome.cfm) known as PEPC. These documents include all environmental assessments and environmental impact statements.

20.      Advance notification in the Federal Register of the intent to conduct a NEPA evaluation of a proposed project *before* any demolition, construction, or onsite project activity commences is essential to the process of meaningful public deliberation and participation in the review of park resources. Both before and during my tenure as Director, the longstanding historical practice at NPS was to publish and solicit public comment on all NEPA materials, including environmental assessments, *before* any demolition, construction, or onsite project activity commenced.

21.     During my time as Director, I oversaw, reviewed, was briefed on or approved of hundreds of projects for which the National Park Service prepared an environmental assessment or an EIS to comply with its NEPA obligations. The NPS PEPC website shows public availability of over 500 Environmental Assessments and over 80 Environmental Impact Statements prepared by the NPS during my tenure as Director from 2009 to 2017.

22.     As Director, I was not involved in all of these NEPA projects. I was, however, briefed on and provided direct engagement on the most highly controversial and high-profile environmental assessments and impact statements. Examples of Environmental Impact Statements include Winter Use (snowmobiles) in Yellowstone National Park, the Merced River Plan in Yosemite, Oyster farm removal in Point Reyes National Seashore, Overflights at Grand Canyon National Park, Off Highway vehicles at Glen Canyon NRA, Glen Canyon Dam operations and the flows of the Colorado River through the Grand Canyon, improvements to the Moose Wilson Road at Grand Teton National Park, reintroduction of wolves to Isle Royale National Park, restoration

of the Mariposa Grove of Giant Sequoias in Yosemite, and the construction of a bridge on the

Tamiami Trail to allow passive waterflows into Everglades National Park.

23.      In my experience, projects frequently changed after the receipt of public comments.

This was particularly true for projects of any significant public interest. During the entirety of my

experience at NPS, including my tenure as Director, NPS carefully considered and responded to

public comments, and it endeavored to address or mitigate environmental impacts raised by

commenters, including such impacts to cultural or historic qualities of park resources. For instance,

the Winter Use Plan for Yellowstone National Park received over 50,000 public comments that

helped shape the final decision to balance appropriate public access with resource conservation.

24.      I recall a particular proposal, as a part of the new general management plan for

Assateague National Seashore to relocate a parking lot and public beach access point, due to

projected climate and sea-level-related erosion impacts to the then-existing site. In response to a

series of NEPA reviews beginning in 2013, including multiple published environmental

assessments, NPS received significant public opposition to the relocation of this parking lot. The

agency first recommended the NEPA process by conducting a new environmental assessment with

additional alternatives in 2015, before deciding not to pursue the project at that time in light of the

public reaction. *See Assateague Island National Seashore (AINS) Parking Lot Relocation*,

Adaptation Clearinghouse, https://www.adaptationclearinghouse.org/resources/assateague-island-

national-seashore-ains-parking-lot-relocation.html (last updated Jan. 29, 2016). The NPS later

adopted a different parking and beach access renovation plan. *See Beach Relocation and Habitat

Restoration        Projects,*        U.S.        Fish        &        Wildlife        Service,

https://www.fws.gov/refuge/chincoteague/beach-relocation-and-habitat-restoration-projects  (last

accessed Jan. 5, 2026) (describing a "multi-decade planning and engagement process" conducted

by NPS and the Fish and Wildlife Service to "carefully consider[] substantial public input and comments that informed the current strategy").

25.    I am unaware of any instance—other than NPS' environmental assessment of the Ballroom Project—of NPS preparing an environmental assessment without *contemporaneously* making that document available for public review before any action was taken. The failure to publish the Ballroom Project environmental assessment is contrary to decades of historical practice and guidance at NPS. It also violates the statutory mandate that such assessments be public documents. It is fundamentally inconsistent with the agency's statutory stewardship mission over the national parks.

26.    I understand that NPS was responsible for approving and managing the Ballroom Project when it prepared its environmental assessment in August 2025, but that the Office of the Executive Residence (EXR) took control of the Project at some point thereafter. That office is currently in charge of the Project. I am not aware of any other occasion where NPS prepared a NEPA review, but another agency subsequently asserted control over the project.

27.    EXR has little if any experience managing construction projects of any size, and, in my opinion, no experience at all managing a project the size and importance of the Ballroom Project. The National Park Service, on the other hand, has extensive experience in the design and construction of buildings throughout the entire National Park System. Teams of architects, engineers, and project managers work out of the NPS Denver Service Center, and the various regional offices to carry out construction projects on some of the most important and sensitive lands in the United States. Projects such as the repair of the Washington Monument after the 2011 earthquake, or the new exhibit space in the undercroft of the Lincoln Memorial are projects overseen and managed by the NPS. NPS is also involved in projects that are funded, in part, with

philanthropic donations. Although partially funded by private donations, such projects are still required to meet all the policies and standards of the National Park Service.

28.     Based on my extensive experience with NEPA reviews conducted by NPS, it is my opinion that President Trump's proposal for a new ballroom—including the demolition of the East Wing and subsequent construction—requires preparation of an EIS, public notification, public meetings and opportunity to comment, a range of alternatives, and a consideration of impacts to the natural and cultural resources of President's Park.

