IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - x

NATIONAL TRUST FOR HISTORIC       CV No. 1:25-cv-04316-RJL
PRESERVATION IN THE UNITED STATES,

        Plaintiff,

v.                    Washington, D.C.
                    Thursday, January 22, 2026
                    3:30 p.m.

NATIONAL PARK SERVICE, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
HELD BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiff:    Thaddeus A. Heuer, Esq.
                    Gregory B. Craig, Esq.
                    Jack C. Smith, Esq.
                    FOLEY HOAG, LLP
                    155 Seaport Boulevard
                    Boston, MA 02210
                    617-832-1187

For the Defendants:  Adam R.F. Gustafson, Esq.
                    Jacob M. Roth, Esq.
                    Brantley Mayers, Esq.
                    Eitan Sirkovich, Esq.
                    Marissa A. Piropato, Esq.
                    Gregory M. Cumming, Esq.
                    Michelle M. Ramus, Esq.
                    DOJ-Enrd
                    Environment and Natural Resources Division
                    950 Pennsylvania Avenue, NW
                    Washington, DC 20530
                    (202) 718-0703

Court Reporter:     Timothy R. Miller, RPR, CRR, NJ-CCR
                    Official Court Reporter
                    U.S. Courthouse, Room 6722
                    333 Constitution Avenue, NW
                    Washington, DC 20001
                    (202) 354-3111

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Your Honor, we are on the record in Civil Matter 25-4316, National Trust for Historic Preservation in the United States v. National Park Services, et al.

Beginning with plaintiff's counsel, please approach the podium and identify yourselves for the record.

MR. CRAIG:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. CRAIG:  My name is Gregory Craig from the Law Firm of Foley Hoag and we represent the plaintiff, the National Trust for Historic Preservation in the United States.  I'd like to introduce my partner Tad Heuer and my colleague Jack Smith.  Tad will be arguing for us today.

THE COURT:  Very good.  Thank you very much.

MR. CRAIG:  Thank you.

MR. GUSTAFSON:  Good afternoon, Your Honor.  Adam Gustafson on behalf of the federal defendants.  With me at counsel table are Brett Shumate -- I'm sorry, Brett Shumate is not here.

THE COURT:  Who are we starting with?

MR. GUSTAFSON:  With me at counsel table are Jacob Roth, who will be arguing the bulk of the case today.

THE COURT:  What do you mean "the bulk of the case"?

MR. GUSTAFSON:  I will be --

THE COURT:  I don't do multiple advocates.  You should have checked in advance.

MR. GUSTAFSON:  Oh, I'm sorry, Your Honor.

THE COURT:  I have one advocate per side.

MR. GUSTAFSON:  Understood, Your Honor.  We planned only to have a separate advocate for the NEPA argument.

THE COURT:  Don't need it.  Don't even need an argument on the NEPA issue.

MR. GUSTAFSON:  Thank you, Your Honor.

With me at counsel table are Jacob Roth --

THE COURT:  Which is which now?

MR. GUSTAFSON:  Jacob Roth will be arguing the case.

THE COURT:  You're going to argue it?  Okay.

Who's the next person now?

MR. GUSTAFSON:  Brantley Mayers.

THE COURT:  What's the name?

MR. MAYERS:  Brantley Mayers.

THE COURT:  Where are you from?

MR. MAYERS:  Department of Justice, Civil Division.

THE COURT:  Civil Division?

MR. MAYERS:  Yes, sir.

THE COURT:  Federal Programs Branch?

MR. MAYERS:  Counsel to the Assistant Attorney General.

THE COURT:  Counsel to the AAG?  Okay.

MR. GUSTAFSON:  Eitan Sirkovich.

MR. SIRKOVICH:  The Civil Division --

THE COURT:  Okay.

MR. GUSTAFSON:  Marissa Piropato.

MS. PIROPATO:  ENRD, DOJ.

THE COURT REPORTER:  I can't hear these people.

MR. GUSTAFSON:  Greg Cumming.

THE COURT:  Speak loudly.

MR. CUMMING:  Also from the Environmental Division, Your Honor.

MR. GUSTAFSON:  And Michelle Ramus.

MS. RAMUS:  Also from the Environmental --

THE COURT:  Very good.

Okay.  So obviously, we're here for a PI argument.  I've read your papers.  They were well done.  I compliment both sides on the hard work and the good job you've done with your pleadings.

There are a lot of issues at play here, especially ones that are novel.  A lot of them.  And we have limited time.  Twenty minutes.  Twenty minutes.  Five-minute rebuttal.  That's it.  That's what you've got today.  I want

to make sure certain issues are addressed.  So I'm going to list them to you.  Make sure you cover these issues.  Okay?

First, the president's constitutional authority to construct the ballroom.  I appreciate that the Government chose not to focus on this issue in their brief.  That's your choice.  But if you're not arguing the president is acting pursuant to his constitutional authority, I want you to state clearly -- emphasis on the word "clearly" -- where the president gets the authority to demolish the East Wing and construct the ballroom.  Okay?  If you disagree, you know what you want to say on that issue.

Second, the funding mechanism.  The briefs talk about a gift authority through the National Park Service.  I'd like the parties -- and especially the Government -- to explain what's going on in plain English, why this Rube Goldberg contraption gives the president authority to destruct and construct the ballroom with private funds.

Third, statutory authorization, 3 U.S. Code Section 105(d).  I want the parties to explain their interpretations of that statute, talk about whether and how it authorizes what the president is doing.

Fourth, and relatedly, what are the limits on your arguments?  Is there anything the president cannot do in the White House under 3 U.S. Code Section 105(d) and the private funding mechanism?  Where's the line between what is

permitted and what is not permitted?  I'm interested in hearing from both parties on what you think the dividing line is for Section 105(d).

Finally, I'd like each side to address irreparable harm and the balance of equities.

As I said a minute ago, the moving parties will have 20 minutes, plus 5 minutes for rebuttal.  Government will have 20 minutes.

You can go first.

