UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br>             Plaintiff,<br><br>       v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>             Defendants. | Case No. 1:25-cv-04316-RJL |

**DEFENDANTS' MOTION TO STAY ANY
PRELIMINARY INJUNCTION PENDING APPEAL**

At a hearing last month, this Court stated that it intended to rule in February on Plaintiff's motion for a preliminary injunction. If the Court ultimately enjoins the East Wing Modernization and State Ballroom Project (the "Project"), Defendants intend to immediately appeal that order to the D.C. Circuit, and respectfully request that this Court stay any such order pending appeal. Given the exigencies involved in suspending a major ongoing construction project with national security implications, Defendants are filing this motion in advance of any ruling, to avoid an emergency situation or at least to facilitate expedited proceedings on appeal.

The factors governing whether to issue a stay include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Here, these factors weigh in favor of a stay. Even assuming the Court rules adversely on the merits, Defendants have strong arguments for appeal, and the equities and public interest weigh overwhelmingly against suspending construction in the interim.

1

1.     Starting with the balance of harms, they powerfully favor a stay pending appeal. Halting the Project at this juncture would be untenable and detrimental to the public interest.

*First*, any injunction would exacerbate rather than redress the National Trust's own stated aesthetic interest.  Halting construction would prolong a gross imbalance between the West Wing and the former East Wing and leave an unsightly excavation site in President's Park indefinitely. That is contrary to Plaintiff's interest and the public interest, especially when one considers that the below-ground work on waterproofing, security improvements, and utility infrastructure will have to take place at some point regardless of what structure is ultimately erected above-ground.

*Second*, as the Secret Service attested, halting construction would imperil the President and others who live and work in the White House.  "[T]he current open construction site is, in and of itself, a hazard and complicates Secret Service operations."  ECF 30-5, ¶ 8.  There are additional reasons, described in detail in a supplemental classified declaration, that halting construction will endanger national security and therefore impair the public interest.  *See* Supp. Classified Decl. While Plaintiff has suggested that the Court could allow construction that is necessary for national security to continue, it is unworkable to distinguish between construction elements that are national security-related and those that are not.  Defendants are lodging, in support of this motion, a second supplemental classified declaration that further explains why that is so.  Put simply, completion of the Project in a timely fashion is imperative for reasons of national security.

*Third*, more generally, continued progress on the project advances the public interest.  The new East Wing's expanded capacity for receiving foreign dignitaries and visitors will substantially benefit the President, EOP, other governmental offices and agencies with a White House presence, and the American people.  The past practice of pitching temporary tents on the South Lawn was costly and cumbersome, did not comport with the dignity due to the White House, and "caused

2

substantial damage to NPS resources on the grounds," including the turf, irrigation systems, and other NPS infrastructure.  ECF 14-6, ¶ 7; ECF 30-5, ¶ 10.  The Project also involves updating life-safety requirements and critical infrastructure, while resolving longstanding problems, such as an unstable roof on the colonnade, water infiltration causing mold and deterioration of structural and historic elements, and the presence of asbestos and lead-based paint.  ECF 30-1, ¶¶ 6, 9.  Indeed, modernization of the East Wing will relieve strain on the more historic portions of the Executive Mansion, preserve the integrity of the entire complex, and thus advance the public interest.

On the other side of the scale, Plaintiff cannot establish that it will suffer irreparable harm if an injunction is stayed pending appeal.  The National Trust has alleged procedural harm, but the White House is consulting with the NCPC and the CFA, and there will be an opportunity later this month to offer public comment to the NCPC.  Plus, as this Court recognized, "bare procedural injury, standing alone, is insufficient to demonstrate irreparable harm."  ECF 17 at 2; *Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 268-69 (D.D.C. 2020).

The National Trust's assertion of aesthetic injury does not demonstrate irreparable harm either.  Insofar as it is based on the demolition of the old East Wing, that has already occurred and cannot be redressed; it therefore cannot threaten any future irreparable harm or support injunctive relief.  Insofar as it is based on the future new East Wing, the D.C. Circuit has found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing."  *Env't Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021).  Although this Court stated at the hearing that it believes the allegations here are sufficient for Article III purposes, irreparable harm is a higher bar, and the mere potential that Dr. Hoagland may dislike the appearance of the new structure when she happens to walk by the White House grounds is entitled to very little weight in the equitable calculus.

