**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES,

              *Plaintiff,*

    v.

NATIONAL PARK SERVICE, *et al.*,

              *Defendants.*

Civil Action No. 25-4316

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

   I.   The National Trust Is Likely to Succeed on the Merits of Its Claims that the Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Have Under Statute. ..................... 4

   A.   The Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Possess Under 3 U.S.C. § 105(d) and 40 U.S.C. § 8106. .......................................................... 6

   B.   The Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Possess Under the Redwood Amendment. ................................................................. 14

   C.   The Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Possess Under 54 U.S.C. §§ 100301-100302 and Pub. L. 87-286, 75 Stat. 586 (1961) to Reorganize the Executive Branch. ..................................................................... 16

   II.   The Court Should Reconsider Its Conclusion that the National Trust Is Unlikely to Succeed on Its Constitutional Claims. ......................................................... 19

   III.  The Remaining Factors Favor Preliminary Injunctive Relief. ........................... 22

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) ................................................................................................4

*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ................................................................5, 11, 13, 17

*Cincinnati Soap Co. v. United States*,
   301 U. S. 308 (1937) ..............................................................................................7

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ................................................................................................7

*Dalton v. Specter*,
   511 U.S. 462 (1994) ..............................................................................2, 19, 20, 21

*Env't Def. Fund v. FERC*,
   2 F.4th 953 (D.C. Cir. 2021) ..............................................................................23

*Fed. Educ. Ass'n v. Trump*,
   No. 25-5303, 2025 U.S. App. LEXIS 25013 (D.C. Cir. Sep. 25, 2025) ...............5, 6

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ................................................................5, 11, 13, 15

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ..........................................................................................2, 16

*In re FTX Trading Ltd.*,
   91 F.4th 148 (3d Cir. 2024) ................................................................................12

*Global Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ..............................................................2, 19, 20, 21

*Illinois v. Trump*,
   No. 25-cv-12174, 2025 U.S. Dist. LEXIS 201113 (N.D. Ill. Oct. 10, 2025) .........21

*Illinois v. Trump*,
   155 F.4th 929 (7th Cir. 2025) ..............................................................................21

*Immigr. & Naturalization Serv. v. Chadha*,
   462 U.S. 919 (1983) ..............................................................................................17

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................23

*Learning Res., Inc. v. Trump*,
  Nos. 24-1287, 25-250, 2026 U.S. LEXIS 714 (Feb. 20, 2026) ....................................9, 12, 13

*Leedom v. Kyne*,
  358 U.S. 184 (1958)...................................................................5, 11

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)...................................................................12

*N. Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ...................................................................5

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022) ...................................................................4, 5

*Nat'l Treas. Emps. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) ...................................................................20

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................3

*Nuclear Reg. Comm'n v. Texas*,
  605 U.S. 665 (2025)................................................................... *passim*

*Ramirez v. U.S. Immigration & Customs Enf't*,
  568 F. Supp. 3d 10 (D.D.C. 2021) ...................................................................24

*V.O.S. Selections, Inc. v. United States*,
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ...................................................................6, 21

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ...................................................................24

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)...................................................................18

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)...................................................................1, 3, 22

*Yates v. United States*,
  574 U.S. 528 (2015)...................................................................9

**Statutes**

3 U.S.C. § 105(d) ................................................................... *passim*

5 U.S.C. § 706(2) ..............................................................................................................2

31 U.S.C. § 1301(a) ..........................................................................................................7

31 U.S.C. § 1321(a) ......................................................................................................4, 10

31 U.S.C. § 1321(b) ...................................................................................................4, 9, 10

31 U.S.C. § 1535 ...............................................................................................................4

40 U.S.C. § 68 .................................................................................................................13

40 U.S.C. § 8106 .............................................................................................4, 11, 12, 13

50 U.S.C. § 1701 ...............................................................................................................9

54 U.S.C. § 100101(a) ................................................................................................14, 15

54 U.S.C. § 100101(b) ............................................................................................... *passim*

54 U.S.C. § 100301 .........................................................................................................16

54 U.S.C. § 100302(a) ................................................................................................16, 17

54 U.S.C. § 101101 .........................................................................................................10

54 U.S.C. § 101101(2) .....................................................................................................11

Pub. L. 99-591, Stat. 3341 (1986) ..................................................................................12

Pub. L. 103-111, Stat. 1051 (1993) ................................................................................13

Pub. L. 118-47, 138 Stat. 460 (2024) .......................................................................7, 8, 9

Pub. L. No. 87-286, 75 Stat. 586 (1961) ..........................................................4, 16, 17, 18

**Other Authorities**

GAO, The Red Book (4th ed. 2016) ..................................................................................7

National Park Service, Foundation Document: The White House and President's
    Park (Sept. 2014),
    https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_2015-508-
    accessible-resize.pdf (last accessed Mar. 5, 2026) ..................................................15

National Park Service, *Comprehensive Design Plan: White House & President's
    Park* (2000),
    https://babel.hathitrust.org/cgi/pt?id=umn.31951p009596291&seq=3 (last
    accessed Mar. 5, 2026).............................................................................................15

Henry B. Hogue, Cong. Research Serv., R44909, Executive Branch
   Reorganization (2017). ..................................................................................................18

Luke Broadwater & Dylan Freedman, *"Cheap" and "Appalling": Trump's
   Ballroom Plans Receive a Flood of Negative Comments*, N.Y. TIMES (Mar. 3,
   2026), https://www.nytimes.com/2026/03/03/us/politics/trump-ballroom-
   comments.html................................................................................................................3

Truth Social,
   https://truthsocial.com/@realDonaldTrump/posts/115956692372915783 (Jan.
   25, 2026) ......................................................................................................................23

Truth Social,
   https://truthsocial.com/@realDonaldTrump/posts/116047799547098230 (Feb.
   10, 2026) ......................................................................................................................22

## <u>INTRODUCTION</u>

On February 26, 2026, the Court denied the motion of the National Trust for Historic Preservation in the United States ("National Trust") for a preliminary injunction,[1] but invited the National Trust to seek leave to amend its complaint to add *ultra vires* counts. *See* ECF 47 at 22; ECF 48. The National Trust moved for leave to file a second amended complaint the next day, ECF 49, and the Court promptly granted the Trust's motion, *see* Mar. 1, 2026 Minute Order.

The National Trust has now renewed its motion for a preliminary injunction, and requests that the Court pause the Defendants' unlawful construction of a massive ballroom on the White House grounds until they obtain authorization from Congress and complete all the necessary review processes.

