UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

   v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 4

I.    THE TRUST IS NOT ENTITLED TO SEEK A SUCCESSIVE PRELIMINARY INJUNCTION...............4

II.   THE TRUST'S *ULTRA VIRES* CLAIMS FAIL ON THE MERITS.........................................7

      A.    *Ultra Vires* Review Is Available Only in Extreme Cases.......................................7

      B.    The Trust Cannot Meet Its Heavy Burden Because the East Wing Project Is
            Authorized Twice Over..........................................................................................9

            1.    Congress has delegated to the President broad authority
                  over alterations and improvements to the White House. .......................... 10

            2.    Congress has also authorized construction in national parks
                  to further and promote the purposes of those parks. ................................ 13

      C.    The Project Does Not Violate 40 U.S.C. § 8106. ..................................................19

      D.    EXR Is Lawfully in Control of the Project. ...........................................................23

      E.    The Trust's Claims Fall Outside the Zone of Interests. .........................................25

III.  THE COURT SHOULD REVISIT THE TRUST'S ARTICLE III STANDING, BUT NOT ITS
      REJECTION OF THE TRUST'S "CONSTITUTIONAL" CLAIMS. .................................................29

      A.    Doctor Hoagland Cannot Suffer Aesthetic Harm from Something She Can
            Scarcely See. .......................................................................................................29

      B.    The White House Is Not Germane to the Trust's Mission....................................31

      C.    There Is No Basis to Relitigate the Trust's "Constitutional" Claims. ...................33

IV.   THE BALANCE OF EQUITIES WEIGHS OVERWHELMINGLY IN DEFENDANTS' FAVOR. ..........34

V.    THE COURT SHOULD TAILOR ANY INJUNCTION TO THE TRUST'S ALLEGED HARM AND
      STAY ANY INJUNCTION PENDING APPEAL. ..........................................................................37

CONCLUSION............................................................................................................... 38

# TABLE OF AUTHORITIES

**CASES**

*Animal Legal Def. Fund v. Vilsack,*
  640 F. Supp. 3d 134 (D.D.C. 2022), *aff'd*, 111 F.4th 1219 (D.C. Cir. 2024) ......................... 30

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ....................................................................................... 25

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................................... 26

*Bicycle Trails Council of Marin v. Babbitt,*
  82 F.3d 1445 (9th Cir. 1996) ........................................................................ 16

*Blassingame v. Trump,*
  87 F.4th 1 (D.C. Cir. 2023) ........................................................................... 23

*Boire v. Greyhound Corp.,*
  376 U.S. 473 (1964) ......................................................................................... 8

*Boston Stock Exch.* v. *State Tax Comm'n,*
  429 U.S. 318 (1977) ....................................................................................... 25

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
  2019 WL 6117418 (D.D.C. Nov. 18, 2019) ............................................... 33

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ....................................................................................... 37

*Changji Esquel Textile Co. v. Raimondo,*
  40 F.4th 716 (D.C. Cir. 2022) ............................................................. 8, 9, 17

*Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget,*
  791 F. Supp. 3d 29 (D.D.C. 2025) .............................................................. 38

*Comm. for Full Emp. v. Hills,*
  70 F.R.D. 678 (E.D. Pa. 1976) .................................................................... 28

*Dalton v. Specter,*
  511 U.S. 462 (1994) ................................................................................ 33, 34

*Davis v. Latschar,*
  202 F.3d 359 (D.C. Cir. 2000) .................................................................... 17

*Dearth v. Holder,*
  641 F.3d 499 (D.C. Cir. 2011) .............................................................. 16, 35

ii

*Est. of Gaither ex rel. Gaither v. D.C.*,
   771 F. Supp. 2d 5 (D.D.C. 2011) ........................................................................ 5

*F.W. Kerr Chem. Co. v. Crandall Assoc., Inc.*,
   815 F.2d 426 (6th Cir. 1987) ............................................................................... 5

*Fed. Educ. Ass'n v. Trump*,
   No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025)............................... 27

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................................ 7, 8

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*,
   830 F.3d 515 (D.C. Cir. 2016) ................................................................... *passim*

*Fund for Animals v. Frizzell*,
   530 F.2d 982 (D.C. Cir. 1975) ............................................................................ 6

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ...................................................................... *passim*

*Griffith v. FLRA*,
   842 F.2d 487 (D.C. Cir. 1988) .................................................................. 7, 8, 11

*Haitian Refugee Center* v. *Gracey*,
   809 F.2d 794 (1987) ......................................................................................... 26

*Hansen v. Nat'l Comm'n on Observance of Int'l Women's Year*,
   628 F.2d 533 (9th Cir. 1980) ............................................................................ 28

*Hernandez* v. *Mesa*,
   589 U.S. 93 (2020).............................................................................................. 26

*Hilton v. Braunskill*,
   481 U.S. 770 (1987)........................................................................................... 37

*Hunter v. FERC*,
   527 F. Supp. 2d 9 (D.D.C. 2007) ....................................................... 8, 9, 12, 17

*Learning Res., Inc. v. Trump*,
   784 F. Supp. 3d 209 (D.D.C. 2025) .................................................................. 38

*Learning Resources, Inc. v. Trump*,
   607 U.S. ---, 2026 WL 477534 (U.S. Feb. 20, 2026) .......................................... 9

*Leedom v. Kyne*,
   358 U.S. 184 (1958)............................................................................................. 7

iii

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................................................ 25

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ............................................................................................ 21, 22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 30

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022) ................................................................ 8, 9, 12, 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
    595 U.S. 109 (2022) ................................................................................................ 21

*Nat'l Gateway Telecom, Inc. v. Aldridge*,
    701 F. Supp. 1104 (D.N.J. 1988) ........................................................................... 24

*Nat'l Parks Conservation Ass'n v. Semonite*,
    282 F. Supp. 3d 284 (D.D.C. 2017) .................................................................. 30, 35

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ......................................................................... 6

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ..................................................................................... 7, 8, 11

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ........................................................................ 7, 8, 24

*Red Star Yeast & Prods. Co. v. La Budde*,
    83 F.2d 394 (7th Cir. 1936) ...................................................................................... 5

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025) ......................................................................... 38

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016) .................................................................................. 31

*Russell Motor Car Co. v. United States*,
    261 U.S. 514 (1923) ................................................................................................ 11

*Salazar ex rel. Salazar v. District of Columbia*,
    896 F.3d 489 (D.C. Cir. 2018) ............................................................................... 36

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ................................................................................................ 33

iv

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................................. 30

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ........................................................................................... 12

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ........................................................................................... 26

*TIG Ins. Co. v. Republic of Argentina*,
  110 F.4th 221 (D.C. Cir. 2024) ......................................................................... 33

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ........................................................................................... 37

*United Food & Com. Workers, Loc. 400, AFL-CIO v. N.L.R.B.*,
  694 F.2d 276 (D.C. Cir. 1982) ........................................................................... 11

*United States v. Brown*,
  58 F. Supp. 3d 115 (D.D.C. 2014) ..................................................................... 11

*United States v. Richardson*,
  418 U.S. 166 (1974) ........................................................................................... 28

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ..................................................................................... 25, 28

*Wash. All. of Tech. Workers v. U.S Dep't of Homeland Sec.*,
  50 F.4th 164 (D.C. Cir. 2022) ........................................................................... 21

*Wilderness Soc'y v. Kane Cnty.*,
  632 F.3d 1162 (10th Cir. 2011) ......................................................................... 27

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 34

*Zukerman v. U.S. Postal Serv.*,
  961 F.3d 431 (D.C. Cir. 2020) ........................................................................... 36

**STATUTES**

3 U.S.C. § 105 ........................................................................................... 2, 10, 27

16 U.S.C. § 451 ................................................................................................... 22

28 U.S.C. § 1581(i) ............................................................................................... 9

31 U.S.C. § 1535 ........................................................................................... 18, 24

40 U.S.C. § 8106 ..................................................................................................... *passim*

54 U.S.C. § 100101 ................................................................................................ *passim*

54 U.S.C. § 100302(a)(3) .............................................................................................. 23

54 U.S.C. § 101101(2) ................................................................................................... 18

54 U.S.C. § 312102 ....................................................................................................... 31

54 U.S.C. § 312102(a) ................................................................................................... 31

54 U.S.C. § 312102(b) ................................................................................................... 31

54 U.S.C. § 312105(g) ................................................................................................... 32

## LEGISLATIVE MATERIALS

Pub. L. No. 57-81, 32 Stat. 152 (1902) ......................................................................... 19

Pub. L. No. 64-235, 39 Stat. 535 (1916) ....................................................................... 13

Pub. L. No. 65-181, 40 Stat. 634 (1918) ....................................................................... 22

Pub. L. No. 66-246, 41 Stat. 874 (1920) ....................................................................... 18

Pub. L. No. 76-417, 54 Stat. 36 (1940) ......................................................................... 22

Pub. L. No. 80-841, 62 Stat. 1112 (1948) ..................................................................... 22

Pub. L. No. 81-408, 63 Stat. 927 (1949) ....................................................................... 31

Pub. L. No. 87-286, 75 Stat. 586 (1961) .................................................................. 15, 23

Pub. L. No. 89-665, §107, 80 Stat. 915 (1966) ............................................................. 32

Pub. L. No. 90-209, 81 Stat. 656 (1967) ....................................................................... 18

Pub. L. No. 95-570, 92 Stat. 2445 (1978) ..................................................................... 10

Pub. L. 101-512, 104 Stat. 1915 (1990) ........................................................................ 22

Pub. L. No. 104-333, 110 Stat. 4093 (1996) ................................................................. 22

Pub. L. No. 119-74, 140 Stat. 5, 100 (2026) ............................................................ 14, 18

## OTHER AUTHORITIES

43A C.J.S. *Injunctions* § 365 (Feb. 2026 update) .......................................................... 5

112 Cong. Rec. 25942 (Oct. 10, 1966) ........................................................................ 32

Alter, Oxford English Dictionary (2d ed. 1989) ......................................................... 10

