**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**, | |
| *Plaintiff*, | |
| v. | Civil Action No. 25-4316 |
| **NATIONAL PARK SERVICE**, *et al.*, | |
| *Defendants*. | |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

   I.   The Ballroom Project Is Ultra Vires of Any Authority the Defendants Have Under
       3 U.S.C. § 105(d) and 40 U.S.C. § 8106. ............................................................. 3

   II.  The Defendants' Reliance on the NPS Organic Act Fails—and Subjects the Ballroom
       Project to APA Review in the Process. ............................................................... 10

      A. The Organic Act Does Not Provide "Direct[] and Specific[]" Authority Required
          by the Redwood Amendment or "Express Authority" Required by § 8106. .................11

      B. The Defendants Now Admit NPS Is Ultimately in Charge of the Ballroom Project
          —and NPS Has Violated the APA. ............................................................... 15

   III.  The Defendants' Other Merits Arguments Fail. ............................................... 20

   IV.  The Remaining Factors Favor Preliminary Injunctive Relief. .......................... 22

   V.   The Defendants' Request for a Stay Pending Appeal Should Be Denied. ........................ 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ........................................................................................................22

*Ass'n of Battery Recyclers v. EPA*,
   716 F.3d 667 (D.C. Cir. 2013) ........................................................................................10

*Bicycle Trails Council v. Babbitt*,
   No. C-93-0009, 1994 U.S. Dist. LEXIS 12805 (N.D. Cal. Sept. 1, 1994) .............................14

*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ......................................................................................3, 13

*Corley v. United States*,
   556 U.S. 303 (2009) ........................................................................................................14

*Ctr. for Biological Diversity v. Trump*,
   453 F. Supp. 3d 11 (D.D.C. 2020) ..................................................................................10

*Deal v. United States*,
   508 U.S. 129 (1993) ..........................................................................................................5

*Delta Constr. Co. v. EPA*,
   783 F.3d 1291 (D.C. Cir. 2015) ......................................................................................21

*FDA v. R.J. Reynolds Vapor Co.*,
   606 U.S. 226 (2025) ..........................................................................................................9

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019) ..........................................................................................................6

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ..........................................................................................9

*KalshiEX LLC v. CFTC*,
   119 F.4th 58 (D.C. Cir. 2024) ........................................................................................24

*King v. St. Vincent's Hosp.*,
   502 U.S. 215 (1991) ..........................................................................................................5

*Learning Res. v. Trump*,
   2026 U.S. LEXIS 714 (Feb. 20, 2026) ...................................................................5, 21, 22

*Lexmark Int'l v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ..........................................................................................................8

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)..................................................................................15

*Marin Audubon Soc'y v. FAA,*
121 F.4th 902 (D.C. Cir. 2024)..........................................................11, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012)....................................................................................8

*Med. Imaging & Tech. All. v. Libr. of Cong.,*
103 F.4th 830 (D.C. Cir. 2024).................................................................18

*Mohamad v. Palestinian Auth.,*
566 U.S. 449 (2012)....................................................................................6

*N.Y. Rehab. Care Mgmt., LLC v. NLRB,*
506 F.3d 1070 (D.C. Cir. 2007).................................................................20

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
26 F.4th 960 (D.C. Cir. 2022)....................................................................12

*Nat'l Parks Conservation Ass'n v. Semonite,*
422 F. Supp. 3d 92 (D.D.C. 2019)............................................................23

*Nat'l Parks Conservation Ass'n v. Semonite,*
282 F. Supp. 3d 284 (D.D.C. 2017)..........................................................22

*NCUA v. First Nat'l Bank & Tr. Co.,*
522 U.S. 479 (1998)........................................................................8, 20, 22

*NLRB v. Noel Canning,*
573 U.S. 513 (2014)..................................................................................21

*Nuclear Reg. Comm'n v. Texas,*
605 U.S. 665 (2025)............................................................................6, 9, 12

*Oregon v. Trump,*
No. 25-cv-1756, 2025 U.S. Dist. LEXIS 219903 (D. Or. Nov. 7, 2025)..................9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012)..................................................................................13

*Sullivan v. Finkelstein,*
496 U.S. 617 (1990)....................................................................................6

*Sweetland v. Walters,*
60 F.3d 852 (D.C. Cir. 1995)....................................................................16

*V.O.S. Selections, Inc. v. United States*,
    772 F. Supp. 3d 1350 (Ct. Int'l Tr. 2025) ............................................................8

*Vill. of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011) ............................................................................7

*Wachovia Bank, N.A. v. Schmidt*,
    546 U.S. 303 (2006) ............................................................................................6

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................................5

**Statutes and Rules**

3 U.S.C. § 105(d) ............................................................................ *passim*

5 U.S.C. § 706(2) ........................................................................................9, 18

15 U.S.C. § 1581(i) ..............................................................................................8

31 U.S.C. § 1301(a) .............................................................................................4

31 U.S.C. § 1321 .................................................................................................4

31 U.S.C. § 1535 ...............................................................................................17

40 U.S.C. § 8106 ............................................................................... *passim*

54 U.S.C. § 100101(a) ....................................................................... *passim*

54 U.S.C. § 100101(b) ....................................................................... *passim*

54 U.S.C. § 308602(b) .......................................................................................21

54 U.S.C. § 312102(a) .........................................................................................8

Pub. L. No. 95-250, § 101(b), 92 Stat. 163, 166 (1978) ................................12

Fed. R. Civ. P. 65(a)(2) ......................................................................................3

**Other Authorities**

*D.C. Appropriation Bill, 1927, Hrg. Before the Subcomm. of H. Comm. on
    Appropriations*, 68th Cong. (1926)....................................................................7

NCPC, *Project File 8763*, available at https://www.ncpc.gov/review/project/8763/
    (last accessed Mar. 16, 2026).............................................................................20

H.R. Subcomm. on Nat'l Parks and Insular Affairs, 95th Cong., *Legislative History of the Redwood Nat'l Park Expansion Act of 1978* ....................................................12

## INTRODUCTION

The Defendants continue to search for a legal theory—any theory—that permits them to erect a massive ballroom on the White House grounds without obtaining the necessary authorization from Congress. After three months, well over a hundred pages of briefing, more than a dozen affidavits, and twelve attorneys scouring the U.S. Code, they are still searching, and for good reason: they need congressional authorization, and none exists.

