**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

      v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**SECOND SUPPLEMENTAL DECLARATION OF JESSICA BOWRON,
COMPTROLLER OF
THE NATIONAL PARK SERVICE EXERCISING THE DELEGATED
AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1. I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025, delegation of that authority from the Acting Secretary of the Interior, and subsequent extensions of that authority by the Secretary of the Interior. I have been employed by NPS since 2007 and have served as NPS Comptroller since 2017.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System nationwide, as well as all NPS programs, directorates, and regional offices. The White House and President's Park (the Park) is an administrative unit within the National Park System in the NPS National Capital Region ("NCR").

1

4. The Economy Act, currently codified at 31 U.S.C. § 1535, is a longstanding authority under which agencies may order goods or services from other federal agencies or major organizational units within the same agency. It promotes efficiency by allowing interagency acquisitions when it is in the government's best interest, funds are available, and the service cannot be provided as conveniently or cheaply by the private sector.

5. The Government Accountability Office ("GAO") is a nonpartisan, independent agency within the legislative branch. The GAO publishes a treatise titled "Principles of Federal Appropriations Law," which is referred to as "the Red Book." The third volume of this treatise, available online at https://www.gao.gov/assets/2019-11/203470.pdf, provides detailed information and guidance to federal agencies regarding Economy Act transactions. Agencies regularly consult this document regarding appropriations issues, including Economy Act transactions, as well as the Office of Management and Budget's ("OMB") Circular No. A-11 "Preparation, Submission and Execution of the Budget," which also discusses Economy Act transactions. OMB's Circular No. A-11 is publicly available at https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf.

6. The Red Book explains that "the subject of an Economy Act transaction must be something the ordering agency is authorized to do and the performing agency is in a position to provide. Also, there must be direct benefit to the paying agency. Apart from these general prescriptions, the Economy Act makes no attempt to define the kinds of work, services, or materials that can be ordered. This is in apparent recognition of the great diversity of tasks and functions one encounters in the federal universe, and the fact that these tasks and functions are subject to change over time." Red Book, Third Edition, Volume III at page 12-64.

7.  The Red Book provides examples of transactions in which the Economy Act "has been used," or at least "recognized as available [authority] for," including an agreement between the Department of Veterans Affairs and the Department of the Navy under which the "Navy would execute and superintend a contract for the construction of the Corregidor-Bataan Memorial."  Red Book, Third Edition, Volume III at page 12-67.

8.  To establish an Economy Act agreement with another federal agency for the other agency to provide goods and services, the NPS initiates an order in the Department of Treasury's system that documents key data elements, including identifying 31 U.S.C. § 1535 as the statutory authority for the transaction. A fully executed order constitutes an obligation of funding under 31 U.S.C. § 1501(a)(1). This obligation is similar to obligations recorded for contracting actions with a non-federal vendor. The Economy Act authorizes advance payments to the seller as well as reimbursement for costs already incurred by the seller pursuant to the agreement.

9.  The NPS often relies on federal partners that provide valuable support and assistance to the NPS to accomplish projects that the NPS has the statutory authority to perform, but lacks the capacity or expertise to accomplish on its own. The NPS often uses Economy Act agreements to accomplish such projects.

10. For instance, the NPS often relies on the Federal Highway Administration (FHWA) to provide design, assisted acquisitions, and construction management services to execute large road projects on NPS lands. The NPS holds statutory authority under its Organic Act to conduct those projects. But without the assistance of FHWA subject matter experts, the NPS would lack the capacity and expertise to execute the volume of complex road projects needed to maintain National Park System roads. FHWA uses its expertise to

3

develop the acquisitions strategy and quality assurance requirements, conduct source evaluation, award and administer the design-build contract, and inspect and accept the construction contractor's work.

11. As one example, in 2021, the NPS entered into a $184 million Economy Act agreement with FHWA to reconstruct 7.5 miles of the George Washington Memorial Parkway between Spout Run and the I-495/Capital Beltway, reconfigure the existing roadway geometry at the Route 123 interchange, and rehabilitate the Central Intelligence Agency interchange. This important project is nearing substantial completion.

12. Another example of an NPS Economy Act agreement is an agreement with the U.S. Army Corps of Engineers to replace a seawall on the west shoreline of Sandy Hook at Gateway National Recreation Area. This seawall provides protection for NPS assets—including the adjacent multiple use path, sewer line, sewage lift station, Hartshorne Drive and historic officer row houses—but it has exceeded its service life and is in a state of failure. Although this project falls within the NPS's statutory authority, the Army Corps' subject matter experts have superior knowledge to provide the design, contracting and project management services needed to successfully execute this $14 million project. Partnering with the Army Corps increases the NPS capacity to protect NPS assets and execute projects that require specialized knowledge and experience.

