```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
```
- - - - - - - - - - - - - - - - - x
NATIONAL TRUST FOR HISTORIC          CV No. 1:25-cv-04316-RJL
PRESERVATION IN THE UNITED STATES,

                      Plaintiff,
v.                                   Washington, D.C.
                                     Tuesday, March 17, 2026
                                     3:30 p.m.
NATIONAL PARK SERVICE, et al.,

                      Defendants.
- - - - - - - - - - - - - - - - - x
_____

           TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
            HELD BEFORE THE HONORABLE RICHARD J. LEON
                  UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiff:    Thaddeus A. Heuer, Esq.
                      Gregory B. Craig, Esq.
                      Jack C. Smith, Esq.
                      FOLEY HOAG, LLP
                      155 Seaport Boulevard
                      Boston, MA 02210
                      617-832-1187


For the Defendants:   Jacob M. Roth, Esq.
                      Brantley Mayers, Esq.
                      Eitan Sirkovich, Esq.
                      Marissa A. Piropato, Esq.
                      Peter M. Torstensen, Esq.
                      DOJ-Enrd
                      Environment and Natural Resources Division
                      950 Pennsylvania Avenue, NW
                      Washington, DC 20530
                      (202) 718-0703


Court Reporter:       Timothy R. Miller, RPR, CRR, NJ-CCR
                      Official Court Reporter
                      U.S. Courthouse, Room 6722
                      333 Constitution Avenue, NW
                      Washington, DC 20001
                      (202) 354-3111


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Your Honor, we are on the record in Civil Matter 25-4316, National Trust for Historic Preservation in the United States v. National Park Service, et al.

Beginning with plaintiff's counsel, please approach the podium and identify yourself for the record.

MR. CRAIG:  Good afternoon, Your Honor.  My name is Gregory Craig.  I'm senior counsel at Foley Hoag, and we're here on behalf of the National Trust for Historic Preservation in the United States.  And I'd like to introduce Tad Heuer who will be arguing for the Trust today.

THE COURT:  Welcome back.

MR. CRAIG:  Thank you.  It's nice to be back.

MR. ROTH:  Good afternoon, Your Honor.  Jacob Roth on behalf of defendants, and I'm joined by Brantley Mayers, Eitan Sirkovich, Pete Torstensen, and Marissa Piropato.

THE COURT:  Where are they from?

MR. ROTH:  So this side, (indicating) is from the Civil Division, front office and Federal Programs Branch; and this side, (indicating) is from the Environment and Natural Resources Division.

THE COURT:  Okay.  Welcome back.

MR. ROTH:  Thank you, Your Honor.

THE COURT:  All right.  Well, we're here for the

second installment of this preliminary injunction battle extraordinaire.  I had thought before today -- well, before the last couple days, I should say -- that this was just a question of where's the president's authority come from, and that's why the ultra vires action, but now it appears that the Government is changing direction.  They're not backing off that position that the president has the authority, but now they're saying that National Park Service is the one that was acting on authority.  So I want to hear some argument from both sides -- especially the Government's side -- on NPS's role in this, especially since the footnote in the earlier brief says that they had no role in it.

Sir, you can have 15 minutes.

MR. HEUER:  Thank you, Your Honor.

I do want to address that point and two others. The first is the one that we thought we were here on which is that ultra vires review is available and applicable.  And the second is that neither 105(d) nor the National Park Service's Organic Act come anywhere close to providing the express congressional approval for the ballroom which renders the project ultra vires of the statutes that mandate such approval, which are 8106 and Redwood.  And, third, I will discuss that the Government's opposition has, in our view, voluntarily reopened the APA claims again the Park Service that they have spent the last three months trying to

foreclose.

THE COURT:  Well, if this is an NPS show and then -- there's no question NPS is covered by the APA.

MR. HEUER:  Correct.

THE COURT:  No question.

MR. HEUER:  Correct.

THE COURT:  Zero.  So I won't even entertain argument that it doesn't.  It does come under the --

MR. HEUER:  We would wholeheartedly agree.

THE COURT:  Yeah.

MR. HEUER:  On the first point about ultra vires review, it is available here.  The Government claims that ultra vires is always a Hail Mary.  It is not.  The Circuit has called ultra vires review a critical backstop when no other mechanism exists to enforce a clear statutory limit.  As we've noted, it is demanding but certainly not insurmountable.  There must be no other avenue for relief available.  Here, the Court's order makes plain there is not.  Congress must not have foreclosed relief.  It has not.  And the plaintiff must show that the Government has patently misconstrued the statute, disregarded a specific and unambiguous statutory directive, or violated some specific command.  That's the Changji Esquel case.

