# United States Court of Appeals

#### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 26-5101**                                    **September Term, 2025**

**1:25-cv-04316-RJL**

**Filed On: April 11, 2026**

National Trust for Historic Preservation in the
United States,

        Appellee

    v.

National Park Service, et al.,

        Appellants


------------------------------

Consolidated with 26-5108


       **BEFORE:**   Millett, Rao*, and Garcia, Circuit Judges

### O R D E R

Upon consideration of the emergency motion for a stay, which includes a request for a 14-day administrative stay, the supplement to the motion, the opposition to the motion, and the reply, it is

**ORDERED** that the district court's stay of its March 31, 2026 preliminary injunction be extended to April 17, 2026.  It is

**FURTHER ORDERED**, on the court's own motion, that these cases be remanded to the district court for further proceedings.

On July 31, 2025, the President announced plans to build a 90,000 square-foot ballroom at the site of the White House's East Wing to be paid for by private donors. Add. 92-93.  The President assured that he was "fully committed to working with the appropriate organizations to preserv[e] the special history of the White House[.]"  Add. 57.  Then, on October 20, 2025, "without advance notice[,]" the President posted on social media that "ground ha[d] been broken[.]"  Add. 58.  Within three days, the East Wing was completely demolished.  Add. 93.

* A dissenting statement of Circuit Judge Rao is attached.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 26-5101**                                      **September Term, 2025**

The National Trust for Historic Preservation in the United States then filed this suit in the United States District Court for the District of Columbia and moved for a temporary restraining order.  Add. 93; ECF Nos. 1, 2.  In opposing the National Trust's motion, Defendants indicated that "nothing about the ballroom ha[d] been finalized," Add. 41, that below-ground construction would not lock in the above-ground ballroom's size, scale, or design, TRO Hr'g Tr., ECF No. 18, at 21:09-21, and that above-ground construction "will not begin until April 2026, at the earliest[,]" Add. 37.  The district court declined to issue a temporary restraining order in express reliance on those representations.  Add. 41-42.

According to Defendants, "a massive excavation and structurally completed site" now lies where the East Wing once stood.  Defs.' Stay Mot. 1.  Defendants report that, within the large pit, "bomb shelters, [a] hospital and medical area, protective partitioning, and Top Secret Military installations * * * are built and/or ready to be built, installed and placed."  *Id.*  Meanwhile, Defendants state that above-ground construction of the ballroom itself is scheduled to begin shortly.  *Id.* at 10.

On March 31, 2026, the district court granted the National Trust's motion for a preliminary injunction.  Add. 125.  The district court concluded that, to the extent the Executive Office of the President or the Office of the Executive Residence had ordered the construction, that action was likely *ultra vires* because Congress has exclusive constitutional authority over federal property like the White House, and no statute authorized the President to demolish an entire Wing of the White House and replace it with a privately funded ballroom.  *See* Add. 100-114.  In addition, to the extent the National Park Service had a role in directing and funding the construction, the district court concluded that such action was likely contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), because the Park Service, too, lacks relevant statutory authority.  *See* Add. 115-117.

The district court enjoined the Park Service, the Executive Office of the President, the Office of the Executive Residence and related entities, officers, and agents "from taking any action in furtherance of the physical development of the proposed ballroom * * *, including but not limited to any further demolition, site preparation work, landscape alteration, excavation, foundation work, or other construction related work[.]"  Add. 125-126.  At the same time, the court exempted from the preliminary injunction those "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff[.]"  Add. 126.  At Defendants' request, the court stayed the effect of its order until April 14th.  *See* Add. 126.

Defendants noticed their appeal and moved this court to enter a full stay pending appeal.  *See generally* Defs.' Stay Mot.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 26-5101**                    **September Term, 2025**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To secure that exceptional relief, the stay applicant must demonstrate, among other things, that it will be "irreparably injured" in the absence of a stay before the appeal concludes. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation marks omitted). "[A] showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024); *see also Margolin v. National Ass'n of Immigr. Judges*, --- S. Ct. ----, 2025 WL 3684278, at *1 (Dec. 19, 2025) (Mem.) (denying stay application where "the Government has not demonstrated that it will suffer irreparable harm without a stay").