29.     The Declaration of Joshua Fisher, ¶ 9, indicates highly toxic substances, including asbestos and lead paint were present in the East Wing. The demolition of the East Wing would have disturbed these highly toxic substances, potentially impacting air quality, health of the workers and employees and visitors at the White House and site soils, requiring mitigation and remediation during and after deconstruction. There is no mention of either asbestos or lead paint in the NPS Environmental Assessment.

30.     The proposed ballroom size (90,000 square feet) and scale are incompatible with the 2000 Comprehensive Design Plan for the White House, which was the subject of an EIS and Record of Decision. The Comprehensive Design Plan for President's Park is equivalent to a General Management Plan prepared for a national park, and subject to an EIS and Record of Decision. Deviations from those plans and proposals evaluated in the park plan that significantly impact the park's primary resources require, by both policy and practice (see Director's Order 2, Park Planning), a new or revised EIS. In my opinion, demolishing the East Wing and replacing it with a larger structure would require a modification of the original EIS for the Comprehensive Plan. It is also my opinion that the NPS environmental assessment should have concluded that due

to the significant impacts to the primary resource of the park (the White House itself) that a full EIS would be necessary.

31.    The Ballroom Project environmental assessment and FONSI identified numerous adverse impacts, each of which alone (and certainly in combination) should have been deemed "significant" and should have triggered the preparation of an EIS. As laid out in the FONSI, these impacts include:

a.    The Ballroom Project's effect on the landscape "originally designed by Thomas Jefferson" "will result in long-term adverse effects on the cultural landscape." FONSI at 5.

b.    The deconstruction of the East Wing will "result[] in the permanent loss of a component that has been integral to White House operations since 1942." *Id.* at 6.

c.    The Ballroom will "disrupt the historical continuity of the White House grounds" and "creat[e] a visual imbalance with the more modestly scaled West Wing and Executive Mansion." *Id.*

d.    The Ballroom Project will "introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features." *Id.*

e.    The Ballroom Project "will result in a substantial change to one portion of the [National Historic Landmark]." *Id.*

f.    The Ballroom Project "will adversely affect the design, setting, and feeling of the White House and the grounds over the long-term." *Id.* at 6, 15.

g.    "The removal of the current East Wing will result in a permanent adverse impact for those who value the experience of this specific space." *Id.* at 7.

32.    The NPS environmental assessment of the Ballroom Project also makes clear that the Executive Office of the President imposed requirements that the NPS should have rejected, contested, or modified. The project requirements included "[1] immediate adjacency to the Executive Mansion, [2] a direct ceremonial procession from the East Room into the venue, and [3] enclosed second-story access from the Executive Mansion." Environmental Assessment at 29. The combined effect of these requirements is to foreclose meaningful alternatives. But considering

alternative ways of achieving a project's objective is a routine and required component of NEPA analysis at NPS. Defining a project with requirements so narrow as to foreclose consideration of any alternatives contravenes the Park Service's stewardship mission and non-impairment mandate. At a minimum, the EA should have considered (and not summarily "dismissed from detailed analysis") alternatives that evaluated a new ballroom at different scales, with at least some designs more consistent with the architectural size and scale of the existing east wing.

33.    The absence of express approval from Congress for the Ballroom Project violates the NPS non-impairment mandate set forth in the Redwood Amendment and operationalized by Director's Order 12. Applying Director's Order 12 to the Ballroom Project, demolishing a major historical structure such as the East Wing of the White House and replacing it with a massive and disproportionate ballroom would "impair park resources or values" and would not be permitted unless "specifically authorized by Congress." Director's Order 12 at 4.

34.    While the NPS Environmental Assessment does not mention funding for the construction of the new ballroom, the Defendants' Supplemental Response states that construction is being privately funded and routed through the Trust for the National Mall, which is in turn donating those funds to the National Park Service gift fund, 31 U.S.C. § 1321(a)(17).

35.    In 2016, as NPS Director, I issued Director's Order 21, *Donations and Philanthropic Partnerships* (https://www.nps.gov/subjects/policy/upload/DO_21_12-28-2016.pdf). Director's Order 21, in conjunction with NPS Management Policies and Handbook, provides detailed guidance—and sets forth specific procedures and practices—for engaging in philanthropic partnerships, reviewing and accepting donations, and maintaining the integrity and impartiality of the National Park Service.

36.    Construction projects in units of the National Park System, even when fully funded by private gift funds, must follow the same evaluation process as federally-funded construction projects. See Director's Order 21. This process requires submitting a privately-funded design to the NPS Development Advisory Board for its review and approval. This essential requirement prevents wealthy individuals from funding the construction of buildings or monuments to celebrate themselves on public property. It prevents the NPS from taking on – in perpetuity – the task of managing a poorly designed or incompatible facility within a unit of the NPS. To my knowledge, the White House ballroom design has not been subject to this review.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Jonathan B. Jarvis

Executed this 20th day of January, 2026.