MR. HEUER:  Thank you, Your Honor.  Tad Heuer on behalf of the National Trust for Historic Preservation.

I do want to start by addressing standing briefly, because the Government's mentioned --

THE COURT:  Don't spend any time on standing.

MR. HEUER:  Excellent, Your Honor.

THE COURT:  And don't worry about it.

MR. HEUER:  Then I do want to go through the Court's three questions which, I believe, is going to answer the questions you have just raised.

THE COURT:  There were four.

MR. HEUER:  Correct.  There were four questions?

THE COURT:  There were four.  Your notes aren't so good.

MR. HEUER:  I believe it was the --

THE COURT:  President's constitutional

authority --

MR. HEUER:  Oh, I understand, Your Honor.

THE COURT:  -- funding mechanism, the statutory authorization under 105(d), and limits on Government's arguments.

MR. HEUER:  Correct.  I was referencing the three questions that you posed in the TRO order which will address the four that you've just outlined now.

So -- and I do have a question for you on NEPA. Do you want to hear about NEPA or not?

THE COURT:  No.

MR. HEUER:  Okay.  And I will conclude on the Winter factors and irreparable harm.

I want to start just briefly with the Court's question, because I think it frames it well, the first question you asked in the TRO order, which was, does the Court -- does the president have congressional approval authority historically to construct something at the White House?  And our answer to that, as you know, is yes.  The annex details this in what we think is significant detail. For 230 years, the presidents have routinely obtained that congressional approval.

THE COURT:  The only two instances that I recall are the swimming pool for Gerald Ford and the tennis court for President Trump.

MR. HEUER:  I believe you are reading from my notes, Your Honor.  Indeed, those are the two.

THE COURT:  I don't want the press to get the wrong impression.  I'm not reading from your notes.

(Laughter.)

I have no idea what your notes look like.

(Laughter.)

MR. HEUER:  If you had let me continue, I would have said the only two exceptions are a pool and a cabana built by the Ford administration and a tennis changing room built by the first Trump administration.  Our position is that both of those are de minimis in size.  They are both for the president's personal use; they are not publicly visible; and, most importantly, they were not challenged for a lack of congressional authorization.  In contrast, a 90-thousand-square-foot ballroom is not de minimis; is not for personal use; is highly visible; and is being challenged.  Those exceptions do not prove a rule.

The answer to the second question you posed is no.  The president has neither constitutional nor statutory authority to construct a ballroom, much less demolish the East Wing.

THE COURT:  The Government suggests 105 gives him that authority.

MR. HEUER:  They do.

THE COURT:  You disagree, obviously.

MR. HEUER:  I do.  Could I speak briefly to constitutional and get that out of the way and then spend time on statutory?

THE COURT:  Sure.  You can do it briefly.  Go ahead.

MR. HEUER:  So on the constitutional question, you asked them if -- you asked what the Government's position was.  I believe they stated plainly on Page 12 of their supplemental brief they agree that the president does not have authority to construct the ballroom under the Constitution.  They state, quote, "nor is the president relying here on constitutional authority.  He is relying on a delegation of authority from Congress," end quote.  And to be clear, our understanding is that the Government is now conceding that if there is no statute that expressly authorizes the president to build a ballroom, they lose on the merits.

So let's go to that statutory authority.  I think we need to frame it just briefly for everyone's benefit that we're talking about 8106 as well as 105(d).  So --

THE COURT:  Well, 8106 is pretty straightforward.

MR. HEUER:  We believe so.  It has three elements.  You cannot construct a building or a structure -- they concede that this is a building or structure -- on any park

or public grounds of the Federal Government in the District -- it is clear that the White House is in President's Park and we are in the District -- without express authority of Congress.  Our position is that Congress has not provided express authority.

So in response, the statute that they volunteer is 3 U.S. Code 105(d), and that authorizes Congress's annual White House maintenance allowance.  Their claim, as we understand it, is that in enacting 105(d), which only authorizes appropriations for things like maintenance, repairs, alterations, refurnishing, heating, air conditioning, and by appropriating under that authorization statute only $2-and-a-half million this year, Congress was expressly approving demolition of the East Wing and construction of a 90-thousand-square-foot ballroom to be funded with $400 million of private funds funneled through the Park Service's gift statute.

That appears to be their position, because it's the only way they can get to anything remotely close to a congressional authorization.  And our response is this: Section 105(d) is not an express approval of Congress to build a 90-thousand-square-foot ballroom.  As we all know from Whitman, Congress does not hide elephants in mouseholes.  Like every other congressional appropriation, 105(d) is limited by what it is expressly appropriated for

and by the amount that was expressly appropriated.  And, crucially, under 105(d), it's even more narrow.  It says expressly "appropriated under this" statute -- "under this subsection."  That means 105(d).

Their position, going to your question about the gift statute -- and I will confess that we are as confused about how this works as they -- as you are -- their position is that you can use the Economy Act plus authorizations under the gift statute to make something a 105(d) congressional authorization simply by putting it in the same bank account that OMB has established for those repair funds.  We think that that is simply not the law.  Section 105(d) is a maintenance allowance.  It is not a freestanding delegation of unlimited congressional authority for construction to the president.  And that makes sense, because the president is a temporary tenant of the White House.  He isn't the landlord.

THE COURT:  He's the steward.

MR. HEUER:  "Steward" is a word that we would accept, as well.  He is a steward, but he is not the owner. We know that because the Property Clause vests authority in the United States's property in Congress.  And Section 8106 means what it says.  Ballroom construction requires an express congressional approval that 105(d) does not provide and which the defendants do not have.

Now, in their supplemental brief, the defendants have helpfully highlighted that there's actually a second congressional approval that they need but do not have, and that's the so-called Redwood Amendment to the National Park Service's organic statute, and it's called the Redwood Amendment because it was dealing with the redwoods out in California when it was passed in 1978, but it also has many other changes that were made to the statute.  And that statute -- the amendment -- requires the Park Service to do two things: one -- among other things -- conserve historic objects and leave them, quote, "unimpaired for future generations"; and it forbids contrary action, quote, "except as directly and specifically provided by Congress," end quote.