The National Trust's future aesthetic injury is also too conjectural, and not sufficiently imminent, to establish irreparable harm. Plans will not be finalized until after consultation with the NCPC and the CFA; construction will not begin on above-grade elements until April at the earliest; and the ongoing below-grade work does not lock in the size of the above-grade design. ECF 30-2, ¶ 12; ECF 30-4, ¶¶ 9–13. "The standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm before a decision on the merits can be reached." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288-89 (D.D.C. 2017); *see id.* at 288 (finding injunction not warranted where "source of the plaintiff's alleged irreparable harm—'mammoth towers'—won't begin to be built for at least another six months, leaving the parties' ample time to fully brief the merits of the case").

For all of these reasons, even if the Court decides to issue an injunction, the equities and balance of harms strongly favor staying that injunction pending appeal, so that the D.C. Circuit can weigh in on the novel issues presented by this case before Defendants and the public suffer irreparable harm from the indefinite suspension of ongoing construction.

2.     As to the merits, this motion will only be relevant if the Court finds that Plaintiff is likely to prevail. Defendants obviously believe otherwise, and hope the Court agrees after careful review of the law and the record. Nonetheless, even if the Court concludes otherwise, Defendants have strong arguments to present on appeal, and this Court has already recognized that these legal issues of first impression will ultimately be decided by an appellate tribunal. The strength of Defendants' merits arguments is sufficient to warrant a stay pending appeal, especially in light of the heavy equitable considerations at play on Defendants' side and the minimal (if any) harms to Plaintiff of allowing the construction to proceed.

*First*, Plaintiff has no cognizable interest in "the White House and its grounds," 54 U.S.C. § 307104, and does not have standing to pursue this matter solely to vindicate generalized public interests.  The Trust itself informed the Court that it has "no personal or financial stake" in the case but seeks only to "enforce[e] and vindicate[e] the rights of the public as a whole."  ECF 2-2 ¶ 16.  But a plaintiff invoking the jurisdiction of an Article III court must show an injury affecting him "in a personal and individual way," for "[v]indicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1, 576 (1992).  Federal courts "do not exercise general legal oversight of the Legislative and Executive Branches."  *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).  This Court indicated at the hearing that Defendants can renew their standing objection on appeal, and that is what they intend to do.

*Second*, because the Executive Residence at the White House (EXR) is not an agency under the APA, Plaintiff does not have a cause of action under that statute.  The other statutes Plaintiff cited do not provide a cause of action either, and Plaintiff did not bring an *ultra vires* claim.  That is fatal.  *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (cause of action is mandatory).  When the Court asked Plaintiff's counsel during rebuttal argument to address this issue, counsel responded first that Plaintiff can proceed directly under 40 U.S.C. § 8106, but that statute has no private cause of action for anyone (let alone for the Trust).  *See* Tr. 43.  Counsel then argued that Plaintiff can sue "under the Constitution" (Tr. 44), but the Supreme Court, the D.C. Circuit, and this Court have all recognized that an asserted lack of statutory authority does not give rise on its own to a constitutional claim.  *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *Global Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025); *Appalachian Voices v. U.S. Envt'l Prot. Agency*, No. CV 25-1982, 2025 WL 2494905, at *8–9 (D.D.C. Aug. 29, 2025) (Leon, J.).

*Third*, the Project is authorized by statute.  Congress has authorized appropriation of funds to the President for "alteration" and "improvement" of the Executive Residence at the White House.  3 U.S.C. § 105(d)(1); Pub. L. No. 95-570, 92 Stat. 2445, 2446 (1978).  Any such sums "may be expended as the President may determine," subject to very limited oversight by Congress. 3 U.S.C. § 105(d).  Indeed, consistent with centuries of practice, Congress intentionally limited its oversight in this space to "avoid an overly broad intrusion into this area of Executive discretion." H.R. Rep. No. 95-979, at 8 (1978); S. Rep. 95-868, at 9 (1978).  Here, the President determined that the Project is a necessary "improvement" to the White House—a conclusion that the record amply supports, given the old wing's deficiencies—and constructing a new one therefore falls within his lawful statutory authority.  That authorization also satisfies any need for congressional approval under 40 U.S.C. § 8106—a statute that, as best Plaintiff can tell, was last invoked by Congress decades ago in connection with a bonsai garden at the National Arboretum, and *never* for construction at the White House.  Whatever that statute was originally intended to mean, and whatever force it continues to hold after decades of subsequent enactments—both of which are questions of first impression subject to considerable uncertainty—it has no application here.