The Court should grant the National Trust's motion. To start, the Trust is likely to succeed on the merits of its claims.[2] *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The National Trust focuses this memorandum primarily on its *ultra vires* claims set forth in Counts X through XIII of the Second Amended Complaint, ECF 50 ¶¶ 197-224, although to preserve its appellate rights, the

---

[1] Despite determining that the National Trust likely had associational standing to assert its claims, ECF 47 at 7-13, the Court preliminarily concluded that the National Trust's constitutional claims likely were properly characterized as allegations that the Defendants had acted *ultra vires* of their statutory authority. *See id.* at 16-22. Separately, the Court concluded that because the Office of the Executive Residence ("EXR") was not an "agency" under the Administrative Procedure Act, the National Trust was unlikely to succeed on its remaining claims, which the Trust had brought under the APA. *Id.* at 13-16.

[2] The facts supporting the National Trust's motion are largely set forth in its prior briefs, as well as in the various declarations submitted by the Trust and the Defendants. *See, e.g.*, ECF 2-1; ECF 2-2; ECF 2-3; ECF 2-4; ECF 14-1; ECF 14-2; ECF 14-3; ECF 14-4; ECF 14-5; ECF 14-6; ECF 14-7; ECF 14-8; ECF 14-9; ECF 14-10; ECF 14-11; ECF 15-1; ECF 20; ECF 20-1; ECF 20-2; ECF 30; ECF 30-1; ECF 30-2; ECF 30-3; ECF 30-4; ECF 30-5; ECF 33; ECF 33-1. Rather than recount those facts again here, the National Trust incorporates these documents by reference and refers to them as relevant.

National Trust has renewed its preliminary injunction motion as to all its claims for the reasons stated in its prior briefs (which the Trust incorporates by reference).

As a threshold matter, it bears reiterating that the only reason that the National Trust has to bring *ultra vires* claims—as opposed to challenging the Ballroom Project under the Administrative Procedure Act as contrary to law, 5 U.S.C. § 706(2)—is because the Defendants, in a transparent effort to evade APA review, have found an entity (EXR) that has historically been considered a non-agency in which to hide the Project. *See* ECF 33 at 7-8. But despite the Defendants' efforts, the Ballroom Project cannot be entirely insulated from judicial review. The Ballroom Project is *ultra vires* of the Defendants' statutory authority in at least three separate ways: (1) it is affirmatively prohibited by several statutes, absent express Congressional approval that the Project does not possess; (2) its funding mechanism is separately in patent violation of numerous federal statutes; and (3) to the extent the Project can be carried out at all, the statutory authority to manage and direct it lies with the National Park Service ("NPS"), and cannot be transferred to EXR. *See infra* Part I. The National Trust is therefore likely to succeed on the merits of its *ultra vires* claims.

Further, and as a secondary matter, the National Trust respectfully requests that the Court reconsider its preliminary determination that the Trust likely cannot assert its constitutional claims. *See infra* Part II. The National Trust makes this request on the good-faith belief that those claims provide an alternative basis for granting the relief sought. Because the Trust's constitutional claims allege direct violations of the Property Clause and Congress's constitutional "control over the . . . duties . . . of executive offices," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010), they are sharply distinct from the claims at issue in *Dalton v. Specter*, 511 U.S. 462 (1994), and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). If the Court reconsiders its prior determination (that the Trust cannot assert constitutional claims because the

Defendants have disclaimed constitutional authority to construct the Ballroom, ECF 47 at 19-20), the Court should hold that the Trust is likely to succeed on the merits of those claims as well.

The other *Winter* factors also favor preliminary injunctive relief. *See infra* Part III. As the National Trust has explained in its prior briefing, it will be irreparably injured in the absence of a preliminary injunction. *See, e.g.*, ECF 2-1 at 34-37; ECF 20 at 36-42; ECF 33 at 24-25. The Defendants are unlawfully constructing the Ballroom *right now*. And they are poised to commence within the next month above-grade construction that will dwarf the White House, irreversibly damage the Executive Residence, and distort the grounds and layout of President's Park—all without Congressional approval, and all without meaningful consideration of the public's input.

For similar reasons, the equities and the public interest—which "merge" when a preliminary injunction is sought against the government, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—also favor relief. To take just one example, the National Capital Planning Commission ("NCPC") has received approximately 32,000 comments in advance of its March 5 hearing—more than 98% of which are opposed to the Ballroom Project[3]—yet the Defendants show no signs of pausing the Project to seriously consider those comments or to seek congressional approval. Rather, the Defendants assert that national security interests require them to continue construction at the former East Wing site, *see, e.g.*, ECF 39 at 2. Yet the National Trust again reiterates—as it has consistently from the outset—that it *is not asking* the Court to pause work required to protect national security. *See* ECF 30 at 41. The National Trust asks only that the Defendants be required to pause construction of the *Ballroom*, which is not (and never has been) necessary for national security.

---

[3] Luke Broadwater & Dylan Freedman, *"Cheap" and "Appalling": Trump's Ballroom Plans Receive a Flood of Negative Comments*, N.Y. TIMES (Mar. 3, 2026), *available at* https://www.nytimes.com/2026/03/03/us/politics/trump-ballroom-comments.html.

The Court should grant the National Trust's motion, and preliminarily enjoin the Defendants from continuing construction work on the Ballroom Project until they have obtained all necessary authorizations and approvals.

## **ARGUMENT**

I. **The National Trust Is Likely to Succeed on the Merits of Its Claims that the Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Have Under Statute.**

The National Trust is likely to succeed on the merits of its claims that the Ballroom Project is *ultra vires* of any authority the Defendants have under (1) the statute that the Defendants assert constitutes "express authority of Congress," per 40 U.S.C. § 8106, for the construction of the Ballroom, *see* ECF 30 at 18 (claiming that "the necessary statutory authority is found in 3 U.S.C. § 105(d)"); (2) the statutes through which the Defendants are funneling to EXR the private donations that are primarily (if not exclusively) funding the Ballroom Project, *see* 54 U.S.C. §§ 100101, 101101(2); 31 U.S.C. §§ 1321(a)(17) & (b)(1), 1535; and (3) the statutes that require control of the Ballroom Project to be vested in NPS, not EXR, *see* ECF 30 at 18-19, 36 (citing Pub. L. No. 87-286, 75 Stat. 586 (1961)). *See* ECF 50 ¶¶ 197-224.

*Ultra vires* review "rests on the longstanding principle" that if the actions of a government official or entity are "unauthorized by the statute under which [they] assume[] to act," they have "violate[d] the law" and "the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (third alteration in original) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). Such review is available where, as here, (1) "statutory provision[s] plainly delineate[] the outer limits" of the defendants' authority; (2) "Congress has not expressly precluded judicial review"; and (3) no

statute otherwise provides for review.[4] *Id.* at 971; *see Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (detailing when *ultra vires* review is available).