*Executive Director's Recommendation, National Capital Region*
    *Campus Renovation Project and Park Police District 1 Substation,*
    *Commission Meeting*, National Capital Planning Commission at 1 (Jan. 7, 2016),
    https://www.ncpc.gov/docs/actions/2016January/National_Park_Service_Police_
    District_1_Substation_Recommendation_7703_Jan2016.pdf ................................... 14

Improve, Oxford English Dictionary, (2d ed. 1989) ................................................... 10

Improved Land, Black's Law Dictionary (5th ed. 1979) ............................................. 10

James V. Saturno, *Authorizations and the Appropriations Process*,
    Cong. Res. Serv. (May 16, 2023), https://www.congress.gov/crs-product/R46497 ................ 13

Joan M. Zezen, *An Urban Oasis: Rock Creek Park's History and Management*
    130-132 (Oct. 2020),
     https://www.scribd.com/document/812110103/Rock-Creek-DC-adhi-2020 ......................... 15

Land, Black's Law Dictionary (12th Ed. 2024) ........................................................... 10

*National Register of Historic Places Registration Form, L'Enfant Plan of the City of*
    *Washington, D.C.*, National Park Service (1997),
    https://npgallery.nps.gov/pdfhost/docs/NRHP/Text/97000332.pdf ............................ 19

*Program Comment on Stewardship and Management of National Park Service*
    *Mission 66-Era Facilities (1945-1972)*,
    89 Fed. Reg. 97631 (Dec. 9, 2024) ......................................................... 14

*The National Parks: Shaping the System*, NATIONAL PARK SERVICE (1991),
    https://npshistory.com/publications/shaping-the-system-1991.pdf .......................... 14

**INTRODUCTION**

In a Second Amended Complaint, the National Trust seeks non-statutory *ultra vires* review of the President's construction of a new modernized East Wing for the White House. On that basis, the Trust renews its request that this Court block the project from proceeding during this litigation. But there is a reason the Trust did not include *ultra vires* claims in the first two iterations of its pleading. The Supreme Court, the D.C. Circuit, and this Court have all made clear that the bar for such a claim is extremely high—the absence of statutory authority must be patent and obvious; an ordinary statutory dispute does not suffice. The Trust cannot come anywhere close to clearing that hurdle, which may be why it instead pressed APA and constitutional claims even though they were squarely foreclosed by precedent. The Trust's third try is not the charm.

Actually, the Trust should not even be afforded another try at a preliminary injunction. It can litigate its new claims in the ordinary course, but preliminary relief is an extraordinary remedy, not a game of Whac-a-Mole. The Trust could have asserted *ultra vires* claims from the outset, and Defendants affirmatively flagged the Trust's failure to do so back in January. *See* ECF 30 (Defs.' Supp. Br.) at 35 n.13. Five months into the project, and with above-ground construction now only weeks away, the Court should not give the Trust another bite at the preliminary-injunction apple to compensate for its own litigation choices. Nor should the Court indulge the Trust's request for reconsideration of the Court's correct rejection of its "constitutional" claims. The Trust does not even try to satisfy the reconsideration standard, but its return to already-rejected claims reflects an implicit recognition that its new claims are not viable.

Indeed, the East Wing project is not *ultra vires*—it is authorized by statute twice over. To prevail, the Trust would have to show that *both* independent sources of authority are so plainly inapplicable as to warrant non-statutory relief. Neither "Hail Mary" pass succeeds; the Trust has no hope of successfully completing both of them.

1

*First*, Congress has long empowered the President—"notwithstanding the provisions of any other law"—to undertake "alteration" and "improvement" of the White House, "as the President may determine." 3 U.S.C. § 105(d). Congress intentionally limited its oversight in this space to "avoid an overly broad intrusion into this area of Executive discretion." H.R. Rep. No. 95-979, at 8 (1978); S. Rep. 95-868, at 9 (1978). The Trust invokes canons of construction to urge a narrow view of "alteration" and "improvement," but the ordinary meanings of those terms are capacious, and the Trust offers no meaningful standard to distinguish permissible alterations from those that are "too major." At most, this is an ordinary dispute of statutory interpretation, not the type of patent violation of a clear statutory prohibition that can support an *ultra vires* claim. And while it is true that § 105(d) funds are not sufficient on their own to pay for the East Wing project, that confuses *authorization* with *appropriations*. The Trust's challenge is to the former.

*Second*, Congress designated the White House as a unit of the National Park System, and authorized the National Park Service (NPS) to promote and regulate the System using "means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). That is the authority NPS has relied on for over a century to construct structures on national parks, including in the District, using both public and private funds. While the Trust disagrees on whether a new East Wing will serve the "fundamental purpose" of President's Park, that is a judgment Congress empowered the Executive to make. NPS reasonably determined that this project would advance the purposes of the unit by providing the White House with modernized infrastructure, improved security, and other benefits, relieving pressure on the historic Executive Mansion in order to best preserve it for future generations. And NPS further determined to contract with the Executive Residence at the White House (EXR), under the Economy Act, to carry out this work— a decision the Trust never challenges. All of this is lawful. None is *ultra vires*.

2

Because the East Wing project is (doubly) authorized, 40 U.S.C. § 8106 is satisfied.  That statute requires express congressional authorization—and Congress provided it, to the President in § 105(d) and to NPS in § 100101(a).  There is no serious argument that Congress must approve *each individual structure*: The Trust acknowledges the President has long constructed new White House structures using only general appropriations.  And NPS has long done so using both lump-sum appropriations and privately donated funds (a funding mechanism Congress permitted).  Indeed, since the enactment of § 8106, Congress has not given specific authorization to big White House projects like the 1941 East Wing renovations, or small White House projects like the 2019 tennis pavilion, or projects in other D.C. national parks like the U.S. Park Police Building in East Potomac Park.  Of course, if Congress wants to block a project, it has tools to do so.  But, absent such action, existing general authority is sufficient.  At minimum, the law does not approach the contrary clarity that would be required to allow a court to intercede.  On that score, statutory history and practice strongly indicate that § 8106 was never intended to apply to the President or to NPS at all.

There is yet another obstacle to the non-statutory cause of action that the Trust now seeks to invoke.  As with other causes of action, both statutory and equitable, a plaintiff must show that it falls within the "zone of interests" of the statutes that it seeks to enforce.  The Trust plainly does not meet that test.  Section 8106, upon which the Trust founds its claims—relates to the balance of power between Congress and the Executive Branch.  Yet the Trust's interest here, as reflected by its theory of standing, is aesthetic in nature.  There is absolutely no basis to conclude that Congress enacted this provision to protect Dr. Hoagland's interest in having her personal aesthetic preferences reflected by the President's architectural design choices.  The Trust's claim to be vindicating statutory "rights" is misplaced.  At most this is a (hypothetical) political dispute

between two branches of government who are best positioned to resolve it between themselves—without interference from a federal court.

Merits aside, the Court should deny a preliminary injunction based on the balance of harms. Even at final judgment, there is no automatic right to injunctive relief. Dr. Hoagland's aesthetic concerns over the size of the new East Wing—which will be barely visible from public spaces—are dwarfed by the harms that a mid-construction injunction would impose. Ceasing construction now would imperil national security for reasons explained in the classified declarations, and that harm cannot simply be cleaved off as the Trust proposes without putting this Court in the untenable role of project manager. The public interest would also be severely impaired by requiring an open construction pit to remain indefinitely adjacent to the Executive Mansion, while delaying the modernization and improvement efforts that everyone recognizes are desperately needed. At minimum, if this Court disagrees, it should stay any injunction pending appeal, to allow the D.C. Circuit to address these novel and weighty issues before a court—for the first time in our Nation's history—interferes with the President's renovations of the White House.

## ARGUMENT

### I.    THE TRUST IS NOT ENTITLED TO SEEK A SUCCESSIVE PRELIMINARY INJUNCTION.

Almost two months ago, Defendants explained that the Trust was unlikely to succeed on its claims because neither the APA nor the Constitution provides a cause of action to challenge the East Wing project. Defs.' Supp. Br. at 12-19. Defendants specifically flagged that the Trust did not "press a non-statutory *ultra vires* claim alleging lack of authority." *Id.* at 35 n.13. In reply, the Trust dug in its heels and declined to make any attempt to carry the heavy *ultra vires* burden. Only after this Court denied preliminary relief because the Trust lacked a statutory or constitutional cause of action, ECF 47 (First PI Op.), did the Trust belatedly amend its complaint a second time to assert *ultra vires* claims. Now the Trust seeks preliminary relief *again*, this time on the basis of

these claims that it chose not to raise at the outset. That is improper. The Trust can pursue its new claims in the ordinary course, but is not entitled to seek successive preliminary relief.

Absent a change in circumstances, courts have long disfavored attempts to successively seek the same relief, especially when the movant could have raised the new theory earlier. *See, e.g.*, *Est. of Gaither ex rel. Gaither v. D.C.*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (reiterating that "motions for reconsideration … cannot be used … as a vehicle for presenting theories or arguments that could have been advanced earlier"). Motions for preliminary relief are no different. "Parties should not be allowed to harass their adversaries and the courts with a barrage of successive motions for extraordinary, preliminary injunctive relief." *F.W. Kerr Chem. Co. v. Crandall Assoc., Inc.*, 815 F.2d 426, 429 (6th Cir. 1987). Instead, courts have required that a successive movant point to new facts justifying the do-over. *See, e.g.*, *Red Star Yeast & Prods. Co. v. La Budde*, 83 F.2d 394, 396 (7th Cir. 1936) ("Denial of an application for a temporary injunction does not prevent another application by the same party in the same suit, *if new facts warrant it*." (emphasis added)); *F.W. Kerr Chem. Co.*, 815 F.2d at 429 ("Because the civil rules do not explicitly define the extent of the district judge's discretion in allowing successive pretrial motions or motions for reconsideration of an interlocutory order such as a preliminary injunction, early court decisions formulated a requirement that a successive motion state new facts warranting reconsideration of the prior decision."); *see also* 43A C.J.S. *Injunctions* § 365 (Feb. 2026 update) ("[A]s a general rule, the second application will be denied merely on a showing that the first one was denied, unless the plaintiff presents new and additional matter discovered since the former hearing.").