Section 105(d) certainly does not provide it. That subsection authorizes *Congress* to appropriate funds for White House upkeep, and permits the executive only to spend funds "appropriated under th[at] subsection"—here, a meager $2.475 million earmarked for "required maintenance, resolution of safety and health issues, and continued preventative maintenance." No matter how many times the Defendants insist otherwise, the plain text of § 105(d) in no way, shape, or form gives the President permission to build anything he wants, with any funds he wants. And were that not enough (it is), § 105(d)'s restrictions are reinforced twice over: first by § 8106, which prohibits construction of the Ballroom without "express authority" of Congress, and second by the Redwood Amendment, which also requires that Congress "directly and specifically" authorize the project.[1] It could hardly be clearer that Congress has not.

Unable to justify the Ballroom Project based on § 105(d), the Defendants have once again changed horses midstream. For the first time, the Defendants claim that they have a second, "independent" source of authorization for the Project: NPS's Organic Act, 54 U.S.C. § 100101(a). *Compare* ECF 52 at 13 (claiming "two independent sources of statutory power"), *with* ECF 30 at 18 ("Defendants respond that the necessary authority is found in 3 U.S.C. § 105(d)."). But their invocation of the Organic Act—which authorizes NPS to "promote and regulate the use" of

---

[1] Abbreviations and defined terms have the same meaning as in the National Trust's prior briefs.

national parks—runs headlong into not only § 8106, but also the Redwood Amendment, which prohibits NPS from administering national parks in a manner that impairs park resources, 54 U.S.C. § 100101(b)(2). Even the Defendants have admitted that constructing a massive ballroom (and damaging the east façade of the Executive Residence in the process) will do exactly that.

In fact, all that the Defendants' eleventh-hour reliance on NPS's Organic Act serves to underscore is that the Ballroom Project can and must be stopped—and not just on *ultra vires* grounds. In a remarkable act of self-sabotage, the Defendants' inability to maintain a consistent legal theory has confirmed that the Ballroom Project is subject to the very APA review they have gone to extraordinary lengths to try to escape.

Recall that to date, the Defendants have evaded APA review because they have strenuously insisted that *EXR* (which, the Court preliminarily held, is not an APA agency) was in charge of the Ballroom Project, and NPS was "indisputably *not* directing" it, ECF 30 at 17 n.7. Not anymore, apparently. In their quixotic effort to avail themselves of the Organic Act's supposed authorization for the Ballroom (it contains none), the Defendants concede that the claimed authority for the Project belongs to *NPS*. Because the buck ultimately stops with NPS, this unlawful Project can be stopped by enjoining NPS. And because NPS is indisputably an APA agency, the Court can do that with no need or occasion to reach the *ultra vires* issue.

In the end, all roads lead to the same place. The Defendants have no authority to build the Ballroom—not even close. They tried the Constitution; then they thought better of it. They moved on to § 105(d), which has gotten them nowhere. And their latest pivot to the NPS Organic Act is not only fruitless, but has also undone the measures that they took to evade APA review in the first place. But the merry-go-round at some point must stop. Having exhausted every possible source of constitutional and statutory authority, only one option remains: The Defendants must halt

construction on the Ballroom unless and until they obtain the congressional authorization that they should have secured long ago. The Court should grant the National Trust's motion and preliminarily enjoin further construction of the Ballroom.[2]

## ARGUMENT

### I.    The Ballroom Project Is Ultra Vires of Any Authority the Defendants Have Under 3 U.S.C. § 105(d) and 40 U.S.C. § 8106.

The Defendants strain to show that the Ballroom Project is not *ultra vires* of their authority under 3 U.S.C. § 105(d) and 40 U.S.C. § 8106—statutes that not only fail to authorize the Project, but clearly and affirmatively prohibit it. Their arguments only highlight that the Project rests on the sort of "patent[]" statutory "misconstruction" that typifies *ultra vires* conduct, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022), and demands injunctive relief here.

**1.** By the Defendants' telling, § 105(d) provides the executive with vast authority to make any "alteration" or "improvement" to the White House that he sees fit, using funds from any government account that he has on hand. *See* ECF 52 at 10. The statute does nothing of the sort. Section 105(d): (1) authorizes Congress to appropriate funds for enumerated statutory purposes (starting with "care," "maintenance," and "repair," along with "alteration" and "improvement," and "heating" and "lighting") and (2) permits the executive to expend "[s]ums appropriated under" § 105(d)—here, $2.475 million for "required maintenance, resolution of safety and health issues, and continued preventative maintenance"—"for [those] expenses." 3 U.S.C. § 105(d); 2024 Appropriations Act, at 532; ECF 51-1 at 11. Nothing in § 105(d) or the 2024 Appropriations Act comes anywhere near authorizing the Defendants to build a massive ballroom with $400 million

---

[2] The Defendants complain that the National Trust has brought a second preliminary-injunction motion. ECF 52 at 4-7. But they have no one to blame for that but themselves. *See* ECF 47 at 20-21. Regardless, if the Court has any concern about hearing a second preliminary-injunction motion, the Trust invites the Court to convert the motion into a final hearing and permanently enjoin further unauthorized construction of the Ballroom. *See* Fed. R. Civ. P. 65(a)(2).

of private donations which were apparently "appropriated to be disbursed" under an entirely *different* statute, 31 U.S.C. §§ 1321(a)(17) & (b)(1). ECF 51-1 at 6-14.

The Defendants fail to respond to nearly all of this. They do not explain—and have never explained—how § 105(d) could authorize them to do anything at all with funds never actually "appropriated under" § 105(d) ("Sums appropriated under ***this subsection*** … may be expended [for the listed purposes]" (emphasis added)), despite the National Trust having pointed out this clear and obvious restriction twice, ECF 33 at 12; ECF 51-1 at 10.[3] And they never explain how Congress's limited grant of permission to use *specified* funds for *specified* purposes vests plenary "operational control," ECF 52 at 10, in the President to do whatever he wants to the White House.

Instead, the Defendants' argument reduces to a single, audacious assertion: because the dictionary definitions of two words found in § 105(d)—"alteration" and "improvement"—could, they claim, plausibly encompass the Ballroom, the National Trust's *ultra vires* claims necessarily fail. *See, e.g.*, *id.* at 10-11; *id.* at 2. But that gets them nowhere. To start, no matter how many times they insist otherwise, the Defendants do not have freestanding authority to "alter[]" or "improve[]" the White House: § 105(d) authorizes *Congress* to appropriate funds pursuant to § 105(d) for those and other articulated purposes, which the executive then must spend consistent with Congress's directives—here, for "required maintenance, resolution of safety and health issues, and continued

---

[3] Section 105(d)'s restriction also rebuts the Defendants' claim that the National Trust has "conflate[d]" § 105(d)'s authorization with the appropriations Congress has made thereunder. ECF 52 at 12. The National Trust has not. The Trust has correctly noted on now three separate occasions that the Executive's "*authority* to act," *id.*, under § 105 is plainly restricted to expending "[s]ums appropriated under th[at] subsection," 3 U.S.C. § 105(d) for the "expenses described" therein and as further limited by the terms of the relevant appropriating act, *see* 31 U.S.C. § 1301(a). An authorization for Congress to make appropriations—i.e., to create budget authority for future expenditures—is not freestanding permission for the executive to do whatever he wants with whatever funds he has, *see* ECF 51-1 at 8. In insisting otherwise (for reasons that elude understanding, *see, e.g.*, ECF 52 at 10, 12-13), it is the *Defendants* who conflate the two.

preventative maintenance." ECF 51-1 at 8 (quoting 2024 Appropriations Act, at 532).