13. At the White House and President's Park, the NPS has entered into multiple Economy Act agreements with other federal agencies with responsibilities at the park, including the Executive Residence at the White House ("EXR") and the U.S. Secret Service ("Secret Service"). The NPS currently has an Economy Act agreement in place with the Secret

Service to reimburse the NPS for costs to maintain security booths and to support security closures of park areas.

14. Starting in 2015, the NPS entered into a series of Economy Act agreements with the Secret Service to execute a project to replace the existing perimeter fence that encompasses the White House grounds with a more protective perimeter barrier. In this instance, the NPS was the servicing agency rather than the ordering agency. The NPS Denver Service Center provided project management and contracting support for design efforts and the construction phase of this project. This means that the NPS acted as the design and construction agent for this project and engaged contractors to complete the project, in consultation with the Secret Service and at the request of the Secret Service. More than $80 million was transferred to the NPS by the Secret Service to fulfill this role and construct and install the fence. The project was substantially completed in 2024.

15. As explained in my previous declaration dated January 15, 2026, EXR has unique expertise in fulfilling the operational needs of the President and providing for the use of the White House for official ceremonial purposes as well as the President's home. EXR is also best positioned to coordinate with all agencies that have equities that may be affected by the East Wing Project.

16. Accordingly, the NPS determined that it was in the best interests of the United States for EXR to contract for and directly manage the Project. consistent with the Economy Act and the park's enabling legislation, Pub. L. No. 87-286, which provides that NPS management of the park shall not "conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes,"

17. In general, the NPS demonstrates compliance with its Organic Act for individual projects by preparing a nonimpairment determination—a document that demonstrates in writing that "in the professional judgement of the NPS decision-maker" the selected action "will not result in impairment to park resources or values." NPS's "Guidance for Non-Impairment Determinations and the NPS NEPA Process" is publicly available at https://www.nps.gov/subjects/nepa/upload/Guidance-for-Non-Impairment-Determinations-andthe-NEPA-Process-Apr-2025_508.pdf.

18. The NPS's 2006 Management Policies provide guidance to the NPS regarding the management of the National Park System. The Management Policies are publicly available at https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf. In Section 1.4.2 of the NPS Management Policies the NPS explains that it interprets "impairment" under the Organic Act of 1916 and "derogation" under the Redwood Amendment to be a single standard, as follows:

> Congress intended the language of the Redwood amendment to the General Authorities Act to reiterate the provisions of the Organic Act, not create a substantively different management standard. The House committee report described the Redwood amendment as a "declaration by Congress" that the promotion and regulation of the national park system is to be consistent with the Organic Act. The Senate committee report stated that under the Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system." So, although the Organic Act and the General Authorities Act, as amended by the Redwood amendment, use different wording ("unimpaired" and "derogation") to describe what the National Park Service must avoid, they define a single standard for the management of the national park system— not two different standards. For simplicity, Management Policies uses "impairment" (or a variation thereof), not both statutory phrases, to refer to that single standard.

Management Policies at 10.

19. Before entering the Economy Act transaction with EXR, the NPS complied with its Organic Act, including the Redwood Amendment, by determining that the East Wing Project would "not cause impairment of, or unacceptable impacts to, the park's resources or visitor experience" and the changes to the park from the Project would be "consistent with the ongoing historical significance of the White House and its grounds." The NPS further concluded that the impacts from the Project would "not prevent the [NPS] from fulfilling the park's purpose." The NPS documented these determinations in its Non-Impairment Determination, attached as Appendix A to the NPS's Finding of No Significant Impact (FONSI), which was attached to my initial declaration in this case in December 2025.

20. In the FONSI itself, the NPS determined that the East Wing Project "aligns with the long-standing functional goals of the Executive Office of the President, meets the current operational needs of the Executive Office of the President, and is consistent with the White House's historical evolution and the park's enabling legislation." FONSI at 10.

21. EXR is therefore handling project management for the Project, meaning that it is in control of all aspects of the day-to-day execution of the Project, including its scope, schedule, budget, design, and completion. However, EXR is coordinating with NPS staff regarding the Project, in particular with respect to potential impacts on NPS operations at the White House.

22. As explained in my January 15, 2026 declaration, the NPS accepted a private donation for the project on November 13, 2025, pursuant to its donation acceptance authority for projects that are authorized by the NPS Organic Act, 54 U.S.C. §§ 100101, 101101.

8

23. Pursuant to the Economy Act, and for the reasons articulated above and in my previous declarations, on November 17, 2025, the NPS entered into a reimbursable agreement with EXR under which the donated funds were transferred to EXR to fund the Project.

24. On February 4, 2026, the NPS accepted a second private donation for the project, again pursuant to its donation acceptance authority, 54 U.S.C. § 101101.

25. On February 9, 2026, pursuant to the Economy Act, and for the reasons articulated above and in my previous declarations, the NPS modified the reimbursable agreement with EXR to add funding. These additional donated funds were then transferred to EXR to fund the Project.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2026.

_____

Jessica Bowron