And both the Circuit in Postal Supervisors and the Supreme Court just last month in Learning Resources have

sustained such challenges to executive action.  And in our view, this case presents exactly the kind of clear and mandatory prohibition that supports ultra vires relief. There is simply nothing vague about the words "shall not." 8106 says "a building or structure shall not be erected on any federal park in the District without express authority of Congress."  So does the Redwood Amendment.  "Federal activities shall not be exercised in derogation of the values and purposes for which the Park Service units have been established except as directly and specifically provided by Congress."  The ultra vires question is whether the defendants have clearly violated a specific and unambiguous statutory directive.  Here, that they obtain express congressional approval for their actions.  In our view, this is not even a close call.  8106 and Redwood forbid such actions without express congressional approval.

THE COURT:  Indeed, where does NPS, under its Organic Act, get the authority to --

MR. HEUER:  I would be pleased to discuss that point, Your Honor.  Under the Organic Act -- which we believe is their alternative backup here because 8105, in our view, clearly doesn't provide them the authority they need -- it is a maintenance statute provision.  It is not a grant of congressional approval to license --

THE COURT:  They claim this is an alteration.

MR. HEUER:  They do claim it is an alteration, and they have made that argument for the last three sets of briefings and we continue to have the same answer.  The words "alteration" and "improvement" are in a statute that Congress authorized repair, care, maintenance, refurnishing, heating, lighting, air conditioning.  It is a maintenance statute.  And we know this because the appropriation that Congress made this year in the 2024 act to allow how much money, they gave $2-and-a-half million for even more specific elements.  That was for required maintenance, health and safety issues, and preventive maintenance.  The word "maintenance" is everywhere in this statute and its appropriation.  This is a maintenance allowance.  It's not a construction license.

So moving to the question about, then, NPS Organic Act, this is their second backup, presumably because it appears that 105 is a dead end.  We would say that the general grant of authority under the Organic Act, which is to promote and regulate the use of national parks, is certainly not a project-specific congressional authorization to erect a ballroom under 8106.  But the Redwood Amendment reinforces that the defendants need express congressional approval that they simply do not have.  Any federal entity under the Redwood Amendment that is engaged in the management or the administration of a National Park System

unit shall not exercise that authority in derogation of the values and purposes for which the system units have been established except as directly and specifically provided by Congress.  And the Redwood Amendment's legislative history, which we cite to in our brief, makes this very clear.  In 1968, Congress designated Redwood National Park in California.  It then found that over the intervening 10 years, the Park Service had done nothing to stop the adverse impacts of erosion and logging on that park.  Congress wanted to put a stop to that.  So in 1978, they commanded that any federal action that impaired a national park required congressional approval.  The Redwood Amendment is a strong congressional remedy to protect vulnerable cultural and environmental park resources from the indifference or the harmful actions of the executive branch, and we know that such harm will occur here because the defendants' own environmental assessment acknowledges it.  It says that there will be permanent adverse effects to the cultural landscape.  There will be a permanent loss of the East Wing. That is impairment.  It is authorized only if directly and specifically provided by Congress, and it has not been.  I think we would say generally as to both 105(d) and the Organic Act, the defendants' problem is not an absence of a clear statutory instruction.  It's their insistence on doing something that the statute clearly forbids.  That is the

core of an ultra vires action.

Now, I would note that they also, having had both of these positions put in front of the Court, go to a third argument which is that 8106 simply doesn't apply to them. I think their problem remains twofold. The first is the plain text of the statute. It contains no carveout for the Park Service, the president, or for any federal entity. If Congress can exempt bonsai facilities at the Arboretum under 8106, it surely knows how to exempt the White House, and it has not.

Second -- it's important to be very clear on this point, because we've had hundreds of pages of briefing at this point -- the defendants admit they lack constitutional authority. Congress has plenary authority over federal property from the Property Clause. So they still need to demonstrate that they have delegated authority from Congress to build the ballroom whether 1 -- 8106 exists or not. They still haven't provided that authority.

We would note that, again, in response to the Government's contention that they have repeated that Gerald Ford's pool and a tennis changing room may have been built at the White House without congressional authorization so the ballroom gets a pass as well should have the same response as this Court gave in January, which was be serious. A ballroom is not a pergola. And, regardless, as

the Supreme Court held in the Lexecon case, which we've cited, even if it had been a longstanding practice not to adhere to a particular statutory command, that does not relieve the Court of its obligation to, quote, give effect to the statute's plain command now.

I'd like to turn to the APA NPS question.  As you've seen in our brief, our position is that the Government's, again, shifting legal position has resulted in the voluntary revival of an APA claim against the National Park Service that they had spent the first two sets of briefing saying did not exist.  So you'll recall back in December and in January, the Government told this Court that the Park Service had no meaningful role in the project so APA review was unavailable, and the Court reasonably took them at their word.