On the present record, Defendants' arguments about irreparable harm, and their intersection with the district court's exclusion of necessary safety and security measures from its injunction, raise unresolved factual questions, as well as a legal dispute about the scope of the exception.

To start, much of Defendants' discussion of national-security risks concerns security fixtures that are, or will be, installed beneath the planned ballroom. *See* Defs.' Stay Mot. 1, 3. But the district court's injunction runs only against the "physical development *of the proposed ballroom*[.]" Add. 126 (emphasis added). And Defendants have repeatedly represented to the district court that any below-ground work was distinct from construction of the ballroom itself and could proceed independently. Defs.' Opp'n to Prelim. Inj., ECF No. 30, at 13 ("[T]he work that must proceed below-grade will not lock in the scope of above-grade construction."); *id.* at 47 ("[B]elow-grade work does not lock in the size of the above-grade design."); Defs.' Mot. to Modify Schedule, ECF No. 22, at ¶ 4 ("[B]elow-grade construction will not necessitate any specific above-grade design."). Yet Defendants now seem to suggest that below-ground "national security upgrades are inseparable from the rest of the Project[.]" Defs.' Reply in Support of Stay Mot. 12. As a result, it remains unclear whether and to what extent the development of certain aspects of the proposed ballroom is necessary to ensure the safety and security of those below-ground national security upgrades or otherwise to ensure the safety of the White House and its occupants while the appeal proceeds.

Defendants also contend that the preliminary injunction will impose irreparable harm because the ballroom—once completed—will be more secure than the now-demolished East Wing. *Compare* Defs.' Stay Mot. 1 (discussing "drone proof roofing materials" and "blast proof glass"), *with id.* at 4 ("[T]he old East Wing was * * * totally vulnerable to attack by even the most basic of Military weaponry[.]"). But planning documents in the record estimate that the ballroom was never expected to be completed for almost three years from when ground was broken. *See* Add. 21 ("[T]he completion of construction [is] anticipated to be summer 2028[.]"). So it is unclear on this record how a potential delay to the construction imposes additional harm beyond

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 26-5101**                                    **September Term, 2025**

the expected and consciously undertaken risks of a lengthy and major construction project of the White House.  The relevant inquiry for purposes of Defendants' stay motion is the narrower question of whether the injunction, with its "safety-and-security exception[,]" Add. 126, will inflict irreparable harm pending the expeditious resolution of the appeal.

That leaves arguments about the ongoing security risks caused by Defendants' decision to demolish the East Wing and undertake a massive excavation and multi-year construction project to the White House itself.  *See* Defs.' Stay Mot. 2 (discussing "expos[ure] to the conditions and elements of an open construction site"), 25 (discussing the risks of "pitching temporary tents"), 26 (relating the Secret Service's assessment that the "current open construction site is, in and of itself, a * * * safety hazard").  This court will not gainsay the importance of ensuring the safety of the White House, the President, staff, and visitors.  The district court did not either.  As noted, the preliminary injunction expressly allows Defendants to take those "actions strictly necessary to ensure the safety and security of the White House" and those in it or on its grounds.  Add. 126.  In other words, as Defendants acknowledge and applaud, the injunction appears to accommodate precisely the concerns animating their request for a stay.  *See* Defs.' Stay Mot. 5 ("We agree with the second part of that ruling having to do with Presidential and White House safety and security[.]").  Defendants have not, on this record, explained how, if at all, the injunction interferes with their existing plans for safety and security at the remaining portions of the White House during the construction project.  The National Trust's motion to clarify the injunction—now pending before the district court—highlights the uncertainty.  *See* Pltf.'s Mot. for Clarification, ECF No. 65, at 1-2.

The stay papers, in short, have raised serious factual questions about the relationship between, on the one hand, above-ground construction of the ballroom itself and the maintenance of safety and security, and prior governmental representations that the below-ground and above-ground stages were distinct and the above-ground design features subject to change, ECF No. 30 at 13, 47; ECF No. 22 at ¶ 4; ECF No. 18 at 21:16-18 (Defendants could "change the size of the ultimate structure" even after "concrete has been poured[.]").  The district court has not yet had occasion to address those questions.