So we have a Park Service that has an obligation to conserve and not impair assets within its control, and the White House is certainly one of those assets, and if it wants to do so, Congress has made it very clear:  "You've got to come to us to ask for permission," a reservation of its rights, and the defendants admit that the ballroom is being funded through Park Service gift funds in some way. Our point is this.  Where the Park Service is disbursing those discretionary funds -- and they are certainly discretionary, because the Park Service has no obligation -- ministerial obligation to hand them directly over to do

ballroom construction.  It's a gift statute.  It can use them in any national park it wishes.  When it has chosen to expend them here, it has made a discretionary determination as an agency in a way that plainly impairs the historic White House complex.  When it does so, it needs congressional approval under the Redwood Amendment.  It does not have it.

You asked whether there were any limitations to what the president can do under 105(d).  We think the answer is clear.  He can do exactly what 105(d) authorizes him to do and no more.  It's not just the express language of 105(d) which, as I note, talks about care, maintenance, repair, alterations, heating, air conditioning, refurnishing.  Those are things that he is doing with the $2.5 million he has been allotted.  It's even less than that, however, because we would note that the 105(d) is merely the authorization statute.  Every year, Congress has to appropriate within that statute.  They pick how much money and they can say what that money is being used for.  And that's what they did last year in 2004 [sic].  And that language says that 2.475 million was appropriated for, quote, "required maintenance, resolution of health and safety issues, and continued preventive maintenance."  Required maintenance, health and safety issues, and continued preventive maintenance.  None of those are a

ballroom.  They don't even talk about the other elements in 105(d).  Congress is very clear this amount of money is being given to the president to do what he wishes as long as it is consistent with the limitations they have placed on him.

THE COURT:  And by authorizing the funds, Congress retains the oversight capacity that it has --

MR. HEUER:  Of course it does.

THE COURT:  -- to make sure that it is being used consistent with its authorization.

MR. HEUER:  Of course it does.

THE COURT:  In this case here, we're using private funds.  There's no authorization oversight -- appropriations oversight.

MR. HEUER:  That is correct.  The only oversight is over the National Park Service's funds.  They've claimed the Park Service isn't involved.  There is an open question about how the Park Service, if it is not involved, is able to give those funds to EXR and why the Park Service does not itself have to comply with NEPA when it is making determinations -- a major federal action of using $200 million to $400 million for a purpose that is not otherwise authorized.  In and of itself -- I know you don't want to talk about NEPA -- but that itself is a major agency action that would require them to comply with NEPA separate and

apart from EXR.  It's Park Service agency funding that is being discretionarily used for a major federal project. That is NEPA.

I want to talk briefly, if you'll indulge me, about the question about whether EXR is an agency because you asked it.  If you want me to move on, I can, but that was one of the questions in the TRO briefing, and we briefed it.  If you believe the papers are fine, we are happy to move on.

THE COURT:  I think the papers are fine.

MR. HEUER:  Okay.

On the question of irreparable harm, I want to be clear that procedural injuries like NEPA non-compliance are redressable irreparable harms.  So NEPA, as we know, is an information-forcing statute.  Its process is its purpose. And this court in Brady as well as the Circuit in Oglala Sioux have held that a procedural violation of NEPA combined with an environmental or aesthetic injury -- which we've shown here -- establishes irreparable harm.  Otherwise, the government could act as it has here.  They would claim that review of NEPA actions are unripe until they are moot, and that's not the law.

We would note that the harms are --

THE COURT:  You say the D.C. Circuit has said that?

MR. HEUER:  In Oglala Sioux which is the case that we cite.  I have given the spelling to the stenographer because I understand it's, you know, not everyone's rolling off the tongue.

Nor are the harms speculative here.  Construction is ongoing.  The defendant's engineer, anonymous as though he may be, concedes that anything other than modest changes to the design at this point would be costly and time consuming.  Their own architect -- their new architect -- indicated to the NCPC just last week -- two weeks ago now -- that the location is set and has been for a while.  We know, when we're looking at NCPC and CFA, that they still have not submitted actual plans.  They have submitted pretty pictures, renderings of elevations.  They have done that for neither NCPC nor CFA.  The public has not had an opportunity to comment.  Indeed, the plan for NCPC, as we understand it, is that they will accept public comment on March 5th which is the same day they propose to have the NCPC vote.

THE COURT:  I don't think, in -- aboveground construction is scheduled to begin until May, I think.

MR. HEUER:  They wanted to build -- start aboveground construction on the colonnade, which connects to the ballroom, this month in January.  So they wanted -- belowground construction was on that in January.  Aboveground, not until April.  But, again, there's a

question here of what is ripeness and mootness.  The NCPC statute and the CFA require approval before you can do something.  They are approving the mass, the size, the bulk. You've seen the affidavit -- or the declaration from our expert, the former president of the national association --

THE COURT:  Mr. Bates.

MR. HEUER:  -- American Institute of Architects, Mr. Bates.  You had asked last time, you know, for counsel not to play architect.  So we heard you and we got a real architect; someone who, I think, has rather unimpeachable credentials.  He has said that any time you are building a foundation, you are, by definition, in many ways -- particularly for a building of this size -- setting what happens aboveground.  Partly, I think, that's because of the laws not of this court but of gravity, but also it's because you are establishing many different conduits, underground utilities, fixing --

THE COURT:  Elevator shafts and --

MR. HEUER:  Exactly.  Those things.  Once you have said your location is set, as their architect has now informed the NCPC, means that you're not putting it somewhere else.  You're not putting it underground, for instance, as the White House comprehensive plan from 2000 created by the Park Service -- took them several years. They consulted with dozens of experts, said:  You're right.

We do need additional space for meetings and the like at the White House.  Where should it go?  It should go underground. And why should it go underground?  To avoid anything more than minor intrusions above the surface.  That went through an EIS.  Here, they have decided to simply ignore the comprehensive design plan that the Park Service established 25 years ago and said:  We just want to do something else. Again, this goes to the fact that there is harm that is ongoing because they have decided to establish different parts of the construction unabated, because they're continuing to do it, that are foreclosing alternatives and constraining design options now.