At the hearing, this Court raised questions about how the Project was funded—through private donations to the National Park Service.  At the outset, Plaintiff never challenged that aspect of the Project or its funding; the issue was consequently not briefed in any detail; and concerns on that front therefore would not justify a preliminary injunction.  *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (party presentation rule).  Regardless, the Court's skepticism was misplaced.  Congress specifically empowered the Secretary of Interior to advance the purposes of the National Park System, and to accept donations for that purpose.  *See* 54 U.S.C. §§ 100101, 101101.  Indeed, that donation authority dates back over a century, *see* Pub. L. No. 66-246, Ch.

235, 42 Stat. 874, 917 (1920), and has often been used, including for the restoration of the Washington Monument after the 2011 earthquake and to construct new park police horse stables on the National Mall. Congress (later) chose to designate the White House and President's Park as a unit within the National Park Service. *See* Pub. L. No 87-286, 75 Stat. 586, 586 (1961). As a result of those two congressional actions, the Interior Secretary may accept donations to fund improvements to the White House, so long as he concludes (as he did) that the project would advance the purposes of the unit. Such funds are "appropriated" by law, 31 U.S.C. §1321(a)(17), (b)(1), just like other appropriations—and are thus subject to the same congressional oversight. This is not a circumvention of the appropriations process—it is a funding mechanism that Congress knowingly authorized and has long been aware is available to support projects on White House grounds. *See, e.g.*, Hr'g Before the Subcomm. on Employee Ethics and Utilization of the Committee on Post Office and Civil Service, *Authorization for the White House Staff*, Serial No. 95-10, pg. 21 (April 26, 1977) ("there are, in fact, two ways that the Executive Residence is taken care of: one is that of this account [under Section 105(d)], and one is that of Interior's own account").

This has been the position of the Executive Branch for nearly fifty years, and no court to Defendants' knowledge has cast doubt on it. *See The White House—The Vice President—Gifts*, 2 Op. O.L.C. 349, 350 (Apr. 27, 1977) ("[I]n our view, [the Gift Authority] constitutes authority for the acceptance of gifts in connection with the Department of Interior's general statutory responsibility under Pub. L. No. 87-286 for maintenance of the White House and its grounds."). Before overriding that longstanding position and forcing the cessation of a project grounded in that established authority, this Court should allow the D.C. Circuit to have its say.

While Defendants maintain that they are correct about all three of these arguments, only one is needed to prevail on appeal.  Respectfully, these arguments are sufficiently weighty, given the balance of harms, to warrant a stay pending appeal, even if the Court determines that Plaintiff is likely to succeed on the merits and accordingly enters a preliminary injunction.

*   *   *

This Court should stay any preliminary injunction pending appeal.  The D.C. Circuit should have the opportunity to weigh in on these significant and novel issues of first impression before the President is ordered to stop work in the middle of a high-priority construction project that implicates national security, particularly at the behest of a third party with no legally cognizable interest in the White House grounds and no applicable cause of action to intrude into this novel matter of inter-branch relations.[1]

---

[1] Pursuant to LCvR 7(m), Defendants conferred with Plaintiff and Plaintiff asked Defendants to "please inform the [C]ourt of the following: a) that the government only first initiated consultation with plaintiff's counsel several hours after the close of business on the day of filing, b) that the government has not provided opposing counsel with an explanation for what is being filed ex parte or why ex parte filing of those materials is appropriate, and c) that the plaintiff opposes[.]"

| | |
|---|---|
| Dated: February 2, 2026 | Respectfully submitted, |
| BRETT A. SHUMATE<br>Assistant Attorney General<br>Civil Division | ADAM R.F. GUSTAFSON<br>Principal Deputy Assistant Attorney General<br>Environment and Natural Resources Division |
| YAAKOV M. ROTH<br>Principal Deputy Assistant Attorney General | PETER M. TORSTENSEN, JR.<br>Deputy Assistant Attorney General |
| ERIC J. HAMILTON<br>Deputy Assistant Attorney General | MARISSA A. PIROPATO<br>Deputy Chief |
| BRANTLEY T. MAYERS<br>Counsel | GREGORY M. CUMMING<br>Senior Attorney<br>MICHELLE RAMUS |
| /s/ *Eitan R. Sirkovich*<br>JOSEPH E. BORSON<br>Assistant Branch Director<br>EITAN R. SIRKOVICH<br>(D.C. Bar No. 90030102)<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br>1100 L Street, N.W.<br>Washington, DC 20005<br>Eitan.R.Sirkovich@usdoj.gov<br>(202) 353-5525 | MARK WIDERSCHEIN<br>Trial Attorneys<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>Natural Resources Section<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530<br>Gregory.Cumming@usdoj.gov<br>Michelle.Ramus@usdoj.gov<br>Mark.Widerschein@usdoj.gov<br>(202) 598-0414 |

*Counsel for Defendants*