Where *ultra vires* review is available, the challenged government action should be enjoined if it is "in excess of . . . delegated powers and contrary to a specific prohibition in the statute." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)); *see also Nuclear Reg. Comm'n*, 605 U.S. at 681 (similar). As the D.C. Circuit has explained, this requires the plaintiff to show that the defendant government official or entity has "patently . . . misconstru[ed]" the statute at issue; "disregard[ed] a specific and unambiguous statutory directive"; or "violate[d] some specific [statutory] command." *Changji Esquel Textile*, 40 F.4th at 722.

While the *ultra vires* standard is appropriately "rigorous," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 (D.C. Cir. 2022), it is far from insurmountable. To the contrary, *ultra vires* review "provides a critical backstop when "there is no other means to protect and enforce a statutory right." *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 U.S. App. LEXIS 25013, at *21 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring) (cleaned up) (quoting *Leedom v. Kyne*, 358 U.S. 184, 190 (1958)). And both the D.C. Circuit and the Supreme Court have recently ruled in favor

---

[4] If, as the Court preliminarily concluded, EXR is not an "agency" for the purposes of the APA, then the National Trust has no statutory mechanism by which to test the Defendants' compliance with the statutes that underlie the Trust's *ultra vires* claims. *Cf. N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012) ("[T]he Postal Service is exempt from review under the [APA], but its actions are reviewable to determine whether it has acted in excess of its statutory authority.").

However, the Court does not, as a necessary predicate to granting the National Trust *ultra vires*-based relief, *also* need to conclude that the Trust's *constitutional* claims are similarly unavailable. This is because the National Trust's freestanding constitutional claims are neither (1) brought under statute nor (2) based upon alleged statutory violations. The Court therefore can—and should— enter a preliminary injunction on ***both*** the National Trust's *ultra vires* claims and constitutional claims, as the Trust has requested.

of plaintiffs who challenged government action as *ultra vires* of statutory authority. *See Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 972-74 (concluding, *inter alia*, that Postal Service's failure to maintain statutorily mandated pay differentials was *ultra vires*); *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369-70 (Ct. Int'l Trade 2025), *aff'd in part, vacated in part, remanded sub nom., V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom., Learning Res., Inc. v. Trump*, 2026 U.S. LEXIS 714 (Feb. 20, 2026); *see also Fed. Educ. Ass'n*, 2025 U.S. App. LEXIS 25013, at *23 (Pan, J., concurring) ("[W]e have ruled in favor of plaintiffs alleging *ultra vires* government conduct when the challenged action is based on unexplained and obvious deviations from statutory text and when the government's interpretation of its statutory authority would lead to an absurd result." (cleaned up)).[5] For the following reasons, the Ballroom Project is *ultra vires* of the Defendants' statutory authority as well.

    A.   The Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Possess Under <u>3 U.S.C. § 105(d) and 40 U.S.C. § 8106.</u>

The only statute the Defendants have claimed authorizes the Ballroom Project is 3 U.S.C. § 105(d). *See* ECF 30 at 18 ("[T]he necessary statutory authority is found in 3 U.S.C. § 105(d)."); ECF 15-1 at 15-16. But § 105(d) does not even come close to authorizing the Project.

As relevant here, § 105(d) does two things. First, and primarily, it serves as an *authorization* for Congress to appropriate funds for the "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d); *see* GAO, The Red

---

[5] The government contends that every *ultra vires* claim is a "Hail Mary pass," citing dicta in *Nuclear Reg. Comm'n*, 605 U.S. at 681. *See* ECF 30 at 35 n.13 (characterizing *ultra vires* claims in this manner). Yet the fact that many *ultra vires* claims do not succeed should not taint the National Trust's claims by association. As recent decisions reflect, where, as here, the executive acts patently beyond statutory authority, *ultra vires* claims are not "Hail Mary pass[es]," *Nuclear Reg. Comm'n*, 605 U.S. at 681, but instead quite frequently succeed.

Book 2-54-55 (4th ed. 2016) ("The expression 'authorized to be appropriated' . . . clearly indicates that no appropriation is made or intended to be made, but the bill when enacted becomes the authority of law for an expected appropriation in the future." (quoting 27 Comp. Dec. 923 (1921)); *id.* at 2-56 ("An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter (up or down) in the subsequent appropriation act."); *see* ECF 30 at 34 (conceding that "[s]ection 105(d) is an *authorization* of appropriations" (emphasis in original)).

Second, § 105(d) permits the President to expend funds that Congress has *appropriated* pursuant to § 105(d)'s authorization, subject to both (1) the outer restrictions imposed by § 105(d), and (2) as with any appropriation, whatever further limitations Congress imposes in the appropriating act itself, *see* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress." (quoting *Cincinnati Soap Co. v. United States*, 301 U. S. 308, 321 (1937))).

As the National Trust has explained (and the Defendants acknowledge, *see* ECF 15-1 at 16 n.9), the relevant appropriations statute here is Public Law 118-47. *See* ECF 20 at 13-14 (citing Pub. L. 138 Stat. 460, 532 (2024) ("2024 Appropriations Act")). The 2024 Appropriations Act appropriates a mere $2.475 million "pursuant to 3 U.S.C. 105(d)" for "required maintenance, resolution of safety and health issues, and continued preventative maintenance." *Id.* The President is therefore restricted to using the appropriated funds for those specific enumerated purposes— *and for no others*, *see* 31 U.S.C. § 1301(a).

The Defendants nevertheless insist that Congress, by authorizing *itself* to appropriate funds for "alteration[s]" and "improvement[s]" to the White House under § 105(d), somehow expressly

permitted *the Defendants* to build a massive ballroom funded by hundreds of millions of dollars in private donations. *See* ECF 30 at 19 ("Defendants respond that the necessary statutory authority [for the Ballroom Project] is found in 3 U.S.C. § 105(d)"). Section 105(d) permits no such thing—and it is not even a close call.

**1.** To start, nothing in § 105(d) even remotely permits the Defendants to construct the Ballroom—expressly or otherwise. The Defendants' contrary argument principally rests on the words "alteration" and "improvement." *See* ECF 30 at 32 (quoting 3 U.S.C. § 105(d)). It is difficult to understand why. As the National Trust has explained, those words—and the rest of § 105(d)(1)—describe the purposes for which *Congress* has authorized *itself* to appropriate funds. They do not authorize the *President* to do anything, absent an actual appropriation. And the appropriation at issue here—the 2024 Appropriations Act—does not even appropriate funds for "alteration[s]" or "improvement[s]" generally.[6] 3 U.S.C. § 105(d). It instead appropriates funds for the specific purposes of "required maintenance, resolution of safety and health issues, and continued preventative maintenance," Pub. L. 118-47, 138 Stat. at 460. The plain language of the 2024 Appropriations Act therefore makes clear that Congress did not appropriate funds to demolish the East Wing, or to construct a Ballroom in its place.