No new circumstances justify a successive motion for a preliminary injunction here. The facts relevant to the Trust's *ultra vires* claims have been clear since Defendants' first substantive filing—the TRO opposition filed on December 15, 2025. There, Defendants made clear their

reliance on "statutory authority" for the project and explained that it was "proceeding under the leadership of the Office of the Executive Residence," which is not an agency under the APA. ECF 14 (Defs.' TRO Opp.) at 2, 6. Yet, despite amending its complaint thereafter, the Trust still did not plead any *ultra vires* claims. ECF 19 (First Am. Compl.). To the extent that any uncertainty remained, Defendants' supplemental brief on January 15, 2026, was pellucid that the East Wing project was proceeding based on statutory authority, and even highlighted the Trust's failure to include an *ultra vires* theory. *See* Defs.' Supp. Br. at 12-19, 28-35, 35 n.13. But again, the Trust made no effort in reply to argue that it could prevail on an *ultra vires* theory. *See, e.g.*, ECF 33 (Pl.'s Supp. Reply).

While the Trust wasted time with foreclosed claims, construction continued; the Project is now in its fifth month. Put differently, because of its own litigation choices (whether intentional or inadvertent), the Trust is now seeking relief in March 2026—over 125 days after construction started—based on claims it could have brought from the start. This unwarranted and prejudicial delay provides yet another reason to deny the successive motion. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (calling delay of "44 days" "inexcusable" and affirming denial of preliminary injunction); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). Given the Trust's persistent claim of immediate and irreparable harm, it should have pressed all viable merits arguments from the outset—not rolled out new claims and new theories after each successive loss.

In short, the Trust is not entitled to another bite at the preliminary-injunction apple. From the beginning, and at least for the last six weeks, the Trust has known that an *ultra vires* claim was an option. The Court should not indulge a successive request for relief under these circumstances. It is one thing to throw the *ultra vires* Hail Mary pass, but quite another to throw it as a do-over after a conventional pass is intercepted. To be sure, the standard to amend is liberal, and the Court

has granted leave, but all that means is that the Trust can pursue its new claims in the ordinary course. The opportunity for extraordinary preliminary relief has passed.

## II.    THE TRUST'S *ULTRA VIRES* CLAIMS FAIL ON THE MERITS.

As the Supreme Court reiterated just last year, *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025), non-statutory *ultra vires* review has an "extremely limited scope," *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988), and thus an *ultra vires* claim "rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). The Trust's claims here are no exception. As explained below, there are two independent sources of statutory power to undertake the East Wing project, and the Trust must show that *both* are plainly wrong. It tries but fails. And because the project falls within the authority conferred on the Executive, 40 U.S.C. § 8106 poses no constraint (and does not apply in any event). The Trust's contrary theories are impossible to reconcile with consistent history and practice and certainly do not rise to the level necessary to secure non-statutory *ultra vires* relief in a preliminary injunction posture.

The *ultra vires* claims also fail for another reason—the Trust is outside the zone of interests of the statutes it seeks to enforce. Section 8106 protects the institutional interests of Congress, not the aesthetic preferences of private citizens. If Congress objects to the East Wing project, it has many tools available to enforce its will. But there is no basis for a private third-party to conscript the federal judiciary into a hypothetical dispute between the two political branches.

### A.    *Ultra Vires* Review Is Available Only in Extreme Cases.

Since enactment of the APA, the Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries'" set forth in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Nuclear Regul. Comm'n*, 605 U.S. at 681. That doctrine permits judicial review of alleged statutory violations "only where," among other requirements, "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and

mandatory.'" *Nyunt*, 589 F.3d at 449; *see, e.g.*, *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th

756, 763 (D.C. Cir. 2022); *see also Nuclear Regul. Comm'n*, 605 U.S. at 681 (requiring executive

action "entirely" in excess of delegated powers and "contrary to a *specific prohibition*").  Given

the stringency of those boundaries, such a claim "is essentially a Hail Mary pass—and in court as

in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449.

The D.C. Circuit has made clear that *ultra vires* review is *not* available to correct "mere

legal" error. *Fed. Express*, 39 F.4th at 764.  "Garden-variety errors of law or fact are not enough."

*Griffith*, 842 F.2d at 493.  Similarly, the Supreme Court has rejected attempts to "dress up a typical

statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682.

As the Court has long explained, *ultra vires* review does not apply simply because an agency has

arguably reached "a conclusion which does not comport with the law." *Boire v. Greyhound Corp.*,

376 U.S. 473, 481 (1964).  As a consequence of that heightened standard, the D.C. Circuit has held

that "vague statutory provisions … are not sufficiently clear and mandatory to warrant non-APA

review." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022)

(*NAPS*).  Such statutes "lack discernible standards by which a court can identify a limit to agency

authority." *Id.* at 972.  The type of error that would justify relief in an ordinary APA case is not

sufficient to warrant relief on a non-statutory *ultra vires* cause of action.

Instead, to successfully bring an *ultra vires* claim, a plaintiff must meet a much higher

standard.  "Only error that is patently a misconstruction of the Act, that disregards a specific and

unambiguous statutory directive, or that violates some specific command of a statute will support

relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).  As this Court

has put it, the executive action must amount to "brazen defiance" of statutory constraints before it

triggers *ultra vires* relief.  *Hunter v. FERC*, 527 F. Supp. 2d 9, 17 n.6 (D.D.C. 2007) (Leon, J.).

Or, put slightly differently, a plaintiff must show that an agency's action was "*obviously* beyond the terms of the statute." *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (emphasis added). This error must be "so extreme that one may view it as jurisdictional or nearly so." *Changji Esquel Textile Co.*, 40 F.4th at 722.

The Trust mistakes a Hail Mary for a screen pass, arguing that the *ultra vires* standard "is far from insurmountable" and that these claims "quite frequently succeed." ECF 51-1 (Second PI Br.) at 5, 6 n.5. But the Trust cites a grand total of *one case* in which the D.C. Circuit found that non-statutory *ultra vires* review was viable. In *NAPS*, the court concluded that provisions in the Postal Act "place clear limits" on the Postal Service's authority, using "explicit language" that is "undoubtably mandatory" and leaves "no discretion for the agency." 26 F.4th at 971. Under those circumstances, the statute "plainly delineate[d] the outer limits of agency authority," *id.*, and the agency had allegedly exceeded it, *id.* at 972-80. The D.C. Circuit therefore reversed dismissal at the pleading stage. *Id.* at 980. That sole example thus serves only to illustrate just how obvious and blatant a statutory violation must be before an *ultra vires* claim becomes tenable.[1]

## B.    The Trust Cannot Meet Its Heavy Burden Because the East Wing Project Is Authorized Twice Over.

The East Wing project falls within two independent sources of statutory authority: one specific to the White House, and the other for national parks generally. This means the Trust must complete not one Hail Mary but two. It cannot succeed. Its readings of these authorizing statutes present, at most, typical statutory disputes. The Trust is wrong but, even more important, there is no executive action here that is "obviously beyond the terms of the statute," *Fla. Health Scis. Ctr.*,

---

[1] The Trust repeatedly cites the Supreme Court's recent tariffs ruling, *Learning Resources, Inc. v. Trump*, 607 U.S. ---, 2026 WL 477534 (U.S. Feb. 20, 2026), but that decision never utters the phrase "*ultra vires*." The plaintiffs subject to the tariffs proceeded in the Court of International Trade under 28 U.S.C. § 1581(i). *See id.* at n.1. And the Supreme Court's merits decision rested on the major questions doctrine, which the Trust properly does not invoke here.

830 F.3d at 522, or in "brazen defiance" of statutory restraints, *Hunter*, 527 F. Supp. 2d at 17 n.6. The Trust accordingly lacks a strong likelihood of success on the merits.

> **1.    Congress has delegated to the President broad authority over alterations and improvements to the White House.**

Congress has authorized appropriation of funds to the President for "the care, maintenance, repair, *alteration*, refurnishing, *improvement*, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1) (emphasis added); Pub. L. No. 95-570, 92 Stat. 2445, 2446 (1978). Such sums "may be expended as the President may determine, notwithstanding the provisions of any other law." 3 U.S.C. § 105(d). This provision confirms, and indeed presupposes, that the President holds operational control over the White House and vests in him, notwithstanding other statutes, the discretion to determine necessary alterations and improvements. Because the East Wing project constitutes an "alteration" and an "improvement," the President has statutory authority to undertake it.

The Trust principally responds that this reading of "alteration" or "improvement" is too sweeping. *See* Second PI Br. at 8-9. But as Defendants previously explained, the plain meanings of "alteration" and "improvement" are capacious. To "alter" means "to modify" or "to change the appearance of." Alter, Oxford English Dictionary (2d ed. 1989). To "improve" means "to bring into a more profitable or desirable state" or "to make better." Improve, Oxford English Dictionary, (2d ed. 1989). And in the context of real property, "improved" land means land that "has been developed" or is "occupied by buildings and structures." Land, Black's Law Dictionary (12th Ed. 2024); *see* Improved Land, Black's Law Dictionary (5th ed. 1979). Modernization of the East Wing to update infrastructure, increase capacity for hosting state events, and bolster security falls readily within both terms. Replacing an old and dilapidated wing of a structure would "change

[its] appearance" and bring it "into a more … desirable state," and erecting a new structure on land is a quintessential way to "improve" that real property.

In response, the Trust argues that "alteration" and "improvement" must be read narrowly in light of the other words in § 105(d), and should not be construed to authorize a project of this scale. The Trust relies on the canon of *noscitur a sociis*, which teaches that "a word may be known by the company it keeps." *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923). But this canon is "not an invariable rule," and applies only where "words are of obscure or doubtful meaning." *Id.* at 519-20. As explained, there is no such obscurity here.