The Defendants' effort to shake "alteration" and "improvement" loose from their inconvenient statutory moorings also fails on its own terms. It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). And here, § 105(d)—when read "as a whole," as it must be— could not be clearer: "alteration" and "improvement" do not encompass completely new structures, but instead contemplate the comparatively minor and routine projects of the sort connoted by the other words in § 105(d)(1). *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[A] statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (citation omitted)); *see Learning Res. v. Trump*, 2026 U.S. LEXIS 714, at *28 (Feb. 20, 2026). The Defendants' knock on *noscitur a sociis*, ECF 52 at 11, misses the point, because here the canon simply confirms what the plain text already communicates: that Congress did not authorize appropriations for the executive to unilaterally demolish and rebuild a third of the White House in the same breath as it authorized appropriations to pay his utility bills. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress … does not … hide elephants in mouseholes.").

Finally, the Defendants protest that § 105(d) establishes no clear line between permissible and impermissible conduct. ECF 52 at 11-12; *see id.* at 8. Of course it does: § 105(d) sets out the purposes for which Congress is authorized to appropriate funds, and Congress then set out in the 2024 Appropriations Act not only the precise amounts the President can spend, but the exact purposes to which those funds can be put. The Defendants' problem is not an absence of clear statutory instruction, but rather their insistence on doing something that the statute clearly forbids.

**2.** Because the Ballroom Project is *ultra vires* of the Defendants' authority under § 105(d),

the Court can end its analysis here. But if any doubt remained, it would be firmly dispelled by 40 U.S.C. § 8106. Section 8106 "specific[ally] prohibit[s]" construction of the Ballroom, *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025), without "express authority" of Congress. And, because § 8106 expressly governs construction in D.C. federal parks, with respect to President's Park it must be read *in pari materia* with § 105(d), *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 315-16 (2006).

The Defendants have never been able to identify express congressional authorization for the Ballroom Project—because none exists. Instead, they have advanced a parade of strained and unconvincing hypotheses for why, despite its plain text, § 8106 does not apply to them. Their latest gambit is that "near-contemporaneous legislative history," ECF 52 at 20, supposedly shows that the Ballroom Project is exempt from § 8106's prohibition. But "reliance on legislative history is unnecessary"—indeed, improper—"in light of the statute's unambiguous language." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 459-60 (2012); *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("[A] court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop." (internal citations omitted)). Despite the Defendants' urging, the Court must begin—and end—with § 8106's unambiguous prohibition of the Defendants' unauthorized construction of the Ballroom.

But even if the Court could look beyond § 8106's text, what the Defendants offer is neither "near-contemporaneous" nor even "legislative history" at all, ECF 52 at 20. It is a single statement made in an unrelated hearing more than a decade *after* § 8106's predecessor statute was enacted, by someone who was not (and never had been) a legislator. In a word, it is worthless. *Cf. Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent

legislative history … should not be taken seriously ….").

The same is true of the rest of the Defendants' historical authority. ECF 52 at 21-23. Their suggestion that the scope of a separate 1864 law has some bearing on the analysis of § 8106 is a non-starter, *id.* at 19-20, as is their claim that the repeal of yet another statute six years before § 8106's affirmative recodification in 2002 means that § 8106 itself was somehow narrowed or partially repealed by implication, *id.* at 21-22. Congress does not silently insert implied exceptions into crystal-clear statutes through repeals of entirely different laws that occurred years earlier. *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 662 (D.C. Cir. 2011) (implied amendments and partial repeals "strongly disfavored"). To the contrary, § 8106 means precisely what it says.

As a last resort, the Defendants retreat to attacking—yet again—the National Trust's exhaustive exposition of Congress's authorization of construction and alterations to the White House dating back to the Residence Act of 1790, *see generally* ECF 20-1. ECF 52 at 20-21. None of their arguments are persuasive, for reasons the Trust has already explained, *see* ECF 33 at 10-11. And while the Defendants offer an assortment of other projects in other D.C. federal parks they claim were also unauthorized, those projects are no more help. Even if it had been "longstanding practice" not to adhere to § 8106, it would not relieve the Court of its obligation to "give effect to [§ 8106's] plain command" now. ECF 33 at 9-10 (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). And based upon the Trust's preliminary review, it appears that at least some of these supposedly unauthorized projects were in fact authorized after all. *See D.C. Approp. Bill, 1927, Hrg. Before a Subcomm. of H. Comm. on Appropriations*, 68th Cong. (1926) (statement of Maj. Ulysses S. Grant III) (explaining that the "field house and other

buildings" had been presented to Congress, which had then appropriated funds for them).[4]

**3.** In a final effort to evade judicial review, the Defendants assert that the National Trust is outside of the zone of interests that § 105(d) and § 8106 are designed to protect. ECF 52 at 25-29. The Defendants' argument is wrong on the facts—the National Trust was congressionally chartered "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest," 54 U.S.C. § 312102(a). Its interests thus fit squarely within those "protected by [§ 8106]," *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014), a statute that imposes uniquely heightened restrictions on construction on federal land in the most historically dense area in the country.

The National Trust's interests are therefore (at minimum) "arguably within the zone of interests to be protected," and no more is required. *NCUA v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 488 (1998); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (noting, in APA context, that the test "is not meant to be especially demanding"). The Defendants' principal response—that the statutes supposedly did not have the National Trust (or "private citizens" at all) in mind, ECF 52 at 27—misses the point. *NCUA*, 522 U.S. at 489 (court "should not inquire whether there has been a congressional intent to benefit the would-be plaintiff"), *id.* at 492 (similar). Contrary to the Defendants' contention, there could hardly be a better match between the Trust and the interests it is suing to vindicate.