THE COURT:  I quote from their brief, Footnote 7: "While NPS is an APA agency, it is indisputably not directing the East Wing project," closed quote.

MR. HEUER:  I would add to that two quotes.  That was the second quote I was going to give you of three.  The first was the project was, quote, "proceeding under the leadership of EXR"; and the next was, quote, "NPS had, and has, no role in directing the project."  This was not a passing statement.  They have said this three times and more.

THE COURT:  Maybe Mr. Roth is an alchemist.

MR. HEUER:  It is possible.

Now, of course, NPS is suddenly everywhere in their brief.  And when I say everywhere, I mean everywhere, starting on Page 2.  Their brief claims the project is doubly authorized by 105(d) and by the NPS Organic Act.  They claim that the NPS NEPA process and its non-impairment determination are touted as evidence of their consistency with the Organic Act, and they argue that EXR is now merely acting as a contractor of the Park Service.

Now, none of this helps them in their need for express congressional authorization under either 8106 or Redwood.  As we've just discussed, the Organic Act doesn't provide that express congressional authority, much less the express impairment authorization that you need under Redwood.  But as is probably obvious, EXR has no authority to do anything under the NPS Organic Act.  They're two different entities.  So if the Organic Act applies, then the Park Service must be in charge, the very claim the Government has tried for months to evade.  And in our view, the Government has two options here.  If it continues to assert that the Organic Act is the statutory foundation of the ballroom project, then an injunction should enter because the Park Service has violated the APA by continuing to construct the ballroom in violation of 8106, in violation

of the commission review statutes, in violation of NEPA, and in violation of the Redwood Amendment.  If it disclaims this newfound supposed express congressional authority under the Organic Act, an injunction should also enter, because no statutory authority exists under the only alternative, 105(d), and they have already disclaimed any constitutional authority.  What they can't do here is have it both ways. They can't claim the Organic Act provides express congressional approval for the ballroom but that NPS is also not in charge.

Briefly, Your Honor, on the remaining Winter factors, there is clearly irreparable harm.  Once above-grade construction proceeds, those adverse aesthetic impacts and the adverse cultural impacts will be locked in.

THE COURT:  That's not supposed to proceed until April; right?

MR. HEUER:  Not until April, but we are now -- St. Patrick's Day.

THE COURT:  Two weeks away.

MR. HEUER:  We are two weeks away.  The imminence is now imminent.  And the defendants concede that.  They have said:  It's in process.  We have been constructing for months, and we are now ready to go above-grade.

And I would note that the Semonite decision that they cite -- and we do as well -- is a cautionary tail here.

In that case, the court declined to issue a preliminary injunction because only foundation work was proceeding and the defendants there claimed that the towers could be removed later.  By the time the National Trust won on the merits in that case, the towers had been built and the Court found the consequences of removal too great to order their removal.  I think, quite simply, our position is the Trust is entitled to more than a Pyrrhic victory here for the same reasons.

The balance of the equities also favors the Trust, as does the public interest.  The defendants continue to insist that there is a national security issue that precludes them from stopping anything.  I need to reiterate the National Trust has never sought to halt work imperative to national security.  We have said that in every brief we have filed, and there have now been many.  The Trust has also repeatedly urged the Court to design any injunction to ensure the president's safety.  We have no interest in making the president unsafe.  Our interest is in preventing a ballroom that is not authorized by law.  And the Court is more than capable of permitting safety-critical work here while pausing a ballroom that has no national security purpose.

THE COURT:  Do you want to take the last couple minutes you have to address -- well, maybe, you don't want

to -- address the standing issue, which they trudge up again for the third or fourth time.

MR. HEUER:  I am happy to address the standing issue, Your Honor.

THE COURT:  They're looking for an escape hatch, it seems.

MR. HEUER:  I would not disagree.  I would say that nothing material has changed from this Court's order on standing other than that the defendants released new renderings last week, one of which is in our reply brief on Page 20, which shows that the ballroom will indeed overwhelm everything that surrounds it and will indeed be visible to everyone from everywhere.

I would also say their persistent assertion that Dr. Hoagland needs some kind of special access to the White House allowing her to view it before she has standing is highly puzzling.  She doesn't need special access to assert harm.  The White House is not a forbidden palace.  It's a public building open to the public.  You can walk around it. You can walk in it.  This notion that Dr. Hoagland, for all the reasons that the Court articulated, is comfortably within the realm of associational standing is one that we simply don't take seriously, and we would agree that they appear to be looking for a way not to reach the merits but to get out on procedural niceties and to say that there's a

standing issue.  That simply doesn't lie here.