We cannot fairly determine, on this hurried record, whether and to what extent the district court's "necessary for safety and security" exception addresses Defendants' claims of irreparable harm, insofar as it may accommodate the Defendants' asserted safety and security need for the ballroom itself or other temporary measures to secure the safety and security of the White House, the President, staff, and visitors while this appeal proceeds.  We thus remand these cases to the district court with instructions to promptly address the pending motion to clarify how the injunction and its exception will ensure safety and security pending litigation.  The district court's previously entered

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 26-5101**                                    **September Term, 2025**

stay of its preliminary injunction is hereby extended to April 17th to allow Defendants, if they wish, to seek Supreme Court review of this order remanding for factual development and clarification.  It is

      **FURTHER ORDERED** that the motion for a stay be dismissed as moot.

      Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to issue the mandate forthwith to the district court.

**<u>Per Curiam</u>**

                             **FOR THE COURT:**
                             Clifton B. Cislak, Clerk

               BY:    /s/
                          Amy Yacisin
                          Deputy Clerk

Rao, *Circuit Judge*, dissenting: The President has commenced construction of a new ballroom and security facilities in the East Wing of the White House. The district court halted construction based on the alleged aesthetic injury of one individual residing in Washington, D.C. I would stay the preliminary injunction pending appeal. The government has demonstrated a strong likelihood of success on the merits because the National Trust for Historic Preservation (the "Trust") lacks standing to sue and because the construction project is authorized by a statute that allows the President to undertake "improvement[s]" to the White House. 3 U.S.C. § 105(d)(1). Importantly, the government has presented credible evidence of ongoing security vulnerabilities at the White House that would be prolonged by halting construction. This constitutes irreparable injury and is clearly a weightier interest than the generalized aesthetic harms identified by a single member of the Trust. Because my colleagues' remand for further factfinding constructively denies the government the stay to which it is entitled, I respectfully dissent.

## I.

Last summer, the President announced plans to renovate the East Wing of the White House, a project that will include updated security facilities and construction of a large ballroom for hosting official events. This East Wing project broke ground in October 2025 and is being managed by the President's Office of the Executive Residence ("EXR"). Because the White House is situated within President's Park, a unit of the National Park System, EXR has been coordinating the project with the National Park Service and is funding the project exclusively with private donations.

The Trust, a congressionally chartered nonprofit corporation, filed this lawsuit in December 2025 seeking to enjoin construction of the East Wing project and asserting various claims under the Administrative Procedure Act

2

("APA") and the Constitution. The district court concluded the Trust had associational standing based on an aesthetic injury alleged by one of its members, Alison Hoagland. The district court denied the Trust's request for a preliminary injunction, however, because EXR was not an "agency" whose actions are subject to review under the APA and because the Trust failed to state a constitutional claim under *Dalton v. Specter*, 511 U.S. 462 (1994).

The Trust amended its complaint to assert ultra vires claims, maintaining that the East Wing project required the "express authority of Congress," 40 U.S.C. § 8106, and no such authority had been given. The Trust again moved for a preliminary injunction, which the district court granted. The court found the Trust was likely to succeed in showing the East Wing project was not authorized by any statute and therefore barred by section 8106. The district court also held the Trust had shown irreparable harm to its aesthetic interests. Finally, the court concluded the balance of the equities favored the Trust in part because of the "ongoing construction of a ballroom that would … 'overshadow[]' the White House and disrupt the appearance of a historic and cultural icon" and because "the White House does not belong to any one man— not even a president!" The preliminary injunction barred further construction of the project except "actions strictly necessary to ensure the safety and security of the White House and … the personal safety of the President and his staff." Add. 126.

The government requests a stay pending appeal of the injunction.

II.

To prevail on a motion for a stay pending appeal, an applicant must make "a strong showing that it is likely to

3

succeed on the merits," "that it will be irreparably injured absent a stay, that the balance of the equities favors it, and that a stay is consistent with the public interest." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (cleaned up). The most critical of these factors is the likelihood of success on the merits. *See Ohio v. EPA*, 144 S. Ct. 2040, 2052–53 (2024).