THE COURT:  You've got a few minutes left on your --

MR. HEUER:  Indeed.

THE COURT:  -- 20 minutes.

MR. HEUER:  Finally, I think we would say that the defendants are not going to be harmed --

THE COURT:  Excuse me.

MR. HEUER:  Yes?

THE COURT:  I was about to say something.

MR. HEUER:  Oh, my apologies.

THE COURT:  It makes an easier job for the court reporter if you wait.

If you want to address irreparable harm, this

would be a good time to do it.

MR. HEUER:  Yes.

As we've just noted, you know, we think that these procedural issues are not merely procedural.  They are tied to injuries that do create them as irreparable harms.  They are not speculative because the ongoing construction means that they are ongoing.  They are establishing and narrowing those design options as we speak because every, you know, construction truck full of concrete that gets poured, the harder it comes and the more they are saying:  We can't change.  That's the irreparable harm.  It is not irreparable harm only when the building is already being built aboveground.  Irreparable harm is occurring now because they are narrowing the parameters of what they can build, even though they have not gone through NCPC, CFA, NEPA, and getting congressional approval to erect a building.

THE COURT:  If one of the issues that you're concerned about is the height of the East Wing, wouldn't it be possible architecturally to always go smaller as opposed to going larger?

MR. HEUER:  Again, having been instructed not to play architect, I'm not sure that I'm the best to answer that, but my understanding from Mr. Bates's affidavit is that that is not necessarily true; that once you've established certain widths, depths, heights, bringing the

building down, you've created structural elements at the periphery that will indicate how tall it can be.  Maybe you can take a little bit of height off.  I think we saw that at NCPC two weeks ago.  Their architect said:  Maybe I could do a little bit on height.  But he wasn't indicating that he could do a lot.  He was actually saying that the building is now going to be as tall as the Executive Mansion.  Before, our understanding was it was, you know, potentially slightly shorter.  It appears that it may be slightly taller than originally proposed.  But our understanding from the affidavit -- and I would refer to the affidavit -- is that simply making a building shorter is not necessarily something you're going to do with your foundation work.

I think the other thing I would note is this.  You can make a very short, squat building.  Architects refer to something called, you know, the golden ratio.  And the golden ratio is how you build, you know, buildings like those in ancient Greece.  They're what the White House is aesthetically modeled upon.  Once you start just saying, "I'm going to lop off 10 or 12 feet," without making changes to your width and your depth, you have created, you know, potentially an even more asymmetric building and an even more obviously inappropriate building than what is being proposed.  So that's why your width and your depth do have a direct relationship to your height.

Finally, I'd note that the defendants will not be harmed by a temporary pause that allows them to follow the law.  Their claim that they need to continue construction to avoid leaving what they call a, quote, "unsightly excavation site" is bold indeed.  Equity does not reward the party for creating the very problem it, then, invokes to avoid relief. And the Trust is not asking the Court to enjoin construction of the bunker or to compromise presidential security.  That is not the aim.  As the Court knows, we were not even aware that that was a factor and a feature here until the defendants filed their opposition to the TRO in December. The Trust is simply asking the Court, as in our proposed order, to enjoin construction of the ballroom until the defendants follow the law.

If the Court has no further questions, I will reserve for reply.

THE COURT:  Five minutes for rebuttal.

Mr. Roth?

MR. ROTH:  May it please the Court.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. ROTH:  Jacob Roth from the Civil Division.

THE COURT:  Welcome.

MR. ROTH:  I was planning to start with standing. I would love to spend a couple minutes if -- I won't if Your

Honor doesn't want me to, but I --

THE COURT:  Not necessary.

MR. ROTH:  Okay.

THE COURT:  I'm comfortable with standing in this --

MR. ROTH:  Excuse me, Your Honor?

THE COURT:  I'm very comfortable with standing in this case.

MR. ROTH:  Okay.

THE COURT:  Sorry to disappoint you.

MR. ROTH:  Okay.  Yeah.  I mean, it -- I don't see it, but --

THE COURT:  You'll get your chance at the Court of Appeals.

MR. ROTH:  Okay.  I was going to address next the "cause of action" question of what is the cause of action under which they're proceeding.  I -- if Your Honor doesn't want to hear about that either, I can move on.

THE COURT:  You can take a minute on that one.

MR. ROTH:  Okay.  I'll take a minute on that.

I think the Trust does need a cause of action.  I don't think they have one here because they are, for the most part, purporting to proceed under the APA.  And that tees up the question that Your Honor asked in the TRO which is, is the entity that is running this project an agency

under the APA?  The entity that is running the project is the Executive Residence, EXR.  I don't think there's a factual dispute about that at this point.  And the D.C. Circuit has already decided in the Sweetland case that EXR is not an agency for purposes of FOIA which is broader than APA.  So necessarily also for purposes of the APA.  Now, the Trust argues that the role of EXR is different now than it was then, but the D.C. Circuit has been very clear that agency status doesn't toggle on and off based on the particular functions at issue.  Once you're in, you're in. If you're out, you're out.  And the D.C. Circuit has decided that EXR is out.  And so that leaves them without a cause of action under the APA.

I'd also just note it is not the case that this is somehow so beyond the scope of EXR's traditional role that it's, you know -- reflects some sort of attempt to circumvent.  The role of EXR is to manage the house and to oversee the ceremonial functions that go on there, and the purpose of this project is to improve and modernize the house and to make it possible to host these large ceremonial events that currently are being done in tents on the lawn. So this is right within the wheelhouse of EXR, and it also reflects the president's personal involvement in the project.  He cares about this, and so he wanted to keep it in-house with his own personal staff who are advising and

assisting.  That's EXR's job and that's why EXR is running this project.

I think that leaves them without a cause of action under the APA.  Some of the other defendants are agencies under the APA, but those other defendants are not -- they're not running the project.  And so there's no agency action there to set aside that would remedy the injuries that are alleged to the Trust.