Even if § 105(d) authorized the President to ignore any limits imposed by Congress in the actual appropriations act, and to use *any* funds appropriated pursuant to § 105(d) to make "alteration[s]" or "improvement[s]"—and, plainly, it does not—the Defendants' contention that

---

[6] While the 2024 Appropriations Act does refer to "repair, alteration, and improvement" in a prefatory clause, that reference simply signals that the source of the § 105(d) statutory authorization for the appropriation is § 105(d)(1), rather than some other subsection of § 105(d), which separately authorize appropriations for other purposes, *see* § 105(d)(2)-(5). Regardless, as the Act immediately makes clear, the scope of the actual appropriation is restricted to the narrower and more specific stated purposes of "required maintenance, resolution of health and safety issues, and continued preventative maintenance," 138 Stat. at 532.

the words "alteration" and "improvement" authorize demolition of the East Wing and construction of the Ballroom in its place is untenable. *See* ECF 30 at 33-34. Put charitably, it stretches § 105(d) well beyond its breaking point. A statute that authorizes appropriations for "air-conditioning, heating, and lighting," 3 U.S.C. § 105(d), cannot possibly be read to expressly authorize the construction of a ballroom that is nearly twice the size of the Executive Residence itself. *Cf.* Jan. 21, 2026 Hrg. Tr. 29:8-15 ("[Section] 105[d] anticipates very small-sized projects, not a $400 million East Wing project."); 36:21-25 ("[W]here do you see in 105 the authority to the president to take down the East Wing and put up a new East Wing?"). Rather, under the well-established canon of *noscitur a sociis*, "alteration" and "improvement" must be interpreted in their statutory context to encompass the sort of comparatively minor projects that unite the other verbs in § 105(d), *see Yates v. United States*, 574 U.S. 528, 544-46 (2015)—which is, unsurprisingly, consistent with how past presidents exercised their authority under § 105(d), *see* ECF 20 at 8-9; ECF 20-1.[7]

**2.** Further, even if § 105(d) permitted the Defendants to expend the $2.475 million appropriated by the 2024 Appropriations Act on the Ballroom—which it plainly does not, for the reasons detailed above—that would still not solve the Defendants' *ultra vires* problem. That is

---

[7] Indeed, this is precisely the reasoning that the Supreme Court employed just last month in determining that the President lacked the power to impose tariffs under his authority to "regulate . . . importation or exportation" under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("IEEPA"). *Learning Res.,* 2026 U.S. LEXIS 714, at *28 ("The 'neighboring words' with which 'regulate' 'is associated' also suggest that Congress did not intend for 'regulate' to include the revenue-raising power. 'Regulate' is one of nine verbs listed in §1702(a)(1)(B). Each authorizes a distinct action a President might take in sanctioning foreign actors or controlling domestic actors engaged in foreign commerce—blocking imports, for example, or prohibiting transactions. . . . None of IEEPA's authorities includes the distinct and extraordinary power to raise revenue. And the fact that no President has ever found such power in IEEPA is strong evidence that it does not exist." (internal citations omitted)).

because the Defendants lack any authority whatsoever to use private donations to make up the yawning gap between that sum and the Ballroom's projected $400 million cost.

The Defendants have admitted that their plan is to funnel $400 million of private donations to EXR through NPS's gift authority, 31 U.S.C. § 1321(b)(1). *See* ECF 30 at 34-35. As detailed below, *see infra* II.B., the Redwood Amendment prohibits whoever is administering President's Park (be it NPS or, with respect to the Ballroom Project, EXR) from taking any action in "derogation of the values and purposes" for which President's Park was established "***except as directly and specifically provided by Congress***," 54 U.S.C. § 100101(b)(2) (the "Redwood Amendment"). The Redwood Amendment thus plainly proscribes—without "direct[] and specific[]" permission from Congress—demolishing the East Wing and constructing in its place a massive Ballroom that will irreparably impair the Executive Residence (and President's Park at large). *See infra* II.B. It necessarily follows that the Redwood Amendment also prohibits using NPS gift funds to do so. *Id.*

But even if the Defendants could lawfully transfer the $400 million into the same account as the $2.475 million appropriated by Congress under § 105(d) in the 2024 Appropriations Act, § 105(d) is unambiguous: the congressional authority for the President to perform work under § 105(d) is expressly limited to the use of "***[s]ums appropriated under***" that specific subsection. 3 U.S.C. § 105(d) (emphasis added). Since private donations are by definition not "[s]ums appropriated under" § 105(d), nothing in § 105(d) can possibly constitute congressional authorization for Defendants to use private donations for the Ballroom Project. *See also* 31 U.S.C. §§ 1321(a)(17) & (b)(1) (providing that "amounts accruing" to the NPS trust fund "are appropriated to be disbursed" under the terms of that fund); ECF 30 at 34 (citing same).

The Defendants are therefore left without any authorization, not just for constructing the Ballroom Project, but for funding the Ballroom's budget using private donations. That is both because § 105(d) does not authorize the Project in the first place, and because even if it did, § 105(d) does not authorize such construction with funds appropriated pursuant to an entirely different statute, *see* 31 U.S.C. §§ 1321(a)(17) & (b)(1).[8] The Defendants' bowdlerization of § 105(d) is not a "[g]arden-variety error[] of law or fact." *Fed. Express*, 39 F.4th at 764 (first alteration in original) (quoting *Griffith v. FLRA*, 843 F.2d 487, 493 (1988)). Rather, it "patently . . . misconstru[es]" the statute, and is *ultra vires* of their authority under it. *Changji Esquel Textile*, 40 F.4th at 722.