More fundamentally, assuming that the Trust is right that parsing § 105(d) requires use of canons—an interpreter's tools when faced with uncertainty about the text's meaning—this only proves that the Trust cannot meet its heavy *ultra vires* burden. To win, the Trust must show that the Defendants' actions are "*obviously* beyond the terms of the statute." *Fla. Health Scis. Ctr.*, 830 F.3d at 522 (emphasis added). But "[r]ules of construction … have no place … except in the domain of ambiguity." *United States v. Brown*, 58 F. Supp. 3d 115, 119 (D.D.C. 2014) (Leon, J.). Accordingly, the Trust's deployment of canons in response to Defendants' citation of dictionary definitions only confirms that § 105(d) does not "expressly" address the issue, *Griffith*, 842 F.2d at 493, and that Defendants have not "disregarded a specific and *unambiguous* statutory directive," *United Food & Com. Workers, Loc. 400, AFL-CIO v. N.L.R.B.*, 694 F.2d 276, 278 (D.C. Cir. 1982) (emphasis added). Instead, the Trust is making "a typical statutory-authority argument," *Nuclear Regul. Comm'n*, 605 U.S. at 682, in what amounts to a "[g]arden-variety" interpretive dispute, *Griffith*, 842 F.2d at 493. This is not the stuff of which a viable *ultra vires* claim is made.

Moreover, the Trust cannot identify with any clarity or specificity the line that it contends Congress drew in § 105(d). The Trust says the statute contemplates only "comparatively minor"

projects, Second PI Br. at 9, but when does a renovation become sufficiently "major" that it no longer fits within § 105(d)'s authorization for alterations and improvements? Would the result be different if the President had retained the exterior walls of the old East Wing but gutted the interior? What about an extension? Or a new story? The Trust never says, and its prior briefing only underscores the vagueness. For example, the Trust previously argued that President Truman's "new balcony" would have fallen within § 105(d)'s grant of authority, but President Trump's "new building" would not. Pl.'s Supp. Reply at 11 n.7. Likewise, the Trust suggested that "temporary" structures are permissible, even if they are large, but not permanent ones. *Id.* at 14 n.9. The Trust has never provided a principled explanation for these distinctions. They have no foundation in text or history. But a vague statute cannot support an *ultra vires* claim. If the Trust cannot draw a clear, bright-line rule between those alterations and improvements that are permissible and those that exceed the statutory scope, then there are no "discernible standards," *NAPS*, 26 F.4th at 972, that would allow the court to hold that the East Wing project is "obviously" on the wrong side of that ostensible line, *Fla. Health Scis. Ctr.*, 830 F.3d at 522.

The Trust's other response to § 105(d) is to say this statute only empowers the President to use funds Congress appropriates under it, which are not sufficient to pay for this project. Second PI Br. at 9-11. That argument conflates two distinct things—*authority* to act, and *funding* to pay for it. The Executive needs both. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (explaining that appropriations "have the limited and specific purpose of providing funds for *authorized* programs" (emphasis added)). Section 105(d) does not itself appropriate funds—it is a framework to govern appropriations, which is an antecedent step to an appropriation. The Trust suggests that the statute only confers power on Congress to appropriate, *see* Second PI Br. at 6-7, but budget authorizations do more than that. Indeed, the "primary purpose of authorizations is to provide an

agency with authority and direction that allows it to administer a program or engage in an activity." James V. Saturno, *Authorizations and the Appropriations Process*, Cong. Res. Serv. at 1 (May 16, 2023), https://www.congress.gov/crs-product/R46497.  That is the role of § 105(d) framework: It confers authority on the President to alter and improve the White House, and authorizes Congress to appropriate funds for that purpose going forward, which it does annually.[2]

As discussed further below, here the funds appropriated under § 105(d) have been lawfully supplemented by another source of appropriations, consistent with the unique role of the White House as both the President's home and a national park.  *See* Hr'g Before the Subcomm. on Emp. Ethics & Utilization of the Comm. on Post Office & Civil Service, *Authorization for the White House Staff*, Serial No. 95-10, pg. 21 (April 26, 1977) (citing "two ways that the Executive Residence is taken care of: one is that of this account [under § 105(d)], and one is that of Interior's own account").  But none of that detracts from the fact that § 105(d) confers *authority* to engage in alterations and improvements to the White House.  Any *ultra vires* challenge to the President's authority therefore fails.

> **2.      Congress has also authorized construction in national parks to further and promote the purposes of those parks.**

Congress has also empowered the Secretary of the Interior, through NPS, to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units," including "to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. §100101(a).  This authority dates

---

[2] The Trust fails to convince that the 2024 Appropriations Act—which appropriated funds for "required maintenance, resolution of safety and health issues, and continued preventative maintenance" pursuant to § 105(d) —does not allow the President to use those appropriated funds to advance the health and safety aspects of the project.  *See* ECF 30-1 (Fisher Decl.) ¶ 9 (detailing the health and safety issues that the project is intended to address).

back to the NPS Organic Act, enacted in 1916. *See* Pub. L. No. 64-235, 39 Stat. 535 (1916); *see also* Ex. A (Supp. Stidham Decl.) ¶ 6.

NPS has used that authority for over a century to engage in construction in national parks. In its early decades, NPS undertook "a wide range of conservation, rehabilitation, and construction projects in both the national and state parks." *The National Parks: Shaping the System*, NATIONAL PARK SERVICE at 44 (1991), https://npshistory.com/publications/shaping-the-system-1991.pdf. After World War II, NPS engaged in a massive campaign to build "comfort stations, picnic shelters, campgrounds, visitor centers, park staff housing, maintenance buildings, warehouses, roads, and other infrastructure." *Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)*, 89 Fed. Reg. 97631, 97631 (Dec. 9, 2024). All that work, including construction of approximately 100 visitor centers, was done pursuant to the NPS Organic Act. Congress has repeatedly recognized NPS's broad authority by appropriating large lump sums for NPS "construction." For 2026, for example, Congress appropriated over $88 million for "construction, improvements, repair, or replacement of physical facilities" by NPS, confirming and reiterating this statutory authority. Pub. L. No. 119-74, 140 Stat. 5, 100 (2026).

Parks within the District of Columbia were transferred to NPS's jurisdiction in 1933. *See* Exec. Order 6166 (June 10, 1933); Exec. Order 6228 (July 28, 1933). Since that time, NPS has engaged in significant construction projects in national parks within the District, again pursuant to the NPS Organic Act. *See* Supp. Stidham Decl. ¶¶ 8-11. In the 1960s, NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and administrative facilities—a total of 74,000 square feet—in East Potomac Park. *See Executive Director's Recommendation, National Capital Region Campus Renovation Project and Park Police District 1 Substation, Commission Meeting*, National Capital Planning Commission at 1 (Jan. 7, 2016),

https://www.ncpc.gov/docs/actions/2016January/National_Park_Service_Police_District_1_Subs

tation_Recommendation_7703_Jan2016.pdf; *see also* Supp. Stidham Decl. ¶ 14.   More recently,

NPS constructed a new U.S. Park Police building in that same park.   Supp. Stidham Decl. ¶ 15.

NPS also completed a new U.S. Park Police Stables on the National Mall.   *Id.* ¶¶ 20-22.   And NPS

built a 7,500-seat tennis stadium in Rock Creek Park.   *See id.* ¶¶ 18-19; *see also* Joan M. Zezen,

*An Urban Oasis: Rock Creek Park's History and Management* 130-132 (Oct. 2020),

https://www.scribd.com/document/812110103/Rock-Creek-DC-adhi-2020.   Additional examples

of construction projects in NPS-administered parklands in the District include the golf clubhouses

at the Rock Creek Park and Langston golf courses, the double-decker driving range and storage

and maintenance facilities at East Potomac Park, and the Rock Creek Park Stables, among others.

*See* Supp. Stidham Decl. ¶ 10.   All of these projects were conducted pursuant to the NPS Organic

Act and its general authority to manage the National Park System.   *See* 54 U.S.C. §100101(a).

The NPS Organic Act equally authorizes the East Wing project.   Congress designated the

White House and President's Park as a unit of the National Park System in 1961.   *See* Pub. L. No.

87-286, 75 Stat. 586, 586 (1961).   And NPS "determined that the Project was consistent with [that]

enabling legislation."   ECF 30-3 (Supp. Bowron Decl.) ¶ 9.   As NPS explained, the project

addresses a longstanding need for a large secure event space on the White House grounds so the

President can host large events, such as state dinners, without reliance on tents that damage the

grounds and NPS infrastructure.   ECF 14-3 (EA) at 1-2; ECF 30-1 (Fisher Decl.) ¶ 6.   And, in line

with the 1961 enabling legislation, the project "will continue to preserve and interpret the museum

corridor and principal public rooms of the White House, ensuring that visitor access and the park's

core interpretive mission are maintained."   ECF 14-2 (FONSI) at 9; *see also* Supp. Bowron Decl.

¶ 9 (summarizing NPS's analysis of why the project was consistent with the enabling legislation). Accordingly, the East Wing project is independently authorized by 54 U.S.C. §100101(a).

The Trust does not dispute that NPS generally has authority to engage in construction on national parks, including on White House grounds.  Instead, the Trust objects that this project in particular is inconsistent with the "fundamental purpose" of the park unit, 54 U.S.C. § 100101(a), and thus also runs afoul of the "Redwood Amendment," which provides that NPS cannot exercise its authority "in derogation of the values and purposes for which the System units have been established," *id.* § 100101(b)(2).  *See* Second PI Br. at 14-16.  In particular, the Trust contends that the new East Wing would impair enjoyment of the White House because it is "out of proportion" and would create "a visual imbalance."  Second PI Br. at 15-16.[3]  That argument is not serious.  It is a weak attempt to second-guess NPS's reasonable and well-documented judgment about how to balance competing policy interests in connection with this unique park and project.

"[T]he Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate."  *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996).  In general, NPS ensures compliance with its Organic Act by preparing what it calls a "non-impairment determination" to show that the action "will not result in impairment to park resources or values."  *Guidance for Non-Impairment Determinations and the NPS NEPA Process*, National Park Service (Apr. 2025).  Here, NPS demonstrated compliance with both 54 U.S.C. §§ 100101(a) and the Redwood Amendment in a non-impairment determination attached to its Finding of No

---

[3] The Trust also contends that Defendants violated a duty to maintain "historic objects" for "enjoyment of future generations," 54 U.S.C. §100101(a), by demolishing the old East Wing, but that assertion is no longer relevant.  Forward-looking relief enjoining the construction of the new East Wing is only available if construction of the new East Wing would be *ultra vires*. *See Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) ("[W]here the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing.  Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury.").