---

[4] Two other points can be disposed of briefly. First, the Defendants contend that § 8106 "should not be read to constrain the President." ECF 52 at 23. While the National Trust disagrees, the Trust also notes that the Court *need* not do so to enjoin EXR, NPS, or the other defendants. ECF 33 at 13-14. Second, the Defendants appear to argue that the *Learning Resources* plaintiffs did not have an *ultra vires* claim but instead "proceeded … under 15 U.S.C. § 1581(i)." ECF 52 at 9 n.1. That is incorrect. Section 1581 is a jurisdictional statute; it does not afford a cause of action. While the Court of International Trade had jurisdiction under § 1581, the plaintiffs advanced an *ultra vires* claim. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1365-67 (§ 1581 jurisdiction), 1369-70 (non-statutory *ultra vires* claim) (Ct. Int'l Trade 2025).

The Defendants' zone-of-interests argument also suffers from a more fundamental problem: the test has no place in the *ultra vires* analysis at all. Because the zone-of-interests test concerns "whether the statute grants the plaintiff the cause of action that [the plaintiff] asserts," *FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 232 n.3 (2025) (quoting *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196-97 (2017)), it is irrelevant to these "**nonstatutory** *ultra vires*" claims, *Nuclear Reg. Comm'n*, 605 U.S. at 680-81 (emphasis added); *see, e.g.*, *Oregon v. Trump*, No. 25-cv-1756, 2025 U.S. Dist. LEXIS 219903, at *91 n.18 (D. Or. Nov. 7, 2025) (concluding same).[5]

The D.C. Circuit has recognized as much. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 n.14 (D.C. Cir. 1987).[6] And that is unsurprising, because the Defendants' argument urges truly perverse results. If *ultra vires* claims were limited to plaintiffs within the zone of interests of the statute the Defendants invoked, they could summarily extinguish *ultra vires* claims—of any sort, in any context—simply by claiming that they were acting *ultra vires* of an entirely irrelevant statute. This is precisely the pretextual mischief that this Court has refused to countenance: "If the Government were to use a Medicare statute, for example, to justify building the border wall on someone's property, it would make little sense to require that person to show that he was a Medicare beneficiary or provider to argue that the Medicare statute did not permit border barrier construction. It is no different here where Plaintiffs claim they are injured by the Government's

---

[5] *Ultra vires* claims can be brought under the APA (i.e., *statutory*) where such review is available, *see* 5 U.S.C. § 706(2)(C) (court may set aside action "in excess of statutory … authority"), or as relevant here, equitably in the absence of a statutory cause of action (i.e., *nonstatutory*).

[6] In *Haitian Refugee Center*, the D.C. Circuit explained that the plaintiff "need not … show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*." 809 F.2d at 811 n.14. "Otherwise," the D.C. Circuit explained, "a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest." *Id.* As it happens, here the Trust *does* come within the statutory zone of interests, but the same analysis holds.

use of statutes that, they say, it had no right to use for these purposes." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48 (D.D.C. 2020). Nothing recommends such a result, let alone requires it, as the Defendants' supposedly contrary authority confirms.[7] *See* ECF 52 at 25 (citing dicta from *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025), which did not hold that *ultra vires* claims at issue were barred by the zone-of-interest test, or cite a decision that did).

## II. The Defendants' Reliance on the NPS Organic Act Fails—and Subjects the Ballroom Project to APA Review in the Process.

Perhaps realizing that § 105(d) offers only a dead end, the Defendants claim—for the first time—a second supposed "independent source[] of authority" for the Ballroom Project: the NPS Organic Act. ECF 52 at 9, 13. The Defendants' late-breaking reliance on the Organic Act is puzzling, since it is difficult to see how *NPS's* enabling statute could possibly authorize *EXR* to do anything. And the Defendants do not argue that the Organic Act does. Rather, they claim that NPS, in exercising its Organic Act powers, could "contract with EXR to manage the project." *id.* at 24. It is *NPS*, in other words, that is now apparently back in charge of the Ballroom Project—not EXR, which has summarily been demoted to general contractor status.

This, to put it mildly, bears no resemblance whatsoever to the position that the Defendants have advanced for months. Think back to the December TRO briefing, where the Defendants insisted that EXR was "managing the [Ballroom Project] under the President's direction," ECF 30

---

[7] The Defendants also urge that the zone-of-interests test should be applied because, they claim, "the Supreme Court has long applied the zone-of-interests test to limit implied constitutional causes of action," too. ECF 52 at 25 (citing *Bos. Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 320 n.3 (1977); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 469, 475 (1982)). That is not accurate. In fact, *Boston Stock's* passing mention of the zone of interests in the constitutional context has proved so unusual to cause Judge Silberman to remark that the decision might have been "simply anomalous" in this respect, *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 676 n.3 (D.C. Cir. 2013) (Silberman, J., concurring). Their citation to a *Bivens* damages action, which have been held to much more exacting standards, is also misplaced. ECF 52 at 26 (citing *Hernandez v. Mesa*, 589 U.S. 93, 109 (2020)).

at 3, and NPS was "indisputably not" in charge, *id.* at 17 n.7; *see also id.* at 15-16. There was good (if cynical) reason for the Defendants to keep NPS out of the picture: If EXR could run the project based on § 105(d) and at the President's direction, the Defendants could evade the APA review that they knew they would flunk. But now the claim is reversed: Defendants assert that the Ballroom Project is supposedly authorized by NPS's Organic Act, and the Project is ultimately subject to the decision-making authority of *NPS*—an "agency" whose actions indisputably may be reviewed under the APA. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 905, 915 (D.C. Cir. 2024).

Instead of solving the Defendant's legal problems, their invocation of the Organic Act simply multiplies them. As explained below, the Organic Act does not, and cannot, provide "direct[] and specific[]" congressional authorization to build the Ballroom the Defendants need under the Redwood Amendment, or the "express authority" required under § 8106, so it does nothing to blunt those *ultra vires* claims (nor could it, as EXR has no authority under the *NPS* Organic Act). *See infra* II.A. And while NPS's reassertion of ultimate control over the project may unwind the Defendants' unlawful reorganization of the Executive Branch, it does so at the cost of what they have strained for months to avoid—APA review of the Ballroom Project. *See infra* II.B.