I think my last point would be this on the merits -- on the irreparable harm.  The defendants' response, as you have seen, is that their, quote, gaping hole at the East Wing site means that construction can't be paused.  They seem to have forgotten the proverbial first law of holes, which is when you find yourself in one, stop digging.  They have known for months that they lack congressional approval yet insist on continuing to dig, literally and figuratively.  They now assert that the larger their hole gets, the more imperative it is that they be allowed to keep digging.  Self-inflicted harm is not a basis for evading equitable relief.

In sum, the Court [sic] is entitled to relief on its ultra vires claims.  As we have said before, the president is the steward of the White House.  Congress is its owner.  When he wishes to undertake a project of this size, the law requires him to go to Congress and obtain express approval.  Because he refuses, this Court should enter the preliminary injunction.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Roth?

MR. ROTH:  Thank you, Your Honor.

And I want to assure the Court, I'll -- I'm going

to address the NPS issue and role when I get to that point in the argument, but I'm absolutely --

THE COURT:  Well, good, and I understand because, frankly, the whole idea here was to deal with the ultra vires issue.  That was what I was hoping that I would get briefs addressing, if not exclusively, principally. Instead, I find we've moved off on a whole new direction that you've come up with with regard to NPS, National Park Service.  So I expect you to start with ultra vires --

MR. ROTH:  Yes.

THE COURT:  -- especially as it relates to the two statutes that are squarely before the Court, 8106 and 105 --

MR. ROTH:  Yeah.

THE COURT:  -- and whatever time you've got left we'll deal with your new theory involving NPS.

MR. ROTH:  Yeah.  Absolutely, Your Honor.  As we'll get to, I don't think it's a new theory, but I'll get to it when I get to it.

THE COURT:  Well, what would you -- would you call it your alternative approach?  What's your principal approach?

MR. ROTH:  Here's where I'd start, Your Honor. The White House has a unique dual role because it is both the president's home and office and the national park, and the consequence of that dual role is that there are two sets

of statutes that speak to grounds and who and what can be done on them.  We have the president's source of authority under Section 105(d), and we have the National Park Service authority under the National Park Service --

THE COURT:  Who's directing this project?  Up until this most recent brief, I was under the distinct impression that EXR was directing this project.

MR. ROTH:  Absolutely correct.

THE COURT:  Now, I'm under the impression that you're saying NPS is directing this project.

MR. ROTH:  No.

THE COURT:  You can't have it both ways.

MR. ROTH:  I agree, Your Honor.  We're not trying to have it both ways.

THE COURT:  So who is it?

MR. ROTH:  EXR is directing the project 100 percent.  We have said that from the beginning, and that is true.  The role of NPS -- which we've also made clear from the beginning -- is, on the funding side, the donations are being made pursuant to NPS --

THE COURT:  Well --

MR. ROTH:  -- donation authority --

THE COURT:  -- that's the Rube Goldberg contraption.

MR. ROTH:  Well, let me -- I think we've tried to

lay it out in -- more clearly in this set of briefs for Your Honor, because I understood the questions Your Honor had at the last hearing, but as I'll get to, NPS did play a role that we have identified since December which is it explained in a determination of no significant impact that the project was consistent with the NPS Organic Act and that it was accepting donations, which it can do for projects that fall within the scope of the NPS Organic Act, and that under the Economy Act, it had contracted with EXR to run the project, and that is why EXR is directing the project, and that is what we've said from the beginning.  EXR is directing the project, but in part it is using authority and funds that NPS has provided through the Economy Act transaction, and we've said that from the beginning and plaintiffs have never challenged the Economy Act transaction.  That would have been a perfectly normal APA claim if they had raised it. They never challenged that step which we identified from the very beginning.  And I'm -- when I get to there, I'll walk through the items in the record that show that, but I just want to start by explaining this has always been dual source of funding and dual source of authority, even though EXR is the one running the project day to day.

I'm not going to spend as much time on 105(d) because we spoke about it at some length last time, but what I'll just say is that I do think the Trust's inability to

draw a clear line between what's in and what's out under 105(d) makes it very hard to support an ultra vires claim based on that statute.  Ultra vires is a high standard.  It requires a clear, obvious violation of the statute, what Your Honor, in Hunter v. FERC, called a brazen defiance of the statute.  We had a dispute with them, I understand, about the scope of "alter" and "improve," and they point to canons and we point to dictionaries and we go back and forth about it, but that is the type of ordinary statutory dispute that doesn't rise to the level of an ultra vires claim under the D.C. Circuit's precedents.

THE COURT:  I don't think the D.C. Circuit's ever had a case like this.

MR. ROTH:  That may be.

THE COURT:  I don't think it --

MR. ROTH:  It's novel.