A.

The government has made a strong showing that it is likely to succeed on its appeal of the preliminary injunction halting the East Wing project. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In granting the injunction, the district court committed two independent errors. First, the district court erred in finding the requisite "clear showing" that the Trust has Article III standing. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (cleaned up). Second, the district court erred in holding the Trust is likely to prevail on its "Hail Mary pass" of an ultra vires claim. *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (cleaned up).

1.

The Trust asserts associational standing based on the incidental aesthetic harm that one of its members has alleged will occur when she will occasionally travel near the White House. Because the Trust does not seek to protect interests germane to its specific statutory purposes and its member lacks standing to sue in her own right, the Trust likely lacks standing.

Article III of the Constitution vests the Judiciary with the power to resolve specific "'Cases' or 'Controversies,'" not

4

abstract "questions and issues." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting U.S. Const. art. III, § 2). The federal courts are not an "open forum for citizens to press general complaints" about violations of federal law. *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1554 (2024) (cleaned up). Plaintiffs seeking to vindicate their rights must therefore demonstrate standing to sue, which requires an injury in fact caused by the defendant and redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact is an "invasion of a legally protected interest" that is "concrete and particularized," as well as "actual or imminent." *Id.* at 560 (cleaned up). This "irreducible constitutional minimum" ensures that a proper party is seeking relief that may be properly issued by a federal court. *See id.*; William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 154–56 (2023).

As an association, the Trust must show that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to [its] purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *SSM Litig. Grp. v. EPA*, 150 F.4th 593, 596 (D.C. Cir. 2025) (cleaned up). To obtain a preliminary injunction, the Trust must submit evidence of specific facts that clearly show it is likely to establish associational standing. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017); *Murthy*, 144 S. Ct. at 1986. The Trust fails to make the necessary showing.

To begin with, the Trust's statutory purposes are not germane to any interests asserted here because the Trust has no authority over or interest in the White House. "The germaneness requirement mandates pertinence between litigation subject and organizational purpose." *Int'l Dark-Sky*

5

*Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1218 (D.C. Cir. 2024) (cleaned up). Private associations are generally afforded leeway to define their own purposes, and germaneness often is easily established in our caselaw. But as a congressionally chartered nonprofit, the Trust "is required to pursue … goals defined by statute." *See DOT v. Ass'n of Am. Railroads*, 575 U.S. 43, 53 (2015). Congress established the Trust to serve four defined purposes: (1) receiving donations of historic sites, buildings, and objects; (2) preserving and administering those sites, buildings, and objects; (3) accepting and administering gifts to carry out its preservation efforts; and (4) executing other statutory functions. 54 U.S.C. § 312102(b). Congress specified the powers of the Trust, all of which may be exercised only "[t]o the extent necessary to enable it to carry out the functions *vested in it by this chapter*." *Id.* § 312105(a) (emphasis added).

To carry out its statutory purposes, the Trust may acquire real property, but it is prohibited from acquiring property within National Park System units. *See id.* §§ 312105(g), 100102(6), 100501. The White House is located within such a unit, President's Park. The Trust therefore has no statutory purpose related to the White House: it cannot acquire donations of real property within President's Park, and it cannot preserve or administer such property.[1] *Cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that where Congress has not "confer[red] power upon" an agency, it "literally has no power to act"). Congress has specifically defined the Trust's purposes and powers, none of which are

---

[1] That the Trust is authorized to contract and make cooperative agreements with other federal entities and officials only underlines the inappropriateness of its current lawsuit against numerous federal entities and officials. *See* 54 U.S.C. § 312105(h).

6

germane to a lawsuit challenging the building of a ballroom and updated security facilities on White House grounds.

The district court and the Trust maintain the lawsuit is germane by invoking Congress's general purpose for creating the Trust: "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." *See* 54 U.S.C. § 312102(a). Yet the same Congress also carved the White House out of the above "sites, buildings, and objects." While our associational standing precedents are sometimes quite capacious, I would not extend them to confer standing on the congressionally created Trust to vindicate an interest that Congress expressly withheld from the Trust's purview. The lack of germaneness is fatal to the Trust's standing.