Beyond the APA, plaintiffs only raise what they call "separation of powers" claims.  And I think Your Honor's opinion in Appalachian Voices from this summer explains why that doesn't work either.  As we'll get to and as Your Honor's questions alluded to, this ultimately comes down to a fight that we have -- a disagreement we have about the statutory authority that the president and the executive branch has.  And when you're disputing the scope of executive authority and whether the executive has gone beyond the scope of that statutory authority, it is not a constitutional claim.  That's what Dalton says.  That's what this Court explained in Appalachian Voices.  It's just a statutory claim.  To bring a statutory claim, you need a cause --

THE COURT:  He's conceded he doesn't have constitutional --

MR. ROTH:  We are not resting on constitutional

authority to undertake this project.  We're resting on statutory authority -- and we'll get to that because that's what Your Honor asked about -- under 105(d) and the Interior gift authority.

THE COURT:  You'd better cover 8106 in the process --

MR. ROTH:  I'm going to start with the --

THE COURT:  -- as well because that's --

MR. ROTH:  Yeah.

THE COURT:  -- kind of --

MR. ROTH:  Yeah.

THE COURT:  -- pretty straightforward.

MR. ROTH:  8106 is on the table, too.  8106, of course, is a statute.  And they claim we're violating the statute.  We say we're not.  I'll get to the merits of that, but for present purposes my point is just -- well, they're all statutory disputes.  If you want to bring a statutory dispute to a federal court to resolve, you need a cause of action to do that.  And that's not the technicality.  That speaks to whether Congress intended for courts to resolve these kinds of disputes.  And if they don't have a cause of action under the APA and there's no real constitutional claim -- they have not brought an ultra vires claim, and that's another non-statutory cause of action that's out there.  They have not pressed that.  That's not in their

complaint. It's not in their amended complaint. It's not in their briefs. They haven't tried to satisfy the standards that apply to ultra vires claims which are high standards, as Your Honor knows. And so I just don't see what they're proceeding under with respect to these statutory disputes. And I'm -- and, again, I'm not going to address them on the merits, but I do think, before one gets to the merits of those statutory questions, we have to figure out what is the cause of action under which this plaintiff, even assuming standing, has a basis to proceed in federal court and ask the Court to step in and resolve the question.

All right. Turning to the merits, then. And I'm going to skip the consultation claims for now and get to the questions the Court asked. And I think they're largely moot, given the -- that the process for those consultations has happened, as we represented at the last hearing that they would. That process is underway. All the details are spelled out in Heather Martin's declaration attached to our supplemental opposition. So I think that's largely off the table.

I'll turn to 8106. And I -- the Trust's argument is the president can't build any structures on the White House grounds without express approval from Congress. I think that the history is a powerful refutation of that

claim, because the Trust has not identified a single structure that the president has erected since the enactment of the statute for which Congress provided express authority.  And there are at least four: the West Wing project in the '30s, the East Wing project in the '40s, the pool in the '70s, and the tennis pavilion more recently.  Those are all new structures, and there's no evidence of Congress specifically approving any of those structures.

THE COURT:  Well, they approved it through the appropriations process, did they not?

MR. ROTH:  Correct, Your Honor.  So there are appropriations for at least two of the four, and that's what the Trust points to.  They say:  Well, the West Wing project, you know, that was under this public works --

THE COURT:  And what comes with the appropriations authority?

MR. ROTH:  Well, I know --

THE COURT:  It's not a trick question.

MR. ROTH:  Yeah.  No.  Your Honor mentioned earlier that oversight comes with the appropriations --

THE COURT:  Exactly.

MR. ROTH:  -- authority.

THE COURT:  Oversight.

MR. ROTH:  Yeah.

THE COURT:  And in this case, there's been an

end-run around that congressional oversight --

MR. ROTH:  Well --

THE COURT:  -- has there not?

MR. ROTH:  I don't think so, Your Honor --

THE COURT:  Rube Goldberg contraption --

MR. ROTH:  I would push back on that for a couple of reasons.

THE COURT:  Go right ahead.

MR. ROTH:  So first, actually, the oversight under 105(d) is very limited because 105(d) specifically says -- well, I'll pull it; I have the text --

THE COURT:  I've got it here.

MR. ROTH:  -- that such sum shall be accounted for solely on the certificate of the president, and the role of the Comptroller General is very -- is narrow with respect to -- it's only for the -- solely for the purpose of verifying that all such expenditures related to expenses in --

THE COURT:  Slow down.  Slow down.  You've got the reporter here.

MR. ROTH:  Sorry.

The exact wording isn't necessarily critical.  My point is 105(d) actually reduces the ordinary oversight that applies which reflects that Congress traditionally has given the executive pretty broad discretion in determining how to

make alterations and improvements to the White House.  So my first point is, actually, the oversight is always a little bit lower in this space.  The second point is -- and I'll get to this when I talk about the gift authority -- but it's not true that the gift authority somehow gives up oversight.

THE COURT:  Hold on.

MR. ROTH:  Yeah.

THE COURT:  105 anticipates very small-sized projects, not a $400 million East Wing project.  There's a big difference between air conditioning -- refurnishing, air conditioning, heating, lighting, maintenance, repairs.  Those -- and it's a relatively small -- by Congress's standards -- relatively small sum of money involved.  Relatively small.  It's not $400 million worth of construction -- destruction and construction.

MR. ROTH:  Yes, Your Honor.  So the amount that was appropriated in the last round of appropriations pursuant to 105(d) was a relatively small number that would not on its own support the project that's going on, and that's why the president needs another source of appropriated funds in order to support the project.  And I'll get to that when I talk about the gift authority for --

THE COURT:  You're not suggesting that he asked and was rejected?

MR. ROTH:  Excuse me, Your Honor?

THE COURT:  You're not suggesting, are you, that he asked Congress for the authority and the appropriation and was rejected?

MR. ROTH:  No, no.