**3.** If more were needed—and more is not—the final nail in the coffin of the Defendants' total lack of statutory authority under § 105(d) (or any other statute upon which the Defendants might rely) is provided by the "specific prohibition" of 40 U.S.C. § 8106, *Nuclear Reg. Comm'n*, 605 U.S. at 681 (quoting *Kyne*, 358 U.S. at 188). The prohibitory language of § 8106 could not be clearer: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Remarkably, the Defendants' contention is that "the necessary statutory authority" demonstrating compliance with § 8106 "is found in 3 U.S.C. § 105(d)." ECF 30 at 18. For the reasons explained

---

[8] Apparently recognizing their patent lack of authority to carry out the Ballroom Project under § 105(d), the Defendants speculate that such authority might exist independently in the NPS gift statute, 54 U.S.C. § 101101. *See* ECF 30 at 34. But nothing in the gift statute constitutes express congressional authority for the Defendants to construct the Ballroom—it simply permits NPS to accept "money that may be donated for the purposes of the System," 54 U.S.C. § 101101(2); *see also* ECF 30 at 34 (quoting same). Even if the Redwood Amendment did not bar the use of NPS gift funds for Ballroom purposes, the Defendants would still need some authorization beyond the gift statute to *construct* the Ballroom. They have none.

above, § 105(d) does not come even close to doing so, and the Defendants are therefore acting *ultra vires* of both § 105(d) and § 8106.

Lacking any basis on which to demonstrate compliance with § 8106, the Defendants' principal response to § 8106's clear and "specific prohibition," *Nuclear Reg. Comm'n*, 605 U.S. at 681, has been to dissemble.[9] Most prominently, despite the statute's plain language, the Defendants assert "historical practice" shows that express Congressional authorization for the Ballroom Project is not required. ECF 30 at 30. But, as the National Trust has explained, this gets the Defendants nowhere.

First, § 8106 plainly prohibits construction of the Ballroom without express congressional authorization. Even if the evidence showed that the executive branch had historically failed to abide by § 8106, there would still be no basis to ignore the text of the statute now. *Cf. In re FTX Trading Ltd.*, 91 F.4th 148, 155 n.7 (3d Cir. 2024) ("[C]ourts must 'give effect to [a] plain command, even if doing that will reverse the longstanding practice under the statute." (second alteration in original) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998))).

Second, the evidence in fact demonstrates remarkably consistent compliance with § 8106. Congress has followed the statute by routinely and expressly authorizing White House modifications, usually (but not always) in earmarked appropriations. *See* ECF 20 at 8-9; ECF 20-1; ECF 33 at 9-11. Other than two *de minimis*, never-challenged exceptions—President Ford's swimming pool and a small tennis pavilion built by President Trump during his first term—the

---

[9] The Defendants have also contended that the statute does not apply to the President; that § 105(d) supersedes § 8106 and authorizes the Ballroom Project; that § 8106 has been superseded by various other statutes; and that § 8106 does not apply to the White House. *See* ECF 30 at 28-35; ECF 15-1 at 15-16. As the National Trust has explained, those arguments are irrelevant, meritless, or both. *See* ECF 33 at 8-14.

executive branch has altered the White House or structures on its grounds only when and as permitted by Congress. *See* ECF 20-1; ECF 33 at 10-11. Simply put, the "lack of historical precedent for the [Ballroom Project], coupled with the breadth of authority that the President now claims, is a telling indication that the [Ballroom Project] extend[s] beyond the President's legitimate reach." *Learning Res.*, 2026 U.S. LEXIS 714, at *22 (op. of Roberts, C.J.) (cleaned up).

Third, if that were not enough, historical practice further demonstrates that when Congress wants to authorize the erection of *privately* funded structures on D.C. federal parkland, it knows precisely how to do it. As the National Trust has explained, Congress has authorized the erection of privately funded bonsai facilities in the National Arboretum. *See, e.g.*, Pub. L. 99-591, 100 Stat. 3341, 3341-5 (1986) ("[F]acilities to house Bonsai collections at the National Arboretum may be constructed with funds accepted under the provisions of Public Law 94-129 (20 U.S.C. 195) ***and the limitation on construction contained in the Act of August 24, 1912 (40 U.S.C. 68) shall not apply to the construction of such facilities.***" (emphasis added)); Pub. L. 103-111, 107 Stat. 1051 (1993) (similar). In each statute, Congress expressly specified the private donations that could be used. It expressly specified the purpose—the erection of bonsai facilities—to which they could be put. And it expressly specified that the facilities could be built *notwithstanding* § 8106 (then 40 U.S.C. § 68). *Cf. Learning Res.*, 2026 U.S. LEXIS 714, at *31 ("Congress's pattern of usage is most relevant to answering that question [of whether IIEPA delegates the power to impose tariffs]. That pattern is plain: When Congress grants the power to impose tariffs, it does so clearly and with careful constraints. It did neither here.").

*    *    *

The Defendants' reading of § 105(d)—which they allege permits them to demolish the East Wing and replace it with a massive ballroom—is not a minor or "garden-variety" misinterpretation.

*Fed. Express*, 39 F.4th at 764 (cleaned up). Rather, it is a patent misconstruction of the statute, which if unchecked will transform a mundane administrative provision authorizing Congress to appropriate funds for the executive to undertake minor upkeep to his temporary residence into a license for the executive to make significant, permanent, and irreversible changes to the White House. *See Changji Esquel Textile*, 40 F.4th at 722. The Ballroom Project is not only contrary to § 105(d) and § 8106; it is *ultra vires* of any authority that Defendants have under those statutes.

        B.   The Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Possess Under the Redwood Amendment.

The Ballroom Project is also *ultra vires* of any authority the Defendants may have under 54 U.S.C. § 100101(b)(2)—colloquially known as the Redwood Amendment—to fund or undertake projects in President's Park, the unit of the National Park System in which the White House is located.

Congress has long recognized the inherent vulnerability of the "natural and historic" resources within the National Park System, having declared that the "fundamental purpose" of the System is to "conserve the scenery, natural and historic objects, and wild life" in "such manner and by such means as will leave them unimpaired for the enjoyment of future generations," 54 U.S.C. § 100101(a). In 1978, Congress not only expressly reaffirmed these purposes, but established stringent protections for our national parks, which include President's Park. Pub. L. No. 95-250, § 101(b), 92 Stat. 163, 166 (1978) (codified at 54 U.S.C. § 100101(b)(2)).

Specifically, Congress unambiguously prohibited any government entity engaged in "management [or] administration" of National Park System units—whether NPS, EXR, or any other entity—from exercising that authority "in derogation of the values and purposes for which the [National Park] System units have been established, ***except as directly and specifically***

14

***provided by Congress***." 54 U.S.C. § 100101(b)(2) (emphasis added); *see Nuclear Reg. Comm'n*, 605 U.S. at 681.

Demolishing the entire East Wing plainly does not leave the White House and President's Park "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). And constructing a massive ballroom on a scale wholly out of proportion to the White House does not maintain the White House and President's Park "unimpaired for the enjoyment of future generations," either. *Id.* The Ballroom Project has instead destroyed nearly a third of the White House and will soon irrevocably alter the rest, in clear "derogation of the values and purposes" for which President's Park was established. *Id.* § 100101(b)(2).