Significant Impact.  NPS explained that the purposes of this park unit include "to support the use and occupancy of the buildings and grounds by the President and First Family, and to facilitate official Executive functions."  FONSI at 12; *see also The White House and President's Park*, NATIONAL PARK SERVICE at 8 (2014) (identifying purposes of this park unit).  NPS found that the project would not affect historically significant views or "compromise the broader visual and spatial relationships that define the L'Enfant Plan."  *Id.* at 14.  And NPS noted the preservation actions taken to document the East Wing for posterity, to preserve important pieces of its historic fabric, and to carefully preserve the museum objects that were located in the East Wing and the first floor of the Executive Mansion.  *Id.* at 14-15.  As a result, the NPS concluded that the project was in furtherance of the fundamental purpose of the park unit and would not prevent NPS "from fulfilling the park's purpose or result in impairment of park resources."  *Id.* at 15.

The Trust makes no attempt to engage with NPS's determination or to explain why it was wrong.  Regardless, there is no basis for the court to question NPS's reasoned judgment here, much less through the narrow filter of *ultra vires* review.  After all, the Organic Act does not set a rubric by which a court can meaningfully determine whether a project "impair[s]" or "conserve[s]" an historic object, 54 U.S.C. § 100101(a), or whether NPS has sufficiently honored "the values and purposes" for which the White House and President's Park were established, *id.* § 100101(b)(2).  Rather, as the D.C. Circuit has recognized, "the Organic Act is silent as to the specifics of park management," so "the Secretary has especially broad discretion on how to implement his statutory mandate."  *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).  Since these vague "provisions lack discernible standards by which a court can identify a limit to agency authority," *ultra vires* review is unavailable.  *NAPS*, 26 F.4th at 971-72.  There is simply no basis to conclude that NPS violated "a specific and unambiguous statutory directive," *Changji Esquel Textile Co.*,, 40 F.4th

at 722, in determining that the project was consistent with the NPS Organic Act and the park's enabling legislation.  At most, this is a policy disagreement, not a challenge to statutory authority.

Two other points bear mention.  *First*, because the East Wing project is authorized by 54 U.S.C. § 100101, it can be permissibly funded through donations under 54 U.S.C. § 101101(2), which allows donations "for the purposes of the [National Park] System."  The Trust appears to agree that, if the project is consistent with the NPS Organic Act, it "follows" that "using NPS gift funds" is permissible.  Second PI Br. at 10.  Indeed, NPS has long used its donation authority for buildings on national parks—including, *e.g.*, the Park Police Stables and Rock Creek Park tennis stadium.  *See* Supp. Stidham Decl. ¶¶ 12-13, 18-21.  Congress enacted that funding mechanism over a century ago, Pub. L. No. 66-246, 41 Stat. 874, 917 (1920), and has repeatedly approved it since, *e.g.*, Pub. L. No. 90-209, 81 Stat. 656, 656 (1967) (encouraging "private gifts of real and personal property or any income therefrom or other interest therein for the benefit of, or in connection with, the National Park Service").  Indeed, the 2026 funding bill repeats that NPS may use "National Park Service Donations" to supplement the $88 million appropriation.  Pub. L. 119-74, 140 Stat. at 101.  Because Congress designated the White House as a national park, NPS has "authority for the acceptance of gifts in connection with the Department of Interior's general statutory responsibility … for maintenance of the White House and its grounds."  *The White House—The Vice President—Gifts*, 2 Op. O.L.C. 349, 350 (Apr. 27, 1977).

*Second*, although 54 U.S.C. § 100101 grants authority to NPS rather than the White House, NPS "determined that it was in the best interests of the United States for EXR to contract for and directly manage the Project."  Supp. Bowron Decl. ¶ 10; *see also id.* ¶¶ 12-13.  The Economy Act authorizes NPS to contract with EXR in that way.  *See* 31 U.S.C. § 1535.  The Trust never argues otherwise in its Second Amended Complaint or its renewed motion, so any challenge is waived.

Anyway, as explained further below, the way in which EXR and NPS have allocated responsibility for this unique project is lawful and routine, not remotely *ultra vires*. *See infra* Part II.D.

### C.     The Project Does Not Violate 40 U.S.C. § 8106.

The Trust argues that Defendants are acting *ultra vires* because they are violating a clear statutory prohibition: A "building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. The Trust is wrong. As explained, Defendants have "express authority" to erect structures on the White House grounds. Section 105(d) vests the President with authority to engage in alterations or improvements. Section 100101(a) vests in NPS the power to regulate the National Park System, including through construction on national parkland.

At times, the Trust appears to suggest that § 8106 requires Congress to expressly authorize each particular structure before it can be built. *E.g.*, Second PI Br. at 11-13. That is incorrect. The statute only requires an entity to have express authority from Congress to *build*—not to build a *particular structure*. That understanding flows from the provision's history: It was enacted shortly after the Army Corps of Engineers set out to reclaim "properties illegally used as dumps, or occupied by shacks, gardens, railroad companies, and even a public schoolhouse and a church." *National Register of Historic Places Registration Form, L'Enfant Plan of the City of Washington, D.C.*, National Park Service, at 60- 61 (1997), https://npgallery.nps.gov/pdfhost/docs/ NRHP/Text/97000332.pdf. An 1864 predecessor law was similarly focused on "prevent[ing] the improper appropriation or occupation of any of the public streets, avenues, squares, or reservations in the City of Washington belonging to the United States," and in particular "the erection of any permanent building upon any property reserved to or for the use of the United States, unless plainly authorized by act of congress." 13 Stat. 412, 412 (1864); *see also* Pub. L. No. 57-81, 32 Stat. 152 (1902) (directing Army Corps to prevent "unlawful occupation" of "public lands in the District of

Columbia"). Congress was concerned about stopping encroachments by unauthorized third parties—not trying to micro-manage park planning by federal authorities.

Near-contemporaneous legislative history confirms that narrower understanding. Major Ulysses S. Grant III, then Director of Public Buildings and Public Parks of the National Capital, testified that § 8106 had been enacted at the request of his office, and "was intended for the purpose of preventing encroachments upon park property *by other Government offices or by the public*, and has never been construed to prevent such construction by the park authorities within the limits of the appropriations." *District of Columbia Appropriation Bill, 1927, Hearing Before the Subcomm. of H. Comm. on Appropriations*, 69th Cong. (1926) (emphasis added). He gave that response upon being asked how his agency was able to build a new facility in Anacostia Park despite that statute; his answer was not challenged. *See id.* The clear takeaway is that otherwise-authorized federal officials need no *further* congressional approval to build particular structures.

Defendants' understanding of § 8106 is also consistent with historical practice, whereas the Trust's more sweeping interpretation is irreconcilable with decades of history. NPS has erected countless structures on national parkland in the District over the past century, yet there is no record of any express congressional approval for buildings like the National Capital Region Headquarters, U.S. Park Police Headquarters, U.S. Park Police Stables, Rock Creek Park tennis stadium, or the numerous nature centers, comfort stations, and cell phone towers that NPS has erected in Rock Creek Park and beyond. *See supra* Part II.B.2.

As for the White House, even the Trust represents that prior Presidents have erected new structures there without structure-specific authority or earmarked appropriations. *See* Pl.'s Supp. Reply at 10-11; Second PI Br. at 12-13. For example, it says President Roosevelt's expansion of the old East Wing was funded by a general defense appropriation and that the West Wing was

20

renovated in 1934 using a general appropriation.  *See* Defs.' Supp. Br. at 31.  And both President

Ford's Pool and President Trump's tennis pavilion were funded by private donations.  *Id.*

The Trust does not even try to reconcile this history with its position that § 8106 requires

express authorization of each building.  Instead, the Trust ignores all national park construction,

labels the two most recent White House projects "*de minimis*," claims a national security exception

for the old East Wing, and quotes a general appropriation as sufficient for the West Wing.  Pl.'s

Supp. Reply at 10-11; Second PI Br. at 12-13.  Ultimately, the Trust speculates that perhaps

everyone has been violating the law for 100 years.  *See* Second PI Br. at 9.  That is not how courts

construe old statutes.  To the contrary, the "lack of historical precedent" is a "telling indication"

that a party has misread a statute.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety

& Health Admin.*, 595 U.S. 109, 119 (2022); *see also Loper Bright Enters. v. Raimondo*, 603 U.S.

369, 386 (2024) (citing "longstanding practice of the government" as an "aid" to "inform a court's

determination of what the law is").  Indeed, "[i]f Congress has continually declined to disturb a

longstanding interpretation of a statute, that 'may provide some indication that Congress at least

acquiesces in, and apparently affirms, that interpretation.'"  *Wash. All. of Tech. Workers v. U.S

Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022).

Moreover, whatever the proper level of generality for an authorization under § 8106, there

is good reason to doubt that the provision applies in the first place to national parks administered

by NPS, much less to the White House.  History tells a narrower story of congressional intent.  In

1912, the Army Corps of Engineers—then known as the Engineering Department in the War

Department—had jurisdiction over parks in the District of Columbia.  Congress included § 8106

along with a group of line-item appropriations to the Engineering Department.  *See* Act of Aug.

24, 1912, ch. 355, 37 Stat. 417, 443-44 (1912).  In that same law, Congress appropriated funds to

the Interior Department, which had jurisdiction over several national parks across the country. For Interior, Congress included a different provision demarcating when Congress's express authority was required: "No expenditure for construction of administration or other buildings … exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." *Id.* at 460. Given the simultaneous enactment of these parallel provisions, it appears that Congress wanted one rule for D.C. parks under the Engineering Department, but a different rule for national parks under the Department of Interior.