## A. The Organic Act Does Not Provide "Direct[] and Specific[]" Authority Required by the Redwood Amendment or "Express Authority" Required by § 8106.[8]

The Defendants' opposition struggles, and then fails, to evade the Redwood Amendment's unambiguous command. Congress did not mince words: Any federal entity engaged in "management" or "administration" of a National Park System unit is forbidden from exercising that authority "in derogation of the values and purposes for which the [National Park] System units

---

[8] The Defendants develop no argument that the Organic Act provides the authorization necessary under § 8106, so the Trust focuses here on the Redwood Amendment, although § 8106 equally forecloses Defendants' reliance on the Act. Because the Defendants never make (and thus waive) any zone-of-interests argument regarding the Redwood Amendment, that poses no bar either.

have been established, ***except as directly and specifically provided by Congress***." 54 U.S.C. § 100101(b)(2) (emphasis added); *see id.* § 100101(a) (declaring that the "fundamental purpose" of the System is to "conserve the scenery, natural and historic objects, and wild life" in "such manner and by such means as will leave them ***unimpaired*** for the enjoyment of future generations" (emphasis added)). That is a "*specific prohibition*," *Nuclear Reg. Comm'n*, 605 U.S. at 681, with a "discernible standard[]," *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,* 26 F.4th 960, 972 (D.C. Cir. 2022). The Defendants have violated it.

Congress enacted the Redwood Amendment in 1978 precisely *because* the Organic Act's general mandate proved insufficient to protect park resources from degradation—a lesson Congress learned after NPS's general Organic Act authority failed to prevent irreversible harm to Redwood National Park. *See* Pub. L. No. 95-250, § 101(b), 92 Stat. 163, 166 (1978); H.R. Subcomm. on Nat'l Parks & Insular Affairs, 95th Cong., Legislative History of the Redwood Nat'l Park Expansion Act of 1978 (Pub. L. 95-250) (Comm. Print 1978), at 1 (describing "a pattern of indifference, indecisiveness, and frustration"). The Redwood Amendment's plain text reflects Congress's emphatic chosen remedy: a flat prohibition against any impairment of park resources, regardless of which federal entity's actions were responsible.

By the Defendants' own admission, the Ballroom Project impairs President's Park. As NPS's Environmental Assessment and Finding of No Significant Impact ("FONSI") acknowledge, the project will cause numerous permanent adverse effects to the historic White House grounds and structure, including permanent loss of the East Wing and erection of a massive ballroom wholly disproportionate to the Executive Mansion.[9]  ECF 51-1 at 15-16; ECF 14-2; ECF 14-3.

---

[9] The Defendants try to recast the Redwood Amendment's plain text as an invitation for the agency to "balance" whether the Ballroom Project benefits more than it impairs. *See* ECF 52 at 15-17. But the statute provides for no such thing. The question is not whether the project's impairment has

The Defendants therefore need "direct[] and specific[]" congressional authorization to carry out the Ballroom Project. And again, they do not have it. The Defendants are left asserting that Congress hid the necessary "direct[] and specific[]" authority to impair the White House in Organic Act's general grant of authority to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units," 54 U.S.C. § 100101(a). ECF 52 at 13-16. As should be plain, that is a far cry from the "direct[] and specific[]" authorization needed to impair existing historic objects under the Redwood Amendment, *id.* § 100101(b)(2). The Ballroom Project's well-documented impairment of the White House circumvents the Redwood Amendment's "specific and unambiguous statutory directive"—plain and simple. *Changji Esquel Textile*, 40 F.4th at 722.

To be blunt: Congress adopted the Redwood Amendment to *cure* the Organic Act's inadequacy, not to *reinforce* its inadequacy. The Defendants' contention—that the general language of the Organic Act circumvents the later-passed and more specific requirement of the Redwood Amendment for direct and specific congressional authorization to impair a historic resource— would render the Redwood Amendment a nullity, an absurd result that no principle of statutory construction permits. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general," especially where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." (citations omitted)).

As their last defense, the Defendants cite cases referencing NPS's "broad discretion" under the Organic Act. *See* ECF 52 at 16-17 (citing *Davis v. Latschar*, 83 F. Supp. 2d 1, 5 (D.D.C. 1998),

---

offsetting benefits; it is whether Congress has "directly and specifically" authorized a "derogation of the values and purposes" for which President's Park was established. 54 U.S.C. § 100101(b)(2).

*aff'd*, 202 F.3d 359 (D.C. Cir. 2000); *Bicycle Trails Council v. Babbitt*, No. C-93-0009, 1994 U.S. Dist. LEXIS 12805, at *24 (N.D. Cal. Sept. 1, 1994), *aff'd*, 82 F.3d 1445 (9th Cir. 1996)). These cases are inapposite. They address NPS's discretion in routine park management—determining "what uses of park resources are proper and what proportion of the park's resources are available for each use," *Bicycle Trails Council*, 1994 U.S. Dist. LEXIS 12805, at *24. They do not hold that NPS may demolish a historic structure that its own Foundation Document identifies as "essential to achieving the purpose of [President's Park] and maintaining its significance," ECF 51-1 at 15 n.10, and erect a massive Ballroom in its place, without direct and specific congressional approval. Neither the general "construction" appropriations on which the Defendants rely, ECF 52 at 14, nor NPS's gift-statute authority to accept private donations, *id.* at 18, constitutes the "direct[] and specific[]" congressional authorization the Redwood Amendment demands.

Yet that is the logical endpoint of the Defendants' position: that NPS has unlimited authority under the Organic Act to demolish or degrade whatever historic resources it sees fit on the lands Congress has entrusted to its stewardship—so long as it can find the money to do so, whether through general appropriations or private donations, *see id.* Congress plainly never intended that result; if it had, the Redwood Amendment would be meaningless*, see Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or … void…." (citation omitted)).

Nor can NPS's own self-serving "non-impairment determination," ECF 52 at 16, insulate the Ballroom Project from scrutiny. The Defendants suggest that *NPS's* conclusion that the Ballroom Project is consistent with the purposes of President's Park settles the matter. *Id.* It does not. NPS cannot invoke its self-proclaimed "reasoned judgment," *id.* at 17, to do what Congress has prohibited "except as directly and specifically provided by Congress," 54 U.S.C.

§ 100101(b)(2). The Redwood Amendment is a legislative command, not a delegation of self-certification authority to the very agency whose conduct is at issue. Whether the Ballroom Project derogates from the values and purposes of President's Park, and whether Congress has directly and specifically authorized that derogation, are questions for this Court, not ones for NPS to answer in its own favor. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("[A]gency interpretations of statutes … are *not* entitled to deference."). No statute directly and specifically authorizes the derogation that the Project inflicts on the historic resources of President's Park. The Project is *ultra vires* of not only § 8106 and § 105(d), but the Redwood Amendment as well.

### B. The Defendants Now Admit NPS Is Ultimately in Charge of the Ballroom Project—and NPS Has Violated the APA.

The Defendants' newfound reliance on the Organic Act has caused their merry-go-round of supposed authorizations for the Ballroom Project to come full circle. At the beginning of this litigation, the National Trust moved for a temporary restraining order and a preliminary injunction stopping the Defendants—including NPS, the lead defendant in this case—from constructing the Ballroom. ECF 2; ECF 2-1. The National Trust did so based on its reasonable belief that the Ballroom Project (a major project in a national park) was likely being led by NPS, and because NPS had violated the APA in multiple ways. *See* ECF 2-1 at 16-30 (detailing violations of NEPA, 40 U.S.C. § 8106, and various commission-review statutes).