THE COURT:  Frankly, I don't think it's even close, frankly.  And, of course, this case will ultimately be there anyway.  No matter who wins, it's going there.

MR. ROTH:  I assume that's true, Your Honor.

THE COURT:  But to call a $400 million project with 90,000 square feet an alteration, that takes some brazen interpretation of the laws of vocabulary.

MR. ROTH:  Well, again, Your Honor, we -- I'm not going to cover ground that we addressed last time.  I do

think that the ordinary dictionary definitions of "alter" and "improve" cover a new wing. And I -- what I would ask the other side is, you know, will their position be different if, instead of demolishing the East Wing, it had been a large extension of a ballroom, or what if it had been built on top of the existing structure as a new story? Would they say that is an alteration or an improvement? Maybe that's on the other side of the line. They can't draw that line, because they're not really identifying a clear statutory test. They're, sort of, just saying: Well, this is too big. It can't possibly be what was meant.

I think, for ultra vires review, we need something more than that. We need something, the D.C. Circuit has said, that rises to the level of almost a jurisdictional error, a Hail Mary that almost never succeeds. I don't think they've met that with respect to 105(d).

But I do want to spend more of the time --

THE COURT: Well, that's a matter of opinion, and it's going to be mine in the first instance.

MR. ROTH: Absolutely agree on that, Your Honor.

I do want to spend more of my time this morning -- this afternoon on the NPS side, because we didn't spend as much time on it last time. But I do want to -- I'll start by addressing this idea that it's a change. Okay? It's not correct. And here's a few ways you can see that's not

correct.  Number one, their opening brief addressed it. Pages 14 to 16 of their opening brief addressed the NPS Organic Act and said:  We don't have authority under the NPS Organic Act.

So I don't know how they can turn around and say this is some new surprise assertion that they never saw coming when they address it and preemptively try to rebut it in their opening brief.  Okay?  That's Pages 14 to 16.  The reason it wasn't a surprise to them is because we've identified it going back to December.  In our December filings at the TRO stage, we attached the National Park Service finding of no significant impact -- it's ECF 14-2 -- which is a 17-page analysis that the National Park Service did as to whether this project was consistent with the NPS Organic Act and was consistent with the Redwood Amendment, and they determined that it was.  We provided a declaration from the Comptroller of the National Park Service, ECF 14-1.

THE COURT:  You have the Organic Act there?  Show me the language in the Organic Act that gives the authority to demolish the East Wing and rebuild it.  Show me the language, NPS's Organic Act.

MR. ROTH:  Here it is.  Your Honor, the NPS Organic Act is 54 U.S.C. 100101 and it provides for the Secretary, through the Director of the National Park Service, to promote and regulate the use of the National

Park System by means and measures that conform to the fundamental purpose of the system units.

THE COURT:  That's a quote.

MR. ROTH:  That's a quote.  That is the authority that the National Park Service has used for a century to do construction in national parks across the country.  And we said that in the declaration from NPS, again, back in December at ECF 14-1 where -- Paragraph 5, the Organic Act of 1916.  This authority generally extends to construction activities at individual park units in furtherance of the purpose of the park unit at issue, and then explained how that also provided NPS the authority to accept donations in -- to advance that project, and that they had made the determination -- this is in Paragraph 9 -- that this project was consistent with the fundamental purpose of the system unit that would not result in impairment of park resources and, therefore, was permissible under that statute, and then said that EXR is handling the day-to-day actual work and directing the project, but those determinations about consistency with the statute and the funding mechanism that goes along with it were provided back in December, and in the January filings we said the same thing, and we have a second declaration from the Comptroller of the National Park Service.  It's at ECF 30-3.  It explains all of this again and says that NPS entered into an agreement with EXR under

the Economy Act under which the funds were being provided to EXR to handle the project day to day, which is what's happening, but that the authority --

THE COURT:  The funds from the private sourcing.

MR. ROTH:  Correct, Your Honor.  Correct.

And they go together.  So the authority to accept donations is 54 U.S.C. 101101.  You can only accept donations for projects that are consistent with the NPS Organic Act which is 100101.  So NPS had to make the determination:  This is consistent with the Organic Act; therefore, we can accept donations for it, but we don't want to do the work.  EXR is best positioned to do the work.  So we have an agreement with EXR under the Economy Act which is the tool that agencies use to -- when they need -- some other entity in the Federal Government is best positioned to carry out a project, they use the Economy Act to provide them with the funding and that second entity actually does the work, but they're using the authority that applies to the first entity.

THE COURT:  Where has an arrangement like that ever before been done?

MR. ROTH:  Been what, Your Honor?