In addition, the Trust identifies no member with standing to sue. The declaration of the Trust's sole identified member, Alison Hoagland, relies on the claim that she will suffer aesthetic harm if the East Wing project is completed. Hoagland Decl. ¶ 14. Aesthetic harm to a plaintiff's recreational activities may qualify as injury in fact, but "mere incidental viewership" of an unpleasant sight does not. *Env't Def. Fund v. FERC*, 2 F.4th 953, 969–70 (D.C. Cir. 2021). Hoagland's declaration claims that "[a]s a resident of Washington D.C." she will walk by and "be impressed" with the White House (but displeased with the new ballroom) "about once a month." Hoagland Decl. ¶ 12. Such vague and infrequent viewing supports "nothing more than [a] generalized grievance[]," which is insufficient for Article III standing. *Env't Def. Fund*, 2 F.4th at 968–70 (rejecting standing to challenge "a looming eyesore" the plaintiff passed "three times per week"); *see Lujan*, 504 U.S. at 562–65 (recognizing the possibility of aesthetic injuries but denying standing based on "'some day' intentions").

7

The district court's finding that Hoagland likely has standing because she intends to travel to the White House in order to "enjoy" and "derive[] aesthetic value" from the building as an attraction, Add. 65 (cleaned up), is not supported by Hoagland's declaration. Because the aesthetic injury Hoagland claims is a future one, she must show it is imminent, and that requires "concrete plans" to "use the area affected by the challenged activity and not an area roughly in the vicinity of it." *Lujan*, 504 U.S. at 564–66 (cleaned up). Hoagland critically fails to make such a showing. Lacking any link between her asserted aesthetic interest in the White House and concrete future plans to view it recreationally, Hoagland falls short of the requisite "clear showing" that she has standing. *Murthy*, 144 S. Ct. at 1986 (cleaned up). As the only member identified by the Trust, this shortcoming also is fatal to the Trust's standing.

Failing the germaneness requirement and lacking a member with standing, the Trust is not a proper party to bring this lawsuit. For that reason, the government is likely to prevail on its appeal.

2.

On the merits, the district court held that the government's construction of the ballroom is likely ultra vires. Because federal law authorizes the construction, the government is also likely to prevail on the merits of its appeal.

"To prevail on an ultra vires claim, the plaintiff must establish three things: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722

8

(D.C. Cir. 2022) (cleaned up). The third requirement is "especially demanding"; it requires a statutory violation "so extreme that one may view it as jurisdictional or nearly so." *Id.* (cleaned up). For this reason, an ultra vires claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (cleaned up).

The Trust's ultra vires claim hinges on 40 U.S.C. § 8106, which requires express congressional authorization to erect a "building or structure … on any reservation, park, or public grounds of the Federal Government in the District of Columbia." 40 U.S.C. § 8106. The Trust maintains that no statute authorizes construction of the East Wing project. I disagree. Construction is likely permitted under 3 U.S.C. § 105(d)(1) and therefore not ultra vires.

Section 105(d)(1) authorizes the President to use lawfully available funds for the "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1). The government leans on the authority to make improvements to support the project. Because the word "improvement" has multiple definitions, we must determine which definition "makes sense in the context of the statutory scheme." *See Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018). Section 105(d)(1) squarely enumerates modifications that can be made to real property, and so the real property definition of "improvement" makes the most sense.[2] With

---

[2] Elsewhere, Congress has used "improvement" in the real property context to include the construction of facilities and buildings. *See* 16 U.S.C. § 666 ("There is hereby authorized to be appropriated … such amounts as may be necessary … [for] the construction of such facilities, buildings, and other improvements."); 10 U.S.C.

9

regards to real property, "improvement" means a "valuable addition made to property" that "amount[s] to more than mere repairs or replacement."[3] *Improvement*, Black's Law Dictionary (5th ed. 1979). The prototypical example is a "building[]," but the definition also includes "any permanent structure." *Id.*

The planned ballroom and security facilities are buildings intended to serve as permanent structures supporting the Executive Residence. The project therefore qualifies as an improvement permitted under section 105(d)(1). This interpretation, grounded in the longstanding law of real property in a statute governing the President's authority over real property (the White House), prevents the Trust from demonstrating the type of "extreme" statutory violation required for an ultra vires claim. *Changji*, 40 F.4th at 722 (cleaned up).