THE COURT:  You're not suggesting that?

MR. ROTH:  I'm not suggesting that, and I don't think he had to do that because Congress already provided for this.  Congress provided, yes, 105(d) and the money pursuant to that, but Congress also provided that the Secretary of the Interior has the power to accept gifts in order to promote the purposes of the National Park Service.

THE COURT:  There's no basis in the legislative history that suggests that that was being done by Congress in the anticipation of a $400 million East Wing project. There's none.  Zero.

MR. ROTH:  I -- Your Honor, I think that's probably because that authority predates the legislation that made the White House part of the National Park Service. So the National Park -- the White House was added as a unit of the National Park Service in 1961 in the statute that we cite.  As a result of that decision, the White House is now part of the National Park Service and the pre-existing authority that the Secretary of Interior had to accept donations for the purposes of the National Park Service is on the table.  And that's been true at least -- and clear, I

think, since the OLC opinion in 1977 that addressed this, and that OLC opinion goes through the statutes and says: Yes, you -- the president can do this because these authorities are out there for the Park Service, and the White House is part of the National Park Service.

THE COURT:  Are you suggesting that Congress is retaining its oversight capacity through the committees that oversee the Interior Department?

MR. ROTH:  Yes, Your Honor.  I don't see any reason why not.  And, in fact, I'll just say, there's already a bill in Congress to constrain the president to say the president should not be able to use the National Park Service funds for this East Wing project.  That bill was introduced in November in the Senate.  So there -- Congress has a way of expressing disapproval of the use of the funds, but Congress did provide a mechanism by which the president can access those appropriations.  And it is an appropriation.  The -- I apologize that it's two statutes and you have to read them together, but there's a statute that says the Secretary of Interior can accept the donations, and then there's another statute that says those funds are the -- are appropriated and can be disbursed for the purposes of the National Park Service.  And that's how the National -- and the purposes of the National Park Service are laid out in statute as well in 54 U.S.C. 100101,

and that's the authority that the Park Service uses to build all sorts of structures both in D.C. and beyond, you know, welcome centers for national parks and other things like that, and because Congress has designated the White House and President's Park as part of the National Park Service, Congress has thereby permitted that gift authority and appropriation authority to be used for that purpose, as well. And, again, that's what OLC approved in 1977 where the -- in connection with the pool. That's what the president used for the tennis pavilion back in 2018, 2019. And that's been public for a while that that's the mechanism the president has used for the funding here. And, again, Congress wants to say you can't use the money for that purpose. There's a bill on the table that they can adopt.

THE COURT: What about the other side of the coin? If Congress wanted the president to do this, he has the majority in both the House and the Senate. He could have very easily got the Speaker of the House and the majority in the Senate to come forward with a bill that would say: Go forward and do a good job.

MR. ROTH: So here's how I think about that, Your Honor. I think that most of the time when the president goes to Congress and says, you know: I want to do this project; I need some money, the reason he's going is to -- is because Congress has to appropriate that money and then

Congress appropriates the money and then he does the project.  Here, the president didn't want $400 million of taxpayer money to be used for this.  The president wanted it to be a donation.  And Congress provided a mechanism for the president to be able to access donations for particular purposes, and this falls within those purposes.  So the president didn't have to go to Congress and say:  I need money.  He had a way to get the money under existing law, and it's a way that saves the taxpayer $400 million.

THE COURT:  And your best effort to demonstrate to this Court that the Congress intended this to be used for a purpose of this size and proportion on an icon that's a national institution is what?  Is what?

MR. ROTH:  Well, Your Honor, I think that I would point to the OLC opinion.  Obviously, a pool is different.

THE COURT:  The '77 --

MR. ROTH:  Yeah.

THE COURT:  The Gerald Ford swimming pool?  You compare that to ripping down the East Wing and building a new East Wing?  Come on.

MR. ROTH:  I'm not comparing --

THE COURT:  Be serious.

MR. ROTH:  I'm not comparing the projects, Your Honor, but I am saying that I do think that made clear and public and Congress was aware that the president and the

executive branch have taken the position that the gift authority that has existed for a long time for the Secretary of Interior can be used to promote the purposes of the National Park Service, including President's Park, and if they wanted to restrict that, they could have restricted that, and they still can restrict that, but they haven't.

Let me go back to where I was.

Okay.  So I was -- what I was saying, Your Honor, was the four examples -- the West Wing, East Wing, pool, and tennis pavilion -- none of -- some of -- two of which have a general appropriation and two of which --

THE COURT:  The only two that were just not authorized funds, the swimming pool and the tennis pavilion.

MR. ROTH:  Yeah, but I just want to be --

THE COURT:  The only two.

MR. ROTH:  Yeah.  I just want to be clear, though, Your Honor.  The other two, they were general appropriations.  They were not specific to this.  So you know -- and they say this about the West Wing project in the '30s.  They say:  Oh, well, that was done under the -- this public works program that was a $3 billion general program to do public works.  It wasn't specific to the White House. It wasn't specific to the West Wing.  It wasn't the president went to Congress and said:  I want to build a West Wing.  Give me money.  It was an existing $3 billion

allotment for public works at large, and the president drew on that for the West Wing. And the East Wing, presumably there was an appropriation. They say: Oh, well, national -- because of national security that wasn't very specific, they haven't really been able to track it down. But, again, definitely no specific authorization or earmark for that project either. And then we have the later two for which the donation authority was used as a source of funding.

So there are all situations where there are different sources of funding that are being accessed. All of those sources of funding are authorized by law, but none of the projects were specifically approved by Congress in any way. And I think that undercuts their theory which, I think, is that Congress has to speak specifically to the project at issue and say: Yes, we want you to do this. That's just not how it's worked for 250 years with, really, very few exceptions. I mean, the only situation where Congress really took an active role in the specifics was under Truman when they created a commission that said: We want the commission to make the decisions about the White House, which, I think, sort of, the exception that proves the rule, really, about Congress's role in these projects.