NPS's guidance documents and analysis reinforce the point. NPS's Foundation Document reaffirms the historic significance of the White House.[10] And, while noting the need for expanded White House event space, the agency's Comprehensive Design Plan, issued in 2000, proposed locating these spaces in "new underground structures to minimize any new intrusions on the surface" specifically to "***preserve[] and maintain[]***" "[t]he integrity and character defining features of the White House and its grounds."[11]

Yet far from preserving and maintaining "[t]he integrity and character defining features of the White House and its grounds," *id.*, NPS admits that the Ballroom Project will cause numerous permanent adverse impacts, including: "long-term adverse effects on the cultural landscape," ECF

[10] *See* National Park Service, Foundation Document: The White House and President's Park (Sept. 2014), at 11-12, available at https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_2015-508-accessible-resize.pdf (last accessed Mar. 5, 2026) ("The White House ***and the Wings***" are "*[f]undamental resources . . . essential to achieving the purpose of the park and maintaining its significance*." (emphasis added)).

[11] National Park Service, *Comprehensive Design Plan: White House & President's Park* (2000), at 92, 96, 103, *available at* https://babel.hathitrust.org/cgi/pt?id=umn.31951p009596291&seq=3 (last accessed Mar. 5, 2026) (emphasis added).

14-2 at 5; "permanent loss" of the East Wing, "a component that has been integral to White House operations since 1942," *id.* at 6; disruption to "the historical continuity of the White House grounds" and creation of "a visual imbalance with the more modestly scaled West Wing and Executive Mansion," *id.*; risks to "the structural stability or finishes of the Executive Mansion and adjacent features," *id.*; "a substantial change to one portion of the [National Historic Landmark]," *id.*; adverse impacts to "the design, setting, and feeling of the White House and the grounds over the long-term," *id.* at 6, 15; and "a permanent adverse impact for those who value the experience of [the East Wing's] specific space," *id.* at 7.

The Redwood Amendment prohibits the Defendants from carrying out the Ballroom Project, rendering their actions in "clear[] . . . defiance" of the bounds of their statutory authority, *Fed. Express*, 39 F.4th at 764, and "contrary to a specific prohibition" in that statute, *Nuclear Reg. Comm'n*, 605 U.S. at 681—namely, the proscription on "[]impair[ment]" of any "historic objects" in the President's Park "except as directly and specifically provided by Congress," 54 U.S.C. § 100101(a) & (b)(2). The National Trust is therefore likely to succeed on this *ultra vires* claim.

### C. The Ballroom Project Is *Ultra Vires* of Any Authority the Defendants Possess Under 54 U.S.C. §§ 100301-100302 and Pub. L. 87-286, 75 Stat. 586 (1961) to Reorganize the Executive Branch.

Finally, Defendants' placing of control of the Ballroom Project with EXR is *ultra vires* of any authority that they may have under 54 U.S.C. §§ 100301-100302 and Pub. L. 87-286, 75 Stat. 586 (1961), which respectively govern control over the National Park System generally and President's Park specifically. Under § 100302, NPS, through its Director, "***shall*** have the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3) (emphasis added); *see id.* § 100301 (establishing NPS). Public Law 87-286, in turn, specifically places control of the White House and President's Park within the jurisdiction of NPS, providing in relevant part: "That all of that portion of reservation numbered 1 in the city of Washington,

16

District of Columbia, which is within the President's park enclosure, comprising eighteen and seven one-hundredths acres, shall continue to be known as the White House and shall be administered pursuant to [the National Park Service Organic Act, now codified at 54 U.S.C. § 100101 et seq.]." 75 Stat. at 586.

"Congress has plenary control over the salary, duties, and even existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010). By affirmatively and exclusively vesting all powers of "supervision, management, and control of [National Park] System units" in NPS, *see* 54 U.S.C. § 100302(a)(3), Congress "specific[ally] prohibit[ed]" any other entity from asserting or exercising those powers, *see Nuclear Reg. Comm'n*, 605 U.S. at 681. Yet—in a transparent attempt to evade APA review—EXR has assumed "supervision, management, and control" of the Ballroom Project, 54 U.S.C. § 100302(a)(3), in order to drastically alter the grounds of President's Park and the White House itself. *See* ECF 14-6 ¶ 8 (emphasis added); ECF 30-1 ¶ 8 (stating that EXR is "developing contractual requirements, contracting for, and managing the Project" and is "the signatory on all contracts associated with the Project"); ECF 14-1 ¶ 13 (stating that EXR retains "control of all aspects of the day-to-day execution of the [Ballroom] Project, including its scope, schedule, budget, design, and completion").

The Defendants have no authority to transfer control of the Ballroom Project to EXR. Any reading of 54 U.S.C. §§ 100301-100302 or Public Law 87-286 that would enable EXR to "control all aspects" of a major infrastructure project at President's Park, *see* ECF 14-1 ¶ 13, is "patently a misconstruction" of those statutes that "disregards a specific and unambiguous statutory directive"—that *NPS* control projects within national parks. *See Changji Esquel Textile*, 40 F.4th at 722; 54 U.S.C. § 100302(a)(3); 75 Stat. at 586. The President can only transfer congressionally

delegated functions among executive-branch entities pursuant to a congressional authorization. *See Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 968-69 (1983) (White, J., dissenting) (detailing history of statutes delegating power to reorganize executive branch); *see generally* Sen. Rep. No. 115-381, at 4 (2018) (explaining that "the U.S. Constitution vests in Congress the authority to organize the Executive Branch," and that "former presidential administrations have asked Congress to grant expedited government reorganization authority to allow it to execute cross-agency government reorganizations more efficiently," which Congress has granted sixteen times, to administrations of both parties (footnote omitted)). Crucially, no such presidential statutory reorganization authority currently exists: the most recent such statutory authorization expired over forty years ago, on December 31, 1984. Henry B. Hogue, Cong. Research Serv., R44909, Executive Branch Reorganization, at 7 & n.23 (2017).

The Defendants' only response has been that Public Law 87-286 "ousts NPS from anything that could 'conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes.'" ECF 30 at 36 (quoting Pub. L. 87-286, 75 Stat. 586 (1961)). By the Defendants' telling, this "primacy," *id.*, means that the President can direct his personal staff to destroy a third of the White House and build a massive ballroom in its place, notwithstanding that the White House is the paramount resource of President's Park, and that NPS—not EXR—is charged with stewardship of the Park.