The statute pertaining to Interior was eventually codified at 16 U.S.C. § 451. In later years, including after NPS was created and vested with control of all national parks (including in the District of Columbia), Congress amended that statute to increase the cost threshold of construction of buildings in national parks that would trigger the need for approval. *See, e.g.*, Pub. L. No. 65-181, 40 Stat. 634, 677 (1918); Pub. L. No. 76-417, 54 Stat. 36, 36 (1940). In its appropriations laws, Congress also routinely exempted NPS construction activity, including construction in the District of Columbia, from this provision. *See, e.g.*, Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948); Pub. L. 101-512, 104 Stat. 1915, 1920 (1990).

Then, in 1996, Congress repealed § 451. *See* Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). That is, Congress *eliminated* the provision that required "express authority of Congress" for national-park construction. This history suggests § 8106 was never intended to limit NPS's construction in national parks. Section 451 played that role—and Congress chose to repeal it. And this explains the Trust's *one* example of Congress expressly authorizing a particular building in the District pursuant to § 8106: a 1993 statute providing that "the limitation on construction contained in [§ 8106] shall not apply to the construction" of "facilities to house bonsai collections at the National Arboretum." Pub. L. No, 103-111, 107 Stat. 1046, 1051 (1993). If § 8106 is read

22

as restricting entities *other than* NPS from constructing buildings on national parkland in D.C., this makes sense: The National Arboretum is managed by the Department of Agriculture and is not a national park. Meanwhile, if § 8106 was intended to restrict NPS construction in national parks—contrary to Major Grant's near-contemporaneous explanation—virtually every building erected on national parks in the District is presumptively unlawful. That implausible construction is miles away from the clarity and obviousness required to sustain an *ultra vires* claim.

All of the above aside, the statute at minimum should not be read to constrain the President. *See* Defs.' Supp. Br. at 29-35. Statutes should not be read to constrain presidential action "absent clear indication of Congress's intent to do so." *Blassingame v. Trump*, 87 F.4th 1, 21 (D.C. Cir. 2023). The Trust runs headlong into that canon because it asks the Court to read § 8106—which makes no mention of the President or the White House—to preclude the President from erecting any structure on White House grounds. Particularly in an *ultra vires* and preliminary injunction posture, the Court should demand more clarity before concluding that Congress intended for such a drastic result, inconsistent with decades of practice and inter-branch understanding.

In short, the Trust seeks to read a new requirement into a century-old statute: a requirement never before discovered for a national park, let alone the White House. It is hardly "obvious[]" that Defendants have violated § 8106's strictures. *Fla. Health Scis. Ctr.*, 830 F.3d at 522.

### D.    EXR Is Lawfully in Control of the Project.

The Trust's final contention is that Defendants' placing of control of the "Ballroom Project with EXR is *ultra vires*." Second PI Br. at 16. This argument rests largely on the 1961 statute, discussed above, that creates the White House as a unit of the National Park System and provides for it to be administered pursuant to the NPS Organic Act. *See* Pub. L. No. 87-286, 75 Stat. 586 (1961); 54 U.S.C. § 100302(a)(3) (providing that the Director of NPS "shall have the supervision, management, and control of System units"). The Trust contends that EXR's control over the

project disregards Congress's "specific and unambiguous statutory directive" and constitutes an unlawful attempt to reorganize the Executive Branch. Second PI Br. at 17-18.

      This last-ditch *ultra vires* claim fails too. The 1961 statute goes on to say that nothing done by NPS "shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." 75 Stat. at 586. As Defendants previously explained, this caveat makes clear that the President—not NPS—has primacy over the use of the White House "for his official purposes." Defs.' Supp. Br. at 36. And thus, presidential direction of the East Wing project for those purposes is in line with this law. The Trust's rebuttal—that the savings clause only supports a presidential veto "when certain specific types of conflicts occur" (Second PI Br. at 18-19)—is not apparent from the face of the statute. Nor is it clear why the President could not reasonably conclude that, given the East Wing project's intimate connection to the President's safety, security, and capacity to perform his constitutional functions, allowing NPS to manage it poses such a conflict. At the very least, the Trust does not show that Defendants' reasonable reading of this allocation of power within the Executive Branch is "plainly" wrong. *Nyunt*, 589 F.3d at 449.

      The Trust's argument fails for a second reason too. Its claim is predicated on the lack of "presidential statutory reorganization authority." Second PI Br. at 18. But, as referenced above, the Economy Act—31 U.S.C. § 1535—remains on the books and authorizes NPS to contract with EXR to manage the project. *See Nat'l Gateway Telecom, Inc. v. Aldridge*, 701 F. Supp. 1104, 1113 (D.N.J. 1988) (Economy Act "permits the head of an agency to place an order with another agency for goods or services upon meeting the conditions specified in the Act."). Here, that is exactly what NPS did. *See* Supp. Bowron Decl. ¶¶ 9-11, 13. And the Trust does not contest this use of § 1535, even though Defendants previously made clear that NPS had invoked the statute.

24

The Trust has thus waived any challenge to the Economy Act determination. It cannot succeed in bringing an *ultra vires* claim based on the EXR's management of the project.

### E.    The Trust's Claims Fall Outside the Zone of Interests.

All of the above aside, there is another fundamental problem with the Trust's *ultra vires* claims. As explained, those claims are largely premised on 40 U.S.C. § 8106, as the only statutory prohibition the Trust claims Defendants are violating (the other statutes are Defendants' sources of authority). But the Trust's interests are quite plainly beyond the zone of interests protected by that statute, which confers no legally cognizable rights at all on the Trust. The D.C. Circuit has recently made clear that "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). The Trust therefore cannot pursue an *ultra vires* cause of action to enforce this statute.

The "zone-of-interests" requirement limits the class of plaintiffs who "may invoke [a] cause of action" for an alleged violation of law to those whose asserted interests "'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Although most typically applied to statutory causes of action, this requirement also applies to judicially implied causes of action. After all, when courts exercise equity jurisdiction, they must respect all "express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This includes the rule that Congress presumptively does not extend a cause of action to a plaintiff whose asserted interests do not "fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129. That is why the Supreme Court has long applied the zone-of-interests test to limit implied constitutional causes of action. *See Boston Stock Exch.* v. *State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (equitable claim under Commerce Clause); *Valley Forge Christian Coll. v. Ams. United for Separation of*

*Church & State, Inc.*, 454 U.S. 464, 469, 475 (1982) (equitable claim under Establishment Clause). Non-statutory *ultra vires* causes of action should not be treated any differently.

Permitting litigants to evade the zone-of-interests requirement by invoking an equitable cause of action would undercut its fundamental rationale. As the Supreme Court has explained, the zone-of-interests requirement reflects Congress's refusal to accept the "absurd consequences [that] would follow" "[i]f any person injured in the Article III sense by a [legal] violation could sue," even where the person's interests are entirely unrelated to the provision being enforced. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176-77 (2011). Courts should be even less willing to impute such absurd results to Congress under the statutory grant of equity jurisdiction than under the "generous review provisions of the APA." *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Hernandez* v. *Mesa*, 589 U.S. 93, 109 (2020) ("It would be anomalous to impute … a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action." (cleaned up)). Any implied equitable cause of action should be subject to at least the same zone-of-interests requirement as an APA claim.[4]

The Trust's pivot to equitable *ultra vires* claims therefore does not eliminate the zone-of-interests requirement. And the Trust plainly cannot satisfy it. Since *ultra vires* claims must be made "by reference to the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175-176, the relevant zone of interests in this case focuses on § 8106 (and to a lesser extent,

---

[4] The D.C. Circuit's decision in *Haitian Refugee Center* v. *Gracey*, 809 F.2d 794 (1987), is not to the contrary. The court observed there, in dicta, almost three decades before *Lexmark*, that there was tension between the existence of *ultra vires* claims and the fact that they will "seldom" succeed because a litigant "injured by *ultra vires* action … normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest." *Id.* at 811 n.14. Nevertheless, the court still needed to account for whether "the litigant's interest may be said to fall within the zone protected by the *limitation* [on the Executive]." *Id.* (emphasis added); *see also Glob. Health Council*, 153 F.4th at 20. That is the relevant question here.

§ 105(d)).  As this Court has already observed, neither "of these statutes grant [the Trust] a right to sue to 'judicially enforce' the statutes' requirements."  ECF 47 (First PI Op.) at 17.

Even under the Trust's characterization of the scope and effect of those statutes, they are meant to protect the institutional interests of Congress under the Property Clause, not the aesthetic interests of private citizens.  *See* ECF 20 (Pl.'s Supp. Br.) at 8 ("authoriz[ation] by Congress … is required by the Property Clause and, since 1912, by 40 U.S.C. § 8106"); Pl.'s Supp. Reply at 14 (ECF 33) (framing case as about "usurpations of *Congress's* constitutional powers").  In other words, these are statutes that speak to the balance of power between Congress and the Executive Branch.  They are not designed to protect private rights, or to confer any private rights on citizens. They have nothing to do with whether private citizens think particular structures would improve or diminish from the experience of visiting or viewing the White House.  And the Trust obviously cannot assert a claim on behalf of Congress; private litigants cannot sue "to enforce the federal government's property rights."  *The Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162, 1171 (10th Cir. 2011).  Put another way, 3 U.S.C. § 105 and 40 U.S.C. § 8106 do not confer on the Trust any "statutory right" that it lacks means to "protect and enforce."  *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626 at *9 (D.C. Cir. Sept. 25, 2025) (Pan, J., concurring) (cleaned up).  That is fatal under *Global Health Council*, which reaffirms that *ultra vires* review is only available if the statute at issue "confer[s] rights upon" the plaintiff.  153 F.4th at 20.

Indeed, there is a striking mismatch between the Trust's injury-in-fact (alleged aesthetic harms to Dr. Hoagland) and the legal wrong asserted by its *ultra vires* claims (construction of the new East Wing without express congressional authorization).  Illustrative of that mismatch is that securing authorization from Congress would not redress the Trust's alleged harm in any way.  That is a strong indication that the Trust is beyond the zone of interests that § 105(d) and § 8106 are

27

meant to protect.  And that, in turn, confirms that Trust should not be permitted to deploy these provisions to force judicial intervention into this sensitive matter.