The Defendants, however, immediately protested that the Ballroom Project was being run by *EXR*. And to that end, they claimed that the ultimate authority to carry out the project came from a statute—3 U.S.C. § 105—that supposedly allowed EXR to construct the Ballroom without any supervision or direction by another APA agency. ECF 15-1 at 6 (project was "proceeding under the leadership of [EXR]" with mere "consultation by NPS"). The Defendants reiterated those representations at the TRO hearing, and claimed that no APA review of the Ballroom Project was

15

possible as a result. Dec. 16, 2025 Hrg. Tr. 24:5-9 ("agency's involvement" was at the "direction" of EOP); *id.* at 22:2-6 (Ballroom Project "is being planned, directed and executed by [EOP] using architects and contractors that [the President] hired" so "there is no agency action … to enjoin").

After the TRO hearing, the Court asked for briefing on the source of "statutory authority to construct [the B]allroom," and whether "the entities directing the ballroom construction," including EXR, were APA agencies. ECF 17 at 4. The Defendants' answer was the same as at the TRO hearing: EXR was "managing the East Wing project under the President's direction," ECF 30 at 3; *see id.* at 12-13 (same); *id.* at 15-16 (same), and NPS was "indisputably" not in charge, *id.* at 17 n.7 (NPS "is indisputably not directing the East Wing project" so the Trust's "APA claims … go nowhere"); *id.* at 23 ("NPS had (and has) no role in directing the Project"); *id.* at 42 ( "[T]he entity controlling the East Wing project, EXR, is not an 'agency' within the meaning of the APA.").

And while over a half-dozen statutes comprised the Defendants' Rube Goldberg project-funding machine, *see id.* at 34-35, the Defendants were clear that only one authorized the Project itself: 3 U.S.C. § 105(d). *See id.* at 18 ("Defendants respond that the necessary statutory authority is found in 3 U.S.C. § 105(d)"); *see also id.* at 34 (claiming that § 105(d) gives "the President … the freedom to expend money in the White House Repair and Restoration account" and then separately explaining how funds are transferred to that account).

There was an obvious reason for all this maneuvering. Thirty years ago (and under entirely different circumstances) the D.C. Circuit had held that EXR was not an agency for APA purposes, *see Sweetland v. Walters*, 60 F.3d 852 (D.C. Cir. 1995). Seizing on form over function, the Defendants realized that by claiming (however baselessly) that the Ballroom Project was authorized by a statute under which EXR could operate directly, they could cut any APA agency out of the process—and circumvent APA review they knew they would fail, *see* ECF 33 at 5-8.

At least at the beginning, that was what the Defendants accomplished. In denying the National Trust's first preliminary-injunction motion, the Court preliminarily concluded that EXR was not an "agency" under the APA, and that the National Trust was therefore unlikely to succeed on its APA claims against EXR. ECF 47 at 13-16. Although the National Trust had moved on its APA claims against NPS as well, ECF 2-1 at 16-30 (APA claims); ECF 2-37 (proposed order against NPS); ECF 20-4 (same), the Court did not separately address those claims in denying the Trust's motion, *see* ECF 47 at 1, 13-16. This was presumably based on the Court's reliance on the Defendants' representations that *EXR* was controlling the project under § 105(d), *see id.* at 5, 13.

Since then, however, the Defendants' position has collapsed. The Defendants cannot come up with any plausible explanation for how 3 U.S.C. § 105(d) authorizes the Ballroom Project—or even comes remotely close enough to stave off *ultra vires* review, *see supra* I.1. And the Defendants know it.  So for the first time, the Defendants now claim that they have "*two* independent sources of statutory authority*": not just § 105(d), but also the NPS Organic Act. *Compare* ECF 52 at 9 (emphasis added), *and id.* at 7 (similar), *with* ECF 30 at 18 ("Defendants respond that the necessary statutory authority is found in 3 U.S.C. § 105(d)").

And suddenly, NPS is *everywhere*. The Defendants now invoke NPS's history of construction in national parks to justify the Ballroom Project. ECF 52 at 14-16. They cite NPS's FONSI and non-impairment determination as evidence that the Project is substantively reasonable. *Id.* at 16-17. They tout NPS's determination that the Project was "consistent with [the] enabling legislation." *Id.* at 16. And they admit that EXR is acting as a mere "contract[or]" to NPS in NPS's exercise of its supposed Organic Act powers. *Id.* at 2, 18, 23-25.[10]

---

[10] The Defendants' shifting invocation of the Economy Act, 31 U.S.C. § 1535, is illustrative of the broad rewriting of recent history attempted by their opposition. The Defendants previously cited the Economy Act as the means by which EXR could receive funds from NPS for use on a project

While the Defendants' late-in-the-day gambit cannot save the Ballroom Project, *see supra* II.A., it has one other, very basic consequence: If the supposed authority for the Project derives from the NPS Organic Act, then NPS is ultimately in charge of the Project, ***and the Ballroom Project is subject to APA review***. *See Marin Audubon Soc'y*, 121 F.4th at 905, 915. While the National Trust can satisfy the standard for *ultra vires* claims for all the reasons already explained, *see supra* I., II.A., the Defendants' belated pivot to the NPS Organic Act means that Trust no longer even needs to meet that standard to obtain relief against NPS.[11] The Ballroom Project can be enjoined ***on the basis of the National Trust's APA claims alone***—just as an injunction against a project developer (i.e., NPS) runs against its general contractor (i.e., EXR).

Under APA review, this case is easy, because NPS has violated the APA many times over. NPS is proceeding with the Ballroom Project without the express authorization of Congress required by 40 U.S.C. § 8106, which is agency action "not in accordance with law," 5 U.S.C. § 706(2). ECF 2-1 at 22-23; ECF 33 at 8-15; ECF 50 (Second Am. Compl.) ¶¶ 172-178. Its EA and FONSI were facially arbitrary and capricious: prepared in secret, withheld from the public until after demolition was complete, and premised on an alternatives analysis reverse-engineered to support a predetermined conclusion, and *still* have not been completed or corrected. ECF 2-1 at 23-30; ECF 20 at 29-36; ECF 33 at 16-20; ECF 50 ¶¶ 142-170. Those analyses flunk the Redwood Amendment as well. Meanwhile, NPS is carrying out construction of the Ballroom Project—as it

---

over which *EXR* was ultimately in charge. *See, e.g.*, ECF 30 at 34-35. Now, Defendants have flipped that framing entirely, casting the Economy Act as the vehicle by which *NPS* has contracted with EXR "to carry out this work" as its general contractor. *See, e.g.*, ECF 52 at 2, 18. Put differently, NPS is no longer funding *EXR's* project; rather, EXR is just running day-to-day operations on *NPS's* project. The switch is obvious, and so are the consequences for APA review.