THE COURT:  Where has an arrangement of that nature ever before been done?  Well, let me ask.  Is this the first time ever?

MR. ROTH:  No, no.  Absolutely not, Your Honor.  Economy Act is used all the time for projects within the Federal Government.  We cite a case --

THE COURT:  I'm talking about an arrangement between NPS and the White House to construct anything at the White House ever.

MR. ROTH:  I don't know, Your Honor, if it's been done in that context before, but as a general matter, the Economy Act is available for exactly that purpose, is to allow an entity that is better positioned to do a particular piece of work to do it using funding and authority of another agency.  And, again, we said that this was what -- how it was happening consistently December and January, and they never challenged that determination.  If they had wanted to challenge the Economy Act transaction, sure, they could have said NPS, you know, is acting arbitrarily and capriciously or contrary to law through this arrangement.  I don't know what the merits of that argument would be because I think it's perfectly lawful, but they could have brought that APA claim.  They never brought that APA claim.  They instead said:  No, we want an injunction against EXR to stop the construction.

Well, they can't do that under the APA, as the Court correctly acknowledged.

THE COURT:  Well, bear in mind that when this

litigation first got going, the impression everybody had, including this Court, was that the Government's position was that the president had constitutional authority to do what he's doing; then we get the first round of briefs and the Government backs off that and disclaims constitutional authority and claims it's statutory authority, in essence. So things have been -- this has been a case where there have been shifting theories and shifting dynamics -- and I regret to say --

MR. ROTH:  I understand, Your Honor.

THE COURT:  -- from the beginning.

MR. ROTH:  I understand, Your Honor, but what I would say is the case moved very quickly at the beginning, TRO and then PI, and initially we were dealing with a whole host of other claims, as well.  I mean, if the Court recalls, the lead claim initially was NEPA and:  You didn't consult with the Commission on Fine Arts; and:  You didn't get approval from the National Capitol Planning Commission.

And the ultra vires statutory authority aspect of this really only came to be developed because the Court had questions about it and then we briefed it.  And I think, in that briefing, from the very beginning, we made clear, yes, 105(d) gives the president authority, but we always said 105(d) didn't supply all the funding we needed because there's only 2-and-a-half million in that account from the

congressional appropriation.  We needed the second source of funding which is the NPS funding, and the way we get that NPS funding is through the NPS Organic Act.  That's the only way we can access that funding, is if the project is consistent and falls within the scope of the NPS Organic Act.  And, again, that is the authority that the Park Service uses for all of its construction in all national parks around the country, including in D.C., and it has for decades and decades, and we pointed this out, and I don't think they argue with that.  Again, their argument on the -- their merits argument on the National Park Service Organic Act, as I understand it, is one thing.  They say:  This project doesn't fall within the scope because it's in derogation of the values and purposes of the park.

That's their argument.  Well, NPS wrote a 17-page memo analyzing that and said the opposite, and they never engage with it.  They just want the Court to declare:  I don't, you know -- we don't think that this project furthers the purposes of the park.

Well, that's not how review of these agency determinations is supposed to operate.  The agency did that analysis.  It's -- it involves a wide array of considerations of the purposes of the park and how this is going to impact them.  This is something NPS does all the time when it's considering any project in a national park.

They do this analysis.  They evaluate the impairment.

THE COURT:  This isn't just any national park.

MR. ROTH:  Correct.

THE COURT:  This is a special place.  This is an iconic symbol of this nation that people -- the Congress has concluded, of course, too -- think of as something that they have an ownership interest in.  Indeed, the president does not have an ownership interest.  He's a steward of the institution for the future presidents that live in that Executive Mansion.  This is not just any park, and there's no track record of anything like this ever being done before.  And wouldn't it have been a heck of a lot easier by any standard to have just gone to Congress to get the authority to do it and then worried about the funding part later?

MR. ROTH:  I understand, Your Honor, but what I would say is --

THE COURT:  I think the answer is "yes" to that question, by the way.

MR. ROTH:  Yes.  Yes, Your Honor.  The -- but what I would say is the Congress did determine to designate the White House as a national park, and in doing so in 1961 it said this will be subject to operation under the NPS Organic Act, and the consequence of that is that at least in the first instance for projects within that scope, the agency

determines whether the project is consistent with the statute.  The agency made that determination.  We gave it to them in December.  And they have not actually challenged that, again, 17-page analysis in the record --

THE COURT:  Well, I'm going to give Mr. Heuer five minutes to address that.

MR. ROTH:  Okay.

THE COURT:  You've used your 15 minutes.  I'll give you a few more minutes since you've gotten sidetracked with my questions.

MR. ROTH:  I appreciate it, Your Honor.  And I'll use that on 8106, if I can.

THE COURT:  Please, because --

MR. ROTH:  Okay.