The district court concluded that "improvement" was limited to "ordinary maintenance and upkeep," relying primarily on *noscitur a sociis*, the principle that "statutory words are often known by the company they keep." *See* Add. 103; *Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018). This interpretation suffers from two flaws. First, the district court never considered the meaning of "improvement" in the real property context, in which improvement means "more than mere repairs." *Improvement*, Black's Law Dictionary (5th ed. 1979); *see Sekhar v. United States*, 570 U.S. 729, 732 (2013)

---

§ 2687a(a)(3)(B)(i) (referring to "construction … or extension of a building, structure, or other improvement to real property").

[3] The term "improvement" is well established in real property law, but I cite the definition contemporaneous with Congress's 1978 addition of the specific list of actions to section 105(d)(1). *See* Act of Nov. 2, 1978, Pub. L. No. 95-570, 92 Stat. 2445, 2446.

10

("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.") (cleaned up). Second, by selecting a colloquial meaning of improvement and limiting that meaning to "ordinary maintenance and upkeep," the district court created a surplusage problem. If "improvement" means only "maintenance and upkeep," it is redundant with "maintenance" and "repair" in section 105(d)(1). *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect."). Text and context confirm that the best meaning of section 105(d)(1) is that "improvement" carries its real property meaning, which includes the construction of buildings and facilities.

Because the East Wing project is likely authorized under section 105(d)(1), it is not prohibited under 40 U.S.C. § 8106. The project is therefore not ultra vires, and the government is likely to prevail on the merits of its appeal.

B.

The government has also shown imminent irreparable injury from the district court's preliminary injunction. To qualify as "irreparable," an injury must be both significant and incapable of being remedied "in the ordinary course of litigation." *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (cleaned up). The government has submitted credible and detailed evidence that the "open construction site" impairs White House security. Add. 54. The construction delay imposed by the preliminary injunction inevitably extends the time during which the President's residence remains less secure. Every additional day of White House vulnerability harms the government.

11

My colleagues remand for further factfinding about the security risks and to clarify the scope of the district court's exception for construction that is "*strictly necessary* to ensure … safety and security." Add. 126 (emphasis added). But they properly do not doubt the ongoing security risks described by the government.[4] While the injunction's exception might mitigate some safety concerns, the scope of the exception will ultimately be determined by the district court, not by those managing construction or overseeing the security of the White House. Accordingly, the exception does not prevent the preliminary injunction from "improperly intrud[ing] on a coordinate branch" in a manner that causes irreparable injury. *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2561 (2025) (cleaned up).

C.

The government also easily prevails on the balance of the equities and the public interest factors. *See Nken* v. *Holder*, 556 U.S. 418, 435 (2009) (holding these factors merge when the government is a party). As explained above, the district court's order enjoins construction "in a manner credibly alleged to pose a serious threat to" White House security. *Winter*, 555 U.S. at 33. That concern is weighed against the incidental aesthetic harms asserted by the Trust. Even if the government's safety concerns are somewhat mitigated by temporary security

---

[4] My colleagues emphasize that the district court's injunction nominally runs only against construction of the proposed ballroom. Order at 3. The government, however, has stated that the security upgrades are "inseparable" from construction of the rest of the East Wing project, including the ballroom. Moreover, the possibility that the ballroom's exact design might evolve as construction progresses is consistent with the representation that the security upgrades are integrated with the ballroom. There is no uncertainty here justifying a remand.

12

measures, the current safety of the President, as well as his family and staff, plainly outweighs future aesthetic harms to the Trust. *See id.* (finding that the Navy's national security interest in an adequately trained antisubmarine force "plainly outweighed" the plaintiffs' ecological and recreational interests in marine mammals).

\* \* \*

For the foregoing reasons, I would stay the preliminary injunction and allow construction of the ballroom and related security facilities to continue during the pendency of an appeal.