Now, I think one way to reconcile the history with the text of 8106 is to look at the "clear statement" rule

that the Supreme Court and the D.C. Circuit have applied in cases involving the president where they say:  If the statute is general, we're not going to read that to constrain the president if Congress hasn't spoken directly to the question of the presidency.  And I think that represents -- reflects an important presumption that exists to protect the separation of powers.  It's a guardrail so that the courts are not put in a position of creating or wading into interbranch disputes; right?  We're going to assume that Congress didn't mean to specifically constrain the president.  If it wants to, it can, and then we'll have to deal with it.  But absent that, why should we make that assumption, sort of, create an interbranch dispute that may not even exist?  And, again, we're, sort of, speculating here.  What does Congress think about this project?  We don't know because they haven't addressed it specifically, but they also haven't acted on the bill that would restrain the project.  So I think there's good reason to read the statute more narrowly so that it does not create an interbranch dispute that may not even exist.

THE COURT:  Well, where do you see in 105 the authority to the president to take down the East Wing and put up a new East Wing?  Where do you see that in the specific language of 105 which is very specific about what the funds are being used for?

MR. ROTH:  Yes, Your Honor.

THE COURT:  Where do you see it?

MR. ROTH:  So we think it's found in "alteration and improvement."  We think "alteration and improvement" are capacious enough terms to include improving, you know -- replacing --

THE COURT:  That's a pretty expansive interpretation of the language, if I may say so myself.

MR. ROTH:  It's -- well, we think it fits within the dictionary definition of those terms.  And we are -- look, I don't think there's any question the East Wing, as it existed before the demolition, needed improvement.  It had a lot of problems that had been documented for a long time.  It had to be improved.  Now, sometimes you can do an improvement without knocking down a building and sometimes you can't.  And in this instance, it was determined that the only way to improve it and the most efficient way to improve it was to take it down and rebuild it, and that's -- the, sort of, explanation for that is in the environmental assessment that was done that explains the analysis that went into that decision, but that was a decision that was made and we think it's covered by "alteration or improvement."

I don't think there's really an administrable line between, you know -- what if it was just the second story;

right?  We're going to take down the second story and rebuild that.  Does that count as an alteration or improvement?  But if you take it down to the studs, you know, then it's not.  What if it's interior versus exterior?  What if you leave the footprint but take everything down?  I mean, there's all sorts of questions that we could get into, but I think that these terms are broad enough.  And, again, these are the terms that have existed -- well, this statute existed since the -- I think, the '70s, but we look at the appropriations acts that the Trust cites in its annex, similar language going way back that covered all of the projects at the White House that all the presidents have undertaken since the beginning.  So this is traditional language that covers --

THE COURT:  You've got two more minutes.  Why don't you address the balance of equities and irreparable harm.

MR. ROTH:  Okay.  I'll address balance of equities and irreparable harm.

I didn't talk about standing.  And Your Honor said Your Honor's comfortable with standing.  That's fine.

THE COURT:  I'm trying to get you a little -- if you need more time.

MR. ROTH:  Sorry?

THE COURT:  I'm not talking standing.  You could

talk about other things.

MR. ROTH:  Yes, I appreciate it.  What I'm saying is some of the issues that relate to standing, they come back in the form of irreparable harm, because even if they're cognizable for purposes of Article III, that doesn't mean they're weighty interests; right?  So they say they're interests -- so the harm to the organization is, you know, they want to facilitate public comment.  Well, there's a public comment process that the NCPC is undertaking starting in just a couple of weeks.  They can participate in that.  They can facilitate public participation in that.  Their harm is they would have liked to have done it a few weeks earlier.  Okay.  That's one harm that we're weighing.  And the other harm is the aesthetic injury to Dr. Hoagland who periodically walks in the neighborhood and sees the building and is concerned that it will distract her from the Executive Mansion.  I think that's not a very weighty interest either.  I mean, I -- again, I think, under D.C. Circuit precedent, it's not a cognizable interest, but it's -- even if it's cognizable, it's a very weak, attenuated, speculative harm, and we point out it's actually not even visible -- barely visible from public spaces.  And they say that's irrelevant.  I don't know how that could be irrelevant when the harm is aesthetic and we're -- this is what we're weighing here.

So you have those two interests on the one side. And then on the other side, the question is, are we going to suspend construction in the middle when there's important work that has to be done in any universe; right? Waterproofing, security work, the excavation, all of that has to happen.  You stop that in the middle and we're exposing the existing building to damage.  We're creating security problems for the president, you know, the national security implications that are addressed in the classified declaration.  And I don't think stopping the project is an equitable result of the balancing of those interests, you know?  They say:  Oh, well, you know, go ahead with the security work.  It can't be divided out that way.  And I don't think there's any administrable way to enforce that kind of rule.  Unless they want the Court to be the project manager of the site, it's not practical.

Beyond that, I think, sure, there's always going to be room for debate over design choices, but I don't think there's any real question that this modernization advances the public interests in the White House and the East Wing that suffered from decades of neglect and insufficient updating and modernization leading to the point where we have security being done in trailers, we have large state dinners happening in tents on the lawn that have to be put up and taken down and destroy the grass and impair the view.

We have mold and water contamination.  We have security infrastructure that is outdated.  We have utilities that are unreliable.  And there is important work that people have been talking about doing for 25 years, if not more, and now it is getting done, and that is in the public interest in the long-term, not stopping construction in the middle and leaving this indefinite, sort of, limbo situation.  I don't see how that advances the public interest or, really, remedies the harms that they're concerned about.

Your Honor, did I address all the questions that Your Honor had at the outset?

THE COURT:  You did the best you could.

MR. ROTH:  I think there was a question about the limits, if there are any limits.  I do think there are limits.  The limits are both legal and political.  I mean, the legal limits, I think, are in 105(d).  We were talking about, what are the outer bounds of "alteration and improvement"?  I do think if the plan was to just bulldoze the entire White House and build something completely different in its place, I think there would be a better argument that that exceeds the scope of "alteration and improvement."

THE COURT:  I would hope so.