But the President is a temporary tenant of the White House—its steward, not its landlord. As the National Trust has explained, the context of the 1961 statute makes clear that at most, this exception was intended to grant the President is a veto over NPS's exercise of control over existing spaces within either the White House or President's Park if and when certain specific types of

conflicts occur. *See* ECF 20 at 14-15. It does not—as the Defendants contend—grant the President plenary and "singular control over the White House." ECF 15-1 at 17. If Congress truly wanted to establish this supposed plenary and "singular control," *id.*, it would have done so in much more direct fashion than through a savings clause in NPS legislation. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Rather, by expressly limiting the exception to conflicts involving "administration," "use," and "occupancy" of the White House, Congress has retained all *other* rights of control—such as structural demolition or construction—for itself.

Given that Congress has clearly retained control over the White House and President's Park, and clearly vested the management of both in NPS, the transfer of control over the Ballroom Project from NPS to EXR is not just unlawful but "so plainly beyond the bounds" of the Defendants' "statutory authority" as to constitute *ultra vires* action. *Fed. Express*, 39 F.4th at 764 (citation omitted). The National Trust is likely to succeed on this *ultra vires* claim, too.

## II.    The Court Should Reconsider Its Conclusion that the National Trust Is Unlikely to Succeed on Its Constitutional Claims.

The Court correctly observed that it was "incongruous" that the Defendants could wholly eliminate the National Trust's constitutional claims by conceding a lack of constitutional authority to build the Ballroom and relying solely on statutory defenses. ECF 47 at 20-21. The Court considered itself constrained to this outcome, however, by *Dalton v. Specter*, 511 U.S. 462 (1994), and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). *See* ECF 47 at 16, 21. Yet neither of those decisions allows the government to evade being held constitutionally accountable for an unconstitutional action solely because it makes a (self-serving) assertion that its unconstitutional action was authorized by some federal statute.

In preliminarily holding otherwise, the Court found it persuasive that this case, like *Dalton* and *Global Health Council*, required interpretation of federal statutes. ECF 47 at 16-19. That finding overlooks the key distinction between those two cases and this one. As the National Trust has explained, ECF 33 at 22-23, in both *Dalton* and *Global Health Council*, a delegating statute explicitly contemplated that the executive could carry out the actions at issue (the closure of a shipyard and the impoundment of budget authority, respectively), so long as the executive complied with the statute's terms. *See Dalton* 511 U.S. at 464-66 (describing delegating statute); *Global Health Council*, 153 F.4th at 15-16 (explaining that the "alleged statutory violations must be the predicate acts for the constitutional claims because without an appropriations statute there could be no improper impoundment," i.e., no impoundment contrary to the "mechanism" "provide[d]" by the ICA "for the President to act on impoundment").[12]

The dispute posed by the National Trust's Property Clause claim is fundamentally different. The dispute is not whether the Defendants have complied with the requirements of a statute by which Congress *actually* delegated them authority to construct the Ballroom.[13] The dispute is instead over whether Congress *has even* delegated any of its Property Clause authority to the Defendants to build the Ballroom in the first place. Of course, resolving that dispute will require litigating the Defendants' statutory *defense*—i.e., that 3 U.S.C. § 105(d) constitutes Congressional

---

[12] *See also Nat'l Treas. Emps. Union v. Vought*, 149 F.4th 762, 821-22 (D.C. Cir. 2025) (Pillard, J., dissenting) (explaining that, "[n]otably," in *Global Health*, "Congress ha[d] delegated authority to the President, via the [ICA] to propose rescissions or deferrals of appropriated funds," meaning that, "as in *Dalton* . . . a statute directly contemplated the presidential action under consideration," such that the executive did not "act[] without any statutory authorization whatsoever"), *vacated and reh'g en banc granted by* 2025 U.S. App. LEXIS 33453 (D.C. Cir. Dec. 17, 2025).

[13] Further underscoring this constitutional-statutory distinction is the fact that whether the executive branch has complied with the terms of any such congressional authorization for the Ballroom Project is the question at issue in the National Trust's *APA claims*, which address, *inter alia*, the various NEPA and commission-review requirements for federal construction projects.

authority to construct the Ballroom Project, *see* ECF 30 at 18. But, if the National Trust is correct that there has not been any such delegation, *see* ECF 20 at 12-15; ECF 33 at 8-14, the result would be that the Defendants have violated the Constitution—as the Defendants would be arrogating Congress's Property Clause powers without any authority whatsoever.

By contrast, had the plaintiffs in *Dalton* or *Global Health Council* prevailed on their nominally "constitutional" claims, they would not have shown that the executive lacked any authority whatsoever to carry out the challenged action. Instead, the plaintiffs would have shown that the executive had failed to properly discharge the authority actually delegated to him—that is, that the executive had *violated a statute*. The National Trust's Property Clause claim therefore can (and must) be properly framed as constitutional, while the *Global Health Council* and *Dalton* plaintiffs' claims were necessarily and exclusively statutory.

The National Trust agrees with the Court that several "recent cases challenging executive action have proceeded under *ultra vires* theories." ECF 47 at 21 n.6 (citing *Illinois v. Trump*, No. 25-cv-12174, 2025 U.S. Dist. LEXIS 201113 (N.D. Ill. Oct. 10, 2025), *stay denied in part and granted in part by,* 155 F.4th 929, 933 (7th Cir. 2025), *stay denied by*, 146 S. Ct. 432, 434 (2025), and *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369-70 (Ct. Int'l Trade 2025), *aff'd in part, vacated in part, and remanded*, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom., Learning Res., Inc. v. Trump*, 2026 U.S. LEXIS 714 (Feb. 20, 2026)*. But the fact that the plaintiffs in those cases *chose* to challenge executive actions as *ultra vires* of the defendants' statutory authority does not mean that the National Trust must be *forced* to forgo its constitutional claims.

To the contrary, in *Illinois*, the plaintiffs *also* proceeded on a constitutional theory and, far from finding that theory barred, both the district court and the Seventh Circuit concluded that the

plaintiffs were likely to succeed on it—notwithstanding the fact that, as here, the government had interposed statutory defenses. *See Illinois*, 2025 U.S. Dist. LEXIS 201113, at *70 ("Given the Court's conclusion that Plaintiffs are likely to succeed on their *ultra vires* claim, it finds Plaintiffs would also be likely to succeed on this theory of a Tenth Amendment violation."); *Illinois*, 155 F.4th at 939 ("[T]he success of the Tenth Amendment claim is tied to the success of plaintiffs' claim that the President's invocation of § 12406 was unlawful. And because, in our preliminary assessment, the federal government does not appear likely to succeed on its argument that it satisfied § 12406, it does not appear likely to succeed in showing the Tenth Amendment permits the deployment of the [National] Guard."). The Court should permit the National Trust to do the same here.