Ultimately, whether Congress authorized the East Wing project is a question the political branches are best suited to resolve.  *Valley Forge*, 454 U.S. at 474–75 ("[E]ven when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches.").  Defendants believe they have congressional authorization.  Congress has taken no steps to suggest otherwise.  This Court should reject the Trust's invitation to intervene in a policy matter that the political branches are perfectly capable of hashing out on their own.

It is "open to serious question whether the Framers of the Constitution ever imagined that general directives to the Congress or the Executive would be subject to enforcement by an individual citizen."  *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974); *see also Comm. for Full Emp. v. Hills*, 70 F.R.D. 678, 682 (E.D. Pa. 1976) ("individual citizens have no standing to initiate litigation where the predominant dispute involves a conflict between the legislative and executive branches").  Indeed, not even a member of Congress has "a direct interest in having monies appropriated by the Congress used for no other purpose than those authorized by law."  *Hansen v. Nat'l Comm'n on Observance of Int'l Women's Year*, 628 F.2d 533, 534 (9th Cir. 1980).  "[T]he absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process."  *Richardson*, 418 U.S. at 179.

For these reasons, the Court should decline the Trust's invitation to intervene for the first time in the Nation's history, based on one citizen's architectural preferences, in the President's renovation activities at the White House.

### III. THE COURT SHOULD REVISIT THE TRUST'S ARTICLE III STANDING, BUT NOT ITS REJECTION OF THE TRUST'S "CONSTITUTIONAL" CLAIMS.

This Court previously concluded that the Trust had shown associational standing based on Dr. Hoagland's alleged aesthetic injuries. *See* First PI Op. at 7. In doing so, however, the Court overlooked two points. *First*, the record is undisputed that Dr. Hoagland could scarcely see the old East Wing from public view, and the new East Wing will be equally obscured. Even if aesthetic injury is viable in theory, it cannot apply where the structure causing offense is barely visible to the plaintiff. *Second*, Dr. Hoagland's injuries are not germane to the Trust's purposes, which *exclude* the White House grounds. Defendants respectfully urge the Court to reconsider the Trust's standing. But the Court should not reconsider its rejection of the constitutional claims, a non-jurisdictional issue that the Trust provides no sound basis for relitigating.

### A. Doctor Hoagland Cannot Suffer Aesthetic Harm from Something She Can Scarcely See.

The Court credited Dr. Hoagland's theory of aesthetic injury stemming from her fear that "[t]he President's proposed ballroom would, in Hoagland's words, 'overshadow[]' the White House and 'diminish [its] primacy' … thereby undermining her enjoyment and appreciation of the grounds." First PI Op. at 10. Even accepting that such a harm satisfies Article III as a matter of law, the Trust has not established it here as a matter of fact. The Trust has no answer to the fact that both the old East Wing and the new East Wing can scarcely be seen from any public vantage point (and Dr. Hoagland does not claim to have any special access allowing her to view it). *See* Defs.' Supp. Br. at 10-11; Fisher Decl. ¶ 11 ("A primary goal of the Project has been to maintain the visual primacy of the Executive Mansion and to ensure that the East Wing remains minimally

visible from public spaces.").  Indeed, NCPC staff concluded that "the existing landscape will substantially screen views of the project from the surrounding public spaces" and "the main views of the Executive Mansion … will largely be maintained."  Ex. B (Supp. Martin Decl.) ¶ 7.

The Trust has never disputed this fact.  Dr. Hoagland's declaration does not say that she ever viewed the East Wing (as opposed to the White House more generally), and she provides no factual basis to support the speculation that she will be able to see the new East Wing.  Notably, all the photographs in Plaintiff's pleading are taken from inside the White House complex or were captured by aerial photography.  ECF 50 (Second Am. Compl.) ¶¶ 33-34, 39, 53, 64-66.  Instead of contesting the fact of non-visibility, the Trust calls it "irrelevant."  Pl.'s Supp. Reply at 5 n.4.  That is unintelligible.  What could possibly be more relevant to an alleged *aesthetic* interest than whether the plaintiff is capable of *observing* its aesthetics?  Not only is visibility relevant—it is a central requirement of an aesthetic injury.  As this Court noted, "the 'desire to use or observe' something, 'even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing.'"  First PI Op. at 9 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992)).  Because Dr. Hoagland neither uses nor observes the East Wing, she has no more of an aesthetic interest in it than in the President's choice of wallpaper in the Lincoln Bedroom—*i.e.*, none.  *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017) (Lamberth, J.) (denying injunction in case where National Trust sought to enjoin completion of tower foundations, because it was "not clear whether [the foundations would] even be visible").

Having never been able to view the East Wing, and with no actual threat of viewing an East Wing she dislikes, the only harm Dr. Hoagland faces is a *psychic* one—the knowledge that a structure she does not like will be erected.  But there is no question that "purely psychic injuries arising from disagreement with government action … do not qualify" for standing.  *Animal Legal*

30

*Def. Fund v. Vilsack*, 640 F. Supp. 3d 134, 151 (D.D.C. 2022), *aff'd*, 111 F.4th 1219 (D.C. Cir. 2024); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  On this record, the Court should therefore conclude that the Trust lacks associational standing.

### B.  The White House Is Not Germane to the Trust's Mission.

Even if cognizable, Dr. Hoagland's injury is not germane to the Trust's purposes.  In preliminarily concluding otherwise, this Court pointed to 54 U.S.C. § 312102(a) and characterized the Trust's purpose as "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest."  First PI Op. at 12.  That overlooked two crucial pieces of statutory context.  *First*, § 312102(a) is not a statement of the *Trust's* purpose but rather the *enacting Congress's* purpose.  *Second*, textual and legislative evidence establishes that the Trust's purpose specifically excludes busying itself with "the White House and its grounds."

To start, 54 U.S.C. § 312102 has two subsections, (a) and (b).  The title of subsection (a) is "Establishment," and the title of subsection (b) is "Purposes."  The most natural reading of the statute is that the Trust's "purposes" are set forth in the subsection with that title—subsection (b).  Under that subsection, the Trust's purposes are limited and enumerated: to (1) receive donations of sites; (2) preserve and administer those sites; (3) accept, hold, and administer gifts of money and other property; and (4) execute the other functions vested in the Trust.  54 U.S.C. § 312102(b).  None of these purposes concerns facilitating public participation in planned construction at sites the Trust does not administer, such as the White House.

The Court focused on subsection (a), which mirrors the preamble of the bill chartering the Trust: "[an] [act] [t]o further the policy enunciated in the Historic Sites Act (49 Stat. 666) and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest and providing a national trust for historic preservation."  Pub. L. No. 81-408, 63 Stat. 927 (1949).  But "a preamble[] … [is] not an operative part of the statute."  *Rothe*

31

*Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 66 (D.C. Cir. 2016). Properly read, § 312102(a) is not a statement of *the Trust's* purpose—it is a statement of *Congress's* purpose in establishing the Trust, which Congress vested with narrower, specific functions not implicated here.

Even if the Trust has a broader statutory purpose of dealing with preservation of historic sites more generally, the White House is *excluded* from that mandate. When Congress chartered the Trust in 1949, it included language excepting "property within the exterior boundaries of national parks" from its mandate. §4, 63 Stat. 927, 929; *see also* 54 U.S.C. § 312105(g). And when Congress later provided the National Trust with matching funds and created an Advisory Council on Historic Preservation to work with it, Congress again reinforced the message to leave the White House alone: "Nothing in this Act shall be construed to be applicable to the White House and its grounds." Pub. L. No. 89-665, §107, 80 Stat. 915, 917 (1966). As the legislative history makes plain, Congress sought to clarify again that the law was not meant to apply to the "homes" of the "three branches of government." *To Establish a Program for the Preservation of Additional Historic Properties throughout the Nation, and for Other Purposes*, Hr'g on S. 3035 Before the Comm. on Interior and Insular Affs., 89th Cong. P. 67 (Aug. 9, 1966). Indeed, the exception was "of great significance" because "[m]any people who were in favor of this legislation were fearful that … the [National Trust] would busy itself not only with the things which the committee intended but also busy itself with *the White House*, the Supreme Court, and the Capitol." 112 Cong. Rec. 25942 (Oct. 10, 1966) (emphasis added). By carving the White House out of the Trust's mandate, Congress sought to quell that fear.

Accordingly, even if Dr. Hoagland can establish standing in her own right to challenge the Project, her claim is not germane to the Trust's purpose, which Congress designed to exclude

"busy[ing] itself with the White House." *Id*.  The Court should therefore reconsider whether these allegations can establish associational standing.[5]

### C.  There Is No Basis to Relitigate the Trust's "Constitutional" Claims.

Although the Court should reconsider Article III standing, it should not take the Trust up on its invitation to reconsider the Court's holding on the "constitutional" claims.  Second PI Br. at 19-22.  The Trust does not even attempt to meet the standard for reconsideration, or, in other words, "show[] new facts or clear errors of law which compel the court to change its prior position."  *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 240 (D.C. Cir. 2024).[6]

In any case, the Court's previous adjudication was entirely correct.  As the Court explained, the Trust's "constitutional" claims turn on questions of statutory authority, and thus judicial review is unavailable under *Dalton v. Specter*, 511 U.S. 462 (1994), which rejected an attempt to "recast statutory claims as constitutional ones," *Glob. Health Council*, 153 F.4th at 14; *see* First PI Order at 19 ("The Court's equitable power to enjoin constitutional violations does not extend to this kind of statutory dispute!"); *id.* at 19 n.5 (same conclusion on reorganization claim); *id.* at 20 (concluding that constitutional claims are "squarely in *Dalton* territory").

The Trust's argument for reconsideration is a reprisal of an argument that already failed to persuade.  This case is "fundamentally different" from *Dalton* and *Global Health*, it maintains, because the question here is about *existence* of a delegation rather than a delegation's *parameters*.

---

[5] For these reasons, and others discussed in Defendants' Supplemental Brief (at 14-16), the Trust cannot establish organizational standing either.

[6] Defendants' request for reconsideration is not subject to the same standard as Plaintiff's because it concerns the Court's subject matter jurisdiction, and "[w]ithout jurisdiction[,] the court cannot proceed at all in any cause."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007); *see also Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 2019 WL 6117418, at *6 (D.D.C. Nov. 18, 2019) ("The Court's obligation to assure itself of its own jurisdiction … continues throughout the litigation.").