[11] Indeed, the *ultra vires* standard would be inappropriate as to NPS, as an APA agency against whom APA review is available. *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 841 n.7 (D.C. Cir. 2024). Of course, EXR remains enjoinable (and should be enjoined) under the *ultra vires* claims.

has been for several months—without NCPC approval. ECF 50 ¶¶ 112-128. For any or all of the above reasons, NPS should be enjoined, just as the Trust has requested. ECF 51-1 at 1-2 (renewing motion as to all claims); ECF 51-2 (proposed order for preliminary injunction against NPS).

In sum, the Defendants can either claim NPS's statutory authority undergirds the legality of the Ballroom Project, meaning APA review and injunctive relief is available against NPS for constructing the Ballroom in violation of § 8106, the commission-review statutes, and NEPA (including the restrictions of the Redwood Amendment). Or they can disclaim NPS's supposed statutory authority, meaning their new source of authority (the Organic Act) collapses, and injunctive relief is available because no statutory authority exists under their only remaining option, § 105(d). What the Defendants cannot do, however, is have it both ways.

Perhaps anticipating this problem, the Defendants claim waiver, attempting to blame the National Trust for the Defendants' inability to keep their own story straight. The National Trust, the Defendants say, did not timely challenge an argument the Defendants had never made: that NPS could exercise its Organic Act authority to contract with EXR under the Economy Act to carry out the Ballroom Project on NPS's behalf. ECF 52 at 18. That is misdirection: How could the Trust have challenged an arrangement that NPS and EXR were insisting did not exist? The Trust was instead constrained to do exactly what it did: promptly challenge each permutation of the Defendants' ever-shifting Project. When NPS seemed to be in charge, the Trust sought to enjoin NPS. *See* ECF 2-1. When EXR then claimed that *it* was in charge, the Trust amended its complaint to challenge the supposed change of control and enjoin EXR. ECF 19 ¶¶ 188-196; ECF 20 at 22-26. And when the Defendants claimed they were sending NPS gift-statute funds to EXR under the Economy Act, ECF 30 at 34, the Trust objected that the transfer was "illegal," ECF 33 at 9, 14-15 (explaining why Redwood Amendment prohibited the transfer). Waiver is meant to prevent

"sandbagging of another party," *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (cleaned up), and the only sandbagging here is the Defendants' last-minute reversal. In any event, the Defendants' waiver argument misses the forest for the trees. From the start, the National Trust has argued that NPS: (1) lacks the necessary authorization for the project; and (2) has not conducted adequate NEPA and commission review. ECF 1 at 35-44. Those violations are sufficient to enjoin NPS—distinct from any Economy Act arrangement with EXR.

### III.    The Defendants' Other Merits Arguments Fail.

The Defendants' litany of other arguments against the Trust's motion are without merit.

*First*, the Defendants urge the Court to reconsider its conclusion regarding standing, arguing that because Dr. Hoagland will supposedly be unable to see the Ballroom from the street, the Trust cannot bring this action. ECF 52 at 29-30. But that is false, as made clear by the Defendants' own renderings—including those published just last week.[12]



A rendering released by the National Capital Planning Commission shows a proposed White House visitor center. (National Capital Planning Commission/US Government/AECOM)

_____

[12] NCPC, Project File 8763, *available at* https://www.ncpc.gov/review/project/8763/ (last accessed Mar. 16, 2026). As demonstrated by the renderings, if both the Ballroom and the visitor center are completed as proposed, the Ballroom's south portico and east façade will be the first thing nearly every visitor to the White House sees.

The Defendants' persistent focus on what can be seen from the street is also puzzling. While they assert that "Dr. Hoagland does not claim to have any special access allowing her to view" the Ballroom, ECF 52 at 29 (and so, they seem to claim, must view it from the street), she does not *need* special access, nor does anyone else: The White House is not a Forbidden Palace, but is open to the public. The Defendants' meritless argument regarding germaneness reiterates points that the Court has already considered and rejected, *compare id.* at 31-33, *with* ECF 47 at 12, and which are no more persuasive for their repetition, *see* ECF 33 at 2-5.[13] And their halfhearted redressability argument, ECF 52 at 27-28, is no better, as halting the Project until Congress authorized it (likely in changed form or not at all) would partially if not completely ameliorate Dr. Hoagland's injury, *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015).

*Second*, the Defendants suggest this is really a dispute between the President and Congress, and that "if Congress want[ed] to block a project, it has tools to do so," ECF 52 at 3. Of course, those tools include declining to appropriate funds for the project, 3 U.S.C. § 105(d), and passing statutes affirmatively prohibiting it, 40 U.S.C. § 8106; 54 U.S.C. § 100101(b)(2). And if a lurking "institutional interest[]" of a political branch were enough to prevent litigants like the National Trust from suing, as the Defendants claim is the case here, ECF 52 at 7, 27, scores of Supreme Court decisions would never have issued, *see, e.g.*, *Learning Res.*, 2026 U.S. LEXIS 714 (tariff power); *NLRB v. Noel Canning*, 573 U.S. 513 (2014) (recess appointments).

*Finally*, the Defendants wrongly assert that reconsidering the Court's determination on the National Trust's constitutional claims would "wipe away the 'established distinction between unconstitutional and ultra vires conduct,'" ECF 52 at 34 (quoting *Glob. Health Council*, 153 F.4th

---

[13] And if more were needed, Congress's tasking the National Trust with other duties, *see, e.g.*, 54 U.S.C. § 308602(b), confirms that the Trust's purposes are not limited to acquiring and managing its own properties, *contra* ECF 52 at 31-33.

at 14). It would not. The Trust respectfully submits that reconsideration is warranted for the reasons already explained.

### IV.    The Remaining Factors Favor Preliminary Injunctive Relief.

The National Trust has amply demonstrated that the remaining *Winter* factors favor injunctive relief. *See* ECF 51-1 at 22-25. The Defendants offer nothing new to disturb that showing.