THE COURT:  -- I'm struggling to see how -- first of all, I'm struggling to see how you see this as an alteration.  That's the 05 --

MR. ROTH:  That's 105.

THE COURT:  -- 105.

MR. ROTH:  Yeah.

THE COURT:  But 106 is a specific directive that would seem to --

MR. ROTH:  Yeah.  So --

THE COURT:  -- it would seem to be --

MR. ROTH:  So let me talk about 8106, because I

think there's -- really, there's two ways to read it, and the way they're reading it does not work.  Okay?  There -- here are the two ways to read it.  One is that if an agency has authority -- general authority to build in an area, 8106 is satisfied.  That's the congressional authorization.  The other way -- which is their way -- is, no, no, Congress has to speak specifically to the particular building that is being erected.

THE COURT:  Normally, they do that when they appropriate money for that purpose.

MR. ROTH:  So --

THE COURT:  This is an end-run on the money appropriation process.

MR. ROTH:  So I don't think -- respectfully, I don't think that's correct, Your Honor, with respect to the National Park Service projects, and we gave a number of examples in the most recent brief and declaration from the Park Service of all the construction that has happened in national parks in D.C. without Congress specifically speaking to a particular structure --

THE COURT:  Building a headquarters for the U.S. Park Police is not the same as building a $400 million project, including the East Wing of the White House.  Come on.  You just cannot -- you can't equate those.

MR. ROTH:  Your Honor, I don't think --

THE COURT:  It doesn't make sense.

MR. ROTH:  I don't think I have to equate them, but my point is we have a statute and we need a consistent interpretation of the statute, and the right way to read the statute is that 8106 does not restrict NPS from building on national parks.  If it did, then almost every building built in D.C. national parks over the last 100 years would have been illegal.  Nobody has ever thought it meant that.  And we've found this near contemporaneous understanding from Major Ulysses Grant from the '20s who was talking to Congress about this and they said:  How did you have the power to build this fieldhouse in Anacostia Park, despite the statute?

And he said:  Oh, we asked for that statute. That's there to protect us from third parties coming in and encroaching on the parks.

It has -- it was never construed to restrict the park authorities from building on the parks.  And, again, they can't explain the history, because regardless of what differences may exist between this project and, you know, the 7,500-person tennis stadium in Rock Creek Park -- and I'm not saying they're the same, but legally either Congress needs to approve both or it doesn't have to approve either, and their reading is just untenable because they are suggesting -- the implication of their reading is that all

of these buildings have always been illegal and Major Grant didn't understand the statute back in the '20s even though his office is the one that asked for it.

And they also have no answer to Section 451 which is this other provision that we discovered in researching this -- the history here, which is -- which was enacted originally at the same time as 8106 but was specific to national parks, and Congress repealed that in 1996.  If either of these -- if one of these is applicable, it's the one applicable to national parks, and Congress chose to get rid of that statute.  Now, that does explain their bonsai example because that's the one example they've found where Congress has actually spoken to a particular structure and said:  Yes, you can do it, notwithstanding 8106.

That was the Department of Agriculture and it wasn't on a national park.  So that makes sense.  It's consistent with the history, but otherwise their reading of -- their reading of the statute just does not comport with the history, and particularly in an ultra vires context, that just can't be enough to get them where they need to go.

THE COURT:  You can have one minute.

MR. ROTH:  Okay.  Well, I'm going to skip zone of interests and I'm going to say that on the balance of harms, I do think this is the rare case where even if the Court

concludes that the Trust does have a likelihood of success on the merits, that should not translate into an injunction against the project because the equitable balancing is so lopsided in favor of the construction continuing and against the aesthetic interests on the other side, and that's for the security reasons that we've identified in the classified declarations and just for practical reasons.  It does not benefit the Trust; it does not benefit the public to have this excavation site dormant indefinitely.  That doesn't help anyone.  So if the Court does conclude that the plaintiff is likely to succeed on the merits, I think the most that should be ordered is a declaratory relief that would, then, allow Congress to take whatever steps it deems necessary and appropriate to deal with it rather than shut down the entire construction in the middle.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Roth.

Mr. Heuer, you can have five minutes.

MR. HEUER:  Thank you, Your Honor.

Several points.  First, on the question of where is the line in 105(d), the Government continues to persist in arguing that it could theoretically authorize demolishing and rebuilding an entire wing of the White House.  At our last hearing, I believe you called that a pretty expansive interpretation and pressed them for some limiting

principles.  The Government responded that bulldozing the White House and building something completely different might cross that line.  Apart from the fact that that is exactly what happened here, that is not a limiting principle.  It is a concession that the Government's reading of 105(d) is one of limitless authority.