MR. ROTH:  Yeah.

I think the National Park Service donation

authority, that has to be used for -- to advance the purposes of the National Park Service.  So if it was something personal or something that did not advance those purposes, the -- that could be a limit, although I would note that isn't -- like, also not one of the claims that has been raised in this case.  There is no challenge in this case in the complaint, the amended complaint, or the briefs to the Interior Secretary's acceptance of the gift or transfer of the money.  That's not one of their claims.  And I mentioned already that the -- there's no ultra vires claim.  So that's a limit.

And then, of course, there is -- there are political limits which is why nobody has touched the central Executive Mansion other than relatively minor alterations like the Truman Balcony.  It's always been understood that is the core site.  That is the site that Congress said in the 1961 statute is the important thing to preserve.  The East Wing, the West Wing have been modified many times over the years by all presidents, but I think there would be enormous political constraints on doing anything to the central Executive Residence.

THE COURT:  Thank you.

MR. ROTH:  Thank you, Your Honor.

THE COURT:  Mr. Heuer, five minutes.

MR. HEUER:  I'll try to address three points, Your

Honor.

First, the question of authorization.  I would say two words: Rube Goldberg.  Congress didn't provide authority under 105(d).  And my brother said that the exact wording isn't critical.  Of course it's critical.  It's a statute.  You've got to comply with the statute.  And now, on the fly, they've shifted that it's not really 105(d); it's now the gift statute that authorized it.  This just goes to show how little they have thought through their funding mechanism seriously when faced with a challenge.

THE COURT:  What about the cause of action claim he makes?

MR. HEUER:  What about it?  Which --

THE COURT:  No cause of action.

MR. HEUER:  Well, there's a cause of action because the National Trust is looking at 10 -- at 8106 as simply not a -- Congress is the only one who can enforce it.  That's not the way that that works.  Congress has said no one can build something on a federal park land -- which the National Trust certainly has an interest in -- unless there is express congressional approval.  There's no reason that the National Trust doesn't have that within their zone of interest to bring it standing, but certainly is also a claim that they can make because it's a cause of action, as we would suggest, under the Constitution because the president

has no authority under 8106 to do any of this, and they have conceded that.  They're not relying on his congressional authority.  They've talked about congressional -- constitutional avoidance, but you can't have constitutional avoidance if you don't have any constitutional authority to do it.  The only people who have constitutional authority here to say he can is Congress.  It's not a grant of authority they've given him previously.  It's something they've reserved themselves and said if you want to do it, you've got to come back and ask for permission.

I think, on their question -- on their point about the 1934 and 1942 elements and the history, as we have noted in our brief, 1934 is a statute -- it's the NRI -- NIRA where Congress expressly directed the Public Works Administration, quote, "under the direction of the president to prepare a comprehensive program of public works, including construction, repair, and improvement of public buildings," and excluded, "only those buildings under the jurisdiction of the Architect of the Capitol."  That's the Supreme Court.  That's the Capitol Complex.  He is allowed under that -- it is fairly clear authority that Congress is saying:  Go forth and build, construct, and otherwise on any public building.  This is certainly a public building.

1942, we think it's clear that this is a couple of months after Pearl Harbor.  You probably don't want to let

the Axis know that you're building a bunker under the White House. Defendants, as we note, surely have some appreciation for the importance of secrecy when it accompanies the building of bunkers.

And on the pool and the tennis -- the pool cabana and the tennis court, we would note that the fact that those were built without congressional authorization under 8106, as we note in our brief, no more proves the inapplicability of that statute than driving 60 in a 55 zone without getting a ticket proves the inapplicability of the speed limit.

I would also note that they don't mention, as we've pointed out, that when Congress wants to say that it is authorizing something under 8106, it's not dead letter. It knows how to do it. It's done it as recently as 1993 with the bonsai gardens at the National Arboretum. It has a statute that says: You can build the bonsai collection housing and the limitation on construction contained in the act of August of 1912 -- which is this act, 40 U.S.C. 68, as it was previously before it was recodified -- shall not apply to the construction of such facilities. If Congress knows how to invoke 8106 for bonsai facilities, it surely is not hiding 8106 authority in some other statute when it comes to the White House.

On the point about whether or not the authority of the Park Service to use the gift statute is relevant, we

would say it certainly isn't mostly -- or not only because of the arguments we made previously, but also because the foundation document of the Park Service from 2014 declares that the White House and its wings are fundamental elements of the White House and President's Park.  When my brother says that it's only really the Executive Mansion that anyone thinks is important, that's simply not true.  The Park Service has said repeatedly in documents for decades that it's the whole thing.  So it's not just about:  You can tear off the wings because those don't matter.  They do matter, and the Park Service has repeatedly said they do.

And, I think, my last point is when they note that it would be inequitable to allow them -- or to prevent them from continuing construction -- except, as we have noted, on the bunker and the other national security elements; we have no concerns about that -- when they say it would be inequitable not to allow them to proceed because it would create the problem of the project being half built, I think we would respectfully suggest that that's probably something they should have thought about before they tore it down to begin with.

Thank you, Your Honor.

THE COURT:  Thank you.

Well, as I said earlier, I appreciate the hard work and the high quality of the briefs that have been

submitted, and I want to compliment both sides in that.

It's a little busy around here's these days.  I'll try to get you an opinion in the not-too-distant future, but I can't promise you.  It won't be in the month of January.  I can promise you that right now, especially with a snowstorm coming of mythic, epic proportions.  But hopefully in February, I'll get you an opinion.  I'm not kidding myself.  I know it will be appealed.  Whichever side wins, the other side will appeal.  So this case is going to go to the D.C. Circuit, for certain, and, maybe, perhaps even to the Supreme Court.  Who knows?  But I know enough to know that going first is sometimes an advantage, sometimes a disadvantage.  Hopefully, in this case, it will be an advantage for me.

We'll stand in recess.

THE DEPUTY CLERK:  All rise.

(Proceedings concluded at 4:38 p.m.)

* * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 26th day of January 2026.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**

United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001