The National Trust therefore urges the Court to reconsider its preliminary conclusion that the National Trust cannot assert its Property Clause claim. And, for the reasons set forth in the National Trust's prior briefs, *see* ECF 2-1 at 31-34; ECF 20 at 9-16; ECF 33 at 8-14; 22-24, the Court should conclude that the National Trust is likely to succeed on that claim.[14]

### III.    The Remaining Factors Favor Preliminary Injunctive Relief.

The other *Winter* factors also favor a preliminary injunction. To start, the National Trust has already demonstrated how it and its members will be irreparably harmed in the absence of a preliminary injunction pausing construction on the Ballroom, *see, e.g.*, ECF 20 at 36-42; ECF 33 at 24-25; ECF 2-3. That harm has since only become more acute. The Defendants have asserted

---

[14] For substantially the same reasons, the Court should reconsider its preliminary conclusion that the National Trust cannot seek equitable relief under the Constitution regarding the Defendants' unlawful reorganization of the executive branch. And, for the reasons in the National Trust's prior briefs, *see* ECF 20 at 23-26; ECF 33 at 24, the Court should conclude that the National Trust is likely to succeed on that claim as well.

that above-grade construction will begin as soon as April, ECF 14-6 ¶ 20, if not earlier—President Trump recently announced that the Ballroom Project is "ahead of schedule."[15]

None of the various arguments the Defendants have advanced in prior briefs changes that calculus. Despite acknowledging that above-grade construction on the Ballroom Project is set to begin as early as April, the Defendants claim that the harm to the National Trust somehow remains "too conjectural" and "not sufficiently imminent." *See* ECF 39 at 4. That argument is wrong, and ignores that the Defendants' *own final plans for the Ballroom*, recently submitted to NCPC and the Commission of Fine Arts ("CFA") and approved by CFA, remain disproportionate and overscaled (and will also irreversibly damage the early-nineteenth-century east façade of the Executive Residence, *see* ECF 20 at 31-32); that the Defendants' own engineer does not contemplate anything more than "modest changes" to the Ballroom's massing after above-grade work begins, *see* ECF 33 at 21-22 (citing ECF 30-4 ¶ 10); and that the President himself claims that it is now "too late" to stop the Ballroom Project.[16]

Equally unavailing is the Defendants' assertion that Dr. Hoagland—a longtime National Trust member, professional historian, and historic-preservation expert who lives in D.C. and regularly visits the White House area for professional and personal reasons—will not be injured by the Ballroom even if it is completed according to the present plans. ECF 39 at 3 (citing *Env't Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021)). As the National Trust has already explained—and the Court has preliminarily held, ECF 47 at 9-11—Dr. Hoagland has described precisely the particularized and continuing use of a specific public place that supports aesthetic

---

[15] Donald J. Trump (@realDonaldTrump), Truth Social, *available at* https://truthsocial.com/@realDonaldTrump/posts/116047799547098230 (Feb. 10, 2026).

[16] Donald J. Trump (@realDonaldTrump), Truth Social, *available at* https://truthsocial.com/@realDonaldTrump/posts/115956692372915783 (Jan. 25, 2026).

injury. While the Defendants have argued that this injury, even if cognizable for standing purposes, is somehow insufficient to support a preliminary injunction, ECF 39 at 3, that is wrong. As the National Trust has explained, Dr. Hoagland's injury is sufficient to show irreparable harm—especially where that harm is tethered, as here, to procedural violations. *See* ECF 33 at 4-5; ECF 20 at 36-41; ECF 2-3 ¶¶ 15-16.

The Defendants' attempts to invoke the public interest fare no better. *See, e.g.*, ECF 39 at 2-3. As the National Trust has explained, it is plainly not in the public's interest to have itself (and its representatives in Congress) systematically and unlawfully excluded from the decisionmaking process involving the most substantial exterior construction project in over a century to one of the country's most historically significant buildings, simply so the Defendants can carry out an illegal construction project without authorization or meaningful review. *See* ECF 45 at 6-7; *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *Ramirez v. U.S. Immigration & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (similar); *see also* ECF 2-1 at 38-39.

To date, the Defendants' principal response has been that the public's interest in national security supports the continued construction of the Ballroom. *See* ECF 39 at 2. Although the Defendants have largely advanced this argument through *ex parte*, *in camera* declarations, they have all but admitted in public filings that the national-security claims relate to a bunker long located at the site of the former East Wing, *see* ECF 30 at 41. The National Trust takes national security and the personal safety of the President seriously. But the National Trust has never requested—and is not requesting in this renewed motion—that the Court enjoin construction of a

*bunker*. The National Trust is simply requesting that the Court enjoin construction of the *Ballroom* (for which, as the National Trust has already explained, there is no national security justification, *see* ECF 45 at 2-4).

Also without merit are the Defendants' other efforts to blunt the public's clear interest in pausing the Ballroom Project until the Defendants comply with the law. The damage to the White House "turf" and "irrigation systems" that might occur if temporary tents are pitched on the White House lawn while this litigation is pending, *see* ECF 39 at 2-3; ECF 30 at 41, does not come close to outweighing the public's interest in ensuring that large-scale modifications to *the White House itself* are made only after Congress has authorized them, and only after all the necessary reviews have been completed. The reduction of unidentified "strain" on the White House likewise does not move the needle, while most of the other supposed "improvements" cited by the Defendants seemingly pertain to the already-completed demolition of the East Wing. *See* ECF 39 at 2-3; ECF 30 at 41-42. And the Defendants cannot use the existence of an "unsightly excavation site" that they themselves created by their own unlawful actions, ECF 39 at 2; ECF 30 at 40, as justification to continue to construct the Ballroom in violation of the law, *see* ECF 33 at 24-25.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the National Trust's memorandum in support of its first motion for a preliminary injunction and briefing submitted in connection therewith, the Court should grant the Trust's motion and preliminarily enjoin work on the Ballroom Project. Further, and for the reasons stated in the National Trust's memorandum in support of its first motion, *see* ECF 2-1 at 40-42, the Court should waive Rule 65's security-bond requirement.

Respectfully submitted,


*/s/ Matthew F. Casassa*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006.
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000


Dated: March 5, 2026

## **CERTIFICATE OF SERVICE**

I certify that on March 5 2026, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent via first class mail to those indicated as non-registered participants.


*/s/ Matthew F. Casassa*