Second PI Br. at 20-22.  This is wordplay.  The scope of the delegation and the existence of a delegation supporting a specific action are two sides of the same coin.  There is no difference between asking whether the project exceeds § 105(d)'s scope and asking whether Congress has "delegated any of its Property Clause authority to the Defendants to build the Ballroom in the first place."  *Id.* at 20.  To answer either question, the Court will have to determine whether project falls within Defendants "statutory authority," *Dalton*, 511 U.S. at 472, under the statutes Defendants invoked.  *See* Second PI Br. at 20-21 ("resolving that dispute will require litigating the Defendants' statutory defense").  And thus, both questions present statutory disputes, not constitutional ones. To conclude otherwise on these facts would wipe away the "established distinction between unconstitutional and ultra vires conduct."  *Glob. Health Council*, 153 F.4th at 14.

## IV.    THE BALANCE OF EQUITIES WEIGHS OVERWHELMINGLY IN DEFENDANTS' FAVOR.

Merits aside, the Court should independently deny a preliminary injunction because the balance of equities weighs heavily against relief.  Even at final judgment, there is no entitlement to injunctive relief for a prevailing party.  Rather, courts must always weigh the equities to evaluate whether an injunctive remedy is an appropriate exercise of remedial discretion.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (explaining that a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" before issuing a preliminary injunction, which is "an extraordinary remedy never awarded as of right").  The Trust's threatened injury is plainly outweighed by the serious harms that would result from halting construction, leaving a large hole that would expose the Executive Mansion to damage and the President to harm.  On the equities, this is not a close call.

The Trust cannot establish that it will suffer any irreparable harm without a preliminary injunction.  In its renewed motion, the Trust suggests that it faces harm because there has not been "meaningful consideration of the public's input."  Second PI Br. at 3.  That is incorrect.  The Trust,

along with other members of the public, was given the chance to present its opinions to the NCPC at public meeting held on March 5.  Supp. Martin Decl. ¶ 7.  Thousands of written comments were submitted.  *Id.*  And Defendants have revised the plans based on NCPC and CFA input—*e.g.*, to remove a triangular pediment above the south portico of the ballroom.  *See id.* ¶ 5.

The Trust also claims aesthetic harm.  Insofar as the aesthetic harm is based on demolition of the old East Wing, that has already occurred; it cannot support injunctive relief.  *See Dearth*, 641 F.3d at 501.  The Trust's future aesthetic injury is also too attenuated to establish irreparable harm.  "The standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm before a decision on the merits can be reached."  *Semonite*, 282 F. Supp. 3d at 288-89.  In *Semonite*, the Trust sought to enjoin the "mammoth towers" project during the first phase of construction, which was planned to result in foundations that "extend[ed] a mere seven feet above the river."  *Id*. at 289.  Observing that it was "not clear whether [the foundations] [would] even be visible from a number of the historical sites in the region," Judge Lamberth refused to find that the plaintiffs suffered "the 'great' harm necessary to warrant a preliminary injunction" at that stage.  *Id*.  Here too, once above-ground construction begins, Dr. Hoagland will not be able to see any part of the East Wing for many months; even once completed, the building will still be scarcely visible.  *See* Fisher Decl. ¶ 11.  This Court should thus reach the same conclusion: that there is no imminent irreparable aesthetic harm at this stage.

Even more important, the Trust's future aesthetic harm should be entitled to almost zero weight in the equitable calculus.  Even if the East Wing were publicly visible, Dr. Hoagland's displeasure with the alleged architectural imbalance is not a weighty interest.

On the other side of the scale, completion of the project in a timely fashion is imperative for reasons of national security that are essential to both Defendants' and the public's interests.  As

the Secret Service has attested, halting construction would imperil the President and others who live and work in the White House. "[T]he current open construction site is, in and of itself, a hazard" that complicates Secret Service operations. ECF 30-5, ¶ 8. There are additional reasons, described in detail in the classified declarations, that halting construction will endanger national security and therefore impair the public interest. *See* First Classified Decl.; Supp. Classified Decl. While the Trust has suggested that the Court could allow construction that is necessary for national security to continue, it is unworkable to distinguish between construction elements that are national security-related and those that are not. *See id*; *see also Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 444 (D.C. Cir. 2020) (recognizing workability as a matter relating to the exercise of judicial power). Indeed, the Trust's proposed order contemplates that Defendants would seek approval from this Court before undertaking work that is needed for national security purposes. *See* ECF 51-2. That is anathema to the separation of powers. *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018) (recognizing injunction as "[d]oubly" exceptional "when the judicial branch undertakes to … superintend [executive] operations on an ongoing basis").

Continued work on the project also advances the public interest more generally, whereas leaving a gaping hole in the ground languishing indefinitely is untenable. The new East Wing's expanded capacity for receiving foreign dignitaries and visitors will benefit the President, other governmental offices and agencies with a White House presence, and the American people. The past practice of pitching temporary tents on the South Lawn was costly and cumbersome, did not comport with the dignity due to the White House, and "caused substantial damage to NPS resources on the grounds." ECF 14-6, ¶ 7; ECF 30-5, ¶ 10. The project also involves updating life-safety requirements and critical infrastructure that are necessary for safety and security, while resolving longstanding problems, such as an unstable roof on the colonnade, water infiltration

36

causing mold and deterioration of structural and historic elements, and the presence of asbestos and lead-based paint.  Fisher Decl. ¶¶ 6, 9.  Indeed, modernization of the East Wing will relieve strain on the more historic portions of the Executive Mansion, preserve the integrity of the entire complex, and thus advance the public interest.

For all of these reasons, the equities and balance of harms strongly weigh against any injunction that would cause Defendants and the public to suffer irreparable harm from indefinite suspension of ongoing construction on this important national project.

## V.    THE COURT SHOULD TAILOR ANY INJUNCTION TO THE TRUST'S ALLEGED HARM AND STAY ANY INJUNCTION PENDING APPEAL.

If the Court concludes that injunctive relief is warranted, it must ensure relief is no broader than necessary to redress the alleged harm Plaintiff faces.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025) (equity power does not allow court to remedy harms to non-parties).  Based on that principle, there is no basis for the categorical injunction halting construction that the Trust requests.  At minimum, work must be allowed to proceed on construction elements that are not visible from public vantage points, since those in no way affect Dr. Hoagland's aesthetic interests.  *See supra* Part III.A.

If the Court ultimately decides to issue an injunction, Defendants intend to immediately appeal to the D.C. Circuit, and respectfully request that this Court stay any such order pending appeal.  Given the exigencies involved in suspending a major ongoing construction project with national security implications, Defendants request this relief in advance of any ruling, to facilitate expedited proceedings on appeal.  The factors governing whether to issue a stay largely overlap with the preliminary injunction factors already discussed: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

To reiterate, Defendants are likely to prevail on the merits, *see supra* Part II; Defendants will be irreparably harmed by the national security concerns any injunction would create, whereas Plaintiff will be unharmed by a stay because Dr. Hoagland cannot even see the project site, *see supra* Parts III.A., IV; and the public interest is served by modernizing the East Wing, not by allowing a vacant construction site to sit dormant indefinitely, *see supra* Part IV.  The public interest will also be served by providing the D.C. Circuit with the opportunity to weigh in on these significant and novel issues of first impression before the President is ordered to stop work in the middle of a high-priority construction project that implicates national security, particularly at the behest of a third party with no legally cognizable interest in the White House grounds and no applicable cause of action to intrude into this novel matter of inter-branch relations.

In similar circumstances, other courts have granted stays pending appeal, or at least temporary stays to allow the D.C. Circuit to adjudicate a stay motion in an orderly way.  *See, e.g.*, *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209, 233 (D.D.C. 2025) (Contreras, J.) (staying a preliminary injunction "for fourteen days so that the parties may seek review in the Court of Appeals"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 111 (D.D.C. 2025) (Moss, J.) ("postpon[ing] the effective date of its class-wide order for fourteen days to permit Defendants to seek a stay pending appeal from the Court of Appeals"); *Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 60 (D.D.C. 2025) (Sullivan, J.) (granting summary judgment to plaintiffs but entering administrative stay).  This Court should follow those examples if it decides to award injunctive relief.

## CONCLUSION

The Court should deny the renewed motion for a preliminary injunction.  At minimum, the

Court should limit any injunctive relief and also stay it pending appeal, or at least stay the order to

give the D.C. Circuit an opportunity to consider whether to grant a stay pending appeal.


Dated: March 12, 2026                    Respectfully submitted,

BRETT A. SHUMATE                         ADAM R.F. GUSTAFSON
Assistant Attorney General               Principal Deputy Assistant Attorney General
Civil Division                           Environment and Natural Resources Division

YAAKOV M. ROTH                           PETER M. TORSTENSEN, JR.
Principal Deputy Assistant Attorney General   Deputy Assistant Attorney General

ERIC J. HAMILTON                         MARISSA A. PIROPATO
Deputy Assistant Attorney General        Deputy Chief

BRANTLEY T. MAYERS                       GREGORY M. CUMMING
Counsel                                  Senior Attorney
                                         MICHELLE RAMUS
JOSEPH E. BORSON                         MARK WIDERSCHEIN
Assistant Branch Director                Trial Attorneys
                                         U.S. Department of Justice
/s/ Eitan R. Sirkovich                   Environment and Natural Resources Division
EITAN R. SIRKOVICH                       Natural Resources Section
(D.C. Bar No. 90030102)                  950 Pennsylvania Avenue, N.W.
Trial Attorney                           Washington, DC 20530
U.S. Department of Justice               Gregory.Cumming@usdoj.gov
Civil Division, Federal Programs Branch  Michelle.Ramus@usdoj.gov
1100 L Street, N.W.                      Mark.Widerschein@usdoj.gov
Washington, DC 20005                     (202) 598-0414
Eitan.R.Sirkovich@usdoj.gov
(202) 353-5525


*Counsel for Defendants*