*First*, the National Trust will suffer irreparable harm absent a preliminary injunction. Continuing construction will cause irreversible damage. *See id.* at 23; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). While the Defendants claim (with impressive chutzpah) that their destruction of the East Wing means that all the damage has already been done, they fail to address the aesthetic harm the completed Ballroom will cause to the White House and President's Park, and do not even mention that the Project will irreparably damage the east façade of the Executive Mansion itself, ECF 20 at 31-32.[14] And while the Defendants note the volume of public comments, ECF 52 at 34-35, they do not appear to have meaningfully considered them. Despite 98% negative feedback, ECF 51-1 at 3, the sole change to the Project (the removal of an oversized pediment) was made at the behest of a member of the CFA.

*National Parks Conservation Association v. Semonite*, 282 F. Supp. 3d 284 (D.D.C. 2017)—cited by the Defendants to claim that the Trust's harm is not sufficiently imminent, ECF 52 at 30, 35—in fact reinforces why an injunction is necessary. There, the court denied the Trust's motion to preliminarily enjoin construction of seventeen electrical towers, reasoning that only construction of the towers' *foundations* was then imminent. *Semonite*, 282 F. Supp. 3d at 289. And the defendants stated that the court could "order the completed towers removed at a later point," *id.* at 289 n.7. But when the Trust prevailed on the merits, the towers had been built, and the court

---

[14] The assertion that Dr. Hoagland's aesthetic injury deserves "almost zero weight," ECF 52 at 35, ignores that this Court has already credited it, *see* ECF 47 at 9-11; ECF 51-1 at 23-24.

found the consequences of tearing them down too great to remedy. *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 94, 100 (D.D.C. 2019). With above-grade construction weeks away, that cautionary tale is reason to grant an injunction, not to deny one.

*Second*, the balance of equities favors the National Trust as well. The Defendants contend, again, that the Ballroom itself is necessary for national security. ECF 52 at 35-36. The Trust takes national security and the safety of the President seriously. But the absence of a massive ballroom on the White House grounds has not prevented any past president from residing in the White House during the past two centuries. And it has not prevented President Trump from continuing to live at the White House since the demolition of the East Wing, either. A preliminary injunction will not change that: The Trust has repeatedly and explicitly urged the Court to design any injunction it issues to *ensure* the safety of the President. *See, e.g.*, ECF 41 at 2; ECF 33 at 25; ECF 20-4; Jan. 22, 2026 Hrg. Tr. 21:7-14. And the Court is more than capable of permitting safety-critical work (including construction of a bunker) to continue while pausing the Ballroom, *see* ECF 20-4. Courts draw such remedial lines every day. That is not "project manage[ment]," ECF 52 at 4—it is equity.

The Defendants also claim that the "gaping hole" at the East Wing site means that construction cannot be paused. *Id.* at 36. But they seem to have forgotten the proverbial First Law of Holes: when you find yourself in one, stop digging. They have known for months that they lack congressional approval, yet have insisted on continuing to dig—literally. They now assert that the larger their physical hole gets, the more imperative it is that they be allowed to keep digging— even though this Court warned in December that if below-grade work "dictate[d] the size or scale of the proposed ballroom" the Defendants "should be prepared to take it down" if an injunction were granted, ECF 17 at 3. Self-inflicted hardship is no basis for evading equitable relief.

*Third*, no matter how much the Defendants tout the ways they believe the public will

supposedly benefit from the Ballroom in the future, ECF 52 at 36-37, it is plainly not in the public's interest to have itself and its representatives in Congress systematically and unlawfully excluded from the decision-making process involving the most substantial exterior construction project in over a century to one of the country's most historically significant buildings, simply so the Defendants can carry out their illegal construction without authorization or meaningful review.

*Finally*, the Defendants' request that an injunction be limited to "construction elements that are not visible from public vantage points," *id.* at 37, should be denied. Since the Defendants appear to believe, however implausibly, that the Ballroom will be all but invisible from public vantage points, it is clear that they would treat such an injunction as none at all.

## V. The Defendants' Request for a Stay Pending Appeal Should Be Denied.

The Defendants' premature and procedurally improper request for a stay pending appeal should also be denied. Unless and until an actual injunction is issued, the Defendants cannot know whether they will suffer irreparable harm (or any harm at all) without a stay of that injunction— which is a "necessary prerequisite" to obtaining relief, *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). National security concerns do not change that calculus. As noted, the National Trust has repeatedly made clear its willingness to accommodate national-security imperatives, *see, e.g.*, ECF 41 at 2; ECF 33 at 25; ECF 20-4; Jan. 22, 2026 Hrg. Tr. 21:7-14, and pausing construction of the *Ballroom* will not endanger either national security or the personal safety of the President.

The Defendants' failure to meet their burden as to irreparable harm is "fatal" to their request for a stay. *KalshiEX*, 119 F.4th at 64. But even if that could be ignored, the merits, public interest, and equities also disfavor a stay for reasons already explained, *see, e.g.*, ECF 45 at 5-9.

## **CONCLUSION**

The Defendants are right about one thing: this case is "novel," ECF 52 at 4. But not because an injunction will encroach upon the Defendants' prerogatives—when it comes to building a massive ballroom on the White House grounds, they have none. Rather, this case is novel because no prior President has ever usurped Congress's Property Clause authority to destroy a third of the White House and rebuild it with private donations, and without any congressional authorization. It is novel because no prior administration has ever claimed that it can evade APA review by routing major projects through the President's butler. And it is novel because no prior administration has ever sought to put its initiatives *completely* beyond judicial review through the two-step of first conceding a lack of constitutional authority in order to defeat any constitutional claims, *see* ECF 47 at 19, and then contending that *ultra vires* claims are entirely unavailable because of the contrived notion that no one can ever fall within the "zone of interests" of whatever inapposite statute the administration has decided to violate, *see* ECF 52 at 25-29.

But if the Court does not enter a preliminary injunction, all this will become commonplace. The Defendants have made no secret that they seek a legal blueprint for imposing their destructive instincts on other parts of the capital district. Today it is the East Wing and the Ballroom; tomorrow it will be the White House's west colonnade and West Wing and North Portico columns, or the Modernist-style John F. Kennedy Center for the Performing Arts, or the Second Empire-style Eisenhower Executive Office Building, or the Art Deco-style Wilbur J. Cohen Building, or whatever else catches their attention.

Neither the White House nor the Nation's capital are architectural baubles subject to the Defendants' unreviewable whim. The Ballroom Project violates the law many times over, and it must be stopped. The Court should grant the National Trust's motion, and the Defendants should be enjoined from further unauthorized construction of the Ballroom.

Respectfully submitted,

*/s/ Matthew F. Casassa*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006.
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000

Dated: March 16, 2026

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 16, 2026, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent via first class mail to those indicated as non-registered participants.

*/s/ Matthew F. Casassa*