Their alternative assertion which was that 105(d)'s notwithstanding clause saves this -- that seems to be what they're going -- is no better.  We've explained this three times.  It applies to sums appropriated under this subsection.  That means 105(d).  That's the $2-and-a-half million that Congress appropriated for maintenance.  The government cannot move hundreds of millions of dollars of private money into the 105(d) maintenance account, summarily declare those funds congressionally authorized, and use them for ballroom construction, even if 105(d) funds could be used for ballroom construction which, because of its plain language, they cannot be.  That is the Rube Goldberg machine run amok.

On the question of whether or not we have -- they have properly talked about the Park Service Organic Act in their original briefing, I would remind the Court that the way that TROs work is that the plaintiffs file first and then the defendants file later.  Why we should be mind readers as to what they might plead after we have pleaded is

beyond me, but I would point out that we agreed that NPS was the entity in charge.  That's why they're the lead defendant.  We were, then, told that they're not in charge.  Now, we're told they are in charge.  What we do is we dutifully plead in anyone that they claim is in charge of the project we want to stop.  It's not our fault that they keep changing positions.  And if you look at those declarations from the acting director that he referenced, the only contract they discuss is the handover of Park Service funds to EXR so EXR can run the project under 105(d), and they did that because they were attempting to say that the Park Service was not in control.  Now, they are claiming the exact opposite.

And as to this question of whether we have waived the Economy Act question under 10- -- under 1535, I would point you to Paragraph 213 of our amended complaint where we say that the ballroom project, as proposed to be funded by the defendants through 101101(2), 31 U.S.C. 1231 [sic], or 31 U.S.C. 1535, the Economy Act, is ultra vires of any authority they may have under the Redwood Amendment.  We've pleaded what they've said we haven't.  This is consistent from this Government.

As to -- the third question I want to talk about briefly is the question on 105 -- or sorry, on the -- 8106 as to these other improvements that they have discovered.

So as we noted in our brief, our preliminary research is that some of these other projects actually were authorized by congressional appropriation, but as I noted in my original -- or my initial discussion, even if they were not, that doesn't help the ballroom, given the plain text of 8106.  That's Lexecon.  Even if it's been the longstanding practice not to adhere to the command, the Court has an obligation to give effect to its plain command now.  Put slightly differently, it is no answer that you cannot be ticketed for speeding on the grounds that you do so all the time but haven't been caught until now.  The only project before this Court is the ballroom, and it unambiguously violates 8106.

As to this question about the Government's discovery of supposed legislative history with Major Ulysses S. Grant, III, that is a single statement made in an unrelated hearing in 1926, I believe -- so 14 years after the passage of this act -- by someone who was not, and had never been, a legislator.  Justice Scalia has warned us that subsequent legislative history is not to be taken seriously. Something that is not legislative history at all certainly cannot be taken seriously.  I think our question here for the Court is if -- based on what we've heard today, if the Court enjoins the Park Service, will construction stop? It's not clear to us that it will.  So we would argue that

an injunction has to enter as to both the Park Service and to EXR and to anyone else who they may come up with who we would -- pleaded in who may have control over this and attempts to keep it going.

I will close with this.  It is abundantly clear that the Government has no cognizable or consistent theory about who's in charge of this project.  First, it was NPS; then it was EXR; then it was NPS; this afternoon, it's EXR. They have no cognizable or consistent theory of their case. First, it was the Constitution; then it was 105(d); now, it's the NPS Organic Act.  They have constructed an elaborate Rube Goldberg funding mechanism that is no more plausible after three rounds of briefing than it was at the outset, and after taking this Court on a months-long merry-go-round ride just to end up right back where we've started, they now claim the project is too far along to be stopped.  We ask this Court to say that enough is enough and grant the requested preliminary injunction.

Thank you, Your Honor.

THE COURT:  Thank you, sir.

Well, I'll do my level best to get you an opinion by the end of the month.  You haven't made it easier on me, but the briefs are very well written.  My compliments to both sides.  And the arguments, although at times testy, were both well done and I appreciate that.  We don't get

that every day in the federal courtroom.

So with that, we'll stand adjourned.

THE DEPUTY CLERK:  All rise.

THE COURT:  Oh, Erin go bragh.

(Laughter.)

THE DEPUTY CLERK:  This Honorable Court stands adjourned.

(Proceedings concluded at 4:19 p.m.)

* * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

**that the above and foregoing constitutes a true and accurate**

**transcript of my stenographic notes and is a full, true and**

**complete transcript of the proceedings to the best of my**

**ability, dated this 24th day of March 2026.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**
**United States Courthouse**
**Room 6722**
**333 Constitution Avenue, NW**
**Washington, DC 20001**